ORIGINAL

STATE OF MICHIGAN

THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN,

-vs- Case No. 13-0628

HOWARD JAMES MCKNIGHT,

Defendant.

______________________________________/

14 FEB 13 AM 7:55

**JURY TRIAL**

BEFORE THE HONORABLE EDWARD EWELL, JR.,

502 Frank Murphy Hall of Justice, 1441 St. Antoine,

Detroit, Michigan - Monday, November 18, 2013

APPEARANCES:

VENESHIA CEZIL, (P72778)
RALPH ELIZONDO, (P41463)
Wayne County Prosecutor's Office
1441 St. Antoine, 12th Floor
Detroit, Michigan 48226-2302

Appearing on behalf of the People.

JAMES HOWARTH, (P15179)
615 Griswold, Suite 820
Detroit, Michigan 48226

PAUL R. JONES, (P42171)
23442 Tireman Street, Suite 1
Dearborn Heights, Michigan 48127

Appearing on behalf of the Defendant.

REPORTED BY:
Betty Sanders, CSR-2931
Official Certified Shorthand Reporter

Processed
Notice of Filing Sent
Clerk

TABLE OF CONTENTS


| WITNESSES | PAGE |
|---|---|
| PRELIMINARY INSTRUCTIONS | 26 |
| JURY VOIR DIRE | 45 |
| PROCEDURAL INSTRUCTIONS | 150 |
| OPENING STATEMENT BY MR. ELIZONDO | 164 |
| OPENING STATEMENT BY MR. HOWARTH | 184 |


EXHIBITS


| IDENTIFICATION | MARKED | ADMITTED |
|---|---|---|


NONE

Detroit, Michigan

Monday, November 18, 2013

9:19 A.M.

\- - -

THE CLERK: Calling Case Number 13-000628; the State of Michigan versus Howard McKnight before the Court today for a jury trial.

MR. ELIZONDO: Good morning, Your Honor.

Ralph Elizondo, assistant prosecutor.

MS. CEZIL: Good morning, Your Honor. Veneshia Cezil on behalf of the People.

THE COURT: Good morning, counsel.

MR. HOWARTH: Good morning, Your Honor.

James Howarth as co-counsel for Mr. McKnight.

MR. JONES: Good morning, Your Honor. Please the Court.

Paul R. Jones, 42171, co-counsel for Mr. McKnight here today.

THE COURT: Good morning, counselors.

Today is the date and time scheduled for jury trial in this matter.

It's my understanding that there are a few preliminary matters that we need to handle before we proceed to trial.

MR. ELIZONDO: That's correct, judge.

Let's see where to start. All right. Number one, there was other folks assigned to this case earlier when I picked that up and was working with Ms. Cezil on this in the last couple weeks. During the course of that, we discovered a memo in the police jacket which I did convey a copy of to counsel. But the bottom line on that is that that memo indicated that there was a person who was identified later on during the canvassing of the area of the alleged crime and that this person had given the police a name and phone number, address, et cetera and indicated that they had seen something that had occurred during that time period of the incident and it may have been related to that incident.

There was no follow-up by the police. I did not become aware of that particular person until I believe it was just last week, a late part of last week. We have contacted that individual, spoken to him. His -- well, at any rate, that person was just identified, at least by us at this point, and I did give that information to counsel.

I did not add him onto the witness list the Court has. I think he should be added. I'm gonna ask that that name be enclosed on the witness list because given the nature of what he says it could have been during the course of the crime and potentially a res gestae witness. So he needs to be included on the witness list.

And that person's name is Jerry, last name spelled G-o-l-s-o-n.

THE COURT: And as a offer of proof, what would he be stating?

MR. ELIZONDO: As an offer of proof, at least from my conversation with him, is that he was in the area on the night of -- that the incident allegedly occurred. That he did see someone at a -- an individual talking to the people who were in a truck that was stalled or passed there. That he may or may not be able to identify anyone. That's essentially what he told me. He said he didn't know if he could. He also indicated that in the interim he has had a stroke but that -- I mean he's able to communicate, but that would be the extent of what he would say.

THE COURT: Defense.

MR. HOWARTH: Well, Your Honor, I've got a problem with this. No problem with the fact that this was found late, although, of course, it should have been found at the very beginning as part of the police jacket.

But the difficulty I have is I got notified early last week that the police had found this memo and that they had talked to Mr. Golson and that Mr. Golson indicated that he saw a car stalled or struck, stalled in the alley where this event happened.

So it's quite likely that this gentleman saw the complainants in this case and very possibly saw the assailant. The ball seems to stop there because I was also told that he was going to be shown a lineup. I don't know anything at all about whether he was -- a lineup was conducted, whether he's made identifications, whether he's given a description of the person that he saw. So how can I comment now on whether this person should be a witness. Probably he should be a witness, but I don't know what his evidence is. And it's the day of trial.

THE COURT: Response.

MR. ELIZONDO: The only thing I'd indicate, judge, I did tell counsel -- I think one of the two of us indicated to counsel that we would attempt to have a lineup.

THE COURT: Well I guess my problem would be I think that in-court identification would be kind of prejudicial at this point. So I mean if he is going to testify and just look at and look in the courtroom, to me I think that would be a -- he may be able to testify -- so if you can't do a lineup, then I'm not gonna allow identification in court.

MR. ELIZONDO: All right.

So would the Court indicate then at that point that we're just gonna strike him from the witness list?

THE COURT: Right.

MR. ELIZONDO: Entirely?

THE COURT: Yes, unless -- I mean unless the defense wants to call him. But I don't know why they would want to do that.

MR. HOWARTH: Well, Your Honor, we have never been given an opportunity to talk to Mr. Golson.

THE COURT: I'm assuming we are going to be here for the next few days.

MR. HOWARTH: I understand that.

THE COURT: I'm sure that that will -- he will be made available, correct, counsel?

MR. ELIZONDO: That's absolutely correct, judge.

The other thing as far as the in -- I mean there is no requirement to have a lineup at a situation like this.

Yes, I agree with you that when you have a person sitting in a odd seat an a person comes in, it's likely that well it could be potentially prejudicial. However, that essentially goes to the weight of what the jury would want to give to that ID because I'm sure counsel would bring that out.

THE COURT: I would tend to agree with you if this was like six months ago or three months ago, but not on the day of trial.

I can't -- to me, I think the defense would not have a adequate time to prepare for that. So to me, you know, unless you're going to do a ID I'm not going to allow that witness to do that at this point in time.

MR. ELIZONDO: All right. Well we'll make that witness available.

Well let me just say this. I will see if we can set up a phone conversation for counsel at his leisure when we have our breaks here to at least begin that initiation and -- of discussion with that witness. And then we'll just ask to revisit that after that occurs, judge.

MR. HOWARTH: Your Honor, this witness may have exculpatory evidence, and for that reason I think the Court should order a lineup.

THE COURT: May have exculpatory evidence?

MR. HOWARTH: Well he may say I have looked at a live lineup, corporeal lineup, I didn't see anybody in there that I saw around the truck that evening.

I would consider that exculpatory evidence and for that reason I think the defense is entitled to a lineup.

THE COURT: I think that's stretching it a bit. If they had done a lineup and he said I -- the guy is not there, that would be exculpatory. But I don't think that

the Court has the responsibility to order on the possibility -- I mean, you know, if you want to call the person, the witness, I'll leave that up to you. But I am not gonna order a lineup cause it might be exculpatory.

What law are you basing that on?

MR. HOWARTH: Your Honor, it's a basic due process issue.

There is a person that appears to have seen the transaction which is on trial here. This person may -- this person has told the police I think I can identify the person I saw at the truck. He is not only a res gestae witness. He is an important witness for one side or the other. And I don't think that the prosecution --

THE COURT: And if he does identify your client, what would you say then?

MR. HOWARTH: I would have to deal with that when the situation comes up, and it would depend on the manner of his identification.

THE COURT: At that point you probably would be trying to exclude it or something.

MR. HOWARTH: I don't know what I would do, Your Honor. I haven't been faced with the situation. I think I'm entitled to be faced with it.

THE COURT: Oh, give me some case law that says you're entitled to it and I'll take a look at that. Just

a general due process, that's not gonna do it. For me, I need more than that. So I mean for me to force them to do a lineup, I have never seen that, you know. I have never seen that.

So if you can show me some case law that says that under these circumstances I am required to do it, then I'll be happy to do it. Absent that, I am not going to do it.

MR. HOWARTH: Well it's about the 12th hour now for me to be able to come into Court and give you some brief on the subject, Your Honor.

THE COURT: I don't need a brief. I just need a case that I can look at.

I mean we are going to be here -- I'm assuming this won't be the first witness to be called. The person won't be called today or tomorrow. Probably won't be here until Wednesday, Thursday before we get to it.

So given your years of experience -- if you were a brand new attorney, I could see now that might be a issue. But -- and you also have co-counsel. I get evidentiary issues like this all the time during -- that come up after the trial starts. So to say that, you know, it's the 11th hour and you can research that -- whether the Court is required to order a lineup, to me I think that's, you know, that's something that you have a, you

know, law student and you give them a couple hours I think they can find it. Experienced attorney should be able to find it sooner than that.

MR. HOWARTH: I'm asking then in the alternative that the Court order that Mr. Golson be made available to the defense no later than tomorrow.

THE COURT: Okay.

MR. ELIZONDO: I don't have any problem with that.

Also, judge, we are going to, in the interim, see if we can set up a lineup for this.

THE COURT: Okay.

MR. ELIZONDO: It's as important to us as it is to counsel. And we'll do that just as soon as we can.

THE COURT: Okay. Any other issues?

MR. ELIZONDO: Let's see here.

During the course of the trial, I want to -- this isn't really 404(b), but I just want to place this out there, give counsel notice.

And the officer is going to testify that the defendant was a person of interest in this case, that when he became a person of interest in this case they checked his record and found that he was wanted on a totally unrelated matter. In fact, I think it's a probation or parole -- probation violation that he was arrested

pursuant to a totally unrelated matter and spontaneous statements came out concerning this case as a result of that arrest.

I would like to just put the Court and counsel on notice that we intend to at least get into the fact that he was arrested on an unrelated matter after he became a person of interest in this case.

MR. HOWARTH: Your Honor, I would object to anything that would give an inference to the jury that this was a person who has committed a crime, he was wanted for a crime, was arrested for something. I think that's highly prejudicial. It doesn't add anything to the government's case.

We're not going to argue that he was picked up by the police. That's fine. He could have been picked up on suspicions. He could have been picked up because he matched the description. But to talk about his being arrested is highly prejudicial in that it is our intention not to call Mr. McKnight as a witness in this case. There is no reason to expose anything of his past criminal history. And that's a back door way of getting in the fact that he has had some adverse contact with law enforcement.

MR. ELIZONDO: It's totally relevant to the issue of the spontaneousness of the statements relating to

this specific crime when he's arrested on something totally unrelated to that, where --

THE COURT: I'm not following you, counsel.

MR. ELIZONDO: Okay. When you're picked up -- and I don't want this jury to believe that the statements occurred, the spontaneous statements concerning this situation, occurred because he was arrested on this particular issue. I would like them to know that he was totally un-- that nobody, at least up to that point, had told him about this case.

He's under the police custody because of something that has nothing to do with this, and as a result of that arrest on something totally unrelated all of a sudden he starts talking about this particular crime, not that he was arrested on this -- about this crime but on something else and then it spills out.

THE COURT: Why does it have to go into the record that he was arrested at all?

MR. ELIZONDO: Because it goes to the issue of how do the police get these statements from him. Why is he spontaneously giving these things up?

And it's also very crucial that we show the process of when these statements occurred. They occurred during booking, basically a transfer of the defendant to-- from the arresting officers to the precinct where he's

going to be held.

There was another group of statements that were-- at that same time, after he was initially processed, there is a second group of statements he makes to another booking officer. And then there is a third group of statements he makes to the officer-in-charge in this case when he finally gets to talk to him because of these other previous statements that he made.

So that whole thing about the arrest is crucial because the evidence is going to show that nobody talked to him about this case. And as a result of him being in the police custody on this totally unrelated thing, he starts spouting out about this particular case. And I think that this jury needs to understand that process and where these statements were made, judge.

THE COURT: Okay.

MR. HOWARTH: I think the simple answer is, Your Honor, how is anybody prejudiced if we allow the jury to understand that Mr. McKnight was in custody on a wholly unrelated matter, that the police had him on -- were holding him on a wholly unrelated matter and he supposedly made those statements? I don't have a problem with that.

But as soon as you get into the question of he was arrested for something else, that implies a criminal record which is not allowable in evidence under Michigan

Rules of Evidence.

THE COURT: Two things. I don't understand your distinction. You said he was in custody on a unrelated matter?

MR. HOWARTH: That's what it is.

THE COURT: So how would he be in custody on a unrelated matter without being arrested?

MR. HOWARTH: Well, Your Honor, the proposition is he could have been brought in on suspicion on this case. It could have been any of a hundred things, but I don't think that this jury should hear that he had been arrested, that there was some prior criminal activity that he was involved in.

He was in custody. Let the jury not worry about why he's in custody. We're not raising it.

THE COURT: What's wrong with that, counsel?

MR. ELIZONDO: That begs the issue of how and what motivates these statements. That is where it's really probative is that it's motivated by not the arrest on that other issue, but it's motivated by that guilty mind of knowing and knowledge of the crime at hand here.

THE COURT: But if he was arrested on a unrelated matter, which is what counsel said, if he was in custody on a unrelated matter, couldn't you make that same argument?

MR. ELIZONDO: I guess I'm missing that.

THE COURT: If he was in custody on a unrelated matter, why couldn't you make the same argument? Why does he have to be arrested for something else? I guess that's what I'm trying to figure out.

MR. ELIZONDO: It's -- okay. Once again --

THE COURT: I will be honest with you.

Maybe if I understood the context of what he said and all that -- I mean it would have been great if this would have been briefed for the Court because I haven't had a chance to really think about it and all that. Cause now, I mean, I do think that there is some prejudice that could be to the defense, although at the same time I think a limiting instruction might cure that. Ladies and gentlemen, you shouldn't be -- don't worry about what the other matter -- what he was arrested for. I mean that could cure it. I mean I have seen that in the past, too. So --

MR. ELIZONDO: Well I have to agree that, yeah, there is some prejudicial aspects to it, but the probative aspect going to --

THE COURT: Well why don't you tell me what did he say?

MR. ELIZONDO: He says when he is -- let's see, judge. These statements were elicited through -- at the

Walker Hearing, so let me just get that, too.

All right. The scenario essentially is the defendant is -- becomes a person of interest in this case. The police then do a check on his background. They find that there is an outstanding warrant, I think it's a probation violation warrant. They go to arrest him on the probation violation. And, quite honestly, they are going to continue to explore the -- this crime and the potential of the defendant's involvement in that. However, before it even gets started they arrest him.

They convey him to Eastern District. And while he is brought in, sat down, the police officer, arresting officers doing the paperwork, turn him over to the Eastern District. He makes excited utterances such as, man -- I'll just read from the officer's report. "While the writer was filling out the detainee intake sheet, McKnight kept asking me, 'Why did I get arrested for, man? Just be honest with me. Who did he say I raped? Did they say they found my DNA? Where did they find my DNA? Is it inside the bitch? Is it in the car?'" The officer says he kept listening to suspect McKnight as he voluntary kept making excited utterances without being asked questions.

This --

THE COURT: I guess what I don't understand. All right. That information -- why is it he have to be

arrested on unrelated matter? I mean what does that, you know --

MR. ELIZONDO: Well because --

THE COURT: If he was in custody as brother counsel indicated, on a different matter, I mean to me --

MR. ELIZONDO: I'm willing to accept that he was in custody, he was brought and in custody. He was in custody on a unrelated matter when he makes these excited statements.

I don't have a problem with that. I'll take that.

THE COURT: Counsel, I think you offered that up.

MR. HOWARTH: I don't have a problem with that as long as there is no reference to some criminality beyond what is charged in the Information in this case.

THE COURT: So you just have to instruct your officer that a booking on a unrelated matter, don't go into the arrest, probation violation, anything.

MR. ELIZONDO: All right. That's fine. I'll work that in.

THE COURT: Okay. Anything else?

MR. ELIZONDO: Let me just check my list. I think it might be a couple other things.

Oh, one of my witnesses, judge, who is the --

her name is Nicole Schaller. She is a registered nurse. She is the forensic nurse examiner who did the examination of the complainant in this matter.

I got a phone call from her this morning. She indicated to me that she is seven months pregnant and on bed rest. And I'm still exploring the availability of her actually being able to come in here to testify. However, what I would propose and what I think I'm gonna be able to do here is the keeper of the records in this particular case, who was a registered nurse, her name is Julie Groat.

Ms. Groat is the supervisor of the nurse who did the examination. Ms. Groat examined the records to make sure they were in conformity with procedures and policies, et cetera. Ms. Groat is the trainer, person who trains these nurses.

I did indicate that Ms. Schaller was going to be testifying I think in this particular matter. She's not going to be -- I don't think she is going to be able to come, but I'm going to talk to her again shortly to find out. But in lieu of that, judge, my intent is to have Ms. Groat introduce the medical records in this case and have her testify concerning the manner of and how these examinations are conducted, and that based on her examination of the records that they were done in conformity. And deal with any issues of that through Ms.

Groat.

THE COURT: All right.

MR. HOWARTH: Is that going to entail any results of the examination?

MR. ELIZONDO: It will entail only -- because the results were no injuries. So there are no injuries to testify about, no physical injuries to --

THE COURT: Did Ms. Schaller actually examine? Did she actually examine the victim in the case?

MR. ELIZONDO: No, Ms. Groat you mean, judge?

THE COURT: Ms. Schaller.

MR. ELIZONDO: Ms. Schaller did the examination.

THE COURT: And she is not available?

MR. ELIZONDO: And she is not available.

The keeper of the records, her supervisor who did examine the records to make sure they were in conformity with the policies and oaths, will be here to testify concerning whether or not the policies were followed, what they are, whether the records indicate they were followed or not. That's essentially what that's about.

There is no injury, but there was a rape kit done and she's gonna be able just to talk a little bit about the rape kit. The findings themselves are from the lab, so there is no real, you know, there is not gonna be

any opinions offered as to injuries, et cetera. But I just want to have her available to testify about the procedure, et cetera.

THE COURT: To what the general procedure would be.

MR. ELIZONDO: The general procedures.

THE COURT: But she can't testify to what was done here, though, can she?

MR. ELIZONDO: Only whether what was done here was consistent with those general procedures and why they would -- why they do what they do.

MR. HOWARTH: How would she know that if she didn't see the procedures being carried out?

MR. ELIZONDO: It would be whether or not the things that were done with the rape kit are consistent with what would have been, should have been done given the patient history, et cetera.

MR. HOWARTH: I'm lost here again on relevancy.

THE COURT: What do you mean, counsel?

MR. HOWARTH: Well I don't see, you know -- they're saying that they have no findings that are relevant to this case.

MR. ELIZONDO: No, that's not what I'm saying.

MR. HOWARTH: All right. Then I'm missing something.

MR. ELIZONDO: What I'm saying is there is not going to be any testimony as to injuries and extrapolating on those because there isn't.

All Ms. Groat is going to testify to is what was-- her examination of the records, and based on her training and experience were the proper -- based on her reading of the records, proper examination procedure done and were the proper samples taken for the forensic kit based on what's in the record.

MR. HOWARTH: Then that's hearsay.

MR. ELIZONDO: Which is hearsay?

MR. HOWARTH: What she read in the records is hearsay.

MR. ELIZONDO: Those records are a business record and those records are and should be admissible through her as the keeper of the records, thus they're not hearsay.

MR. HOWARTH: I believe that they have to, number one, be authenticated; and, number two, that notice has to be given to the defense of the use of those documents under, I think it's 1101(c) off the top of my head.

THE COURT: Well they are business records. I think -- if they can establish all of the foundational elements for that. I guess my problem, counselor, is the

first question that counsel asked how do we know what she did is what she put in her reports?

MR. ELIZONDO: Well --

THE COURT: I mean that's maybe a matter up for cross-examination.

Because I mean to me I think you're setting yourself up for how do you know she actually followed this procedure. This is what she is supposed to do, but how do you know this is what she did. Because you would be asked the question well did you do this, and, yes, I did follow procedure.

I mean that would be a question well it's a possibility that she -- that she could be cross-examined on that. I mean I think at this point it sounds like it would be admissible, but it seems like you would be opening yourself up to a lot of questions that, you know, I don't know.

MR. ELIZONDO: Well I'm fine with the cross-examination aspect. And, you know, it is what it is. But I believe based on the fact that she had to-- not only is she the keeper of the records, she is the supervising person who had to review these and sign off on them as being okay.

So counsel can cross-examine away. I mean those are valid questions and I expect them to do but whether

they do that --

THE COURT: Defense counsel, I mean you are going to have some time to -- that's my preliminary ruling that I will allow it. So if you will give me something else, I probably will revisit that. But we probably should do that before we pick the jury to make sure double jeopardy doesn't attach.

But how is this different from just like in a murder case a different a medical examiner conducted a medical exam, they are for whatever reason not available then that supervisor comes in and reads the report in that case? I'll give you some time to think about that cause I know you're just hearing this now just like I'm hearing it now. So I will give you some time to think about that and we can --

MR. ELIZONDO: Lastly.

THE COURT: Last.

MR. ELIZONDO: Lastly, judge, there was a -- an individual last name was Robinson. Mr. Ali Robinson who had -- actually his name's Ali Deshawn Robinson.

Mr. Robinson had early in the investigation been pointed to the officer and detective as a potential suspect in this case. Mr. Robinson -- there was a buccal swab taken from Mr. Robinson which was sent to the lab, Michigan State Police Forensic Lab. There was also and

just very recently a photo lineup that was done with Mr. Robinson and the two victims in this particular case.

Mr. Robinson was not identified in that lineup. I did show counsel a copy of the photo array, but again it was an 11th hour thing. That's why I'm bringing it up at this point in time.

And also the DNA report would indicate -- indicated that Mr. Robinson was excluded from the samples that were taken and found relevant to this case. The only thing I'm bringing up at this point in time is the fact that the lineup was held, photo array was presented with Mr. Robinson to both victims and they were -- they did not identify anybody in that photo lineup and photo array.

THE COURT: Any response to that?

MR. HOWARTH: And if you could remind me, Your Honor, was the photo array done with the defendant in this case? There was a actual lineup, physical lineup with the defendant in this case?

THE COURT: Okay. What was the result of that?

MR. ELIZONDO: Both victims picked him out.

THE COURT: Any other response?

MR. HOWARTH: There is no response to that, Your Honor.

I would like to ask Mr. Elizondo on the record whether this photo lineup which was done apparently last

week, whether -- number one, whether any attorney was present.

MR. ELIZONDO: At a photo lineup, no. I believe it was just the officer-in-charge and the complainants. And it was presented to them separately.

MR. HOWARTH: And, for the record, Your Honor, it's my understanding that the defendant's photo was not included in that lineup.

MR. ELIZONDO: It was not.

THE COURT: Okay. All right. One moment.

We're going to do a brief -- the jurors are ready or here. We're going to do a probation violation real quick and then we'll --

(Off the record.)

THE COURT: Counsel, are we ready to bring the jury?

MR. ELIZONDO: We're ready, judge.

(The prospective jurors entered the courtroom at 10:34 A.M.)

THE COURT: Good morning, ladies and gentlemen.

THE PROSPECTIVE JURORS: Good morning.

THE COURT: My name is Edward Ewell, Jr.

I am a judge here at Wayne County Circuit Court. It's my privilege and pleasure to welcome you to our court's criminal division here at Frank Murphy Hall of

Justice.

I want to first apologize cause I know you were waiting in the hallway a little while. We had to take care of some matters outside of your presence. Hopefully that will move things along a little faster. But one of the things I want to say right off is that we recognize that your time is important. We weren't wasting it. We just had to take care of some things outside of your presence.

Before I get into my prepared remarks, I want to say that we also recognize that this is a imposition for you. I mean there are a number of other places that you could be other than here in court this morning, but we couldn't do what we are about to do without you. Jury duty -- when I'm out in public, a lot of times people will say well how do I get out of it. And I will pause and go well, you know, that's a good question. But it's -- there is a question that you should recognize that people fought and died for the right to serve on the jury and think about it like this.

I would say if you or a member of your family were charged with a crime, you would want your fellow citizens to take it seriously, to do their duty and to try to be fair about it. In that same way, if you or a member of your family were a victim of a crime you would want

your fellow citizens to take it seriously and to be fair about it and keep a open mind in that regard.

We recognize that this has taken you from your jobs, school, retirement, vacations, a number of things. But I always go back to that a lot of times people say-- well they might say well I can't stand the police or something like that until something happens and they want to call the police. And we can't all be -- part of our society, our constitution doesn't require us a lot to be-- we always talk about we have these rights. As Americans, our government doesn't call for us, as far as a society, doesn't call on us to do a whole lot for those rights. One of those things they do require is to serve on a jury.

When we think about our men and women who are fighting overseas for our freedom, oftentimes we forget that one of those freedoms is the right to have a jury. One of the reasons why I think there is so much unrest in the world is because in other countries, a lot of other countries, you could be arrested, never charged, held. And if you had a trial, it might be with one person, or it might be the people who are in power, it might be people in a certain religion or people who come from a certain race or sex.

In our country, in our country it's not one person who makes the decision. It's not powerful or the

rich. It's not a certain religion. It's the people. In the Constitution, it says that every citizen charged with a crime has a right to a trial by a jury of 12 people, both the prosecution and the citizens have a right to a trial.

So I say all this to say that we recognize this is a imposition, but we need you. And it's an important part of our court and our nation's history that the jury is a part that we can't do without.

With that, I'm going to go to my prepared remarks. I know that jury duty may be a new experience for some of you. Jury duty is one of the most serious duties that members of a free society are asked to perform. Our system of self-government could not exist without it.

The jury is an important part of this court. The right to a jury trial is a ancient tradition and part of our heritage as Americans. The law says that both a person accused of a crime and the prosecution have a right to a trial not by one person but by 12 impartial people. Jurors must be as free as humanly possible from bias, prejudice or sympathy for either side. Each side in a trial is entitled to jurors who keep an open mind until the time comes to decide the case.

I'm going to now ask each of you if you will all

please stand right now and raise your right hand and to swear to answer all the questions fully, truthfully and honestly that you will be asked about your qualifications to serve as a juror.

THE CLERK: Do you solemnly swear or affirm to answer truthfully all questions put to you touching upon your qualifications to serve as a jury?

THE PROSPECTIVE JURORS: I do.

THE CLERK: Thank you. You all may be seated, please.

THE COURT: Thank you very much, ladies and gentlemen.

The trial begins with jury selection. The purpose of this process is so that we can obtain information about you that will help us choose a fair and impartial jury to hear this case. During the jury selection, the lawyers and I -- I will be asking you most of the questions. I will be asking you questions. This is called the voir dire. The questions are meant to find out if you know anything about this particular case. Also, we need to find out if you have any opinion or personal experiences that might influence you for or against the prosecution, the defendant or any of the witnesses. One or more of these things could cause you to be excused in this particular case even though you may

otherwise be qualified to serve as a juror in another case.

The questions may probe deeply into your attitudes, beliefs and experiences. They are not meant to be an unreasonable prying into your private life. The law requires that we get this information so that a fair and impartial jury can be chosen. If you do not hear or understand a question, you should say so. If you do understand it, you should answer it truthfully and completely. Please do not hesitate to speak freely about anything you believe we should know.

During the jury selection, you may be excused from serving on the jury in one of two ways. First, I may excuse you for cause. That is, that I might determine that there is a valid legal reason why you cannot or should not serve on a jury in this case. I will let you know now it's a very, very high standard for me to excuse you. Or a lawyer from one side or the other may excuse you without giving any reason for doing so. This is called a peremptory challenge. The law gives each side the right to excuse a certain number of jurors in this way. If you are excused, you should not feel bad or take it personally. As I explained before, there simply may be something about this particular case that causes you to be excused.

I'd like to reintroduce myself. I am Ed Ewell, Jr. I have been a judge here for about ten years. My staff. To my left, or to your right, is my court reporter or sometimes we refer to them as stenographers. And she is taking everything down. And sometimes I speak too quickly or too low and she will give me a look that I need to slow it down or talk a little louder.

She also will be taking down everything you say. So remember to keep your voices up. A record is being made of everything that goes on in trial and that's another reason why two people can't speak at the same time. So she has a very, very tough job because it's very vital that a adequate and accurate record be taken in the case.

Directly in front of me is my court clerk Ms. Tonia Aikens. She is basically the general in the court. She has a another very, very important job because she doesn't just call the cases. Because there is a lot of paperwork. There is a lot of things to be entered into the computer. We have, you won't imagine, a lot of other cases besides this one. You'll see at points in time lawyers will be coming in, witnesses and she will have to keep up with all that and help keep me on task and on schedule. So that's my court clerk Ms. Aikens.

To my right you have met two of the people who

help me keep order in the court. That is Deputy Ms. Marsha Tate and my other deputy Gary McDougal. You also might see -- I have an intern whose name escapes me right now Earl Kirkland. I know him but I'm just, you know, I used to wonder when my parents would do that sometimes and they would look at us and ask us what's your name again. I am just now getting to that point where I do forget things from time to time. But my intern, his name's Earl Kirkland. You may see him coming in and out. That's my staff.

This is a criminal case involving five serious charges. And I'm gonna just read -- right now I'm just gonna give you the general -- it's two counts of kidnapping for Mr. Lucille -- Ms. Lucille James and one Mr. James Stone; two counts of armed robbery and that was with Ms. Lucille James and Mr. James Stone, and finally one count of criminal sexual conduct in the first degree. These charges are gonna be more fully explained to you later. They have been made against the defendant who -- and who has pled not guilty to the charges but he is represented by counsel.

And I'm going to ask at this time if, Mr. Howarth, if you could please stand, introduce yourself, who is with you at counsel table and your client.

MR. HOWARTH: Good morning.

THE PROSPECTIVE JURORS: Good morning.

MR. HOWARTH: My name is James Howarth. And during this case I'm going to be assisted by the young man who is now standing up. His name is Paul Jones who is also an attorney in the Detroit area.

Seated behind me in the white shirt, if you'd stand up, please, this is our client and his name is Howard McKnight.

Thank you.

MR. JONES: Thank you.

THE COURT: Thank you, counsel.

The lawyer for the State of Michigan, Mr. Elizondo, if you could please stand, introduce yourself, introduce who is with you at counsel table and any proposed witnesses you plan to call.

MR. ELIZONDO: Thank you, judge. Good morning.

THE PROSPECTIVE JURORS: Good morning.

MR. ELIZONDO: Actually, there is two attorneys here. My names's Ralph Elizondo. I'm an assistant prosecuting attorney.

MS. CEZIL: Veneshia Cezil, also assistant prosecutor with Wayne County.

MR. ELIZONDO: And we will be doing the case together as we proceed here.

THE COURT: Proposed witnesses.

MR. ELIZONDO: All right.

I'm going to list names of individuals that may be called as witnesses in this particular case. First of all would be Lucille James, James Stone, individual by the name of James James, Jesse James. From the Detroit Police Department's Eastern District, Police Officer Vinceon Perkins, Police Officer Derrick Mahone, Police Officer Tamara Tillerson, and Police Officer Atiba Jones.

From the Detroit Police Department's Graphic Arts Division, Police Officer Alphonso Tinsley. From the Detroit Police Department Headquarters Surveillance group are the following: Police Officers Alex Parra, that's spelled P-a-r-r-a; Police Officer Alex -- I'm sorry, that was Alex Parra. Police Officer Ali Jaber, that last name is spelled J-a-b-e-r; Police Officer first initial, "G", last name Steen; Police Officer first initial "J", last name McDonald; Police Officer first initial "D", last name Sanders; Sergeant Benito Mendoza, Police Officer first initial "C" last name Hopkins.

From the Detroit Police Department Southwest District, Police Officer Connie Watts, also known as Police Officer Connie Bell. Somewhere she got married I believe.

From the Detroit Police Department Sex Crimes Unit Police Officer Laura Manzella, Police Officer Jeffery

Manson, police or sergeant Bernadette Dunbeck, Police Officer Michelle Strong, Police Officer Roy Gilbert, Police Officer Jose Ortiz.

We may also call Attorney Rebecca Tieppo, last name is spelled T-i-e-p-p-o. From the Wayne County Sexual Assault Forensic Nurse Examining Group we may call Julie Groat, registered nurse; also Nicole Schaller, registered nurse.

From the Michigan State Police Department's Forensic Lab two witnesses; Brian Schloff and Mikehl Hafner, H-a-f-n-e-r.

From the Detroit Police Department Southwest District Police Officer Jordan Hall. From the Detroit Police Department's Evidence Tech Unit a Lori Briggs.

In addition, two additional civilians on the witness list. One is Ali Deshawn Robinson and lastly civilian Jerry Golson, G-o-l-s-o-n. Those are potential witnesses in this case. Oh, I'm sorry, one other. My officer-in-charge is Police Officer Robert Kane from the Detroit Police Department's Sex Crimes Unit. That officer may be at the table with us on occasion. He will be running in and out assisting.

Thank you, judge.

THE COURT: Thank you, counsel.

I know, ladies and gentlemen, there were a lot

of names, including my staff, but does anyone in the audience recognize any of the names that were called or recognize any of the people who are in the courtroom?

THE PROSPECTIVE JURORS: (No verbal response.)

THE COURT: Okay. Thank you very much.

Ladies and gentlemen, we think this trial is gonna last -- all of those witnesses are not going to testify. There will only be some. But given that it's a possibility, that's why they listed them all.

We think this trial is gonna last from today until the end of the week, that including when the deliberations should start. If you believe that the length of the trial, that will be five days, will be a hardship for you, please let me know that right now by a show of hands. I am going to go around the -- saying it's a hardship is not gonna get you off the trial. It's something we can consider.

So let's start with the first row. Sir, your name right here.

THE PROSPECTIVE JUROR: Leon Jackson.

THE COURT: Mr. Jackson. And the general nature of your hardship?

THE PROSPECTIVE JUROR: I only have -- I won't be able -- it's family nature. And I have children that I have to --

THE COURT: Once you get to the box, we'll get more detail about that later.

Would you raise your hand, sir?

THE PROSPECTIVE JUROR: Michael Kisser. Reason is --

THE COURT: How do you spell your last name?

THE PROSPECTIVE JUROR: K-i-s-s-e-r.

THE COURT: Okay.

THE PROSPECTIVE JUROR: And the reason is I just to amount I make per hour.

THE COURT: Financial?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Thank you, sir.

Anyone else in row one?

Anybody else in row one?

Row two? Yes, ma'am, your name?

THE PROSPECTIVE JUROR: My name is Julie Peterson.

Currently my car broke down this morning so --

THE COURT: Sorry to hear that.

THE PROSPECTIVE JUROR: My husband drove me here and that would be a hardship.

I have two kids at home that are young and one of them is special needs. And anything disruptive to her routine is very difficult for us to manage.

THE COURT: I understand. Thank you very much, ma'am.

Anyone else in row two? Still on row two.

All right. Row three? We'll start over here.

Name first. Your name, ma'am? Stand up.

THE PROSPECTIVE JUROR: Kimberly Parton.

I might not have finances to get back and forth.

THE COURT: Thank you, ma'am.

Yes, sir.

THE PROSPECTIVE JUROR: My name's Steven Baker and it's just financial reasons, job.

THE COURT: Yes, sir.

THE PROSPECTIVE JUROR: My name is Abraham Hammons. It's actually health reasons. I have a problem with my blood pressure.

THE COURT: I'll have to ask you another question, but we'll get to that.

Okay. You can have a seat, sir.

Yes, sir.

THE PROSPECTIVE JUROR: My name is Matthew Tabor. Mine would also be work, financial related.

My store is a one-man operation. It's myself just open and close everyday, so financial.

THE COURT: Thank you, sir.

Yes, ma'am.

THE PROSPECTIVE JUROR: I don't have the money to pay for parking.

THE COURT: You have to say your name first.

THE PROSPECTIVE JUROR: I'm sorry. Rosanne Wallace.

I don't have the money to pay for parking and the gas to get down here.

THE COURT: They do reimburse you for that, but I'm sure that's after the fact so.

THE PROSPECTIVE JUROR: Right.

THE COURT: All right. Thank you.

Yes, ma'am.

THE PROSPECTIVE JUROR: Tonya R. Woods. It's still concerning financial situation with me also.

THE COURT: Okay. Thank you, ma'am.

THE PROSPECTIVE JUROR: Anita Ayers.

My daughter goes to work everyday and I am having a hard time babysitting. I baby sit her child and me and her trying to figure out how to get someone to watch the child and I'm the only one so far.

THE COURT: Okay. And, yes, ma'am.

THE PROSPECTIVE JUROR: My name is Annie Jones and I have a hip problem.

THE COURT: Okay. Thank you all.

As I indicated to you before, this is something

we take into -- that does not -- the financial, a lot of the other things that you indicated, that in and of itself is not a reason to get excused but we do take that into account. But we will see as we go forward how that checks out.

The next question does go to health. And it's already been mentioned, I think some of you indicated that. Some of you may have health problems that could cause you from serving on the jury.

Does anyone have a medical problem that makes them unable to sit for more than a hour at that time? Cause we take a break about every hour. Other than what's already been mentioned, does anyone have a sight or hearing problem?

THE PROSPECTIVE JUROR: I'm diabetic.

THE COURT: Oh, pardon. I didn't see you.

THE PROSPECTIVE JUROR: I am diabetic.

THE COURT: Diabetic. Your name, ma'am?

THE PROSPECTIVE JUROR: Rosanne Wallace.

THE COURT: When you say diabetic, are you taking medication?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Your last name again, ma'am?

THE PROSPECTIVE JUROR: Rosanne Wallace.

THE COURT: Okay. And if we -- well I have to

ask you this.

We take breaks. If you need to eat or take medication, all you would have to do is raise your hand and we would do that to accommodate that, that's if you get chosen.

Just a word about some of the legal principles that we will be following in the trial in terms of the presumption of innocence, the burden of proof and reasonable doubt.

A person accused of a crime is presumed to be innocent. This means you must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.

Every crime is made up of parts called elements. The prosecutor must prove each element of a crime beyond a reasonable doubt. The defendant is not required to prove his innocence or to do anything. If you find that the prosecutor has not proven every element beyond a reasonable doubt, then you must find the defendant not guilty.

A reasonable doubt is a fair, honest doubt growing out of the evidence or the lack of evidence. It is not merely an imaginary or possible doubt, but a doubt

based upon reason and common sense. A reasonable doubt is just that a doubt that is reasonable after a careful and considered examination of the facts and circumstances of this particular case.

This is a criminal case. The paper used to charge the defendant with a crime is called an Information. The Information in this case charges the defendant -- and I misspoke earlier when I said five counts. It's actually nine.

Charges the defendant with the following counts. First, Count One, kidnapping; that the defendant on or around December 31, 2012, in the area of Findlay and Bradford in the City of Detroit, did knowingly restrain Lucille James with the intent to engage in a criminal sexual penetration or criminal sexual conduct.

Count Two is also kidnapping and the defendant did knowingly restrain James Stone with the intent to engage in a criminal sexual penetration or criminal sexual contact with that person or use that person as a shield or hostage.

Count Three, armed robbery; that the defendant did, in the course of committing larceny of money and/or jewelry, assault or put in fear a person present, Lucille James, and in the course of committing that conduct possessed a pistol.

Armed robbery, Count Four. Defendant, in the course of committing a larceny of money and/or jewelry, assault or put in fear a person present, James Stone, and in the course of that conduct possessed a pistol.

Count Five, criminal sexual conduct first degree; that the defendant did engage in a sexual penetration, to wit, penis in genital opening with Lucille James under circumstances involving a kidnapping and/or armed robbery.

Count Six, felonious assault; that the defendant did make an assault upon Lucille James with a dangerous weapon, to wit, a pistol, but without intending to commit the crime of assault with intent to commit great bodily harm less than murder.

Felonious assault. Count Eight -- seven, excuse me. The defendant made assault upon James Stone with a dangerous weapon, to wit, a pistol, but without intending to commit the crime of assault with intent to commit great bodily harm less than murder.

Count Eight, felon in possession of a firearm. That the defendant did possess or use a firearm when ineligible to do so.

And, Count Nine, the defendant did carry or have in his possession a firearm, to wit, a pistol, at the time he committed to commit the crime of armed robbery.

The defendant has pled not guilty to these charges. You should clearly understand the Information that I just read for you is not evidence. An Information is read in every criminal trial so that the defendant and jury can hear the charges. You must not think of it as evidence of his guilt or that he must be guilty simply because he has been charged.

Ladies and gentlemen, at this point in time we are gonna start filling the jury box. And after we do that, I am -- I will be asking the following general questions and they are this: What community are you from? You don't have -- don't give a street or address. How are you employed? Are you married, and if so what does your spouse do? How many children do you have? And what's your highest level of education? And thank you very much for your patience.

THE CLERK: Juror for Seat Number One, Toby Castle.

THE COURT: I didn't hear that.

THE CLERK: Toby Castle, C-a-s-t-l-e.

Juror for Seat Number Two, Rodney Johnson.

Juror for Seat Number Three, Bianca Hines.

Juror for Seat Number Four, Sasson Leggett, L-e-g-g-e-t-t.

Juror for Seat Number Five, Annie Jones.

Juror for Seat Number Six, Alyssa Vallar, V-a-l-l-a-r.

Juror for Seat Number Seven, William McDuffie-Conner.

Juror for Seat Number Eight, Alicia Hargrove.

Juror for Seat Number Nine, Abe Hammons.

Juror for Seat Number Ten, May G. Holland.

Juror for Seat Number Eleven, Kimberly Parton, P-a-r-t-o-n.

Juror for Seat Number 12, Jana, is it Deron, D-e-r-o-n.

Juror for Seat Number 13, James Head.

And, finally, juror for Seat Number 14, Krystal Kerley, K-e-r-l-e-y.

THE COURT: Good morning, Mr. Castle. How are you, sir?

JUROR NUMBER ONE: Good, sir.

THE COURT: What community are you from?

JUROR NUMBER ONE: Lincoln Park.

THE COURT: How are you employed?

JUROR NUMBER ONE: Truck driver.

THE COURT: And are you married?

JUROR NUMBER ONE: Yes.

THE COURT: And what does your suppose do?

JUROR NUMBER TEN: She is a export for ocean

freight.

THE COURT: And children?

JUROR NUMBER ONE: One, college.

THE COURT: Okay. And boy or girl?

JUROR NUMBER ONE: Boy.

THE COURT: Your highest level of education, sir?

JUROR NUMBER ONE: Graduated from high school.

THE COURT: Thank you very much.

Mr. Johnson, how are you, sir?

JUROR NUMBER TWO: Pretty good, sir.

THE COURT: What community are you from?

JUROR NUMBER TWO: Allen Park. Downriver.

THE COURT: And how are you employed, sir?

JUROR NUMBER TWO: Truck driver, UPS.

THE COURT: Married?

JUROR NUMBER TWO: Yes.

THE COURT: And what does you spouse do?

JUROR NUMBER TWO: She is a office clerk at UPS.

THE COURT: Children?

JUROR NUMBER TWO: Yes.

THE COURT: How many?

JUROR NUMBER TWO: One.

THE COURT: How old?

JUROR NUMBER TWO: Four months.

THE COURT: Congratulations.

JUROR NUMBER TWO: Thank you.

THE COURT: And your highest level of education?

JUROR NUMBER TWO: High school.

THE COURT: Thank you very much, sir.

Miss is it Hines?

JUROR NUMBER THREE: Uh-huh.

THE COURT: How are you, ma'am?

JUROR NUMBER THREE: Good.

THE COURT: What community are you from?

JUROR NUMBER THREE: River Rouge.

THE COURT: And how are you employed, ma'am?

JUROR NUMBER THREE: Kmart.

THE COURT: And are you married?

JUROR NUMBER THREE: No.

THE COURT: Children?

JUROR NUMBER THREE: No.

THE COURT: And your highest level of education?

JUROR NUMBER THREE: A senior in college.

THE COURT: What are you studying?

JUROR NUMBER THREE: Fashion marketing and management.

THE COURT: Great. Thank you very much, ma'am.

Good morning. Is it Ms. Leggett?

JUROR NUMBER FOUR: Yes.

THE COURT: How are you, ma'am?

JUROR NUMBER THREE: Good. How are you?

THE COURT: Good. What community are you from?

JUROR NUMBER FOUR: Detroit.

THE COURT: And how are you employed, ma'am?

JUROR NUMBER FOUR: I work for a armor truck company.

THE COURT: A armor truck company?

JUROR NUMBER FOUR: Yes.

THE COURT: Okay. What do you do for them?

JUROR NUMBER FOUR: Um, I drive.

THE COURT: Is it something you can say or no?

JUROR NUMBER FOUR: No, I work. I drive on the trucks.

THE COURT: Oh, you drive a truck and carry a gun and all that good stuff?

JUROR NUMBER FOUR: Yes.

THE COURT: Okay. Are you married?

JUROR NUMBER FOUR: No.

THE COURT: Children?

JUROR NUMBER FOUR: No.

THE COURT: Your highest level of education?

JUROR NUMBER FOUR: High school.

THE COURT: Thank you very much, ma'am.

Ms. Jones.

JUROR NUMBER FIVE: Yes.

THE COURT: How are you, ma'am?

JUROR NUMBER FIVE: All right.

THE COURT: What community are you from?

JUROR NUMBER FIVE: Detroit.

THE COURT: Are you employed?

JUROR NUMBER FIVE: I'm not.

THE COURT: You're not. Married?

JUROR NUMBER FIVE: No. My husband passed.

THE COURT: Okay. Sorry to hear that. Children?

JUROR NUMBER FIVE: Four.

THE COURT: Four. How old are they, the age ranges? You don't have to give each age, but the youngest to oldest.

JUROR NUMBER FIVE: Well all of them is grown.

THE COURT: All of them is grown.

And your highest level of education, ma'am?

JUROR NUMBER FIVE: Sixth grade.

THE COURT: Sixth grade. You indicated earlier about your hip problem.

Are you taking pain medication for that?

JUROR NUMBER FIVE: Yeah, bad arthritis and high blood pressure and diabetes.

THE COURT: All that, okay.

JUROR NUMBER FIVE: High cholesterol.

THE COURT: And high cholesterol. All of it, okay.

Can you sit for more than a hour at a time or are you in pain right now or --

JUROR NUMBER FIVE: Well when I get up, I just can move.

THE COURT: Okay. So if you were having a problem, can you raise your hand if you were having a problem with pain or medication or something like that?

JUROR NUMBER FIVE: Yeah.

THE COURT: Okay. All right. Thank you, ma'am.

Ms. Vallar, did I say that right?

JUROR NUMBER SIX: Vallar.

THE COURT: You say it --

JUROR NUMBER SIX: Vallar.

THE COURT: Valla. Vallar, okay.

What community are you from, ma'am?

JUROR NUMBER SIX: Southgate.

THE COURT: How are you employed?

JUROR NUMBER SIX: Rivergate Terrace.

THE COURT: Rivergate Terrace. Oh, the apartment complex.

JUROR NUMBER SIX: Nursing home.

THE COURT: Nursing home, okay.

What do you do there?

JUROR NUMBER SIX: Dietary.

THE COURT: Okay. Are you married, ma'am?

JUROR NUMBER SIX: No.

THE COURT: Children?

JUROR NUMBER SIX: No.

THE COURT: Your highest level of education?

JUROR NUMBER SIX: High school.

THE COURT: Thank you very much.

Mr. -- is that McDuffie-Conner?

JUROR NUMBER SEVEN: Yes.

THE COURT: How are you, sir?

JUROR NUMBER SEVEN: Good.

THE COURT: What community are you from?

JUROR NUMBER SEVEN: Detroit.

THE COURT: How are you employed, sir?

JUROR NUMBER SEVEN: McDonald's.

THE COURT: Okay. Are you married?

JUROR NUMBER SEVEN: No.

THE COURT: Children?

JUROR NUMBER SEVEN: No.

THE COURT: And your highest level of education?

JUROR NUMBER SEVEN: I am a sophomore in college.

THE COURT: Great. What are you studying?

JUROR NUMBER SEVEN: Sound and recording.

THE COURT: Thank you very much, sir.

Ms. Hargove.

JUROR NUMBER EIGHT: Yes.

THE COURT: How are you?

JUROR NUMBER EIGHT: I'm fine.

THE COURT: What community are you from?

JUROR NUMBER EIGHT: Detroit.

THE COURT: How are you employed?

JUROR NUMBER EIGHT: Rainbow Rehabilitation.

THE COURT: Okay. What do you do there?

JUROR NUMBER EIGHT: I'm a RA for the client.

THE COURT: Okay. Are you married?

JUROR NUMBER EIGHT: No.

THE COURT: Children?

JUROR NUMBER EIGHT: No.

THE COURT: And your highest level of education?

JUROR NUMBER EIGHT: Senior in college.

THE COURT: What are you studying?

JUROR NUMBER EIGHT: Social work.

THE COURT: Thank you very much, ma'am.

Mr. Hammons, sir, how are you?

JUROR NUMBER NINE: Good.

THE COURT: What community are you from?

JUROR NUMBER NINE: Canton.

THE COURT: And how are you employed?
JUROR NUMBER NINE: Ford Motor Company.
THE COURT: What do you do there, sir?
JUROR NUMBER NINE: Classified as a Group Three.
THE COURT: Okay. Are you married?
JUROR NUMBER NINE: No, single.
THE COURT: Children?
JUROR NUMBER NINE: Three.
THE COURT: How old?
JUROR NUMBER NINE: Thirty-seven, 35 and 34.
THE COURT: And I have to ask is your spouse still former spouse or do you have a spouse?
JUROR NUMBER NINE: No, I'm divorced.
THE COURT: You're divorced?
JUROR NUMBER NINE: Yes.
THE COURT: What does your former spouse do?
JUROR NUMBER NINE: She is a caterer.
THE COURT: Okay. Did I ask you your highest level of education?
JUROR NUMBER NINE: No.
THE COURT: What is that?
JUROR NUMBER NINE: Twelfth grade.
THE COURT: Thank you very much.
And you indicated three children. How old are they?

JUROR NUMBER NINE: Thirty-seven, 35 and 34.

THE COURT: Thank you, sir.

Ms. Holland.

JUROR NUMBER TEN: Yes.

THE COURT: How are you, ma'am?

JUROR NUMBER TEN: Fine. How are you?

THE COURT: Doing fine. What community are you from?

JUROR NUMBER TEN: Detroit.

THE COURT: And how are you employed, ma'am?

JUROR NUMBER TEN: Head-start program.

THE COURT: What was that again?

JUROR NUMBER TEN: Head-start program.

THE COURT: What do you do there?

JUROR NUMBER TEN: Coordinator.

THE COURT: Are you married, ma'am?

JUROR NUMBER TEN: Single.

THE COURT: Okay. Children?

JUROR NUMBER TEN: Yes, three.

THE COURT: How old?

JUROR NUMBER TEN: Fifty, 48 and 40.

THE COURT: Wow. You look great.

JUROR NUMBER TEN: Thank you. Thank you.

THE COURT: And what is your highest level of education?

JUROR NUMBER TEN: Associate's degree in college.

THE COURT: Okay. And what is -- your former spouse, what does he do?

JUROR NUMBER TEN: Deceased.

THE COURT: I'm sorry to hear that, ma'am.

What did your spouse do?

JUROR NUMBER TEN: Worked for Shell Oil Company.

THE COURT: Thank you very much, ma'am.

Ms. Parton.

JUROR NUMBER ELEVEN: Yes.

THE COURT: How are you, ma'am?

JUROR NUMBER ELEVEN: Good. How are you?

THE COURT: I'm doing good.

What community are you from?

JUROR NUMBER ELEVEN: River Rouge.

THE COURT: And how are you employed, ma'am?

JUROR NUMBER ELEVEN: Fixed income.

THE COURT: Okay. Married?

JUROR NUMBER ELEVEN: No.

THE COURT: Children?

JUROR NUMBER ELEVEN: Yes.

THE COURT: And how many?

JUROR NUMBER ELEVEN: One, 17-year-old girl.

THE COURT: Okay. And what is your highest

level of education, ma'am?

JUROR NUMBER ELEVEN: High school.

THE COURT: Okay. You indicated I think that you had some problems getting back and forth, you had some issues regarding that.

JUROR NUMBER ELEVEN: I will be okay.

THE COURT: You'll be okay. Okay. Thank you.

Next is it Ms. -- is it Deron?

JUROR NUMBER TWELVE: Deron.

THE COURT: Deron. How are you, ma'am?

JUROR NUMBER TWELVE: I'm fine, thank you.

THE COURT: What community are you from?

JUROR NUMBER TWELVE: Grosse Pointe Park.

THE COURT: And how are you employed, ma'am?

JUROR NUMBER TWELVE: I'm retired.

THE COURT: What did you retire from?

JUROR NUMBER TWELVE: Medical profession. I worked at -- well it's now Beaumont. Beaumont Bon-Secure Hospital for 18 years.

THE COURT: What do you do there?

JUROR NUMBER TWELVE: I was in nursing management.

THE COURT: I know you're too young to be retired, but I'll leave that alone.

Married? Single?

JUROR NUMBER TWELVE: Married.

THE COURT: What does your spouse do?

JUROR NUMBER TWELVE: He's an attorney.

THE COURT: Okay. I'm going to get into that a little later on what kind and all that stuff.

And what is your highest level of education?

JUROR NUMBER TWELVE: College.

THE COURT: Children?

JUROR NUMBER TWELVE: Two children, 47 and 31.

THE COURT: You're kidding. Wow. You look great.

JUROR NUMBER TWELVE: Thank you.

THE COURT: And I did ask you your highest level of education. You said you did --

JUROR NUMBER TWELVE: College.

THE COURT: What did you study in college?

JUROR NUMBER TWELVE: History major.

THE COURT: Okay. Thank you very much, ma'am. Mr. -- is it Mr. Head?

JUROR NUMBER THIRTEEN: Yes, sir.

THE COURT: How are you, sir?

JUROR NUMBER THIRTEEN: Very well.

THE COURT: What community are you from?

JUROR NUMBER THIRTEEN: Detroit.

THE COURT: And how are you employed?

JUROR NUMBER THIRTEEN: I'm retired; Chrysler.

THE COURT: Retired?

JUROR NUMBER THIRTEEN: Yes.

THE COURT: All these young retired people. I wish I could be you guys. Let me stop there.

How long were you at Chrysler?

JUROR NUMBER THIRTEEN: Thirty-three years.

THE COURT: You did your time. I understand.

JUROR NUMBER THIRTEEN: Yes, sir.

THE COURT: Are you married, sir?

JUROR NUMBER THIRTEEN: Yes.

THE COURT: What does your spouse do?

JUROR NUMBER THIRTEEN: She's retired also.

THE COURT: What did she do when she was working?

JUROR NUMBER THIRTEEN: Hairdresser.

THE COURT: Okay. Children?

JUROR NUMBER THIRTEEN: Six.

THE COURT: Wow. Congratulations.

JUROR NUMBER THIRTEEN: Thirty-two to 42.

THE COURT: Okay. And your highest level of education?

JUROR NUMBER THIRTEEN: Twelfth grade.

THE COURT: Thank you very much, sir.

Last, but not least, it's Kerley?

JUROR NUMBER FOURTEEN: Kerley.

THE COURT: How are you, ma'am?

JUROR NUMBER FOURTEEN: Fine.

THE COURT: What community are you from?

JUROR NUMBER FOURTEEN: Detroit.

THE COURT: How are you employed?

JUROR NUMBER FOURTEEN: Chase Bank.

THE COURT: Okay. What do you do there?

JUROR NUMBER FOURTEEN: Assistant branch manager.

THE COURT: Okay. Married?

JUROR NUMBER FOURTEEN: Yes.

THE COURT: And what does your suppose do?

JUROR NUMBER FOURTEEN: He work for adult foster care system.

THE COURT: Okay. Children?

JUROR NUMBER FOURTEEN: Three.

THE COURT: And their age ranges?

JUROR NUMBER FOURTEEN: Twenty-seven, 26 and 24.

THE COURT: Okay. And what's your highest level of education, ma'am?

JUROR NUMBER FOURTEEN: Twelfth grade.

THE COURT: Thank you very much.

Ladies and gentlemen in the audience, I'm going to now be asking your fellow potential jurors a series of

questions which they're going to -- some of them will apply to them and some of them won't. And at some point in time pretty soon we probably will start excusing certain people and they will be going downstairs.

Just so you know, we will be taking a break in about in the next 20 to 30 minutes, give you a chance to stretch your legs and whatever. But we ask that you pay careful attention to the questions because if you get replaced I'm going to say have you been paying careful attention and you're going to say yes. I'll say would you have answered yes to any of the questions that I have asked so far and you will tell me which ones you would have answered yes to.

Now if you don't remember the questions, don't worry about it. I will go back over them. Just say can you repeat them. If you do remember them, you know which ones apply to you, but it will go a lot faster as we are going through this process.

So the first question to the panel is how many of you, by show of hands, have ever served on a criminal jury before? How many of you have ever served on a criminal jury before by show of hands? Only one?

That would be you, Ms. Kerley. How long ago was that?

JUROR NUMBER FOURTEEN: Probably about three or

four years ago.

THE COURT: Was it in this building?

JUROR NUMBER FOURTEEN: Yes.

THE COURT: I'm going to come back to you, sir.

Without telling me what the verdict was, did you reach a verdict?

JUROR NUMBER FOURTEEN: Yes.

THE COURT: Okay. And the last question is can you set that experience aside, this is a totally new case, when you look at this case?

JUROR NUMBER FOURTEEN: Yes.

THE COURT: Thank you, ma'am.

I think, Mr. McDuffie-Conner, you raised your hand. Did you serve on a jury before?

JUROR NUMBER SEVEN: Yes. Yes.

THE COURT: How long ago was it?

JUROR NUMBER SEVEN: Last year.

THE COURT: Last year?

JUROR NUMBER SEVEN: Uh-huh.

THE COURT: Was that in this building?

JUROR NUMBER SEVEN: Yes.

THE COURT: We have got you back already, huh?

JUROR NUMBER SEVEN: Yeah.

THE COURT: Don't sound so excited about that.

JUROR NUMBER SEVEN: I'm not.

THE COURT: You're not. Well I understand.

Did you actually reach a verdict in that case?

JUROR NUMBER SEVEN: Yes.

THE COURT: Okay. Can you set that aside when you look at this case if you get chosen?

JUROR NUMBER SEVEN: Yes.

THE COURT: Thank you, sir.

Anybody else serve on a criminal jury before?

Yes, ma'am. Ms. Parton, how long ago was it?

JUROR NUMBER ELEVEN: Yes. About ten -- it was a real long time ago. Maybe about ten years.

THE COURT: Okay. Was it in this building?

JUROR NUMBER ELEVEN: No.

THE COURT: Okay. Did you reach a verdict?

JUROR NUMBER ELEVEN: Yes.

THE COURT: Can you set that aside when you look at this case?

JUROR NUMBER ELEVEN: Yes.

THE COURT: Okay. Thank you, ma'am.

Anyone else?

Okay. Next question has anyone on the panel or a member of your family ever been a victim of a crime?

Okay. Starting with you, Ms. Hines, who was it?

JUROR NUMBER THREE: My auntie.

THE COURT: And how long ago was it?

JUROR NUMBER THREE: Three, three years.

THE COURT: Three years ago. What kind of crime was it?

JUROR NUMBER THREE: Murder.

THE COURT: Oh, I'm sorry to hear that, ma'am. Was there a trial?

JUROR NUMBER THREE: Yep.

THE COURT: Did you go to any of it?

JUROR NUMBER THREE: No.

THE COURT: You have to answer out loud.

This case does not involve murder, but I know that was serious. This is serious.

The question is can you set that aside when you look at this case?

JUROR NUMBER THREE: Yes.

THE COURT: Thank you, ma'am. Appreciate that.

Anyone else in row one? Yes, ma'am, Ms. Leggett.

JUROR NUMBER FOUR: Yes. My brother had a -- an assault. He was assaulted.

THE COURT: How long ago was that, ma'am?

JUROR NUMBER FOUR: Like 15, about 15 years ago.

THE COURT: Okay. Was there anybody prosecuted for that?

JUROR NUMBER FOUR: I don't -- I was like -- I

was young. I don't remember like how it turned out.

THE COURT: Can you set that aside when looking at this case?

JUROR NUMBER FOUR: Yes.

THE COURT: Thank you, ma'am. Anybody else row one? Row two? Row three?

Yes, ma'am, Ms. Deron.

JUROR NUMBER TWELVE: Deron.

THE COURT: Deron. I'm sorry.

JUROR NUMBER TWELVE: I was a victim of carjacking and assault. Perpetrator was never caught.

THE COURT: Okay. How long ago was it, ma'am?

JUROR NUMBER TWELVE: Probably 40 years.

THE COURT: Forty years ago. I know even though it's 40 years I'm sure it's still --

JUROR NUMBER TWELVE: It's very hard.

THE COURT: Very, very hard. So I have to ask you the question.

This case does involve -- it doesn't involve carjacking, but it does involve an assaultive case.

Do you think you could separate it or not?

JUROR NUMBER TWELVE: Honestly, I would have a hard time.

THE COURT: Okay. That's fair. Thank you, ma'am.

Anybody else in row three?

Okay. You all still paying attention out there?

THE PROSPECTIVE JURORS: Yes.

THE COURT: Okay. Thank you very much.

Next question. Does anyone on the panel here by show of hands any close association with police officers or law enforcement officials either yourself or your family by show of hands?

Row one, Ms. Leggett, who is it?

JUROR NUMBER FOUR: My brother's a state trooper.

THE COURT: Your brother's a state trooper.

Do you discuss his cases with him?

JUROR NUMBER FOUR: No.

THE COURT: Or his job?

JUROR NUMBER FOUR: No.

THE COURT: Would you be -- the fact that your brother's a state trooper, if a police officer testifies here, and I'm sure there will be some, would you be able to judge the -- their testimony the same way you would anyone else?

JUROR NUMBER FOUR: Yes.

THE COURT: All right. Thank you, ma'am.

Row two. I think Ms. Vallar.

JUROR NUMBER SIX: My uncle is a detective for

Southgate.

THE COURT: Your uncle's a detective.

Do you discuss his cases was him?

JUROR NUMBER SIX: No.

THE COURT: Given the fact that your uncle's a detective, would you be able to judge the testimony of police officers the same way you would anyone else?

JUROR NUMBER SIX: Yes.

THE COURT: Thank you, ma'am.

Anybody else in row two? Mr. McDuffie-Conner, who is it?

JUROR NUMBER SEVEN: My cousins. Both my cousins are Detroit police officers.

THE COURT: Okay. Would you -- given the fact your cousins a Detroit police officer, would you be able to judge testimony of the police the same way you would anyone else?

JUROR NUMBER SEVEN: No.

THE COURT: No? Because your cousins are?

Well explain it to me.

JUROR NUMBER SEVEN: My cousin's -- one of my cousins just recently passed away.

THE COURT: The one that's a police officer?

JUROR NUMBER SEVEN: Yes.

THE COURT: In the line of duty?

JUROR NUMBER SEVEN: Yeah. Officer Charles.

THE COURT: Okay. Why don't you -- can you stand up and come forward?

Counsel.

(Discussion had at the bench between the Court, counsel and Prospective Juror Number Seven.

THE COURT: At this point in time, the Court is going to excuse Mr. McDuffie-Conner and Ms. Deron.

THE CLERK: Juror for Seat Number Seven, Tonya Woods.

Juror for Seat Number 12, Anita Ayers, A-y-e-r-s.

THE COURT: Good morning, Ms. Woods. How are you?

JUROR NUMBER SEVEN: Good morning.

THE COURT: What community are you from?

JUROR NUMBER SEVEN: From Westland, Michigan.

THE COURT: And how are you employed, ma'am?

JUROR NUMBER SEVEN: I am a PC aide and a CENA at Harwood Nursing Facility.

THE COURT: I have no idea what that is.

JUROR NUMBER SEVEN: Well I take care of elderly people, rehabilitation, that kind of thing.

THE COURT: Okay.

JUROR NUMBER SEVEN: I been doing it for

13 years.

THE COURT: Okay. Are you married?

JUROR NUMBER SEVEN: Divorced.

THE COURT: What does your former spouse do?

JUROR NUMBER SEVEN: He was self-employed.

THE COURT: Okay. Children?

JUROR NUMBER SEVEN: Two.

THE COURT: How old are they?

JUROR NUMBER SEVEN: Twenty-eight and 30.

THE COURT: And what is your highest level of education?

JUROR NUMBER SEVEN: Twelfth.

THE COURT: Thank you very much, ma'am.

Is it Ms. Ayers?

JUROR NUMBER TWELVE: Yes.

THE COURT: What community are you from?

JUROR NUMBER TWELVE: Detroit.

THE COURT: And how are you employed?

JUROR NUMBER TWELVE: Unemployed.

THE COURT: When you were employed, what did you do last time?

JUROR NUMBER TWELVE: Machine operator.

THE COURT: Are you married?

JUROR NUMBER TWELVE: Well, yeah, separated.

THE COURT: That was a -- that was -- so you're

separated. I have to -- I'm sorry.

What does the separated spouse do?

JUROR NUMBER TWELVE: Well he don't do nothing right now. He used to be a truck driver.

THE COURT: Okay. Children?

JUROR NUMBER TWELVE: Two.

THE COURT: How old?

JUROR NUMBER TWELVE: Twenty-three and 22.

THE COURT: What is your highest level of education?

JUROR NUMBER TWELVE: High school.

THE COURT: Thank you very much.

Ms. Woods, Ms. Ayers, you heard the questions I asked your fellow jurors?

JUROR NUMBER SEVEN: Yes.

THE COURT: Would you answered yes to any of those questions?

JUROR NUMBER SEVEN: Last one that you had that discussion there in the front about --

THE COURT: You need to have a private discussion or no?

I mean, ladies and gentlemen, if any of you -- if we ask a question that you feel is private or personal, something tragic or something, you can always come up if you don't want to say it in front of everyone.

JUROR NUMBER SEVEN: I do. Can I come up there cause I do have -- and it just happened a year ago.

THE COURT: Yes.

JUROR NUMBER SEVEN: Okay.

(Discussion had at the bench between the Court, counsel and Prospective Juror Number Seven.)

THE COURT: Ms. Woods, is it anything else you would have answered yes to other than that?

JUROR NUMBER SEVEN: No.

THE COURT: Okay. How about you, Ms. Ayers?

JUROR NUMBER TWELVE: Uh-huh.

THE COURT: Prior jury service? You served on a jury before?

JUROR NUMBER TWELVE: No.

THE COURT: Okay. And what about victim of a crime?

JUROR NUMBER TWELVE: Yes.

THE COURT: You, yourself?

JUROR NUMBER TWELVE: No.

THE COURT: Who? Member of your family?

JUROR NUMBER TWELVE: Yeah, my baby -- my daughter's daddy.

THE COURT: Your daughter's father?

JUROR NUMBER TWELVE: Yes.

THE COURT: And he has been a victim of a crime?

How long ago was that?

JUROR NUMBER TWELVE: Twenty years ago.

THE COURT: Twenty years ago. Was there a trial or anything like that?

JUROR NUMBER TWELVE: Yes, it was.

THE COURT: Did you go to that?

JUROR NUMBER TWELVE: No.

THE COURT: Okay. Can you set that aside when you look at this case?

JUROR NUMBER TWELVE: (No verbal response.)

THE COURT: You cannot?

JUROR NUMBER TWELVE: (No verbal response.)

THE COURT: What kind of crime was it?

JUROR NUMBER TWELVE: He got killed.

THE COURT: Oh, he got killed?

JUROR NUMBER TWELVE: Yeah.

THE COURT: I'm sorry to hear that. Okay. Thank you very much, ma'am.

Anyone else? That's right. It can't be anyone else. Only two people.

All right. The Court is gonna thank and excuse Ms. Harris and Ms. Woods.

MS. CEZIL: Judge, may we approach?

THE COURT: Yes.

(Discussion had at the bench between the Court

and counsel.)

THE CLERK: Juror for Seat Number Seven, Steven Baker.

And juror for Seat Number 12, Linda, last name S-c-h-e-r-d-t. Can you pronounce the last name for me, ma'am, please?

Ma'am, can you pronounce your last name, please?

JUROR NUMBER TWELVE: Scherdt.

THE CLERK: Okay. Thank you.

THE COURT: Mr. Baker, good morning, sir.

JUROR NUMBER SEVEN: Good morning.

THE COURT: How are you?

JUROR NUMBER SEVEN: Good.

THE COURT: What community are you from?

JUROR NUMBER SEVEN: New Boston.

THE COURT: How are you employed, sir?

JUROR NUMBER SEVEN: I am a manager at a family fun center.

THE COURT: Okay. Are you married?

JUROR NUMBER SEVEN: No.

THE COURT: And children?

JUROR NUMBER SEVEN: No.

THE COURT: Highest level of education?

JUROR NUMBER SEVEN: High school.

THE COURT: Okay. Thank you very much.

Ms. Scherdt, how are you?

JUROR NUMBER TWELVE: Fine.

THE COURT: What community are you from?

JUROR NUMBER TWELVE: I'm sorry. I'm having trouble hearing you.

THE COURT: What community are you from, what city?

JUROR NUMBER TWELVE: Plymouth.

THE COURT: How are you employed?

JUROR NUMBER TWELVE: Retired.

THE COURT: And what did you retire from?

JUROR NUMBER TWELVE: Teaching.

THE COURT: Okay. What did you teach?

JUROR NUMBER TWELVE: Livonia in elementary.

THE COURT: Okay. Are you married?

JUROR NUMBER TWELVE: No.

THE COURT: Okay. Children?

JUROR NUMBER TWELVE: No.

THE COURT: Okay. What is your highest level of education?

JUROR NUMBER TWELVE: College.

THE COURT: Okay. And what did you study in college?

JUROR NUMBER TWELVE: Elementary education.

THE COURT: Thank you very much, ma'am.

Mr. Baker, Ms. Scherdt, you heard the questions I asked your fellow jurors.

Would you have answered yes to prior jury service or victim of a crime?

JUROR NUMBER SEVEN: For me victim of a crime, yes.

THE COURT: And who is it?

JUROR NUMBER SEVEN: My grandparents.

THE COURT: Your grandparents?

JUROR NUMBER SEVEN: Yes.

THE COURT: How long ago was that?

JUROR NUMBER SEVEN: Last year.

THE COURT: Last year?

JUROR NUMBER SEVEN: Yeah.

THE COURT: I have to ask what happened.

JUROR NUMBER SEVEN: People stole from them, yeah.

THE COURT: How?

JUROR NUMBER SEVEN: They weren't victims. I mean they went to their bar and stole a bunch of their stuff and the perpetrator was never caught.

THE COURT: So I'm still not understanding.

Was anybody -- the perpetrator was never caught?

JUROR NUMBER SEVEN: No.

THE COURT: Your grandparents owned a bar?

JUROR NUMBER SEVEN: It's their house. Like their garage, you know, like their -- where their stuff was stored.

THE COURT: So I'm still trying to -- so someone broke into your grandparents' home?

JUROR NUMBER SEVEN: Yeah.

THE COURT: And they stole something from the garage?

JUROR NUMBER SEVEN: Well they didn't break into their home but they broke into the garage barn.

THE COURT: Oh, the barn.

JUROR NUMBER SEVEN: Yeah.

THE COURT: And they stole some stuff?

JUROR NUMBER SEVEN: Yeah, a lot of stuff.

THE COURT: And nobody was prosecuted?

JUROR NUMBER SEVEN: No.

THE COURT: Can you set that aside when you look at this case?

JUROR NUMBER SEVEN: Yes.

THE COURT: Anything else, sir?

JUROR NUMBER SEVEN: No.

THE COURT: And, Ms. Scherdt, you already said no.

JUROR NUMBER TWELVE: I did have a cousin who was beat up and robbed.

THE COURT: How long ago was that, ma'am?
JUROR NUMBER TWELVE: It's been about four years ago.
THE COURT: Okay. Was anybody charged?
JUROR NUMBER TWELVE: No.
THE COURT: Can you set that aside when you look at this case?
JUROR NUMBER TWELVE: (No verbal response.)
THE COURT: That's a yes?
JUROR NUMBER TWELVE: Yes.
THE COURT: Thank you, ma'am.
The next question does anyone have any close association with persons involved in the legal profession such as attorneys and/or court personnel?
Yes, Mr. Hammons, who is it?
JUROR NUMBER NINE: My neighbor is a prosecuting attorney for Wayne County.
THE COURT: And do you discuss his cases with him?
JUROR NUMBER NINE: No.
THE COURT: Okay. Does that have any bearing on your ability to be fair in this case?
JUROR NUMBER NINE: I wouldn't think so, no.
THE COURT: Thank you, sir. Anybody else?
Has anyone on the panel ever been arrested or

convicted of a crime other than a traffic offense?

THE PROSPECTIVE JURORS: (No verbal response.)

THE COURT: Okay. Does anyone -- you all still paying attention out there?

Does anyone sitting on the panel have a family member or close friend who has been arrested or convicted of a crime other than a traffic offense?

Okay. Starting in row one, who is it, Ms. Hines?

JUROR NUMBER THREE: My cousin.

THE COURT: And what kind of crime was it?

JUROR NUMBER THREE: Murder.

THE COURT: And how long ago was that?

JUROR NUMBER THREE: Three.

THE COURT: Three years ago, too. Okay.

And did you go to any of that trial?

JUROR NUMBER THREE: Nope.

THE COURT: Can you set that aside when you look at this case?

JUROR NUMBER THREE: Yep.

THE COURT: Thank you.

Row two? Yes, ma'am, Ms. Hargrove.

JUROR NUMBER EIGHT: My aunt.

THE COURT: Okay. How long ago was that?

JUROR NUMBER EIGHT: It was like 15 years.

THE COURT: Fifteen years ago. And what kind of crime was it?

JUROR NUMBER EIGHT: Had to do with fraud.

THE COURT: Can you set that aside when you look at this case?

JUROR NUMBER EIGHT: Uh-huh.

THE COURT: That's a yes?

JUROR NUMBER EIGHT: Yes.

THE COURT: Thank you, ma'am.

Anyone else in row two?

All right. Row three? I am trying to get there real quickly. Ms. Kerley, who is it?

JUROR NUMBER FOURTEEN: I had a cousin who did a carjacking. He did 15 years.

THE COURT: How long ago was that?

JUROR NUMBER FOURTEEN: Well he just got out maybe like three years ago.

THE COURT: Can you set that aside when you look at this case?

JUROR NUMBER FOURTEEN: Yes.

THE COURT: Thank you. Anybody else in row three? Thank you very much.

Is everyone able to keep a open mind until they've heard all the evidence?

THE PROSPECTIVE JURORS: Yes.

THE COURT: Is everyone able to -- if you were picked, would you be able to give your opinion to your fellow jurors?

THE PROSPECTIVE JURORS: Yes.

THE COURT: If you were picked, would you listen, be able to listen, not just talk, would you be able to listen to your fellow jurors and their opinions?

THE PROSPECTIVE JURORS: Yes.

THE COURT: Okay. Would all of you be able to follow my instructions on the law?

THE PROSPECTIVE JURORS: Yes.

THE COURT: Okay. If you or a member of your family were charged with a crime, if you were charged, would you want someone like you to serve on a juror?

THE PROSPECTIVE JURORS: Yes.

THE COURT: If you were a victim of a crime, would you want someone like you to serve as a juror?

THE PROSPECTIVE JURORS: Yes.

THE COURT: Okay. Ladies and gentlemen, we're going to take our morning recess. We'll be back in about 15 minutes.

Remember where you are in those seats there. Make sure you come back there. It doesn't matter out there.

We are going to take 15 minutes. We are going

to come back. We are going to go until about 12:20, 12:25 somewhere in there. We'll take about a hour for lunch and then we'll continue on from there.

But thank you very much for your patience and we will see you soon.

(The prospective jurors were excused from the courtroom at 11:33 A.M.)

(Off the record.)

THE COURT: Let's bring the jury in.

MR. ELIZONDO: Judge, and another thing I have arranged to have Mr. Golson brought over after it's done. We are going to keep him in the witness room. Counsel can interview him at that point.

THE COURT: Okay. Ready for the jurors?

MR. ELIZONDO: Yes, sir.

(The prospective jurors entered the courtroom at 11:55 A.M.)

THE COURT: Counsel, could I have you approach again.

(Discussion had at the bench between the Court and counsel.)

THE COURT: All right. I just had a chance to meet with counsel and the Court -- we are in agreement that we are going to excuse Ms. Jones and move on. That's Juror Number Five.

THE CLERK: Juror for Seat Number Five, the first name V-o-n-t-a-e, last name Powell.

THE COURT: Mr. Powell.

JUROR NUMBER FIVE: Yes, sir.

THE COURT: How are you?

JUROR NUMBER FIVE: I'm doing fine.

THE COURT: What community are you from, sir?

JUROR NUMBER FIVE: Detroit.

THE COURT: How are you employed?

JUROR NUMBER FIVE: White Castle. White Castle.

THE COURT: You have to keep your voice up a little higher.

JUROR NUMBER FIVE: I'm sorry. White Castle.

THE COURT: Are you married?

JUROR NUMBER FIVE: No, sir.

THE COURT: Children?

JUROR NUMBER FIVE: No, sir.

THE COURT: And your highest level of education?

JUROR NUMBER FIVE: High school.

THE COURT: Thank you very much, sir.

You heard the questions I asked your fellow jurors?

JUROR NUMBER FIVE: Yes, sir.

THE COURT: Would you have answered yes to any of them?

JUROR NUMBER FIVE: Yes, sir.

THE COURT: Which one?

JUROR NUMBER FIVE: I was a victim of a armed robbery less than a year ago.

THE COURT: Less than a year ago?

JUROR NUMBER FIVE: Yes, sir.

THE COURT: Was anybody charged with that?

JUROR NUMBER FIVE: He's -- yes, I believe so. Yes, sir.

THE COURT: So that's still going through the system?

JUROR NUMBER FIVE: Yes, sir.

THE COURT: This case does involve a armed robbery. You were a victim.

Would you be able to separate that?

JUROR NUMBER FIVE: No, sir.

THE COURT: You could not, okay. We'll excuse you, sir.

THE CLERK: Juror for Seat Number Five, Matthew Tabor, T-a-b-o-r.

THE COURT: Good afternoon, Mr. Tabor. How are you, sir?

JUROR NUMBER FIVE: Doing well, thank you.

THE COURT: What community are you from?

JUROR NUMBER FIVE: Dearborn.

THE COURT: How are you employed?

JUROR NUMBER FIVE: I am the operator for the last Games Works shop in Michigan.

THE COURT: Last games what is that?

JUROR NUMBER FIVE: It's like a hobby store, board games, collectibles.

THE COURT: I think you indicated you are the owner/operator?

JUROR NUMBER FIVE: Uh-huh.

THE COURT: That's a yes?

JUROR NUMBER FIVE: Yes, sir.

THE COURT: How long have you been doing that?

JUROR NUMBER FIVE: I just took it over about six months ago.

THE COURT: Are you married?

JUROR NUMBER FIVE: No, sir.

THE COURT: Children?

JUROR NUMBER FIVE: None.

THE COURT: Highest level of education?

JUROR NUMBER FIVE: Sophomore at college.

THE COURT: So you're still in school?

JUROR NUMBER FIVE: Uh-huh.

THE COURT: What are you studying?

JUROR NUMBER FIVE: English and secondary education.

THE COURT: Okay. You heard the questions I asked your fellow jurors?

JUROR NUMBER FIVE: Yes, sir.

THE COURT: Would you have answered yes to any of those questions?

JUROR NUMBER FIVE: No, all the way up until the family members.

THE COURT: In law enforcement or family member victim of a crime?

JUROR NUMBER FIVE: The last one have they been-- was that have they committed --

THE COURT: Right. Have you ever been charged or convicted of a crime?

JUROR NUMBER FIVE: Personally, no.

THE COURT: Has anybody in your family ever been charged and convicted?

JUROR NUMBER FIVE: Yes, sir.

THE COURT: Who would that be?

JUROR NUMBER FIVE: My father and my uncle.

THE COURT: And start with your father. What kind of crime was it?

JUROR NUMBER FIVE: It was -- I guess it was assault but it was dismissed in self defense.

THE COURT: Okay. And what about your uncle?

JUROR NUMBER FIVE: I don't recall what the

actual charge was. I believe it had something to do with embezzlement to his company.

THE COURT: How long ago was your father's?

JUROR NUMBER FIVE: This would be about four years ago.

THE COURT: Was there any -- you said it was dismissed. Did you go to any of the hearings?

JUROR NUMBER FIVE: No.

THE COURT: Can you set that aside when you look at this case?

JUROR NUMBER FIVE: Absolutely.

THE COURT: And the same with your uncle's situation.

JUROR NUMBER FIVE: Yes.

THE COURT: Okay. You can keep a open mind until you've heard all the evidence if you're picked?

JUROR NUMBER FIVE: Yes.

THE COURT: Would you want someone like you to serve on the jury?

JUROR NUMBER FIVE: Absolutely.

THE COURT: Okay. Other than your work situation?

JUROR NUMBER FIVE: Yeah.

THE COURT: Okay. This is to the panel. It's a question that I skipped over.

To everyone, by show of hands and certainly everyone out there, did anyone, is anyone on the panel familiar with a incident that was on the news involving -- it would have happened on New Year's Eve which is -- and it would have been a case involving the rape and robbery of a elderly couple that was stranded on a road by show of hands?

Did you hear any news reports of that incident?

JUROR NUMBER NINE: I think I did hear about it, yeah.

JUROR NUMBER FOURTEEN: I heard about it on the news.

THE COURT: You heard about it on the news.

Let's start with you, Mr. Hammons. Do you have any independent recollection of a news report?

JUROR NUMBER NINE: No. Just, you know, I remember hearing about it since you brought it up.

THE COURT: All right. Can you set aside anything that you may have heard or remember when you judge the facts of this case?

JUROR NUMBER NINE: I think so, yes.

THE COURT: Okay. Same question for you, Mr. Head.

How about you?

JUROR NUMBER THIRTEEN: Same thing.

THE COURT: Okay. And this applies to everyone.

If you were chosen as a juror, you recognize that you couldn't go back and look at the internet or prior newspapers to look at anything like that, the only information you are supposed to get about the case should be in court.

You all understand that?

THE PROSPECTIVE JURORS: (No verbal response.)

THE COURT: For those of you that applies to you in the audience, when you come up please bring that to my attention.

With that, Mr. Elizondo, I don't know how you want to do it.

You may proceed.

MR. ELIZONDO: Thank you.

Good afternoon.

THE PROSPECTIVE JURORS: Good afternoon.

MR. ELIZONDO: This is the only chance actually the attorneys get to talk to you in any way, shape or form. So really I'm just gonna get right down to the nitty-gritty here.

We're looking for people who can set aside prejudices, sympathies, et cetera and deal with this case based on the evidence that's gonna be presented.

Okay. This is about sexual assault. This is

about armed robbery. And the judge gave you a little bit of information about the case in general.

Is there anybody here who because of the nature of this case, the fact that it involves a sexual, alleged sexual assault, involves alleged armed robbery, and that the victims or the complainants in this case are older, I think one is in their late 50's, the other one's 60, early 60's.

THE COURT: I don't know. That depends on the person if you're going to say that's older.

MR. ELIZONDO: Well actually he's younger than me probably, so whatever that means, okay. But the bottom line is that's the generalness of this, you know, the situation here.

Is there anybody here who just based on what I just said, just that overall thing, is thinking, you know what, this is not a kind of case I can be fair in?

Let's see. Is it Mr. Hammons? Okay.

JUROR NUMBER NINE: I have two daughters and I guess when I think about them and I think about this case in a way I can relate it, you know, to my kids, if something like that happened to them --

MR. ELIZONDO: Okay. My guess is, I might be wrong, but my guess is that that's probably true for everybody here who would think I have got a mother,

father, I have got daughters, son, whatever.

The question here is, though, obviously it touches sort of something inside for you. Is this something that -- and we need to know can you put whatever that is aside and judge it solely on the evidence? Because it's the evidence that's gonna be presented that's gonna be the decision-maker.

JUROR NUMBER NINE: I don't know if I can do that.

MR. ELIZONDO: Okay. Fair enough, sir.

JUROR NUMBER NINE: Just being honest.

MR. ELIZONDO: And I appreciate your honesty.

Another hand I see, is it Vallar?

JUROR NUMBER SIX: Yes.

MR. ELIZONDO: Okay.

JUROR NUMBER SIX: My aunt was raped about 20, 30 years ago and I just don't see pity in anybody who would do that.

MR. ELIZONDO: Okay. Well, you know, we're gonna start out with this promise, and the judge will get into more about that, and that is that there is this presumption of innocence that the defendant in any case has, okay. We start there. There is no guilty person in this courtroom right now of these charges unless we prove it, okay.

Now my question then -- let's just start with the first part. Do you accept that premise that nobody's guilty at this point?

JUROR NUMBER SIX: It's like 50-50.

MR. ELIZONDO: Okay. That's how you feel?

JUROR NUMBER SIX: Yeah.

MR. ELIZONDO: All right. Fair enough.

Again, I appreciate your honesty.

Anybody else that has where this touched you in a particular way that you feel you need to express some sort of thought?

Okay. Let's see here. Anybody here watch CSI? How many? Let me see your hands. Be honest. Okay. You know CSI, those of you who didn't raise your hand, do you know what that is? What that about. I see a lot of heads nodding just for a record.

All right. CSI began in 1999. Just looked it up, okay. Talking about the science and about the investigation of crimes. Everybody agree that that's basically what the case is about or the program's about?

All right. In this particular case, there is gonna be evidence presented to you, I believe, from the Michigan State forensic people about DNA evidence, okay.

Does anybody here know what DNA evidence or what DNA is? I'm going to venture a guess. I see some heads

nodding.

Mr. Baker.

JUROR NUMBER SEVEN: Yes.

MR. ELIZONDO: What's DNA?

JUROR NUMBER SEVEN: DNA is kind of -- it's hard to explain, but I know what it is. It's like a what like the most basic of what you are, what makes you different from other people is you have different, I don't know --

MR. ELIZONDO: Okay.

JUROR NUMBER SEVEN: I know what it is, but I can't explain it.

MR. ELIZONDO: Okay. Fair enough.

Anybody else want to venture a guess?

Mr. Tabor.

JUROR NUMBER FIVE: It's your genetic make-up. You had -- it's absolutely you. It's what makes you you. Nobody else has your DNA.

MR. ELIZONDO: Okay. DNA and that whole concept, it's like Mr. Baker said, it's hard to explain.

Now what I'm gonna ask is this. Can you open your mind to the witnesses that are gonna be here and evaluate what they and how they explain DNA evidence to you and kind of put aside whatever you might have learned on TV, put aside whatever, you know, out there in that and just listen and be educated about DNA evidence?

Can you all promise that you will do that? Anybody here that's gonna have a problem, say I already know that, doesn't matter? Anybody? Okay.

Everybody can keep a open mind?

JUROR NUMBER TWELVE: Yes.

MR. ELIZONDO: Okay. Now is there anybody here who's formulated the thought that in a rape case or a sexual assault case, maybe I shouldn't use that word rape, a sexual assault case that DNA evidence has to be present? Is there anybody here that believes that, that if a person is sexually assaulted there is going to be DNA evidence left there? Is there anybody that believes that? Raise your hand right there. Need to know.

All right. The answer to that question obviously we'll be presenting through evidence. I just wanna make sure nobody has got the closed mind at this point and is willing to listen and evaluate the testimony.

Can you all promise to do that?

THE PROSPECTIVE JURORS: Yes.

MR. ELIZONDO: Okay. Biology.

Anybody here a biology major or study biology? Anybody have a general knowledge of biology?

Okay. We are going to -- you're going to be hearing some evidence from a nurse about things that occurred. And I just want -- again, it kind of goes along

with that DNA stuff.

Can you keep an open mind and listen to the evidence and evaluate it based on what you hear here and your common sense and your personal knowledge? Can you promise that you will do that also? Everybody?

THE PROSPECTIVE JURORS: Yes.

MR. ELIZONDO: Let's see here. Following the law.

The judge will eventually tell you what the law is concerning these particular crimes. And he's gonna -- and he'll talk about elements and that will become a little clearer later on about what it is that a prosecutor has to prove in order to prove this case.

Can you all, if you're chosen to be on this jury, cast aside any kind of ideas of what you think a crime might be? For example, kidnapping. You might have in your mind something kidnapping's this and when -- can you cast that aside and listen to when the judge instructs as to what I have to show you and accept what the judge says? Because that's gonna be your job if you're chosen.

Can you all promise that you will do that?

THE PROSPECTIVE JURORS: Yes.

MR. ELIZONDO: Okay. Is there anybody here who can think of any reason right now at this point, other than what we've discussed, that you could not be fair,

could not listen to the evidence, could not think your way through it, could not be able to discuss with others? I mean cause you're gonna have to do that, work as a team.

Is there anybody here who has any reason to believe why they would not be able to fulfill one of those requirements? Anybody at all?

THE PROSPECTIVE JURORS: (No verbal response.)

MR. ELIZONDO: Those of you, some of you had -- I know, sir, Mr. Tabor, you said something about the work issue.

JUROR NUMBER FIVE: Yeah. If I don't -- if I'm not there -- I'm the only employee for my store. So if I'm not there, the store is just closed.

MR. ELIZONDO: Okay. And I understand how that is a financial burden to you.

I guess my question is will that -- if you are chosen to be here, is that gonna make it so that you would not be able to be a full, participating member here?

JUROR NUMBER FIVE: No.

MR. ELIZONDO: Will you rush things just so we can get this done and get this out of the way?

JUROR NUMBER FIVE: No.

MR. ELIZONDO: Anybody else who expressed, is there anybody here who had their -- I don't remember.

THE COURT: Mr. Baker and Ms. Parton.

JUROR NUMBER SIX: I told him that my car's in the shop, that I won't be able to make it everyday because my parents work. So I wouldn't have a ride here every single day if I was chosen.

MR. ELIZONDO: So that would be a problem. Okay. Anybody else?

JUROR NUMBER SEVEN: I --

MR. ELIZONDO: Your name is Mr. Hargrove?

THE COURT: Baker.

JUROR NUMBER SEVEN: Baker.

MR. ELIZONDO: Baker. I'm sorry.

JUROR NUMBER SEVEN: Yeah, I indicated financial reasons but it's nothing to that I won't be able to work around.

MR. ELIZONDO: Okay. Because the main thing we want to make sure, one thing we want to make sure is if you're chosen that again you're not just gonna rush this through, that you are gonna take the time and listen and concentrate fully on what's been presented.

JUROR NUMBER SEVEN: Yeah, it won't make me partial at all.

MR. ELIZONDO: Ms. -- is it Parton?

JUROR NUMBER ELEVEN: Parton, yes.

What the judge said that this would only be like maybe four or five days?

MR. ELIZONDO: Okay. I believe the judge said we were going to try and get it done by the end of this week. Here is the thing, though. The presentation of evidence -- I'm hoping we can get this done like -- again, don't hold me to this, but we will try maybe like Thursday, Friday.

How long -- here is the thing. How long you deliberate on that, though, we can't tell. That could be an hour. It could be a day. It could be three days. I don't know. So I, you know, we couldn't give you a for sure end date.

JUROR NUMBER ELEVEN: Okay.

MR. ELIZONDO: Does that cause a problem, though?

JUROR NUMBER ELEVEN: No.

MR. ELIZONDO: All right. Thank you, judge.

MR. HOWARTH: Your Honor, I was just looking at the clock because of your other concerns.

THE COURT: Okay. Ladies and gentlemen, we are going to take our lunch break at this time. I am going to give you several things that -- you will be back here at 1:45 and we'll continue. That's one. And we'll end at four just so you know how long we are going to be here for the day.

We'll take another 15-minute break this

afternoon. The most important thing you cannot discuss the case. Even though you haven't heard anything about it, you can't discuss the case. I am going to say that every time we take a break because that's important.

The only time you're allowed to discuss the case is after the case is over and you have your instructions and the people are there to deliberate.

We thank you very much for your patience. And we shall see you again at 1:45. One second.

The Court is going to thank and excuse Ms. Vallar and we'll get a new juror for Ms. Vallar.

All right.

(The jury was excused for lunch at 12:19 P.M.)

THE COURT: All right. We are still on the record.

Counsel, this is Mrs. --

JUROR NUMBER ELEVEN: Parton. It's not personal like that.

THE COURT: Oh.

JUROR NUMBER ELEVEN: It's just a general question.

THE COURT: Well we like to keep it on the record anyway.

So what's your question?

JUROR NUMBER ELEVEN: Instead of driving, I was

gon' catch the bus and I was wondering could I bring lunch, where would I keep it, how does that work?

THE COURT: We have a lunch -- in the jury room they have a --

JUROR NUMBER ELEVEN: So I will be able to bring my own stuff?

THE COURT: Yes.

JUROR NUMBER ELEVEN: Okay. That's all I wanted to know.

THE COURT: All right. We'll see you at 1:45.

(Off the record.)

(The lunch recess was taken.)

THE COURT: Bring the jurors.

(The prospective jurors entered the courtroom at 1:55 P.M.)

THE COURT: Madam Clerk.

THE CLERK: Juror for Seat Number Seven, Felecia Caldwell.

THE COURT: Six.

THE CLERK: Sorry.

THE COURT: Good afternoon, Ms. Caldwell. How are you, ma'am?

JUROR NUMBER SIX: Hi.

THE COURT: How are you?

JUROR NUMBER SIX: I'm good. I'm sorry.

THE COURT: What community are you from?

JUROR NUMBER SIX: Detroit.

THE COURT: And how are you employed?

JUROR NUMBER SIX: Popeye's.

THE COURT: Are you married?

JUROR NUMBER SIX: No.

THE COURT: Children?

JUROR NUMBER SIX: No.

THE COURT: What's your highest level of education?

JUROR NUMBER SIX: I'm a sophomore at Henry Ford.

THE COURT: What are you studying?

JUROR NUMBER SIX: Business management.

THE COURT: Okay. You heard the questions I had asked?

JUROR NUMBER SIX: No for question one and --

THE COURT: Prior jury service?

JUROR NUMBER SIX: Yeah, I said no for that. And --

THE COURT: Victim of a crime?

JUROR NUMBER SIX: No.

THE COURT: Police officers?

JUROR NUMBER SIX: I'm sorry.

THE COURT: Relationship with police officers?

JUROR NUMBER SIX: Oh, no.

THE COURT: What about relationship with lawyers or court personnel?

JUROR NUMBER SIX: No.

THE COURT: Have you ever been charged or convicted of a crime?

JUROR NUMBER SIX: No.

THE COURT: What about somebody in your family?

JUROR NUMBER SIX: Yes.

THE COURT: All right. I have to ask who is it? What kind of crime?

JUROR NUMBER SIX: My dad.

THE COURT: Your dad?

JUROR NUMBER SIX: Yeah.

THE COURT: What kind of crime was it?

JUROR NUMBER SIX: I'm not sure. He said it was before I was born. He said it was before I was born. He did seven years.

THE COURT: So you don't know what kind of crime it was?

JUROR NUMBER SIX: No.

THE COURT: Okay. Would that influence you one way or the other in however would you would look at this case?

JUROR NUMBER SIX: No.

THE COURT: You can be fair?

JUROR NUMBER SIX: Yes.

THE COURT: You can follow my instructions on the law?

JUROR NUMBER SIX: Yes.

THE COURT: And listen to your fellow jurors?

JUROR NUMBER SIX: Yes.

THE COURT: And basically say to them what you-- what your opinion is?

JUROR NUMBER SIX: Yes.

THE COURT: Okay. And would you want someone like you to serve on a jury?

JUROR NUMBER SIX: Yes.

THE COURT: All right. Mr. Howarth, you're up.

MR. HOWARTH: Good afternoon.

THE PROSPECTIVE JURORS: Good afternoon.

MR. HOWARTH: Do you mind, Ralph?

MR. ELIZONDO: No.

MR. HOWARTH: Thanks.

The last time I walked into a courtroom holding one of these, it was over at federal court a couple blocks away. And the judge as I got up to the podium there asked me if I was going to pick the jury by using a Ouija board. I had to assure him that, no, all this contraption is is got everybody's name down on it so I can take them off

easily enough, okay.

As Mr. Elizondo correctly told you before he began to ask you questions, this is the only chance that I get to talk with you as opposed to talking to you and making some kind of speech. Both the prosecution and the defense are looking for one thing and that's jurors that are gonna be fair to our respective clients; People of the State of Michigan, Howard McKnight.

I've got just a couple of questions and I'd like to do them to speed things up by taking you into little groups for a single question. So, for example, if I were to take the entire first row here, Mr. Castle, Ms. Johnson, Ms. Hines and Ms. Leggett, I have a question for the four of you and maybe we can discuss it.

You know, of course, that you're going to be listening to a criminal trial and you've heard the charges. I wanna ask the four of you, and I'll just go right down the row, do you expect in this criminal trial that you are going to hear Mr. McKnight testify in this trial under oath?

JUROR NUMBER ONE: Do I expect it?

MR. HOWARTH: Yes.

JUROR NUMBER ONE: I have no idea.

JUROR NUMBER TWO: Sure.

MR. HOWARTH: Not sure?

JUROR NUMBER THREE: I wouldn't expect.

MR. HOWARTH: But you're thinking maybe you might?

JUROR NUMBER THREE: Yeah.

MR. HOWARTH: And of course last we'll hear -- and we have Ms. Leggett, right?

JUROR NUMBER FOUR: Yes.

MR. HOWARTH: All right. Are you expecting him to testify?

JUROR NUMBER FOUR: Yeah.

MR. HOWARTH: Sure. You've heard very serious charges against him, right?

JUROR NUMBER FOUR: Yes.

MR. HOWARTH: And normally just the way we live in society, when we hear somebody accused of serious charges you say well if you didn't do it, stand up and say you didn't do it. Take a seat. Do what you got to do, right? It makes good sense, right?

Jurors for the one, two, three days that they serve have to make themselves just a little bit different from citizens dealing with an event in the neighborhood or the workplace or something. And that is that you have to listen to instructions from Judge Ewell and you have to follow them. One of those instructions, I believe, is that no defendant in any criminal case in this country is

required in any way to take the witness stand and deny the charges.

Now the question is can the four people in the front row that we've talked to, I mean you've given various answers and I appreciate that as to the level that you might expect Mr. McKnight to testify. But can you live with the fact that he absolutely has no obligation to do so?

JUROR NUMBER ONE: Sure.

JUROR NUMBER TWO: Yes.

JUROR NUMBER THREE: Yes.

JUROR NUMBER FOUR: Yes.

MR. HOWARTH: Okay. Do you think it's something that if you were selected as a juror and went into the jury room that you might discuss with the other jurors? Hey, he didn't testify. He must have done something.

If Judge Ewell tells you you can't take it into consideration, you can't discuss it, you've got to put it out of your mind, can I have four solemn pledges I'll do that? Yes?

JUROR NUMBER ONE: Yes.

JUROR NUMBER TWO: Yes.

JUROR NUMBER THREE: Yes.

JUROR NUMBER FOUR: Yes.

MR. HOWARTH: Good. Now did anybody else

sitting here, I'm not going to go down every row and ask that same question. Does everybody agree with our four front row people?

JUROR NUMBER NINE: I don't.

MR. HOWARTH: Okay. We have one disagreement. And that would be Mr. Hammons, right?

Okay. And, Mr. Hammons, you already told us that you have a problem with this case anyway and I appreciate that. Okay. We'll take that into consideration.

Now in our second group there we have Mr. Tabor, Ms. Caldwell, Mr. Baker and Ms. Hargrove, right?

JUROR NUMBER SIX: Yes.

MR. HOWARTH: Got my names right on the board.

All right. You've heard Mr. Elizondo tell you about scientific evidence and he talked to you about CSI. I would have been one of the people, if I were on that jury, had raised my hand and say I've never seen CSI in my life. But even if I weren't an attorney, I would have heard a lot about DNA.

Going down the line, starting with Mr. Tabor, in a criminal case if DNA were available, in other words DNA was found, DNA was tested, do you think that's important?

JUROR NUMBER FIVE: Very important.

MR. HOWARTH: All right. Ms. Caldwell, do you

agree with Mr. Tabor?

JUROR NUMBER SIX: Yes.

MR. HOWARTH: And, Mr. Baker, do you agree with Mr. Caldwell and Mr. Taylor, right?

JUROR NUMBER SEVEN: Yeah, I do.

MR. HOWARTH: Okay. And, Ms. Hargrove?

JUROR NUMBER EIGHT: Yes.

MR. HOWARTH: All right. You'll also be told that if an expert comes in and says I have a conclusion about the DNA in a case, you decide whether you'll follow his testimony. That sounds fair, too, doesn't it? No matter how important you think DNA is, am I right?

Therefore, if an expert walked into this courtroom and said the DNA in this case is an exact match to Mr. McKnight, I'd still be up to you as jurors to decide whether I go along with that. Fair?

All right. On the other hand, if a DNA expert came in and told you, again starting with Mr. Tabor, that we've got DNA in this case, we can identify it as being DNA, It did come from the complainant who is going to tell us that she was raped or a victim of a criminal sexual encounter, but that DNA doesn't match Mr. McKnight, would that be important to you, Mr. Tabor?

JUROR NUMBER FIVE: Yes.

MR. HOWARTH: And, again, would it be just as

very important as you said it would be the other way around?

JUROR NUMBER FIVE: Yes.

MR. HOWARTH: So if the DNA -- and it's there and it's not like we didn't find any, we found it and it doesn't match this man, would that bother you? Bother you if you were asked to convict him?

JUROR NUMBER FIVE: Oh, I was gonna say I thought I supposed to be impartial.

MR. HOWARTH: No, you are. But would it affect you in making your decision that the DNA -- we find DNA, it's not his? Would that be a factor worth taking into consideration?

JUROR NUMBER FIVE: Yes.

MR. HOWARTH: And, Mrs. Caldwell?

JUROR NUMBER SIX: Yes.

MR. HOWARTH: And, Mr. Baker?

JUROR NUMBER SEVEN: Yes.

MR. HOWARTH: And again, Ms. Hargrove?

JUROR NUMBER EIGHT: Yes.

MR. HOWARTH: That's important, isn't it?

JUROR NUMBER EIGHT: Yes.

MR. HOWARTH: Is that fair? You don't have to follow the expert, but you're gonna listen to what that expert says, aren't you?

JUROR NUMBER EIGHT: Right.

MR. HOWARTH: All right. Now again row number one, the back row and our two numbers 13 and 14, I'm gonna guess everybody agrees with that, right?

Now going to the back row, Mr. Castle, Mr. -- excuse me, Mr. Hammons, Ms. Holland (sic), Ms. Parton, Ms. Scherdt, this is also you're going to find a case that deals with identification. And that merely means somebody saying I'm looking at somebody -- it could be I'm looking at Mr. Elizondo -- it could be I'm looking at Mr. McKnight and I'm saying that's a person that I saw a year ago.

That would be important to you, would it not, if you're going to decide whether Mr. McKnight is the person that did this crime? Am I right? That's important.

Any of you, however, ever have the occasion to make an identification mistake? And let me explain to you what I mean by an identification mistake. Let's suppose you're in a shopping center. Let's suppose you're just walking around downtown in your community or in your place of worship and you see somebody. Oh, there is Ralph, and you start -- woe, I thought that was Ralph. That's not Ralph.

Have any of you ever had that occasion that you thought you recognized somebody and then you found out that that's not the person? Fair?

THE PROSPECTIVE JURORS: (No verbal response.)

MR. HOWARTH: Do you think it's a fair statement that people make mistakes about identification?

THE PROSPECTIVE JURORS: (No verbal response.)

MR. HOWARTH: And if a person were making an identification, would you want to know what the background and circumstances are, not only I say that's the person who hit me on the head last week but why do I say that. That's important too, isn't it? Agreed? Everyone in the back row and everybody agrees?

THE PROSPECTIVE JURORS: Yes.

MR. HOWARTH: Okay. And I just have one last field of questioning and we've got our two jurors left would be Mr. Head and Ms. Kerley.

You clearly heard in this case that there is gonna be testimony from police officers, all right. And you said, generally speaking, I don't think police officers should be believed over other people, correct? Fair?

THE PROSPECTIVE JURORS: (No verbal response.)

MR. HOWARTH: Do you think it's possible that a police officer who is caught up in the investigation of a crime might exaggerate a bit in order to say somebody is guilty?

JUROR NUMBER THIRTEEN: Possible.

MR. HOWARTH: Possible?

JUROR NUMBER FOURTEEN: Yes.

MR. HOWARTH: And if a police officer said something happened, for example, said Mr. McKnight here while He was in custody just blurted out something, in effect saying I did it, right, might you want to look to see if there is anything that backs that up?

JUROR NUMBER FOURTEEN: Yes.

JUROR NUMBER THIRTEEN: Uh-huh.

MR. HOWARTH: And it would be fair to say that maybe among the many things are did you get it in writing, did you record it, did you tape it, did you audio it, did you have it written down in any way.

Are those things that you would at least think about?

JUROR NUMBER THIRTEEN: Uh-huh.

MR. HOWARTH: Fair?

JUROR NUMBER FOURTEEN: Right.

MR. HOWARTH: And does anyone disagree with our two jurors in seats 13 and 14?

JUROR NUMBER SEVEN: I kind of disagree, yeah.

MR. HOWARTH: Okay, fine. And that's --

JUROR NUMBER SEVEN: Mr. Baker.

MR. HOWARTH: Mr. Baker?

JUROR NUMBER SEVEN: Yeah.

MR. HOWARTH: Go ahead, Mr. Baker.

JUROR NUMBER SEVEN: I would hope that a police officer who were to testify under oath would be able to have the integrity to be honest and be impartial about the situation and not necessarily take his or her own opinions on the matter like a personal opinion, rather than what they have discovered as, you know, part of their job.

MR. HOWARTH: Well, Mr. Baker, do you think a police officer is more honest than you?

JUROR NUMBER SEVEN: No.

MR. HOWARTH: Not more, not less?

No more, no less, right? Fair?

JUROR NUMBER SEVEN: Yep.

MR. HOWARTH: Do you think people sometimes just don't tell the truth?

JUROR NUMBER SEVEN: Yeah. But I don't think in this situation lying would be a thing that somebody would do.

MR. HOWARTH: So in this situation would a police officer's testimony be worth more than any other person sitting in this jury box?

JUROR NUMBER SEVEN: No, just as long as it's the truth and not fabrication or exaggerated.

MR. HOWARTH: Might you want to look to see if it's backed up with what I was saying? For instance, you

say that this statement was made. Have you got it in writing? Do you have it on tape? Did you, you know, audio it? Did you do anything to preserve it?

Would you like to that?

JUROR NUMBER SEVEN: Yeah, but I also wouldn't make the assumption that that person made anything up.

MR. HOWARTH: Okay. Thank you very much. That's all the questions that I have.

THE COURT: Thank you, counselor.

Challenge for cause from the People?

MS. CEZIL: Not for cause, Your Honor.

Thank you.

THE COURT: From the defense?

MR. HOWARTH: Your Honor, I believe that Mr. Hammons himself said that he did not believe that he could be fair in this case because of a matter that dealt with a family member.

THE COURT: Is that correct, Mr. Hammons?

JUROR NUMBER NINE: That's correct.

THE COURT: All right. The Court will thank and excuse you. You're excused, sir.

Peremptory challenges from the People?

MS. CEZIL: Your Honor, at this time the People would like to thank and excuse juror in seated in Seat Number Three.

THE COURT: Ms. Hines. Is that the only one you want to do now?

MS. CEZIL: Yes, Your Honor. Thank you.

THE COURT: You know you can exercise more than one at a time. Thank you.

Peremptory challenges from the defense?

MR. HOWARTH: Your Honor, we would ask the Court to excuse with thanks the juror in Seat Number Seven, Mr. Baker.

THE CLERK: Juror for Seat Number Three, Debra Deguise, D-e-g-u-i-s-e.

Juror for Seat Number Seven, Keith Kitts, K-i-t-t-s.

Juror for Seat Number Nine, Leon Jackson.

THE COURT: Good afternoon, Ms. -- is it Deguise?

JUROR NUMBER THREE: Yes, Deguise.

THE COURT: Deguise. How are you, ma'am?

JUROR NUMBER THREE: Good, thank you. And yourself?

THE COURT: Doing well, thank you.

What community are you from?

JUROR NUMBER THREE: Livonia.

THE COURT: How are you employed?

JUROR NUMBER THREE: I am self-employed. I am a

broker-owner of a real estate company.

THE COURT: Are you married?

JUROR NUMBER THREE: I am. My husband is a realtor at my office and I have four children.

THE COURT: Okay. Age ranges?

JUROR NUMBER THREE: Twenty-five, 21, 14 and 11.

THE COURT: Your highest level of education?

JUROR NUMBER THREE: Twelfth grade.

THE COURT: Mr. Kitts, how are you?

JUROR NUMBER SEVEN: Good. How are you?

THE COURT: What community are you from?

JUROR NUMBER SEVEN: I'm from Westland.

THE COURT: How are you employed, sir?

JUROR NUMBER SEVEN: I am laser operator at a production shop.

THE COURT: Are you married?

JUROR NUMBER SEVEN: No.

THE COURT: Children?

JUROR NUMBER SEVEN: No.

THE COURT: What's your highest level of education?

JUROR NUMBER SEVEN: I am a sophomore at college.

THE COURT: What are you studying?

JUROR NUMBER SEVEN: Cardiology.

THE COURT: Oh, cool. And last, but not least, Mr. Jackson.

How are you, sir?

JUROR NUMBER NINE: Well, sir.

THE COURT: What community are you from?

JUROR NUMBER NINE: Detroit.

THE COURT: How are you employed?

JUROR NUMBER NINE: Table games dealer at MGM Grand Casino.

THE COURT: Okay. Are you married? Single, sir?

JUROR NUMBER NINE: Yes.

THE COURT: And what does your suppose do?

JUROR NUMBER NINE: She is a call center representative for a community credit union.

THE COURT: Okay. Children?

JUROR NUMBER NINE: Yes.

THE COURT: How many?

JUROR NUMBER NINE: Two. Two.

THE COURT: How old?

JUROR NUMBER NINE: Thirteen and 15.

THE COURT: And your highest level of education, sir?

JUROR NUMBER NINE: College.

THE COURT: Okay. What did you study in

college?

JUROR NUMBER NINE: I'm studying business.

THE COURT: Thank you, sir.

I think you last indicated that you had a family situation.

JUROR NUMBER NINE: Yes. We're just having a -- we just have one vehicle. I think we can possibly work our way around it.

THE COURT: Okay, if you get chosen.

Okay. Thank you, sir. To my three new jurors, Mr. Jackson, Mr. Kitts and Ms. Deguise, you heard the questions I asked your fellow jurors this morning and this afternoon.

Would you have answered yes to any of those questions? I will ask you, Ms. Deguise.

JUROR NUMBER THREE: Yes, I have been on jury before.

THE COURT: How long ago?

JUROR NUMBER THREE: It's probably been about eight years.

THE COURT: Did you reach a verdict?

JUROR NUMBER THREE: They did not. I was chosen out of the hat, so I was an alternate.

THE COURT: Can you set that experience aside when you --

JUROR NUMBER THREE: Yes.

THE COURT: Anything else you would have answered yes to?

JUROR NUMBER THREE: No.

THE COURT: How about you, Mr. Kitts?

JUROR NUMBER SEVEN: Nope.

THE COURT: And how about you, Mr. Jackson?

JUROR NUMBER NINE: Yes. I have relationship with police officers.

THE COURT: Okay.

JUROR NUMBER NINE: One of my family members is a federal agent.

THE COURT: Okay.

JUROR NUMBER NINE: And a friend of, close friend of mine is a police officer in -- Detroit police officer.

THE COURT: Given your close relationship and your family member relationship with law enforcement, would you be able to judge the testimony of a police officer the same way you would anyone else?

JUROR NUMBER NINE: Yes.

THE COURT: Okay. Anything else, sir?

JUROR NUMBER NINE: My mother was a victim of violent crimes, well of abuse.

THE COURT: Okay.

JUROR NUMBER NINE: Physical abuse when I was a child. And it was done in front of me.

THE COURT: It was in front of you?

JUROR NUMBER NINE: Yes.

THE COURT: Okay. Sorry to hear that, sir.

Can you set that aside when you look at this case?

JUROR NUMBER NINE: Yes.

THE COURT: All right. Anything else, sir?

JUROR NUMBER NINE: No.

THE COURT: So the three new jurors, you all can keep a open mind until you've heard all of the evidence?

THE PROSPECTIVE JURORS: Yes.

THE COURT: You would be able to discuss your opinions with your fellow jurors?

THE PROSPECTIVE JURORS: Yes.

THE COURT: Would you be able to listen to your fellow jurors as they discuss --

THE PROSPECTIVE JURORS: Yes.

THE COURT: You will be able to follow my instructions on the law?

THE PROSPECTIVE JURORS: Yes.

THE COURT: And you heard the questions that both the prosecution and defense asked.

Would you have any further comments regarding

that?

JUROR NUMBER FIVE: No.

JUROR NUMBER THREE: No.

JUROR NUMBER SEVEN: No.

THE COURT: Okay. Challenges for cause from the defense?

MR. HOWARTH: No challenge for cause, Your Honor.

THE COURT: Prosecution?

MS. CEZIL: None for cause. Thank you.

THE COURT: Peremptory challenges from the defense?

MR. HOWARTH: Your Honor, we'd ask the Court to excuse with thanks the juror in Seat Number 12, Ms. Scherdt.

THE COURT: Okay. Is that all? Is that all, counsel?

MR. HOWARTH: Yes, Your Honor.

THE COURT: Peremptory challenges from the People?

MS. CEZIL: Thank you, Your Honor.

We'd like to thank and excuse the jurors seated in Seat Number Eight as well as Seat Number 11.

THE COURT: I believe Ms. Parton and Ms. -- is it Hargrove?

JUROR NUMBER EIGHT: Yes.

THE CLERK: Juror for Seat Number Eight, Elaine Reed.

Juror for Seat Number 11, Michael Robbins.

Juror for Seat Number 12, Lauren Romo.

THE COURT: Good afternoon, Ms. Reed. How are you, ma'am?

JUROR NUMBER EIGHT: I'm good. Thanks for having asking.

THE COURT: Pardon.

JUROR NUMBER EIGHT: Thanks for asking.

THE COURT: What community are you from?

JUROR NUMBER EIGHT: Detroit.

THE COURT: How are you employed, ma'am?

JUROR NUMBER EIGHT: Department of Corrections dental assistant.

THE COURT: Okay. Are you married?

JUROR NUMBER EIGHT: Yes.

THE COURT: And what does your spouse do?

JUROR NUMBER EIGHT: Correction officer.

THE COURT: Okay. Children?

JUROR NUMBER EIGHT: Two step-children.

THE COURT: Okay. How old are they?

JUROR NUMBER EIGHT: Twenty-eight and 30.

THE COURT: And your highest level of education?

JUROR NUMBER EIGHT: High school, two year college.

THE COURT: What did you study in college?

JUROR NUMBER EIGHT: Dental assistant.

THE COURT: All right. Thank you, ma'am.

Mr. Robbins, how are you, sir?

JUROR NUMBER ELEVEN: Good, Your Honor.

THE COURT: What community are you from?

JUROR NUMBER ELEVEN: Redford.

THE COURT: How are you employed?

JUROR NUMBER ELEVEN: Manager for Target.

THE COURT: Married?

JUROR NUMBER ELEVEN: Yes.

THE COURT: And what does your spouse do?

JUROR NUMBER ELEVEN: She also works for Target.

THE COURT: Children?

JUROR NUMBER ELEVEN: No children.

THE COURT: And your highest level of education?

JUROR NUMBER ELEVEN: College.

THE COURT: What are you studying?

JUROR NUMBER ELEVEN: Marketing and applied management.

THE COURT: Thank you, sir.

And, Ms. Romo, how are you, ma'am?

JUROR NUMBER TWELVE: Good. How are you?

THE COURT: Good. What community are you from?

JUROR NUMBER TWELVE: Trenton.

THE COURT: And how are you employed?

JUROR NUMBER TWELVE: I work for Henry Ford Health Systems.

THE COURT: What do you do there?

JUROR NUMBER TWELVE: I am a customer service representative.

THE COURT: Are you married?

JUROR NUMBER TWELVE: No.

THE COURT: Children?

JUROR NUMBER TWELVE: No.

THE COURT: And highest level of education?

JUROR NUMBER TWELVE: I have college.

THE COURT: Okay. What are you studying in college?

JUROR NUMBER TWELVE: I got a bachelor's in social science.

THE COURT: Thank you very much, ma'am.

So to Ms. Reed, Mr. Robbins, Ms. Romo, you heard the questions I heard your fellow jurors.

Would you have answered yes to any of them, starting with you, Ms. Reed?

JUROR NUMBER EIGHT: No.

THE COURT: What about law enforcement?

JUROR NUMBER EIGHT: No.

THE COURT: How about you, Mr. Robbins?

JUROR NUMBER ELEVEN: Victim of a crime.

THE COURT: Yourself or somebody you know?

JUROR NUMBER ELEVEN: My cousin.

THE COURT: Okay. And how long ago was it?

JUROR NUMBER ELEVEN: About nine years ago.

THE COURT: What kind of crime was it?

JUROR NUMBER ELEVEN: She was killed in a collision involving a drunk driver.

THE COURT: I'm sorry to hear that, sir.

Can you set that aside when you look at this case?

JUROR NUMBER TWELVE: I can.

THE COURT: Thank you, sir. Anything else?

JUROR NUMBER ELEVEN: No.

THE COURT: And how about you, Ms. Romo?

JUROR NUMBER TWELVE: I have an uncle who is a lawyer.

THE COURT: Okay. What kind of law does he practice?

JUROR NUMBER TWELVE: I'm not sure.

THE COURT: Okay. Would that have any bearing on your ability to be fair here?

JUROR NUMBER TWELVE: I don't think so.

THE COURT: Okay. Thank you, ma'am. Anything else, Ms. Romo?

JUROR NUMBER TWELVE: No.

THE COURT: So the three of you will be able to follow my instructions on the law?

THE PROSPECTIVE JURORS: Yes.

THE COURT: Keep a open mind until you've heard all the evidence?

THE PROSPECTIVE JURORS: Yes.

THE COURT: You will discuss the case with your fellow jurors?

THE PROSPECTIVE JURORS: Yes.

THE COURT: And listen to them as well?

THE PROSPECTIVE JURORS: Yes.

THE COURT: Would you all want someone like you to be on your jury?

THE PROSPECTIVE JURORS: Yes.

THE COURT: Challenges for cause from the People?

MS. CEZIL: None. Thank you, Your Honor.

THE COURT: From the defense?

MR. HOWARTH: No challenge for cause.

THE COURT: Peremptory challenges from the People?

MS. CEZIL: Just a moment, Your Honor. Thank

you.

We would like to thank and excuse juror seated in Seat Number Five. Thank you.

THE COURT: That will be Mr. Tabor.

THE CLERK: Tabor, yes.

THE COURT: Peremptory challenges from the defense?

MR. HOWARTH: Your Honor, we would ask the Court to excuse with thanks the juror in Seat Number Eight, Ms. Reed.

THE CLERK: Juror for Seat Number Five, Joey Richmond.

And juror for Seat Number Eight, Kurt Tolliver.

THE COURT: Good afternoon, Mr. Richmond. How are you, sir?

JUROR NUMBER FIVE: Good.

THE COURT: What community are you from?

JUROR NUMBER FIVE: Lincoln Park.

THE COURT: How are you employed, sir?

JUROR NUMBER FIVE: I am a supervisor at Home Depot.

THE COURT: Are you married?

JUROR NUMBER FIVE: No.

THE COURT: Children?

JUROR NUMBER FIVE: No.

THE COURT: Highest level of education?

JUROR NUMBER FIVE: High school.

THE COURT: Okay. Thank you, sir.

Mr. Tolliver, how are you, sir?

JUROR NUMBER EIGHT: Fine. Thank you.

THE COURT: What community are you from, sir?

JUROR NUMBER EIGHT: Allen Park.

THE COURT: How are you employed, sir?

JUROR NUMBER EIGHT: I work as electrical designer for a engineer group in Livonia.

THE COURT: Are you married?

JUROR NUMBER EIGHT: Yes.

THE COURT: What does your spouse do?

JUROR NUMBER EIGHT: She is a cashier for Atkinson Ford.

THE COURT: What is that?

JUROR NUMBER EIGHT: I got two step-children and two from my prior marriage.

THE COURT: Their age ranges?

JUROR NUMBER EIGHT: Twenty-three, 22, 19 and 16.

THE COURT: Thank you, sir.

And your highest level of education?

JUROR NUMBER EIGHT: Associate's degree in business.

THE COURT: Thank you very much.

Mr. Richmond and Tolliver, you heard the questions I asked your fellow jurors.

Would you have answered yes to any of them, starting first with you, Mr. Richmond?

JUROR NUMBER FIVE: No.

THE COURT: You, Mr. Tolliver?

JUROR NUMBER EIGHT: No.

THE COURT: Okay. So you can keep a open mind until you've heard all the evidence, gentlemen?

JUROR NUMBER EIGHT: Yes.

JUROR NUMBER ELEVEN: Yes, sir.

THE COURT: Follow my instructions on the law?

THE PROSPECTIVE JURORS: Yes, sir.

THE COURT: Discuss the case and listen to your follow jurors?

JUROR NUMBER FIVE: Yes, sir.

JUROR NUMBER EIGHT: Yes.

THE COURT: Will both of you want someone like you to serve on your jury?

JUROR NUMBER FIVE: Yes.

JUROR NUMBER EIGHT: Absolutely.

THE COURT: Challenges for cause from the defense?

MR. HOWARTH: No challenge for cause, Your

Honor.

THE COURT: The People?

MS. CEZIL: None. Thank you, Your Honor.

THE COURT: Peremptory challenges from the defense?

MR. HOWARTH: Got to take a side, Your Honor.

THE COURT: Okay.

MR. HOWARTH: Your Honor, we would ask that the Court excuse with thanks the juror in Seat Number Four, Ms. Leggett.

THE COURT: Peremptory challenges from the People?

MS. CEZIL: Thank you, Your Honor.

We would like to thank and excuse the juror seated in Seat Number Six.

THE COURT: Ms. Caldwell.

THE CLERK: Juror for Seat Number Four, James last T-o-l-z-d-o-r-f.

JUROR NUMBER FOUR: Tolzdorf.

THE CLERK: I'm sorry. One more time.

JUROR NUMBER FOUR: Tolzdorf.

THE CLERK: Tolzdorf.

JUROR NUMBER FOUR: Four?

THE CLERK: Yes.

Juror for Seat Number Six, David is it Dowhan,

D-o-w-h-a-n.

JUROR NUMBER SIX: Yes.

THE CLERK: Thank you.

THE COURT: Good afternoon, Mr. Tolzdorf. How are you, sir?

JUROR NUMBER FOUR: Good, thank you.

THE COURT: What community are you from, sir?

JUROR NUMBER FOUR: Dearborn.

THE COURT: How are you employed?

JUROR NUMBER FOUR: I am a manager for a electrical distributor.

THE COURT: Are you married?

JUROR NUMBER FOUR: Yes.

THE COURT: And what does your spouse do?

JUROR NUMBER FOUR: He is an estimator for an electrical distributor.

THE COURT: Children?

JUROR NUMBER FOUR: Two.

THE COURT: How old are they?

JUROR NUMBER FOUR: Twenty-nine and 33.

THE COURT: And your highest level of education?

JUROR NUMBER FOUR: Trade school Henry Ford Community College.

THE COURT: Okay. Thank you, sir.

Mr. Dowhan.

JUROR NUMBER SIX: Dowhan.

THE COURT: Dowhan?

JUROR NUMBER SIX: Yes.

THE COURT: I'm sorry. I said that wrong. How do you spell that, Mr. Dowhan?

JUROR NUMBER SIX: D-o-w-h-a-n.

THE COURT: Okay. That's why I had it wrong. What community are you from, sir.

JUROR NUMBER SIX: Grosse Ile.

THE COURT: How are you employed?

JUROR NUMBER SIX: I work for CMS Energy.

THE COURT: What do you do there?

JUROR NUMBER SIX: I'm a new business developer.

THE COURT: Are you married, sir?

JUROR NUMBER SIX: Yes, I am.

THE COURT: And what does your spouse do?

JUROR NUMBER SIX: She is controller for Ford.

THE COURT: Okay. Children?

JUROR NUMBER SIX: Children. Two daughters, 32 and 30, and one stepdaughter 22.

THE COURT: And your highest level of education?

JUROR NUMBER SIX: MBA.

THE COURT: Okay. Thank you, sir. Mr. Dowhan and Mr. Tolzdorf, you heard the questions I asked your fellow jurors.

Would you have answered yes to any of them?

JUROR NUMBER SIX: Yes.

JUROR NUMBER FOUR: Yes.

THE COURT: First start with Mr. Tolzdorf.

JUROR NUMBER FOUR: The only one I have yes to is I was a victim of a violent crime 15 years ago. It was a armed robbery in my business where I'm still employed at.

THE COURT: Okay.

JUROR NUMBER FOUR: The person was not prosecuted cause I could not honestly identify them --

THE COURT: Okay.

JUROR NUMBER FOUR: -- in a lineup, so the case was never solved.

THE COURT: Okay. I'm sorry to hear that. I am a sure you still remember it as if it was yesterday.

The question is can you be fair in this case? Can you set that aside and judge this case?

JUROR NUMBER FOUR: Yes.

THE COURT: Thank you, sir. Appreciate that.

Anything else, Mr. Tolzdorf?

JUROR NUMBER FOUR: Nope. That's about it.

THE COURT: Okay.

And how about you, Mr. Dowhan? What would you have answered yes to?

JUROR NUMBER SIX: My daughter's an attorney.

THE COURT: Okay. What kind of attorney is she?

JUROR NUMBER SIX: She works for Circuit Court judge down in Florida.

THE COURT: Okay.

JUROR NUMBER SIX: And my former wife was an attorney.

THE COURT: Okay. What kind of law does she practice?

JUROR NUMBER SIX: Well she worked for the Corp of Engineers, so it was business law.

THE COURT: Okay. So on that legal front, can you set that aside when you look at this case?

JUROR NUMBER SIX: Yes.

THE COURT: Anything else, sir?

JUROR NUMBER SIX: Yes. Let's see. I've got a couple goods friends Detroit cops.

THE COURT: Okay.

JUROR NUMBER SIX: And --

THE COURT: Do you discuss their job with them?

JUROR NUMBER SIX: Well they're retired now and, no, I don't really.

THE COURT: Okay. Would you be able to judge the testimony of a police officer, given your friendship, the same way you would anyone else someone who testify?

JUROR NUMBER SIX: Yes.

THE COURT: Thank you, sir. Anything else?

JUROR NUMBER SIX: I served in a couple of criminal trials before.

THE COURT: Okay. How long ago was that?

JUROR NUMBER SIX: Let me see. One was about two or three years ago.

THE COURT: Okay.

JUROR NUMBER SIX: And the other was maybe ten or so.

THE COURT: And both of those cases, did you reach a verdict?

JUROR NUMBER SIX: Yes, we did.

THE COURT: Can you set those cases aside when you examine this case?

JUROR NUMBER SIX: Yes.

THE COURT: If you were picked.

Okay. Thank you.

Anything else, sir?

JUROR NUMBER SIX: I can't think of anything.

THE COURT: Thank you very much, Mr. Dowhan.

So you both can keep a open mind until you've heard all of the evidence?

JUROR NUMBER SIX: Yes.

JUROR NUMBER FOUR: Yes.

THE COURT: Follow my instructions on the law?

JUROR NUMBER SIX: Yes.

THE COURT: Okay. And would you want someone like you to serve as a juror?

JUROR NUMBER SIX: Yes.

JUROR NUMBER FOUR: Yes.

THE COURT: Challenge for cause from the People?

MS. CEZIL: None. Thank you, Your Honor.

THE COURT: From the defense?

MR. HOWARTH: No, Your Honor.

THE COURT: Peremptory challenges from the People?

MS. CEZIL: None at this time. Thank you.

THE COURT: Peremptory challenges from the defense?

MR. HOWARTH: Your Honor, we would ask the Court to excuse with thanks juror in Seat Number Two, Mr. Johnson.

THE CLERK: Counsel, is that it for now?

MR. HOWARTH: Yes, ma'am. I'm sorry.

THE CLERK: Juror for Seat Number Two.

THE COURT: I was gonna say to Mr. Howarth you've excused five, you have seven left.

MR. HOWARTH: Thank you, Your Honor.

THE CLERK: Juror for Seat Number Two,

Christopher Hutchinson.

THE COURT: Mr. Hutchinson, how are you, sir?

JUROR NUMBER TWO: Very good.

THE COURT: What community are you from?

JUROR NUMBER TWO: Plymouth.

THE COURT: How are you employed?

JUROR NUMBER TWO: I am a physician at Beaumont Hospital.

THE COURT: What kind of physician? What do you practice?

JUROR NUMBER TWO: Emergency medicine.

THE COURT: So you've seen a lot.

Are you married, sir?

JUROR NUMBER TWO: Yes.

THE COURT: What does your spouse do?

JUROR NUMBER TWO: She is a photographer.

THE COURT: Okay. Children?

JUROR NUMBER TWO: Yes.

THE COURT: How many?

JUROR NUMBER TWO: Three; 16, 14 and 13.

THE COURT: Okay. And your highest level of education, sir?

JUROR NUMBER TWO: Doctorate in medicine.

THE COURT: Okay. You heard the questions I asked of your follow jurors.

Would you have answered yes to any of those?

JUROR NUMBER TWO: Yes, sir.

THE COURT: Which ones?

JUROR NUMBER TWO: My brother's a detective in Texas but that doesn't impact me.

THE COURT: So you can judge the testimony of police officers the same way you would anyone else?

JUROR NUMBER TWO: Yes.

THE COURT: Okay.

JUROR NUMBER TWO: I know several attorneys that I've got kids go to school with and again that doesn't impact me.

THE COURT: Thank you, sir. Anything else?

JUROR NUMBER TWO: I had a uncle that served a number of years for stealing a car.

THE COURT: Okay.

JUROR NUMBER TWO: That doesn't influence me.

THE COURT: Okay.

JUROR NUMBER TWO: I think that's it.

THE COURT: Okay. No victim of a crime?

JUROR NUMBER TWO: No.

THE COURT: Okay. All right. You can be fair?

JUROR NUMBER TWO: You know what I have to --

THE COURT: Okay.

JUROR NUMBER TWO: Can I approach?

THE COURT: Yes, sir.

(Discussion had at the bench between the Court and counsel.)

THE COURT: Okay. Dr. Hutchinson is excused.

THE CLERK: Juror for Seat Number Two, Carl Allison.

THE COURT: It's not that bad, Mr. Allison. It will be all right.

How are you, sir?

JUROR NUMBER TWO: I'm doing fine. Thank you.

THE COURT: What community are you from?

JUROR NUMBER TWO: Pardon? Detroit. West side Detroit.

THE COURT: And how are you employed?

JUROR NUMBER TWO: I'm unemployed at this time, sir.

THE COURT: When you last were employed, what did you do?

JUROR NUMBER TWO: I was a store manager at McDonald's.

THE COURT: Are you married?

JUROR NUMBER TWO: No.

THE COURT: Children?

JUROR NUMBER TWO: Two.

THE COURT: How old?

JUROR NUMBER TWO: Forty-one and 25.

THE COURT: And were you ever married before?

JUROR NUMBER TWO: Yes.

THE COURT: What did your prior spouse do?

JUROR NUMBER TWO: Oh, she is a nurse.

THE COURT: Okay. And what is your highest level of education, sir?

JUROR NUMBER TWO: Two and a half years of college.

THE COURT: Okay. What did you study?

JUROR NUMBER TWO: Business.

THE COURT: Okay. You heard the questions I asked your fellow jurors?

JUROR NUMBER TWO: Yes.

THE COURT: Would you have answered yes to any of those?

JUROR NUMBER TWO: Yes.

THE COURT: Which ones?

JUROR NUMBER TWO: While my family in the house, we was broke in. Armed robbery with my father and my grandmother was tied up, duct tape.

THE COURT: Were you there when this happened?

JUROR NUMBER TWO: I was there. I was on the third floor sleep. They never accounted for me.

THE COURT: Okay. How long ago was that, sir?

JUROR NUMBER TWO: That was about ten years ago.

THE COURT: Okay. Was anybody injured or anything?

JUROR NUMBER TWO: Yeah, they beat my father half to death with a gun, you know. My grandma was 99 at the time. And his girlfriend, she was tied up, duct tape.

I was in the house. It happen they didn't account for me. I was scared. I would have startled them if I came downstairs.

THE COURT: I am sure that it was traumatic and still is.

JUROR NUMBER TWO: Yes.

THE COURT: I have to ask the question.

JUROR NUMBER TWO: Yes, go ahead.

THE COURT: Can you set it aside when you look at this case?

JUROR NUMBER TWO: I think I can.

THE COURT: Is it a situation you can set aside?

JUROR NUMBER TWO: Pardon?

THE COURT: Is it a situation you cannot set aside?

JUROR NUMBER TWO: I don't know for surely. I don't know for sure.

I have another situation whereas my neighbor -- I think it was 2005, 2006. We was in the kitchen, living

room playing, about to eat and he was coming home from the bank and we saw him -- I looked up, we saw him getting robbed.

THE COURT: Saw your neighbor getting robbed?

JUROR NUMBER TWO: Yeah. I was taking care of him, too. He was about 90 something years old.

And they had a gun, took the gun and knocked his pocket off, you know -- hands off his pockets coming from the bank. And they robbed him and then I had to come-- we had to be a eyewitness for the court. That was about 2005, 2006 something like that.

THE COURT: Okay. So that's the same question.

Can you set that aside when you look at this case?

JUROR NUMBER TWO: I don't know.

THE COURT: You don't know?

JUROR NUMBER TWO: I don't know. It's kind of, you know, the details kind of -- the stuff was kind of, you know, the charge was kind of similar. I don't know.

THE COURT: That's fair.

All right. The Court's gonna excuse you, sir.

JUROR NUMBER TWO: Excuse me? Thanks.

THE CLERK: Juror for Seat Number Two, Rosanne Wallace.

THE COURT: Good afternoon, Ms. Wallace. How

are you, ma'am?

JUROR NUMBER TWO: Fine. How are you?

THE COURT: I'm doing fine.

What community are you from?

JUROR NUMBER TWO: Inkster.

THE COURT: And how are you employed?

JUROR NUMBER TWO: I'm retired.

THE COURT: What did you retire from?

JUROR NUMBER TWO: Wayne County DPW.

THE COURT: Okay. Are you married now?

JUROR NUMBER TWO: I'm a widow.

THE COURT: Okay. Your spouse, what did he do? Sorry.

JUROR NUMBER TWO: He was a truck driver.

THE COURT: Okay. Any children?

JUROR NUMBER TWO: Yes.

THE COURT: How many?

JUROR NUMBER TWO: Three.

THE COURT: And their age ranges?

JUROR NUMBER TWO: Forty-seven, 42 and 36.

THE COURT: And what's your highest level of education, ma'am?

JUROR NUMBER TWO: High school.

THE COURT: Thank you very much.

You heard the questions I asked your fellow

jurors.

Would you have answered yes to any of them regarding prior jury service, victim of a crime, law enforcement?

Yes, ma'am.

JUROR NUMBER TWO: I was on a jury, but when we got into the jury room the guy said he was guilty.

THE COURT: Okay. So would you -- can you set that aside when you look at this case?

JUROR NUMBER TWO: Yes.

THE COURT: Okay. Anything else you would have answered yes to?

JUROR NUMBER TWO: Say that again.

THE COURT: Any of the other questions you would have answered yes to?

JUROR NUMBER TWO: I know a lot of people that's been -- that have been in crimes. I mean, you know.

THE COURT: Victim of a crime or committed?

JUROR NUMBER TWO: The victim of a crime and committed crimes, too.

THE COURT: Both of those, okay.

A lot means -- you said a lot. You mean more than ten?

JUROR NUMBER TWO: No.

THE COURT: Less than five?

JUROR NUMBER TWO: About five.

THE COURT: Are these family members or friends?

JUROR NUMBER TWO: Family members.

THE COURT: Let's deal with the victims first. What kind of crimes were they?

JUROR NUMBER TWO: They were things like robbery and a couple of 'em got their cars stolen.

THE COURT: Okay.

JUROR NUMBER TWO: My house has been broken into before, too.

THE COURT: Given all that victimization of your friends, family and even yourself, can you set that aside when you look at this case?

JUROR NUMBER TWO: I'm not absolutely sure.

THE COURT: Okay. What about the people that you know that have been charged or convicted of a crime?

You have never been charged or convicted of anything, have you?

JUROR NUMBER TWO: No.

THE COURT: What about -- you said you know some people who have?

JUROR NUMBER TWO: Yes.

THE COURT: Are these family members or friends?

JUROR NUMBER TWO: Friends.

THE COURT: Okay. And what kind of things have

they been charged, convicted of?

JUROR NUMBER TWO: Car theft and things of that nature.

THE COURT: So the same type of things?

JUROR NUMBER TWO: Yes.

THE COURT: Okay. Can you set that aside when you look at this case?

JUROR NUMBER TWO: I think so.

THE COURT: Okay. Do you think you're a fair person?

JUROR NUMBER TWO: Yes.

THE COURT: Open minded?

JUROR NUMBER TWO: Yes.

THE COURT: Would you prejudge something? Would you wait until you heard everything?

JUROR NUMBER TWO: I would try my best to hear it all.

THE COURT: And you're the kind of person who would listen to other people's opinions?

JUROR NUMBER TWO: Sometime.

THE COURT: All right. Would you -- do you have a problem giving your own opinion?

JUROR NUMBER TWO: No.

THE COURT: I didn't think so.

Would you want someone like you to serve on a

jury?

JUROR NUMBER TWO: Yes.

THE COURT: All right. Challenges for cause from the defense?

MR. HOWARTH: No challenges, Your Honor.

THE COURT: From the People?

MS. CEZIL: No. Thank you.

THE COURT: Peremptory challenges from the defense?

MR. HOWARTH: Your Honor, we ask the Court to excuse with thanks juror in Seat Number Four, Mr. Tolzdorf.

THE COURT: Peremptory challenges from the People?

MS. CEZIL: None. Thank you.

THE CLERK: Juror for Seat Number Four, Cynthia Sherer-Henrion.

JUROR NUMBER FOUR: It's Henrion.

THE COURT: How do you say it again?

JUROR NUMBER FOUR: Henrion.

THE CLERK: I'm sorry. Thank you.

THE COURT: How do you spell that?

JUROR NUMBER FOUR: It's Henrion, Sherer-Henrion.

THE COURT: Oh, hyphenated. I'm sorry.

THE COURT: Ms. Sherer-Henrion, how are you?
JUROR NUMBER FOUR: I'm well, thank you.
THE COURT: What community are you from?
JUROR NUMBER FOUR: Melvindale.
THE COURT: How are you employed?
JUROR NUMBER FOUR: Southgate Community Schools.
THE COURT: What do you do there?
JUROR NUMBER FOUR: I'm a secretary at the alternative high school.
THE COURT: Are you married?
JUROR NUMBER FOUR: Yes.
THE COURT: And what does your spouse do?
JUROR NUMBER FOUR: He's retired from Chrysler.
THE COURT: Okay. Children?
JUROR NUMBER FOUR: Four.
THE COURT: Age ranges?
JUROR NUMBER FOUR: Thirty-nine to 25.
THE COURT: And your highest level of education?
JUROR NUMBER FOUR: Associate's.
THE COURT: Okay. In what area? What area is the associate's?
JUROR NUMBER FOUR: It was liberal arts.
THE COURT: You heard the questions I asked your fellow jurors?
JUROR NUMBER FOUR: Uh-huh.

THE COURT: Would you have answered yes to any of those?

JUROR NUMBER FOUR: No.

THE COURT: Could you keep a open mind until you've heard all the evidence?

JUROR NUMBER FOUR: (No verbal response.)

THE COURT: That's a yes?

JUROR NUMBER FOUR: Yes.

THE COURT: Follow my instructions on the law?

JUROR NUMBER FOUR: Yes.

THE COURT: Discuss the case with your fellow jurors and listen to them?

JUROR NUMBER FOUR: Yes.

THE COURT: Would you want someone like you to serve on your jury?

JUROR NUMBER FOUR: Yes.

THE COURT: Challenge for cause from the People?

MS. CEZIL: None. Thank you.

THE COURT: From the defense?

MR. HOWARTH: No, Your Honor.

THE COURT: Peremptory challenges from the People?

MS. CEZIL: None. Thank you, Your Honor.

THE COURT: Peremptory challenges from the defense?

MR. HOWARTH: We're satisfied, Your Honor.

THE COURT: Okay. We have a jury panel.

Those of you in the audience, thank you very much. I'm pretty sure that since you've been here all day that they are not going to put you on another case this late. So have a safe trip home and we thank you for your patience.

(The remaining prospective jurors were excused at 2:42 P.M.)

THE COURT: Ladies and gentlemen, I'm going to give you some instructions now, give you a short break and then we're gonna come back and hear opening statements. I don't know if we're going get anything beyond that today. We'll see when I talk to the attorneys.

But the instructions I give you now are gonna take about eight, nine minutes. I'm gonna give you about a ten-minute break. You can put your stuff in the jury room or your coats and we'll come back out and we'll begin with the openings. Again, we thank you very much for your patience.

Ladies and gentlemen of the jury, you have been chosen to decide a criminal charge made by the State of Michigan against one of your fellow citizens. I'll now ask you all if you will all please stand and swear to perform your duty to try the case justly and to reach a

true and just verdict.

THE CLERK: If everyone can raise your right hand, please.

Do you solemnly swear or affirm to deliberate this case according to the evidence and the laws by the State of Michigan?

THE JURORS: Yes.

THE CLERK: Thank you. You all may be seated.

THE COURT: Ladies and gentlemen, you can see we have chosen a jury of 14. After you have heard all of my instructions, we will draw from a lot. Basically you will be in a pool. Two of you will be excused as an alternate once the instructions have been read at the end of the case.

I have said this to you before, I am going to say it a lot of times. You are not to discuss the case with anyone, including your family and friends. You must not even discuss it with the other jurors until the time comes for you to decide the case. When it is time for you to decide the case, I'm going to send you to the jury room here and you will discuss the case among yourselves, but only in the jury room and only when all 12 jurors are present.

There are two bathrooms, man -- male and female. If someone goes to the bathroom, you have to stop your

discussions until they return.

When the trial is over you may, if you wish, discuss the case with anyone. When I call for a recess during the trial, I'm going to either send you to the jury room or allow you to leave the courtroom on your own and conduct your own business. But, again, you must not discuss the case with anyone or let anyone attempt to discuss it with you or in your presence. If someone tries to do that, tell him or her to step and explain that as a juror you are not allowed to discuss the case. If he or she continues, please leave and report the incident to me as soon as possible.

It's called jury tampering. That's a felony. Very serious offense and we need to know about it right away.

You must not talk to the defendant, the lawyers or the witnesses about anything at all, even if it has nothing to do with the case. And the reason for that is just the appearance of that, we'd have to have a hearing and all that. You don't want to get involved in all that. So to be on the safe side, we ask that you don't talk to anybody involved with the case. It's very important that you have only get information about this case in court, when you are acting as a jury and when the defendant and the lawyers and I are all here.

Sometimes the lawyers and I will have discussions outside of your presence. You've already seen that. Also, while you are in the jury room I may have to take care of other matters that have nothing to do with this case. Please pay no attention to those interruptions.

During the trial, do not read, listen to or watch any news reports about the case. Not sure if there will be, but that could happen. Under the law, the evidence you consider to decide the case must meet certain standards. For example, witnesses must swear to tell the truth and the lawyers must be able to cross-examine them. Because news reports do not meet these standards, they could give you incorrect or misleading information that might unfairly favor one side or the other. So to be fair to both sides, please follow these instructions. That includes the internet as well.

Also, don't try to go to the scene of the alleged crime. If it was necessary to do that -- and in the over ten years I have been here, I have only had to do that one time and I don't think that's gonna be appropriate here. So but the main thing is don't try to do anything independent of what happens in court, including making any experimentations or things of that nature.

I will now explain to you some of the legal principles you will need to know and the procedure we will follow in the trial. My responsibilities as a judge in this trial are to make sure that the trial is run fairly and efficiently, to make decisions about the evidence and to instruct you about the law that applies to this case. You must take the law as I give it to you. Nothing I say is meant to reflect my own opinions about the case or the facts of the case. As jurors, you are the ones who will decide the facts.

Your responsibility as the jury is to decide what the facts of the case are. This is your job and nobody else's. You must think about all the evidence and all the testimony and then decide what each piece of evidence means and how important you think it is. This includes how much you believe what each of the witnesses said. What you decide about any fact in the case is final.

Now during the trial the lawyers may object -- I expect -- we have very good lawyers on both sides of this case, but there will be some objections to questions or statements made by the witnesses. I will rules on these objections according to the law. My rulings for or against one side or the other are not meant to reflect my own personal opinion about the case.

I'm kind of like a umpire in a baseball game calling balls and strikes. The umpire doesn't have a stake in the game and neither do I. I'm just here to make sure that both sides get a fair trial. So just because I might rule for one side doesn't mean that I think that that side should win. That's the reason for that instruction.

I may ask some of the witnesses questions myself. These questions are meant to reflect -- are not meant to reflect my own opinion about the case. If I ask a question, my only reason would be to ask about things that I think should be more fully explored.

There has been a few changes in the law that allows jurors to ask questions. I am going to let you do that in this case. But if you ask a question, don't just jump up -- don't say anything is what I'm saying. Write it down on a piece of paper. And when you come back from the break, you are going to have a note pad, a pencil or pen on your seat and that will be there for you to take notes. I'm going to get to that in a moment, but it will also be there for you to -- if you have a question, write it down, I will have the attorneys come up and the question has to meet certain evidentiary standards. If it meets that standard, I'll ask it. If not, after the trial is over I'll tell you why we couldn't ask that question.

But you will be allowed to ask questions if they are appropriate. The thing that you should know about the questions that are asked, whether they come from me, the lawyers or yourself, the questions that are asked are not evidence. Only the witnesses' answer is evidence. You should not think that something is true because the lawyer or I ask a question that may suggest or assume that it is.

You may have heard this term called circumstantial evidence. Before I get into what that is, facts can be proved by direct evidence from a witness or an exhibit. Direct evidence is evidence that we actually see or hear. For example, if you look outside and see rain falling, that would be direct evidence that it is -- it's actually raining.

Facts can also be proved by indirect or what we call circumstantial evidence. Circumstantial evidence is evidence that normally or reasonably leads to other facts. So, for example, if we look -- someone comes from outside and they are wearing a raincoat and they are dripping water and have a very wet umbrella, that would be circumstantial evidence that it's raining. You may consider circumstantial evidence. Circumstantial evidence can be used to prove the elements of a crime. Circumstantial evidence and a combination of direct evidence can be used to prove the elements of a crime. In

other words, you should consider all the evidence that you believe.

I may give you more instructions during the trial, but at the end of the trial I will give you detailed written instructions you will be able to take in the jury room about the law that applies to this case. You should take all my instructions together as the series of the law that you are to follow.

The trial will follow this procedure. First, the prosecutor will make an opening statement where they will give you their legal theories about the case. The defendant's lawyer does not have to make a opening statement, but he may make a opening statement after the prosecutor makes theirs or he may wait until later. These statements are not evidence. They are only meant to help you understand how each side views the case.

Next, after that, the prosecutor will present their witnesses or their evidence. Prosecutor will call witnesses to testify and may show you exhibits like documents or objects. The defendant's lawyer has the right to cross-examine the prosecutor's witnesses.

After the prosecutor has presented all their evidence, the defense may also offer evidence but they do not have to do that. By law, the defendant does not have to prove his innocence or produce any evidence. If the

defense does call any witnesses, the prosecutor has the right to cross-examine them. The prosecutor may also call witnesses to contradict the testimony of defense witnesses.

After all the evidence has been presented, the prosecutor and defense lawyer will make their closing arguments. Like the opening statements, these are not evidence. They are only meant to help you understand the evidence and the way each side views the evidence. You must base your verdict only on the evidence.

When it is time for you to decide the case, you are only allowed to consider the evidence that was admitted in the case. Evidence includes the sworn testimony of witnesses who will take that stand, the exhibits that I admit into evidence and anything else I tell you to consider as evidence.

And probably the most important thing is in terms of the case is what you will be doing is judging the credibility and the weight of evidence. As I told you before, it is your job to decide what the facts of the case are. You must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a witness says. You are free to believe all, none or any parts of a person's testimony.

In deciding which testimony you believe, you should rely on your own common sense and everyday experience. However, in deciding whether you believe a witness's testimony you must set aside any bias or prejudice you may have based upon that person's race, gender or natural origin. There are no set fixed rules for how you judge a person's testimony, but it may help you to think about these questions: Was the witness able to see or hear clearly? How long was the witness watching or listening? Was anything else going on that may have distracted the witness? Does the witness seem to have a good memory? How does the witness look and act while testifying? Does the witness seem to be making a honest effort to tell the truth, or does the witness seem to evade the questions or argue with the lawyers? Does the witness's age or maturity affect how you judge his or her testimony? Does the witness have any bias or prejudice or personal interest in how the case is decided? Have there been any promises, threats, or other personal influences that may reflect how the person testified? In general, does the witness have any special reason to lie or any special reason to tell the truth? All in all, how reasonable does the witness's testimony seem when you think about all of the other evidence in the case?

Again, it's important for you to keep a open

mind and not make a decision about anything in the case until you go to the jury room to decide it.

After all of the evidence has been presented and the lawyers have given their arguments, I will give you detailed written instructions about the law that applies to this case, then you will go to the jury room to decide on your verdict. A verdict must be unanimous. That means that every juror must agree on it and it must reflect the individual decision of each juror.

As I told you before, I am gonna allow you to take notes in this case but I always say this. Don't get so caught up into taking notes and writing everything a person says down. That's not what you're here to do. Those notes are just for you to maybe if you think something is important so that you remember it for later. It's more important that you actually pay attention to the witnesses as they testify.

You should know that the notes stay here. I keep them locked in my office. So after you leave every time, just leave them on the seats. We'll collect them, when you come back they'll be back on the seats.

With that, we're gonna take a brief recess. We will be back for the opening statements. You can retire to the jury room. You can hang your coats in there until we leave which will probably be in about -- it will be

4:00 at the latest or it will be less than that.

(The jury was excused to the jury room at 2:56 P.M.)

THE COURT: Anything else needs to go on the record for now?

MS. CEZIL: I don't know if we need to go on the record necessarily, but for timing purposes --

THE COURT: Yes.

MS. CEZIL: If we are going to go into opening today, we have our complainants on call. If we should -- or are we gonna start testimony today?

THE COURT: Were they going to be the first witnesses you call?

MR. ELIZONDO: Yeah.

THE COURT: Okay. Well we won't finish, so we might as well start in the morning. I'd rather get to opening and we'll start with testimony in the morning.

Does that meet your --

MR. HOWARTH: That's absolutely fine, Your Honor.

The only thing I'm sorry that I got hung up out in the hallway while Mr. Golson was here.

THE COURT: That's fine.

MR. HOWARTH: The defense does want Mr. Golson as a witness.

THE COURT: You do?

MR. HOWARTH: Yes.

MR. ELIZONDO: We're gonna present him.

MR. HOWARTH: That's fine.

MR. ELIZONDO: We'll present him. We're gonna put him in our case-in-chief. He can interview him before he testifies.

MR. HOWARTH: No problem.

THE COURT: Okay. In terms of start time tomorrow.

MR. ELIZONDO: I'm sorry.

THE COURT: Start time tomorrow.

MR. ELIZONDO: Starting? I'm sorry.

THE COURT: Start time tomorrow. Cause I am going to get right in --

MR. ELIZONDO: 9:00 is fine with me. It's up to you, judge.

MR. HOWARTH: That's fine.

THE COURT: I want to say 9:15. I just don't know how the jurors are gonna get in the front door.

Is that going to be a problem?

MR. ELIZONDO: It's always a line.

THE COURT: Why don't we say 9:15.

MR. ELIZONDO: All right.

Judge, the only other thing I have reviewed the

Information. And as to Count Eight, the possession by a felon, as I read this, this -- and it lists the crimes that allegedly he was convicted.

THE COURT: They don't get the Information.

MR. ELIZONDO: I understand that.

THE COURT: I didn't read what the formal crime was so I just said --

MR. ELIZONDO: Well these are all incorrect, you know. So I think what I'd like to make a motion right now to amend the Information to -- it should just be unarmed robbery as opposed to all those things that are listed in there.

THE COURT: Any objection?

MR. HOWARTH: I don't think that Mr. Elizondo means unarmed robbery.

THE COURT: No. What he means is he's amending the Information to reflect that. That's what he is moving to do.

MR. HOWARTH: Oh, the past conviction.

THE COURT: Past conviction.

MR. HOWARTH: No problem with that, Your Honor.

THE COURT: But for purposes of the jury instruction, it will just say unspecified felony. Typically the -- and maybe like on Wednesday or Thursday morning, my prosecutor, my courtroom prosecutor, prepares

a set of instructions to give to the defense. If the defense have any objection or have anything they want to add to that, we will meet and discuss that so we can be orderly about that, and along with the verdict form.

So if you want to get the standard ones, I'm sure other than maybe the CSC, Ms. Graham has all of those that she could probably give you a copy of.

Anything else?

MR. ELIZONDO: Nothing from us.

THE COURT: How long are you going to need for opening?

MR. ELIZONDO: It's hard for me to say. I mean there is a lot here. I was kind of hoping we would do this tomorrow morning first thing.

THE COURT: No.

MR. ELIZONDO: Well I'm thinking about 30 minutes probably.

THE COURT: So we won't be able to get to the witness anyway.

How about you, counsel?

MR. HOWARTH: I won't be 30 minutes.

THE COURT: Thirty minutes might be kind of long. I could see closing, but opening? I'm not going to hold you to that, but you could do it in under 30. I mean what is -- well I have to hear. It's going to be -- well

I don't want to --

MR. ELIZONDO: It could be -- you know, I don't know, judge. You know, I'm a lawyer. I tell you ten minutes, it will be 30.

THE COURT: That's scary.

MR. ELIZONDO: You know.

THE COURT: Don't you remember that in law school application when it said brevity is the soul of whit? After about 20 minutes, that's when they start falling off, you know.

MR. ELIZONDO: I know.

THE COURT: Okay. If that's the case, then I want to start in about five minutes just so we have enough time. I don't want to go over 4:00.

MR. HOWARTH: That's fine.

(Off the record.)

THE COURT: Ready, counsel?

(The jury entered the courtroom at 3:08 P.M.)

THE COURT: People ready to proceed?

MR. ELIZONDO: We are, judge.

THE COURT: You may do so.

MR. ELIZONDO: Thank you.

Ladies and gentlemen, back on New Year's Eve of last year, December 31, 2012, Mr. Stone and Ms. James, a couple, been married -- well they've been together for

41 years. They've got three children, three grown children.

Ms. James and Mr. Stone decide that they wanna go down to one of the casinos because it's New Year's Eve. They want to get some noisemakers and some hats that they know they give away at the casino. Wanted to get that for their grandchildren. So they go out early in the evening, drive down to the casino to pick up those things. And, in fact, they go down. They get to the casino, they get their things and they start driving back home.

Now you're gonna hear that they had just purchased a truck. It was a used truck, but they had just got it and really didn't know it well. On the way home, there is some problem with the steering. You're gonna hear that Mr. Stone was driving and when he got the steering problem he thought he better -- he was cruising down Gratiot -- he probably should get off the main road. It's winter. There is snow. There is ice. It's cold.

Pulls off onto a side road. You're gonna hear that when he pulls off down that road that he has a real problem with the steering. Pulls to a stop, gets out and looks and his tires are flat.

You're gonna hear that after that that the car or the truck actually had been stalled like right in the middle of the street. Mr. Stone wanted to see if he could

get it over to the side, so you're gonna hear about how he struggles to try to push the vehicle over to the side, all the while Ms. James remaining in the car, in the vehicle.

You're gonna hear that while this is going on, Mr. Stone is approached by a young man and that the young man offers to help. You're gonna hear Mr. Stone is engaged with that young man. He's talking to him. He's right up with him. And that they have an exchange for probably about 20 minutes where they're talking back and forth, where they're working together trying to move the truck.

You're gonna hear that after a while they weren't able to move this and that the young man takes off. All the while, Mrs. James is still in her truck. Ms. James has got the cell phone. She's trying to get ahold of one of her sons to see if they can come out to help 'em out.

You're gonna hear that the young man who was out assisting Mr. Stone returns a short while later. And you're gonna hear that they're outside the truck once again right up in each other -- right next to each other, talking, discussing, trying to figure out how to move this truck.

Mrs. James is able to reach one of her sons on the phone and unable to give him directions on how to get

there because she really doesn't know where they're at, so he hands the phone to her husband who tries to give directions. And eventually the phone goes to that young man who is standing outside. And that young man speaks to one of the sons of the couple and does give them directions or tells him where the cross streets are and where this truck is.

Short while later, gives the phone back. And as he and Mr. Stone are out there talking, decides at some point to tell Mr. Stone that he's carrying a gun. You're gonna hear that Mr. Stone talks to him and tries to give him some fatherly advice. He is gonna tell him, look, you know, it's the way you're dressed tonight and you're a young man, carrying a gun like that's nothing but trouble.

You're gonna hear that it was nothing but trouble. Because a little while right after that, Mr. Stone's gonna tell you the young man looks and says, sir, I'm gonna have to rob you, pulls the gun and puts it into his stomach.

You're gonna hear that they're on the outside of the truck while this is going on. You're gonna hear Mrs. James is in the truck in the passenger side. You're gonna hear that while Mr. Stone has that gun pressed against him that he is ordered to tell Mrs. James to take some rings off her fingers. You're gonna hear that Ms.

James complies.

You're gonna hear the rings were really just kind of Dollar Store rings. They really weren't worth a lot. But she complies, takes 'em off, gives them, hands them out to her husband who then hands that off to that young man.

You're gonna hear at that point they still are face-to-face out there with the gun in his chest. And at that time, the person, that young man, looks in and says I want that necklace that she's got on and which Ms. James takes her necklace off and hands it out.

At that point, the request is I want money. You're gonna hear that Ms. James did have some money on her person. She had some money, a few hundred that she had stuffed in her bra. And that she pulled it out of her bra, handed it to her husband on the outside and he then hands it to the young man.

Once again, while this all was going on the young man that is out there with the gun and Mr. Stone are right next to each other face-to-face. You're gonna hear that at that point this couple is hoping it's over. He's got the money. He's got the jewelry. Maybe he'll just let us go. Oh, no. Oh, no.

This young man looks at Mr. Stone and says I'm gonna fuck your wife. Makes Mr. Stone get into the car.

Goes over to the passenger side. Makes Ms. James lay back, her head on her husband's lap with the gun at her chest, all the time with this person saying I'm gonna kill you, I'm gonna shoot you if you move. All this time Mr. Stone is forced to have his hands on the steering wheel, cannot do a thing while his wife's head is on his lap, while that young man forces Ms. James to pull her boot off, pull her pants down.

You're gonna hear her tell you how at that point she is in fear of her life. That the defendant, that young man, pulls out his penis, forces his penis into her vagina. You're gonna hear that this didn't last for very long.

You're gonna hear that while that person was trying to force their penis into her vagina that it was touching her in that genitals area there. You will hear about that. She's gonna tell you that stuff. All the while, Mr. Stone is sitting in the truck looking over that short distance at that young man who is doing that to his wife.

You're gonna hear that at some point the victims hear a car driving through the neighborhood or coming up in the neighborhood and that at that point the young person withdraws his penis, pulls his pants up and starts to leave and walk down the street, sort of running down

the street. As he gets a little bit away from there, you're gonna hear that he fired three shots up in the air.

At that point, the folks are able to call 911. They call 911. They wait in that truck for police officers to come. They wait a half an hour in that truck for a police officer to come and nobody comes.

You're gonna hear from them that they were afraid that this person would come back, seeing that they were there, and so they both decide to walk to their son's house which is about a mile and a half, two miles away from the area.

You're gonna hear that -- we'll talk a little bit about the sons. Nobody showed. Nobody came to their help that night.

You're gonna hear how they -- and both of these folks have health issues. You're gonna hear more about that, too. They were still able to get out of that truck and walk the mile and a half, two miles to their son James' home, James James.

You're gonna hear, ladies and gentlemen, that once they get to the house that they tell their son what happened. Their son puts them into a car, they go over to the brother Jesse's house, Jesse James. He is the one who got the phone call originally.

You're gonna hear that Jesse was having a New

Year's Eve party and got the call just before the ball, you know, the midnight thing. So he was just kind of waiting at home. He thought maybe the other brothers were taking care of it. And you're gonna hear how shocked he was when he comes into that house and say mom and dad were robbed and mom was raped. They take their parents to the hospital immediately.

Up to this point, still no police.

You're gonna hear that once they get to the hospital that they are transferred to a second medical facility where Mrs. James is seen by a nurse practitioner whose name is Nicole Schaller. Ms. Schaller does an exam for -- does an exam to Ms. James. But you're gonna hear about that exam. It's kind of a special sort of thing. It's a sexual assault examination. It's done by a person called a sexual assault nurse examiner. You'll meet one or two of them during the course of this trial, I believe.

And you're gonna find out they're specially trained in doing the medical examination of a victim, of a person who has been sexually assaulted. And you're gonna hear that they've got a procedure and a way they do this sort of examination. You're gonna hear that in this case-- well strike that. In every case the examination consists essentially of two major parts. First part is getting a patient history.

Patient history is really important in these cases. You're gonna learn about how these sexual assault exams -- nurse examiners work. You're gonna hear that that history is important because that will help to direct them on two things. Number one is the safety of that individual. Were they injured? Do they need treatment? It's really kind of a treatment plan.

And you're gonna hear that that also, the second part of that treatment plan, is getting potential evidence from the victim. And they'll talk to you a little bit about how that's specially done. But the bottom line is they take the patient history to find out what the patient says happened to them and then from that point they do the examination and the evidence is collected.

Now I mention that at this point because when you hear about the patient history in this case, ladies and gentlemen, you're going to -- and again this is gonna be kind of a educational process. And I hope you guys will, you folks will take it that way, too. Because there is a lot of stuff going on in the investigation. There is a lot of stuff going on in these investigation examinations that's important. And I'm gonna want you to really pay close attention to how they do it and why they do it.

You're gonna hear that in that patient history

she alleges penetration into her vagina. You're going to hear that that is the only type of penetration she's alleging. You're gonna hear, though, when they take the samples, we call it often a rape kit, you'll probably hear that referred to here, but it's forensic evidence that's collected; that in addition to taking samples, vaginal samples and samples of the vaginal area, but they also do an anal swab.

And you're gonna learn, ladies and gentlemen, that even though there is no, in that history, any statement about anal penetration, you're gonna learn that they do that kind of in course because of the fact that the semen, when it's ejaculated or semen when it comes into contact, will often flow down and will often collect into that anal area. So it's just seeing the standard procedure that they're gonna do that type of examination.

You're gonna hear that after the examination is done that those -- the forensic kit is boxed up. They'll tell you the process and how they do all that and sent off to the lab in hopes of finding some sort of forensic evidence. That's the first night.

After the hospital aspect of Ms. James' experience that night, they see a police officer. And I think you'll hear they kind of talk to 'em but they're exhausted. They've been through a lot. They go home and

they get some sleep before the police actually get them to take some statements and do that the next day.

You're gonna hear that in the course of the investigation that occurs in the next few days. Because at this point it's a whodunit. They don't know. The victims in this case don't know the person who did this. So it's a matter of figuring out who in the whole wide world is it that committed this act.

The police go to work. First thing they do, or one of the first things they do, is bring in a sketch artist. Maybe you're familiar with what a sketch artist does. Sketch artist comes, talks to victims, sees if they can give them that general description, see if they can put together a picture.

Well you're gonna hear Ms. James really did not get a very good look at the person's face. But you're gonna hear that Mr. Stone, based on the amount of time that he spent with that individual, you're gonna hear that the amount of time in that close proximity between him and that individual, Mr. Stone had engrained in his mind the face of what -- of that person who did that to his wife. Mr. Stone who had sat there while that went on and saw that person doing it; that was engrained in his head.

Mr. Stone is able to come up with a composite. They come up with a composite sketch of the alleged

perpetrator. We'll have that for you. You'll get a chance to see that. After the sketch is created, the sketch then is disseminated. They're sent out to the TV stations and that and they put it out there.

You're gonna hear, ladies and gentlemen, that a few days later through the tip line that they have, those calls, that a tip did come in and that someone was named. The person whose name came in on that tip line was the defendant sitting right over here Mr. McKnight.

You're gonna hear that at that point Mr. McKnight becomes sort of a person of interest in this investigation. You're gonna hear about the police's first contact with Mr. McKnight. Mr. McKnight is in custody with the police. He is taken to one of the precincts to be processed.

The officer who was transporting Mr. McKnight, Officer Jaber, among others, you'll hear there were a bunch, but him in particular, has taken Mr. McKnight and in order for them to -- for Mr. McKnight to be transferred to the custody of that local precinct some paperwork's got to be filled out. And the officer is gonna tell you that all the time or the time that Mr. McKnight is in his custody Mr. McKnight is talking and talking and asking questions.

He's gonna tell you that when they do get to the

district office, I think it's the Eastern District office, that he starts to fill out the paperwork and Mr. McKnight starts to make some spontaneous statements concerning why he thinks he's arrested. Now I'm not gonna go into the details of those. Those will come out in the testimony.

But what you are gonna hear is that Mr. McKnight acknowledges, even without anybody telling him what this is about, about a rape that occurred at the specific location of this crime. He's going to -- he makes statements to that officer as he's asking questions concerning how he viewed himself. He places himself there, and you're gonna hear the things that he said that happened at that location.

Now maybe you picked up during voir dire some of the things that counsel was saying about statements and written and all that. The thing I need you to take into consideration is, and I want you to listen to the officer as he tells him how when he takes him out of the car, that he's taking him into this lobby area. This is not an interrogation place. That's not what he was doing. All he was doing is signing paperwork so they can transfer him off to and get him off his hands essentially. Those statements are made.

You're gonna hear that this kind of agitated state continues, and that when he is transferred to the

next officer, Officer Watts, who just works at the precinct, her job is just, you know, getting people and getting the basic information, logging them in, getting them in, putting them in there; you're gonna hear from that officer, Officer Watts, and she is gonna tell you about the again incriminating statements that the defendant makes to her as she is logging this in.

Once again, ladies and gentlemen, there is no video. There is no audio because this is a booking area where interrogations don't occur. That's not what goes on there. But you're also gonna find out that Officer Watts didn't have a -- really know what this was all about. She was not even aware of the circumstances of what Mr. McKnight was being brought in for, but yet Mr. McKnight gives her some very direct and specific information about that.

All right. You're gonna hear, ladies and gentlemen, that there is also one other time when Mr. McKnight makes some statements also. I'm not, again, not gonna go into those. You'll hear it. Just gonna want you to be aware that that's coming.

Next, a lineup. A lineup is held. Mr. McKnight is brought into a location. He is placed with other individuals. And you'll see, I've got the picture, that will be out there, you'll see how and who he was with and

who he was next to. He's placed into the lineup.

And you're gonna hear how Ms. James goes into the lineup and she is not told who is there. She is aware that this person who assaulted her might be there, but she's not told who it is. She goes in, she looks and she picks one person Mr. McKnight.

You're gonna hear that the lineup is attended by a neutral attorney. And I'm gonna have her in here, too, to talk to you a little bit about how that lineup was set up, her impressions of whether it was suggestive, other impressions of whether anybody was suggesting to the individuals there who to pick. She'll tell you.

You're gonna hear that after Ms. James has gone in and comes out that Mr. Stone is brought in. Mr. Stone who spent that time talking to the person; Mr. Stone who saw the gun in his chest with the person pointing it right at him; Mr. Stone comes in, has no problem. Boom, that's him right there.

You're gonna hear, ladies and gentlemen, about the forensic aspect of it. The DNA aspect of it. And this is where I want you to really listen and educate yourself.

We're gonna have two people come in and talk about what that means; forensic evidence. They're going to hopefully break it down so that we can all understand

it cause it does get complicated.

The bottom line here is, ladies and gentlemen, when the rape kit was sent down to the lab they pull out the things that they find in there and they test it. There is -- the first test is for serology. It's to see whether there is some sort of biological material in those samples.

And what they do is they get a DNA sample from known individuals. For example, there will be a DNA sample of Ms. James in there because they've taken the DNA from her that they want to compare and see if it's her or somebody else. There was a known sample taken from Mr. Stone also to be put in there so they can do the comparison to see if they find something, whether or not it matches to Mr. Stone. There was also a sample taken from the defendant Mr. McKnight and that was placed in there to see whether or not he matched anything that they might find in there.

Now you're gonna hear that when the initial screening is done they find biological material basically on two items that they're gonna test; a vaginal swab and an anal swab. And what they did, the first part says I think there is sperm there, I see it, they put it under the microscope. That information then and those samples are given to another person. That person is the person

who is the DNA specialist. He's gonna tell you about his findings and what he does and how he does it.

The bottom line on the findings here -- and I also should have put this in. When the nurse does the examination and that sort of stuff, one of the questions they ask the person there that they're examining is when is the last time you had consensual sex. Because -- and they'll tell you that and that's because sperm can stay in that location for up to about five days, 96 hours. So they ask in the last 96 hours have you had sex with anyone. And Mrs. James' answer was yes Mr. Stone, okay.

Now that's important because of this next step where we're gonna go. The lab looks at the samples. They breakdown the DNA and they're able to separate it and they're gonna tell you how they can do that.

They're gonna tell you that as to the vaginal sample that they found two different types of DNA there. One of 'em was Mrs. -- Ms. James, hers.

They're gonna tell you that the second one when they plot it out there are sixteen markers they're looking for for absolute match. They were able to place 15 markers to Mr. Stone, all right. That DNA probably was Mr. Stone's. They're gonna tell you that that second DNA they found was probably Mr. Stone's.

They're also gonna tell you that it excluded the

defendant, okay, when they tested it out. They know that that's not him.

They're gonna tell you that the anal swab that is taken in this one they're gonna find three different types of DNA. They're gonna tell you that the first swab or the first line of DNA they find belongs to the victim. It's just kind of natural that they're gonna find her DNA on her samples.

They're gonna tell you that the other two donors, one of them matches, once again, at 15 spots being Mr. James -- Mr. Stones, I'm sorry. They're gonna tell you that the second -- because there is extra DNA there, they're gonna tell you that there is not enough DNA there to either include the defendant nor exclude him. Bottom line is that leftover DNA doesn't really tell anything.

Now they will tell you that there are ways to exclude individuals, that they can look at the DNA and say definitely not him, he's out. And they'll tell you how they do that and that sort of thing. But they are gonna tell you that that line of DNA, that extra one they found an anal swab is we can neither include nor exclude the defendant.

So looking at that line of evidence that's just part of the evidentiary aspect of the case. So they'll go into that and we'll talk about that in closing a little

bit more about what this means, but I just want to put that out to you.

Now during the course of this investigation, and you're gonna hear about this, too, that a few days before the defendant was implicated in this case that the police had arrested another individual. His name is Mr. Ali Robinson. And they're gonna tell you that he was arrested and he kind of fit the general description of the unknown perpetrator so they took a DNA sample from that individual. You're gonna hear about that. That was tossed in there.

But you're gonna hear that the lab when they did their analysis of Mr. Robinson's DNA sample he was excluded, specifically excluded from the vaginal and he was specifically excluded from the anal. That the two victims in this case looked at a photo lineup of Mr. Robinson's picture in it and they were not able to -- they didn't recognize anybody there. So Mr. Robinson was excluded from this process. You're gonna hear about it, that's why I'm asserting it in here right now.

Ladies and gentlemen, I think at this stage of the game it's a lot of stuff -- and the judge told me you'll lose them after 20 minutes. Well maybe I do, but I think it's important for you guys to get this at least out here at the outline of where we're gonna go and what we

are gonna do.

But the thing, the key to you, ladies and gentlemen, will be the very last witness we present and that's gonna be Mr. Stone. Because he is the person who spent up close and personal time with the person who perpetrated this on his wife. He is the person who spoke to the person who perpetrated this against his wife. Mr. Stone.

And I'm just gonna ask you to listen to his testimony. And as counsel said during his voir dire, yeah, people make mistakes. Absolutely they make mistakes on identification. But I want you all to consider how is it that that would happen. I want you to consider about the amount of time he had to spend with him. I want you to consider about how close he was to him when all of this was going on.

All of that taken together, ladies and gentlemen, I think that when this evidence is presented to you, you're gonna have sufficient evidence in front of you to prove beyond a reasonable doubt that on this day, brand new year 2013, that it was James McKnight (sic) who came up to Mr. Stone. That it was James McKnight (sic) who took those objects from them. It was James McKnight (sic) who pointed the gun at Mr. Stone. It was James McKnight (sic) who pointed the gun at the chest of Ms. James. It

was James McKnight (sic) who put his penis into her vagina.

Ladies and gentlemen, I think at that point in time there is gonna be sufficient evidence for you to find, I'm going to ask you to find him guilty as charged on all of those counts.

Thank you.

THE COURT: Thank you, counsel.

MR. HOWARTH: Good afternoon again.

THE JURORS: Good afternoon.

MR. HOWARTH: I'm in a far more difficult position than my friend Mr. Elizondo is because the State of Michigan, with the wealth of power and information and crime tracking and police officials that they have on hand, is in a much greater position to solve crimes than Jim Howarth and Mr. Jones over here; these two old fellows that come to court everyday and try and convince people that sometimes it's just not necessarily so what you've heard.

We're further hampered in this case by a decision that we all make, all the folks sitting here at this table. And that is that we're not presenting any evidence in this case. We're not presenting testimony of any kind, including that of Mr. McKnight.

We're here to convince you of two things.

People make mistakes. Science doesn't make mistakes. People make mistakes on identification. People make mistakes about what they saw, what they believe they saw. Science doesn't make mistakes.

As to people making mistakes, and I hate to take advantage of my good friend Mr. Elizondo, but when he told you in the last two minutes in his opening that James McKnight committed this crime, there is no doubt that James McKnight is the person who should be convicted in this, he made the mistakes of the fact that my client's name is not James McKnight. It's Howard McKnight.

It's a mistake. It certainly isn't something that's gonna cause you to get up and say well we might as well go home because the prosecutor made a mistake about his name. It's a mistake. And this is a case in which a lot of mistakes were made, some by some very good meaning people and some by some people whose motives you're gonna have to question.

But let's talk about what you're gonna hear, not from our case because we are not presenting one but what you're gonna hear from the prosecution's case. We agree with the first part of Mr. Elizondo's opening statement. Yes, it was New Year's Eve. Yes, these two good and decent people from the City of Detroit were going out to celebrate.

They went to the casino, probably had a couple of drinks, came home. They weren't bothering anybody. They were doing their own good business. Yes, they had trouble with the car. Yes, they got stuck. Yes, a man approached them. But this is where the first mistake is made. Did one man approach them or did two different men approach them at two different times? Keep your mind open for this possibility.

Very much supported by the evidence that when the Mr. James Stone got stuck in the snow, a young man did come up to them. Might very well have even been Howard McKnight. That person came up, he was a nice person. He was a decent person. He was a kind person. He tried to help them out. He tried to move the truck. He put his shoulder to it. He tried to get them out of there. He gave advice to them. He even took the cell phone -- you will hear when the McKnight -- when the Stone family was having difficulty in reaching their son, he took the cell phone from them, this first man, he helped them get their son on the phone and tell them how to get there.

Now obviously this first person that they come in contact with didn't have any intention of robbing them or hurting them in any way. He's trying to get them help. That man left. That man left and went away.

What the government wants you to believe is that

for some reason or another, which maybe someone can come up with, that man came back. He was there, he left and he came back. And I would submit to you from the evidence that what you're gonna find is this other person who comes back to the car is a different person. That person is not helpful. That person is not there to give help or advice. He's there to rob and hurt those people and he is not Howard McKnight. And there is hard, strong evidence that it is not Howard McKnight.

That person did the terrible things that he did and that person left hard, scientific evidence behind him in his DNA. That person left behind the type of evidence that I believe the evidence is gonna show you that if the scientists can find that the evidence is there. They can find who did the crime if they have the opportunity to look at the DNA of Mr. A, Mr. B, Mr. C, D, E. They can go down that list and they can say this person is we can't tell, can't tell one way or another. This next person, can't tell one way or another. Third person, oh, oh, no, this person didn't do it, scientifically with probabilities that run into the trillions and sextillions didn't do it. And they can also find a person who did it with the probability running into the millions, trillions and sextillions.

In this case, on the good evidence that they

found, that is the vaginal swab that was taken, they found that this man Howard McKnight didn't leave the DNA. That he didn't do it.

Now if they wanted to look at a secondary source, I guess they have that right. Remember that there is a primary source of DNA and a secondary source. And although it's not terribly pleasant and to go into the graphics of it, I'm defending a young man who's on trial for a serious crime. And what you have is that the DNA originally goes into the vagina, some of it leaks or drips out into another place. The primary source is the vagina. The secondary source, that is, some smaller portion of the DNA goes in a secondary source. That secondary source is less likely to point to who the person is that committed the crime.

But in the primary source in the vagina where they find DNA, and they find that it's from multiple donors, which makes sense that the husband is gonna be a donor and that the rapist is gonna be a donor, they find the DNA of the husband is there. The DNA of Howard McKnight is not there. The government knows. They know they have this problem, so they tell you well really in effect forget the science. Forget the hard science.

Let's go to something where mistakes can be made, unlike science. Let's go to the identification.

Fine. We welcome you to look at the identification because you're going to find that this is what happened at the lineup ID. I wasn't there, but I can tell you from the fact that I've had the opportunity to look at the government's evidence.

What you're gonna find is that the wife goes in first and she is looking. But she knows in her mind when she goes in there that she has no ability to recognize the face of the person that robbed her and raped her. She will admit to that. I was not looking for a face. I was looking for a body frame. In other words, a build of the person. Not -- I didn't see this lineup. I didn't get a chance to look at those folks as they stood there alive, but she says what I made my identification based on was that wherever it was that Mr. McKnight was standing in that lineup that was the person who had the same kind of body frame, not his face.

And as for the husband, his testimony which Mr. Elizondo told you was so positive, what I recall him saying, and we'll find out what he says when he comes before you, is that he walked into that room and right away he noticed that one of the people, person number four in the live lineup, seemed to look away from him. Well you have a glass shield in these lineup rooms where the people who are on -- the people who are being looked at

side can't see out there. They don't know who is out there looking at them and whether the person is walking up towards them or away from there or anything.

But Mr. Stone sees this person look away from him. He's not gonna fool me with that. I'll look to the other side, and that is how he picks Mr. McKnight.

Now when it comes to identifications and lineup identifications, there was another identification which I didn't hear about in the government's opening statement. And as a matter of fact, I didn't hear anything about the existence of this evidence until about a week ago.

About a week ago, it comes to pass that the government tells us, oh, incidentally, we were looking through this file and we see that the police, very shortly after this robbery and rape happened, went out and did a canvass of the neighborhood. And good for them. And they went out and asked the folks in the neighborhood is it possible that on New Year's morning you might have seen an incident with a truck, some elderly folks and maybe a younger guy interacting with those elderly folks in the truck.

And by goodness they found somebody. Found a man by the name of Mr. Gholston (sic). You didn't hear that name, did you, in the opening statement of the government? Didn't hear about Mr. Gholston (sic). And

they found Mr. Gholston and they said Mr. Gholston did you see something like that. And he said yes I did. Now this is back year ago. And they said do you think if you went and saw a lineup that you might well be able to identify that young man who we think is the perpetrator of an awful crime. And Mr. Gholston said yeah I think I could.

Let a year go by and that's their fault. It's water over the damn. So they had the lineup. When? Well I won't have to look at a calendar to find out when. I'd look at my watch. Because it was a couple of hours ago that that lineup was conducted just across the street here.

They conducted that lineup and Mr. Gholston was there. And they put six individuals in that lineup; one, two, three, four, five, six. And number six is Howard McKnight. And Mr. Golson walked into that room and he walked down and he looked. He was told look at each face. He looked at each face. He's behind that same kind of a glass where the people on the other side can't see him. He can see through, they can't see out. He looked at those six faces and he say no, no, no, no, no, no and no to number six. I don't see the person there.

What I'm gonna ask you simply to do in this case is to take the possibilities it's a mistake and weigh it against the truth that you have from science and from

somebody who the government chose not to even look into until today. And it's gonna be very hard to give a verdict of not guilty in this case only for one reason. Because of the horror of the crime, not because of the amount of proof. But your verdict will be based on the amount of proof.

The criminal who committed this crime, I will submit to you from the evidence in front of you, is probably still walking in the City of Detroit, not sitting in this courtroom.

And your verdict -- and it's a sad verdict in a way, even especially for these two elderly people. It's a sad verdict but it's the true verdict. It's the right verdict. It's the honest verdict. The verdict is on all of these counts not guilty.

Thank you.

THE COURT: Thank you, counsel.

Ladies and gentlemen, given the hour we are gonna recess for the today. I caution you again not to discuss the case.

We're gonna start -- if you could be outside the courtroom tomorrow at 9:15, we'll get started first thing in the morning with the witnesses. We thank you for your patience and careful attention. We are -- you're excused for the day.

(The jury was excused at 3:55 P.M.)

THE COURT: Anything else to go on the record, counsel?

MR. ELIZONDO: No, judge.

MR. HOWARTH: No, Your Honor.

THE COURT: We'll see you.

(The proceedings were adjourned at about 3:56 P.M.)

\- - -

CERTIFICATE

STATE OF MICHIGAN)
)
COUNTY OF WAYNE )

I, Betty Sanders, CSR-2931, and Official Court Reporter of the Third Judicial Circuit Court for the County of Wayne, Criminal Division, State of Michigan, do hereby certify that the foregoing pages 1 through 194, inclusive, comprise a full, true and correct transcript of the proceedings and testimony taken in the matter of the People of the State of Michigan versus Howard McKnight, on Monday, November 18, 2013.

Betty Sanders, CSR-2931

Dated this 27th day of January, 2014.