ORIGINAL

STATE OF MICHIGAN

THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN,

-vs-                                        Case No. 13-0628

HOWARD JAMES MCKNIGHT,

Defendant.

_________________________________/

14 FEB 19 AM 7:50

**JURY TRIAL**

BEFORE THE HONORABLE EDWARD EWELL, JR.

502 Frank Murphy Hall of Justice, 1441 St. Antoine,

Detroit, Michigan - Thursday, November 19, 2013

APPEARANCES:

VENESHIA CEZIL, (P72778)
RALPH ELIZONDO, (P41463)
Wayne County Prosecutor's Office
1441 St. Antoine, 12th Floor
Detroit, Michigan 48226-2302

Appearing on behalf of the People.

JAMES HOWARTH, (P15179)
615 Griswold, Suite 820
Detroit, Michigan 48226

PAUL R. JONES, (P42171)
23442 Tireman, Suite 1
Dearborn Heights, Michigan 48127
Appearing on behalf of the Defendant.

REPORTED BY:
Betty Sanders, CSR-2931
Official Certified Shorthand Reporter

Processed
Notice of Filing Sent
Clerk

TABLE OF CONTENTS


| WITNESSES | PAGE |
|---|---|
| **LUCILLE STONE** | |
| DIRECT EXAMINATION BY MS. CEZIL | 5 |
| CROSS-EXAMINATION BY MR. HOWARTH | 52 |
| REDIRECT EXAMINATION BY MS. CEZIL | 64 |
| RECROSS-EXAMINATION BY MR. HOWARTH | 69 |
| **JAMES JAMES** | |
| DIRECT EXAMINATION BY MS. CEZIL | 74 |
| **JESSE JAMES** | |
| DIRECT EXAMINATION BY MS. CEZIL | 80 |
| CROSS-EXAMINATION BY MR. HOWARTH | 84 |
| **ALPHONZO TINSLEY** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 91 |
| CROSS-EXAMINATION BY MR. HOWARTH | 104 |
| **LORI BRIGGS** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 110 |
| CROSS-EXAMINATION BY MR. HOWARTH | 116 |
| **JERRY GOLSON** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 127 |
| CROSS-EXAMINATION BY MR. HOWARTH | 142 |
| REDIRECT EXAMINATION BY MR. ELIZONDO | 149 |
| RECROSS-EXAMINATION BY MR. HOWARTH | 154 |
| **MIKEHL HAFNER** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 158 |
| CROSS-EXAMINATION BY MR. JONES | 176 |
| REDIRECT EXAMINATION BY MR. ELIZONDO | 180 |


EXHIBITS


| IDENTIFICATION | | MARKED | ADMITTED |
|---|---|---|---|
| PEOPLE'S 1 | PHOTO LINEUP | 3 | 46 |
| PEOPLE'S 2 | IDENTIFICATION SHEET | 3 | 47 |
| PEOPLE'S 3 | | 3 | -- |
| PEOPLE'S 4 | PHOTOGRAPH OF TRUCK | 3 | 9 |
| PEOPLE'S 5 | PHOTOGRAPH OF TRUCK | 3 | 30 |
| PEOPLE'S 6 | PHOTOGRAPH OF TRUCK | 3 | -- |
| PEOPLE'S 7 | PHOTOGRAPH OF TRUCK | 3 | -- |
| PEOPLE'S 8 | COPY OF COMPOSITE SKETCH | 90 | 99 |
| PEOPLE'S 9 | PHOTOGRAPH OF DEFENDANT | 90 | 101 |
| PEOPLE'S 10 | PHOTOGRAPH | 119 | 130 |
| PEOPLE'S 11 | PHOTOGRAPH | 119 | 130 |
| PEOPLE'S 12 | DNA SAMPLES | 119 | 166 |
| PEOPLE'S 13 | | 119 | -- |
| PEOPLE'S 14 | DNA SAMPLES | 119 | 174 |
| PEOPLE'S 15 | DNA SAMPLES | 119 | 175 |
| PEOPLE'S 16 | | 119 | -- |

Detroit, Michigan

Thursday, November 19, 2013

9:11 A.M.

- - -

(People's Proposed Exhibits 1 through 7 marked for identification.)

THE CLERK: Calling Case Number 13-000628; the State of Michigan versus Howard McKnight before the Court today for a jury trial in progress.

MR. ELIZONDO: Good morning, Your Honor.

Ralph Elizondo, assistant prosecutor.

MS. CEZIL: Good morning, Your Honor.

Veneshia Cezil on behalf of the People.

MR. HOWARTH: Your Honor, James Howarth. I'm co-counsel on behalf of Howard McKnight.

MR. JONES: Your Honor, Paul Jones with co-counsel on behalf of Howard McKnight.

THE COURT: Good morning, counsel.

Today is the date and time scheduled for continuation of a jury trial in this matter.

Are we ready to proceed?

MS. CEZIL: Yes, Your Honor.

MR. HOWARTH: Yes.

THE COURT: Bring the jury.

(The jury entered the courtroom at 9:47 A.M.)

THE COURT: Good morning, ladies and gentlemen.

THE JURORS: Good morning.

THE COURT: We apologize for the delay. I know you all were here, ready to go. And we were supposed to be ready to go right at 9:15 but we had some technical difficulties that we had to get straight so that we can get started.

Are the People ready to call their first witness?

MR. ELIZONDO: Yes, Your Honor.

The People call Ms. Lucille Stone.

THE CLERK: Ma'am, raise your right hand for me.

You do solemnly swear or affirm that the testimony you're about to give before the Court will be the whole truth?

THE WITNESS: I do.

THE CLERK: Thank you. You may be seated, ma'am.

**LUCILLE STONE,**

having been first duly sworn by the Clerk of the Court at about 9:48 A.M., was examined and testified upon her oath, as follows:

MS. CEZIL: May I proceed, Your Honor?

THE WITNESS: Yes, you may.

DIRECT EXAMINATION

**BY MS. CEZIL:**

Q. Good morning, Ms. Stone.

A. Good morning.

Q. I'm gonna take you back to December 31st of 2012, okay?

A. Right.

Q. Do you recall who you were with on that -- on the evening hours of that day?

A. Yes, I was with Mr. James Stone, my husband.

Q. Okay. When you say your husband, are you and Mr. James Stone legally married?

A. No, we are not. We have kids in common.

Q. Okay. How long have you and Mr. Stone been in a relationship with one another?

A. Forty-two years now.

Q. You said that you had children in common; is that correct?

A. Yes.

Q. And how many children do you have?

A. We have three.

Q. Okay. And what -- are those children male or female?

A. They male. They all male.

Q. Okay. Can you tell us their names and their ages?

A. My oldest son name is Kevin and he's 40.

Q. Okay. What is Kevin's last name?

A. James.

Q. All right. And what about your next son?
A. My next son is James Edward James and he's 39.
Q. Okay. And you said you had one more son; is that correct?
A. Yes, his name is Jesse James.
Q. Okay.
A. And he 35.
Q. Thirty-five?
A. Yes.
Q. Okay. So back up a little bit.
You said that you were with Mr. Stone, your husband?
A. Yes.
Q. Is that correct?
Okay. Where were you at with Mr. Stone?
A. We was coming down Gratiot.
Q. Okay. Do you recall around what time that was?
A. Around nine.
Q. Okay. Where were the two of you before you were coming down Gratiot?
A. We were going to the casino.
Q. Okay. Before you went to the casino, from what you observed, did you observe Mr. Stone have any alcohol?
A. Well we had a beer at my son's house earlier.
Q. Okay. When you say you had a beer, are you referring to yourself and your husband?

A. Yes, both of us.
Q. Okay. How many beers did you have?
A. One.
Q. Okay. And how about your husband?
A. He had one.
Q. Okay. Now after you have the beers at your son's house, you mention going to the casino; is that correct?
A. Yes.
Q. Do you recall which casino you were going to?
A. We went to the Motor City.
Q. Okay. Is that in Detroit?
A. It's in Detroit on Grand River.
Q. Okay. When you got to the casino, do you recall how long you stayed?
A. About two hours.
Q. Okay. Did you observe Mr. Stone have anything to drink at the casino?
A. No, he didn't. He was with me.
Q. Okay. How about yourself? Did you have anything to drink?
A. No.
Q. Okay. Now did you get anything from the casino when you went there?
A. We got some gift things they give every year.
Q. Okay.

A. Like hats and tiaras.
Q. Okay.
A. We got them for our grand kids.
Q. All right. So after you get the gift things, and you told us hats and tiaras for your grandchildren, what's the next thing that you remember that you and Mr. Stone did?
A. Well we walked around. We gambled a little while.
Q. Okay. At some point do the two of you leave the casino?
A. Yes.
Q. Okay. Now I'm not sure, I don't believe I asked you this.
How did the two of you get down to the casino?
A. We had just purchased a truck.
Q. Okay. Now when you said that you had just purchased a truck, do you remember how long prior to the 31st that you purchased that truck?
A. That date. About that morning. About 9:00, 10:00.
Q. Okay.
MR. CEZIL: Your Honor, may I approach the witness?
THE COURT: Yes, you may.
Q. (By Ms Cezil, continuing): Okay. Ms. James, I'm handing you what's been marked as Proposed Exhibit Number 4, okay.
A. All right.
Q. If you could take a look at that and let me know if you recognize what I've handed you?

A. Yes, I do.
Q. Okay. And what is that? How do you recognize that?
A. This is a red truck that belongs to me.
Q. You said it's a red truck that belongs to you.
Is that the truck that you and your husband went to the casino in?
A. Yes, it is.
Q. Is it in the same or similar condition it was on the night --
A. No, it's not.
Q. Okay. What is different about it?
A. This got a flat tire.
Q. Okay.
MS. CEZIL: Your Honor, we would move to admit People's Proposed Exhibit Number 4.
MR. HOWARTH: No objection.
THE COURT: So admitted.
MS. CEZIL: Thank you.
Permission to publish to the jury, Your Honor?
THE COURT: Yes.
MS. CEZIL: Okay. Can everyone see that?
Q. (By Ms. Cezil, continuing): Now, Ms. James, you said that you had just purchased a truck a few days before?
A. Yes.
Q. Is that correct? Just so that -- a point of reference

this is the same vehicle that you and Mr. Stone went into the -- went to casino --

THE COURT: Let me stop you, counsel.

I think she indicated they purchased it that date, not before.

THE WITNESS: Not the day before.

Q. (By Ms. Cezil, continuing): Is it fair to say you were familiar with this truck prior to that?

A. Not really familiar. But we, you know, we had enough time to get, you know -- we didn't know too much about the tires.

Q. Okay. Now after you get the noisemakers and the tiaras and things that you have told us about, what's the next thing you remember happening?

A. Well after we walked around the casino, we left.

Q. Okay.

A. When we left, we was driving down Gratiot.

Q. Okay. Was there anything unusual that occurred as you and Mr. Stone were driving down Gratiot?

A. We had a flat. He said, "My tires going flat."

Q. Okay. Was there any change in the feeling of that vehicle?

A. The truck start jerking and wobbling.

Q. Okay. Now after you hear him say that we have a flat, does that cause you to do anything?

A. No. I just -- I was like nawl we -- I asked him was we having one. I was like, "Are we having a flat?"
Q. Okay.
A. Just like that.
Q. Do you remember the weather conditions that night?
A. It was snowing and -- I think it was snowing a little bit. I'm not for sure. But it was cold and the ice was on the ground.
Q. Okay. When you say ice was on the ground, was ice on Gratiot as well?
A. Yes.
Q. Okay. Now after you discovered that you guys have that flat and you feel the ice on the -- on Gratiot, what's the next thing you remember happening?
A. He said, "I'm gon' have to get off because I don't want to have a accident."
Q. Okay. Does -- do you see Mr. Stone get off of Gratiot?
A. Yes, I do.
Q. Okay. Do you know which street he turns off on?
A. He turn off on Bradford.
Q. Okay. Now after Mr. Stone turns off on Bradford, what's the next thing you remember happening?
A. He drove down Bradford between -- in between Whithorn and Findlay. He pulls over.
Q. Okay. Now upon -- once he pulls over, do you observe

anybody else outside on Whithorn and Findlay?
A. I just -- not just then.
Q. Not just then, right. Okay.
A. Right.
Q. At some point, do you observe anyone else?
A. Yes.
Q. Can you please tell us about the first time you realize that there was someone else out on that street with you?
A. Well when we first had -- when he first pulled over, it was a guy walking.
Q. Okay.
A. That's all I remember.
Q. Do you recall what the guy was wearing when he was walking?
A. He had on all black.
Q. Okay.
A. That's what I could see, because it was dark.
Q. It was dark, okay.
Now what's the next thing you remember after you see the guy walking?
A. After I seen him walking -- well I didn't see no more then. I was just -- when I looked up. I was looking down at my phone and when I looked up he was standing at the truck talking to my husband.
Q. Okay. Now when you say he was standing at the truck

talking to your husband, where were you positioned in the truck?
A. I'm on the passenger side.
Q. Okay.
A. And he's on the driver -- we'll I'm like in between like, you know, not all the way to the door but away from the door. And he's on the passenger side but he on the outside.
Q. Okay. When you say that you hear him talking to your husband, do you actually hear his voice or you talking about you saw him talking to your husband?
A. I heard, you know, could hear his voice.
Q. Okay. Do your -- okay.
Now did you hear what he was saying, the person that was talking to your husband?
A. Not really.
Q. Okay. What's the next thing you remember happening after you look up and you see the person, the male speaking to your husband?
A. They was trying to push the truck.
Q. Okay.
A. I didn't really know what he was saying because the motor was running. And they was trying to push the truck and he was helping him push. So I just figured that, you know, he was trying to be a good person to him.

Q. Okay. When they were trying to push the truck, do you recall whether or not the truck lights were on on the outside of the vehicle?
A. I don't remember.
Q. Okay. What about on the inside of the vehicle?
A. No.
Q. Okay. Do you know about how long they tried to push that truck for?
A. For quite a while. For about five or ten minutes.
Q. Okay. When they are trying to push the truck or you see your husband and this young man that you referred to earlier talking, how far away are they from one another?
A. They close. Real close.
Q. Okay.

MS. CEZIL: May I approach the witness?

THE COURT: Yes, you may.

Q. (By Ms. Cezil, continuing): Ms. Stone, I am gonna walk towards you -- or excuse me -- Ms. James. And you could tell me when to stop and show us how far apart they were from each other when they were talking.
A. All right.
Q. Okay.
A. They were about that close.
Q. About this close?
A. Yes.

Q. Okay. I'm not the best with measurements, but can you stick your -- would you say that's a arm's length between the two of us?
A. Yes.
Q. Okay.
MS. CEZIL: Just for the record, Your Honor, the witness has extended her arm between the distance of where I'm standing from her and where she is sitting in the witness chair.
THE COURT: Okay. Would we -- I guess I would ask defense counsel -- you said it's approximately 10 feet?
MR. HOWARTH: It looked closer to me, Your Honor, but --
THE COURT: So between 8 and 10 feet.
MR. HOWARTH: Sir, I won't quibble about it. I think everybody saw it.
Yeah, eight feet sounds fine.
THE COURT: I was just saying for the record.
MR. HOWARTH: I understand. But I'm not real good at that either.
THE COURT: Okay. All right. Thank you, counsel.
MS. CEZIL: Thank you.
Q. (By Ms. Cezil, continuing): Okay. After you see them

speaking to each other, and as you said about a arm's length away from where I stood from you; is that correct?
A. Yeah.
Q. Okay. How long did you observe that exchange between them and them being that distance from one another?
A. When I stopped paying attention then. I just really was just monitoring on trying to get somebody to come and help.
Q. Okay. When you were trying to get someone to come and help, what were you doing, if anything?
A. I was on the phone. I had three phones.
Q. Okay.
A. I got two of my own and he have one.
Q. When you say he, who you are referring to?
A. Mr. Stone. Mr. Stone have a phone on his own, and the two I had they just went dead.
Q. Okay. So what do you do after the phone goes dead?
A. After it goes dead, I asked him could I borrow his.
Q. Okay. Did you borrow Mr. Stone's phone?
A. Yes. He said, "Call my son." I kept trying to call. That's what I was doing anyway.
Q. Which son were you trying to call?
A. I first tried to call Jesse.
Q. Okay. Did you ever get in touch with Jesse when you first tried to call him?

A. At first when I first started, I couldn't. And then when I tried it the second time, I did.
Q. Okay. Did you tell -- when you got in touch with Jesse the second time, did you tell him that you and Mr. Stone had broken down?
A. Well, yes.
Q. Okay. Now you said that you --
A. But I didn't tell him. I hand the phone to him.
Q. When you say you handed the phone to him, who are you referring to?
A. Mr. Stone.
Q. Okay. After you handed the phone to Mr. Stone, correct?
A. Yes.
Q. Is there anything -- did you know whether or not Jesse was gonna come and help the two of you?
A. I didn't know nothing.
Q. Okay. What's the next thing you remember after that?
A. After he talked to him on the phone?
Q. Yes, ma'am.
A. He, Mr. Stone, came back to the -- well we was at the truck but he got back in.
Q. Okay.
A. He had been talking to him again.
Q. When you say talking to him again, are you referring to the young man that you saw walk up?

A. Yes.
Q. Okay. Now after you saw him talking to the young man that walked up again, okay, do you observe anything else?
A. He left.
Q. Okay. Before he left, did you have a opportunity to look at his body structure?
A. No.
Q. Okay. Did -- before he left, did you have a opportunity to see what clothing he was wearing?
A. I knew he had on the same thing, yes.
Q. Okay. Well let's talk about that. You said the same thing?
A. He had on black, all black. I could observe him with all black.
Q. All right. Now is this the same young man that you observed -- you told us earlier that you observed walk up when you and Mr. Stone were first out there?
A. Right. Yes, ma'am.
Q. Is that the same young man that you observed talking to Mr. Stone?
A. Yes.
Q. Okay. And then you said you just told us that, at some upon he left; is that correct?
A. Yes.
Q. Okay. Now when he leaves, do you see that individual

again?
A. Yes, I do.
Q. Okay. Do you know about how long after he left you saw him again?
A. About five to ten minutes.
Q. Okay. When saw you the person come back after the five to ten minutes --
A. Well I was sitting in the truck and I glanced back. You know how you just glance back. Cause I was still on the phone.
Mr. Stone was trying to push with his feet still moving the truck.
Q. Okay.
A. And I glanced in the mirror and I looked -- I asked him, I said -- I asked Mr. Stone, I said, "Isn't that the same person?"
Q. Okay. After you asked Mr. Stone isn't that the same person, does the person continue to walk over to the two of you?
A. Yes.
Q. Okay. Is that still by the truck, Ms. James?
A. Yes.
Q. Okay. When that person walks over and comes to the truck, are they -- is there anything different about the clothing from the person you had seen the five to ten minutes

earlier?
A. No.
Q. Okay. Is there anything different about that body structure?
A. No.
Q. Do you hear that person speak the second time they came?
A. His same voice.
Q. Okay. Is that -- I'm sorry. Didn't hear you.
A. Yes.
Q. Okay. You said something about the same voice?
A. Yes, the same voice.
Q. Okay. When you say it's the same voice, did you hear the same voice from the person that came up the first time and recognize it to the voice of the person the second time?
A. Yes, I did. Yes.
Q. Okay. After the person comes back up the second time, what's the next thing you remember happening?
A. After he came back the second time, they stood there and talked for a while.
Q. Okay.
A. Still talking.
Q. Now let's talk about when he stood there and talked for a while.
Did you see that or are you talking about hearing or both?

A. I heard and I glanced.
Q. Okay. When they're talking, how far away are they from one another?
A. Real close.
Q. Okay.
A. Up close.
Q. Now --
A. They were so close that I couldn't see his face or just the clothes, you know, like as usual.
Q. When you say that they're real close, are they face-to-face to each other?
A. Face-to-face.
Q. Okay.
MS. CEZIL: May I approach the witness again, Your Honor?
THE COURT: Yes.
Q. (By Ms. Cezil, continuing): Okay. Now just like we did before, I am gonna walk toward you and I want you to tell me when to stop when you see how the distance between the young man and Mr. Stone, okay?
A. All right. About that close.
Q. Okay. Is this -- now you extended your arm?
A. Yes, cause the door is in between. He's standing like in the door, like a little bit in the door.
Q. Okay. When you say he's standing in the door --

A. Mr. Stone is standing like in the door.
Q. Okay. And where is the defendant or --
A. He is on the outside over.
Q. He is on the outside over?
A. Yes.
Q. Okay. Is that still --
THE COURT: I have a question. I'm sorry. You were sitting in the passenger seat?
THE WITNESS: Yes.
THE COURT: And the driver's door is open or closed?
THE WITNESS: Yes, the driver's door is open.
THE COURT: Okay. You may proceed.
MS. CEZIL: May I proceed, Your Honor?
THE COURT: Yes.
MS. CEZIL: Okay.
Q. (By Ms. Cezil, continuing): Now as the two of them are standing at the driver's door as you've just told us; is that correct?
A. Yes.
Q. What's the next thing you remember happening?
A. Mr. Stone looked away, just like turned a little bit and he said, um, "This young man wants your rings."
Q. Okay. Now was there anything unusual about Mr. Stone's voice when he said this, ma'am?

A. Yes, he was trembling and shaking.
Q. Okay. Now when Mr. Stone says, "This young man wants your rings," what, if anything, do you do at that point?
A. I was like want my rings? Because I knew they wasn't worth anything. They was just friendship rings from my grand kids.
Q. Okay. Now after you thought that to yourself, do you do anything?
A. I just held my hand out, then he pulled it off.
Q. When you say he --
A. Pulled the ring. Mr. Stone pulls my rings off my fingers.
Q. Okay. After Mr. Stone pulls the rings off your finger -- pull the rings off of your fingers, what's the next thing that you remember happening?
A. He pulled my rings off my -- after he pulled the rings off my fingers, he said, "This young man" -- well he throwed (sic) them back to me. Mr. Stone throwed (sic) the rings back in.
Q. Okay.
A. And then he said, "He wants that necklace you got on."
Q. Okay.
A. I said, "Well wait a minute. Wait a minute." He said, "Or he gon' shoot my ass," just like that.
And that's what made me really look. I looked then.

Q. Okay. When you looked, what did you see, Ms. James?
A. I can see the gun in his side.
Q. Okay. Do you remember -- can you describe for us what that gun looked like?
A. No, I just knew it was a gun.
Q. Okay. Now you said that you saw a gun in Mr. Stone's side; is that correct?
A. Yes.
Q. Okay. What's the next thing you remember happening after?
A. I just -- he said just -- he just said, "Jerk it off," you know. I jerked the necklace off and handed it to Mr. Stone.
Q. When you say, "He just said 'jerk it off'," who are you referring to? Mr. Stone or the young man?
A. The young man.
Q. Okay. Now when the young man says just jerk it off, is this the same voice you heard from the first person that you saw?
A. Yes, it is.
Q. And is this the same voice that you heard from the second person that came back?
A. Yes.
Q. Okay. Are all of these voices the same person?
A. The same.
Q. To you?

A. Yes.
Q. Okay. What's the next thing that happens after you take your -- jerk your necklace off, Ms. Stone?
A. He told him to tell me to run the money.
Q. Okay. Did you have any money on you at that time?
A. Yes, I did.
Q. Okay. Where did you have money on you?
A. I was trying to play it off and I was gon' say I didn't have any. I said, "We don't have any money," just like that.
Q. Okay.
A. He was like, "Tell her to give me the damn money or I'm gon' shoot you."
Q. Now when you say he was like tell her to give me the money or I'm gonna shoot you, is this Mr. Stone you're referring to or the young man?
A. Yes. He told Mr. Stone to tell me to give him -- give me the damn money.
Q. Okay. Now do you give him the money?
A. I reach in my bra, got it, yes.
Q. When you say that you reached in your bra, did you have the money in your brazier?
A. Yes, I did.
Q. Okay. What happens after you reach into your bra?
A. After I reach into my bra and handed him the money, I was

still sitting there with the phone in my hand. I didn't really -- I knew he had the gun, but I wasn't really thinking, you know. And he walked around to the front of the truck.
Q. Okay. When you say, "he," are you referring --
A. He walked Mr. Stone around to the -- the young man walked Mr. Stone around to the front of the truck.
Q. Okay. Now when you say he walked him around to the front of the truck, can you explain to us what you mean by that?
A. He had the gun on him and he told him to get your ass around there.
Q. Okay. I'm sorry. I didn't hear the last part.
A. He had the gun on him and he made him walk around to the front.
Q. Okay. I heard you say something about get your ass. And I know that may be uncomfortable for you but --
A. Yes, it is.
Q. You have to paint a picture for us.
A. He said, "Get your ass on around there."
Q. Okay. When you say he says that, are you referring to the young man?
A. The young man said, "Get your ass on around" -- told Mr. Stone to get his ass on around there.
Q. Okay. What's the next thing you remember happening after the young man says that to Mr. Stone?

A. Mr. Stone walked to the front of the truck and they stopped. They like paused. I seen it when they paused and I still couldn't see his face.
Q. Okay. Now when you say you couldn't see his face, is this the same body structure that you remembered?
A. Yes, it was.
Q. Okay. And is that the person from the first time, Ms. James?
A. Yes, it is.
Q. And is it also the person from the second time?
A. Yes.
Q. Okay. Now when you -- when you're looking and you can see the body structure, and as you say you couldn't really see the face, what's the next thing that you see, if anything?
A. Well I didn't see nothing. I couldn't see the gun no more, but I knew he still had it on him cause Mr. Stone broke down.
Q. When you say Mr. Stone broke down, explain to us what you mean by that.
A. He started crying, "Nawl, man, nawl, man."
Q. Okay. Do you hear the young man saying anything?
A. Yes, he said -- he got to the truck and he said, "I'm gon' fuck your wife."
Q. Okay. After you hear Mr. Stone break down and saying, "Nawl, man" and you hear the young man say, "I'm gonna

fuck your wife," what is the next thing you remember happening?

A. I remember he, um, walked -- pulled the door and he said, "Take them pants off. Take them damn pants off," just like that. I said, "Okay. Just don't hurt us." I said, "Don't hurt us."

Q. When you say that he walked to the door --

A. Yes.

Q. -- is this the driver's door he is walking to or the passenger door?

A. Passenger. First he told -- first he told Mr. Stone to get your ass around to the driver's side.

Q. Okay.

A. And then after Mr. Stone got around there, he said, "Put your hands on the steering wheel and don't move."

Well by Mr. Stone having the stroke, it's kind of hard for him so he was shaking a little bit. But he said, "And put your hands, don't you move." He kept saying, "Don't you move."

Q. Okay. Where is the gun as he's saying, "Don't you move?"

A. He had it -- he still had it on me. He had stuck it on me.

Q. Okay. Is he saying anything else during that time to Mr. Stone?

A. He said I'm -- he said, "Get your ass around there and

don't move or I'm gon' shoot this bitch." That's what he said.

Q. Okay. What's the next thing you remember after he says, "I'm gonna shoot this bitch"?

A. After he said that, he said, "Take them pants off and hurry up and take 'em off." He -- I said, "Just don't hurt us." I kept telling him don't hurt us. I said, "I got to unzip my boots." Just like boots.

So I went to reach my boot. He said, "Don't you look at me." He said, "Don't you look at me." I said, "I'm not looking at you." Just had my eyes closed and I was taking my boot off. And I was talking and I took my boot off.

When I took my boot off and pulled my pants and my panties down, then he was like, "Scoot down in this truck just like this." When I scooted down in the truck, he um --

Q. Okay.

MS. CEZIL: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Ms. Cezil, continuing): Ms. James, I'm showing you what's been marked as People's Proposed Exhibit Number 5.

Okay. Do you recognize that?

A. Yes, that's the inside of my truck.

Q. Okay. Is this the same truck you were talking about or you identified for us earlier?
A. Yes, it is.
Q. Okay.
MS. CEZIL: Your Honor, I would move for the admission of People's Proposed Exhibit Number 5.
MR. HOWARTH: No objection.
THE COURT: So admitted.
MS. CEZIL: Permission to publish to the jury?
THE COURT: So granted.
Q. (By Ms. Cezil, continuing): Okay. Ms. James, I'm showing you People's Exhibit Number 5 that we just looked at; is that correct?
A. Yes. Yes.
Q. Okay. Now the last thing we talked about he said scoot down; is that correct?
A. Yes. He said, "Scoot your ass down in the seat." I said, "Okay. Just don't hurt me." He said, "Don't look at me."
Q. Okay. Now when you -- can you indicate for us where you were sitting?
A. I was sitting on the passenger side.
Q. Okay. Now I see that there is a seat on the passenger side and a door next to it; is that correct?
A. Right.
Q. Okay. Was that door open or closed?

A. It was open.
Q. Okay. What's the next thing you remember happening after?
THE COURT: Can someone point which one is the passenger door?
MS. CEZIL: Okay. Can she --
THE COURT: She can step down.
MS. CEZIL: Yeah, if you can step down and show us.
THE WITNESS: This is the passenger door (indicating).
MS. CEZIL: Can you speak up, please?
THE WITNESS: This is the passenger door (indicating).
THE COURT: Thank you, ma'am. You can have a seat.
MS. CEZIL: Thank you.
Q. (By Ms. Cezil, continuing): Okay. After he tells you to scoot down on that seat, do you do that, Ms. James?
A. Yes, I do.
Q. Okay. And why do you do that?
A. Because he had the gun on me and I was scared. I was afraid.
Q. Okay. When you say he had the gun on you, where exactly was the gun?
A. He had it on my like my chest area.

Q. Okay. Now where is Mr. Stone sitting?
A. He's in the passenger seat with his hands on the steering wheel.
Q. He is in the passenger seat?
A. I mean in the driver's seat.
Q. Okay. Now after he has the gun on you and tells you to scoot down, what's the next thing that you remember happening?
A. And after I had took my pants and my panties down, he stuck his penis in my vagina.
Q. Okay. Let's break that down a bit.
Now you said that you had to scoot down; is that correct?
A. Yes.
Q. Okay. I don't want you to slip, so if you can't do it there we can have another chair here, okay.
Can you show us how you were scooted down?
A. Yes, I can. I was all the way to the edge of the seat.
Q. Okay.
A. And I was just like laying back like this. And when I laid back, I was on Mr. Stone's lap.
Q. Okay. When you say you were on Mr. Stone's lap, what part of your body was touching what part of your body (sic)?
A. My head was on his lap.
Q. Okay. When your head is on Mr. Stone's lap and you're

scooted down as you showed us, so the record reflect the witness slid out of her chair and laid back flat, is all are your body inside -- the lower part of your body inside of the truck or is part of it outside of the truck?
A. Part of it was out.
Q. Okay. What's the next thing you remember happening after that?
A. After he had stuck his thing in my penis (sic), I could hear he said, "Lay your ass down 'fore I shoot you, before I shoot you and don't look at me."
Q. Okay. Where is the gun at that point?
A. It's still on me.
Q. All right. Now let's back up a little bit.
You said that he stuck your -- stuck his penis in your vagina; is that correct?
A. Yes.
Q. Okay. Now did that go past your vagina?
A. Yes, it did.
Q. Now was he able to get his penis in the -- immediately as he tried to put it in your vagina?
A. No, he was having a problem.
Q. Okay. When you say he was having a problem, and it's not to embarrass you, can you please explain to us what you mean?
A. Well he act like he just couldn't do it, you know,

pushing.
Q. Okay. Is he saying anything to you at that time?
A. "Don't look at me." He keep saying, "Don't look at me."
Q. Okay. Now after he is saying don't look at you -- or don't look at me, and he is trying to put his penis in your vagina, okay, does he ever go, actually go inside of your vagina?
A. Yes, he does. Well it felt like it.
Q. Okay. Now is that -- where did it feel like it was at? Is that the part where babies come from or just past the lips of the vagina?
A. Part where my babies come from.
Q. How many times did he put his penis in your vagina?
A. Once.
Q. Do you know about how long that lasted?
A. About two to three minutes.
Q. Okay. When he is trying to put his penis in your vagina, does he touch anywhere else on your lower body with his penis?
A. Just -- not with his penis. No, his hand -- he was like pushing.
Q. Okay. Explain that to us.
When you say with his hand he was pushing, what do you mean by that?
A. He had the one hand that he had, the other one was on the

gun and he had his hand pushing trying to get in.
Q. Okay. Ms. James, do you know whether or not he was erect?
A. I don't know. I think it felt like it cause it felt like I done peed on myself.
Q. You felt like you had some pee on yourself?
A. Yes.
Q. Do you know where that pee came from?
A. Out of my vagina.
Q. Okay. Do you -- do you remember whether or not you had to use the restroom, Ms. James?
A. I did. Not at that time right then, but I did.
Q. Okay.
A. Afterwards.
Q. All right. Now you said that he used his hand and tried to push in; is that correct?
A. Yes.
Q. Okay. As he's doing that, you said that he had a difficult time to get in; is that also correct?
A. Yes.
Q. Okay. What's the next thing that you remember happening?
A. I heard a motor. I don't know whether it was a car, truck or what but I heard an automobile. And, um, he was still saying, "Don't you look at me." And he looked at Mr. Stone and said, "Don't you move. Don't you move."

And I heard it when it went by. And after it

went by, he backed up. And when he backed up off of me, he backed by the truck door and then he stopped. I could still -- I could see him running.

Q. All right. Let's back up a little bit.

From the time that you said that he tried to put his penis in your vagina -- and he placed his penis in your vagina one time; is that correct?

A. Yes.

Q. And the time that you heard the vehicle come by, do you know about how long, how much time had passed by?

A. Like a few minutes. Just a few minutes.

Q. Okay. When you say a few minutes, was that less than five minutes?

A. Yes.

Q. Would that be less than three minutes?

A. About three. About three.

Q. After he backs up and you see him running, what's the next thing that you remember?

A. He ran. I remember trying to -- I sat up a little bit and I remember Stone running around to the truck, to my side of the truck. But that was after he -- when he got to Findlay, he turn around and shot back at us three times with the truck.

Q. Okay. Now you told us about what happened to you in the vehicle when you had slid down and him trying to put is

penis in your vagina; is that correct?
A. Yes. Yes.
Q. Did he ever put his penis in your anal area?
A. No.
Q. Okay. You told us about getting those rings back. You recall that?
A. Yes.
Q. Did you ever get that necklace back?
A. No, I didn't.
Q. How about that money? Did you get that money back?
A. No. No.
Q. Okay. Who was the last person that you saw with that money?
A. I was. Him.
Q. Him?
A. He was.
Q. When you say, "him," are you referring to the --
A. I'm talking about the young man.
Q. Okay. Did you ever try to leave that truck?
A. After the shooting, I was afraid. I was afraid for my life.
Q. Okay. What about when the young man was still there with the gun? Did you try to leave the truck at that point?
A. No, I didn't.
Q. Why not?

A. Because he had the gun on us and I was afraid.
Q. Did you ever see Mr. Stone try to leave the truck?
A. No.
Q. Ms. James, do you remember the -- prior to December 31st, do you remember the last time that you had consensual sex with anyone?
A. Well it was with Mr. Stone. It was like two, three days.
Q. Okay. Again, not to embarrass you, did you have any anal sex with Mr. Stone?
A. No.
Q. With anyone else prior to that night out there on what happened?
A. No, I don't have sex -- no.
Q. Now I'm gonna take you back to when -- you just told us that you heard him run off, go down the street and then fire three shots at you?
A. Yes.
Q. Okay. What happens after that?
A. I was crying and saying, "Lord, have mercy. He gon' kill us." I told Mr. Stone he was gon' kill us. He ran around to see was I all right. When he got around there, I was trying to pull my pants on. And I got -- I said, "I got to call the police. I got to call the police." And he was like, "Use my phone." So mine was dead, so he told me to use his phone.

I used his phone. I called 911.

Q. Okay. When you called 911, did you -- were you able to speak with anyone?

A. Yes, I was.

Q. Okay. Did anyone ever come out there after you called 911?

A. No. I stayed there about 30 minutes.

Q. After you stayed there about 30 minutes, do you leave at some point?

A. Yes, I did.

Q. What causes you to leave?

A. I was afraid for my life. I was afraid he was gon' come back and he might kill us this time.

Q. Okay. After you wait for the 30 minutes and you leave, where do you go?

A. I -- we walked home.

Q. Okay.

A. Me and Mr. Stone.

Q. Now when you say that you and Mr. Stone walked home, you told us earlier Mr. Stone has some medical issues; is that correct?

A. Yes, he do.

Q. Can you please tell us what those are?

A. He had a stroke.

Q. Okay. And was this prior to the December 31st date?

A. Yes, it was. It was.
Q. Okay. How about yourself? Did you have any --
A. Yes, I'm a diabetic and I got high blood and I'm asthma.
Q. Okay. Now when you and Mr. Stone are walking home, what are the conditions out there, the weather conditions?
A. It's slick and icy.
Q. Okay.
A. And I fell a couple times on the way home.
Q. All right. You told us that you had to use the restroom really bad.
Ms. James, when I ask you the questions just wait for a minute until I finish?
A. All right.
Q. Okay. You told us earlier that you had to use the restroom but not at that point?
A. Right.
Q. Okay. Can you tell us what you mean by that and at what point you were referring to?
A. Well I didn't have to use -- I didn't have to pee until after the ordeal was over with.
Q. Okay. Now was there a restroom out there for you to use, Ms. James?
A. No, it wasn't.
Q. Okay. Is it fair to say as you were walking it's possible that you could have peed on yourself?

A. No.
Q. Okay. All right. You said were you walking home and you slipped a few times?
A. Yes.
Q. Okay. Is Mr. Stone still with you at this point?
A. Yes, he is holding me up.
Q. Okay.
A. We holding each other.
Q. How long do the two of you walk for?
A. For about -- we walked about a mile, a mile and a half.
Q. Okay. And where do you walk to?
A. To my house.
Q. All right. And when you get to your house, is anyone there?
A. Yes.
Q. Okay. Who is there?
A. We knocked on the back door and my son came up James.
Q. Okay. Is this James James that you're referring to?
A. Yes, it is.
Q. Okay. What happens when James comes up?
A. I was like I been -- we have been robbed and I been raped. And I was crying out real loud. And Mr. Stone just broke down. He was crying. We your mama been raped and I got to go to the hospital, I got to go to the hospital. I said but I have got to use the bathroom. I said I got to

use the bathroom and I know I can't, so I held it.

Q. Okay. Now when you say that you held it, what's the next thing -- and you had to use the bathroom?

A. My son was putting on his clothes while I was saying that. I was just sitting there with my daughter-in-law. She was in the dining room with me.

Q. Okay. Now where is the first place that you go after that?

A. We went to St. John.

Q. Okay. Once you get to St. John's Hospital, what happens, if anything? Can you tell us about that?

A. When I got to St. John's, I went to the desk and they put the band on me like they put on you. I told them I had been raped and they said we don't do rape victims here. But they took me in the back and the few doctors came, you know, and they talked to me.

Q. Okay.

A. Calmed us down some and the rest of my family came.

Q. Do any police come at that point?

A. Well it was a while before they came. I think it was like-- I don't really know the time that they made it there, but they came.

Q. Okay. Did they come to St. John's Hospital, Ms. James?

A. Yes, ma'am, they did.

Q. Okay. Now you said that they told you that they don't do

rape kits; is that correct?
A. Yes.
Q. Okay. Do you go somewhere else after St. John's?
A. Yes, they said they was gon' send me to Detroit Receiving.
Q. Okay. When you get to Detroit Receiving, do you see any-- do you see any health care providers there?
A. Yes.
Q. Okay. Do you recall whether you saw a doctor or a nurse?
A. I seen a doctor. I think it was a doctor. She was a doctor. I'm not sure, but she did the exam on me.
Q. Okay. When you say she did an exam on you, can you please explain to us what exactly she did to you?
A. She did a -- I forgot what kind of test that was that she did, but it was for the make sure I didn't have a disease.
Q. Okay. Did she do any physical examination to you?
A. Yes.
Q. Tell us what that was.
A. Well she put -- did a pap smear and, um, all kind, you know, like they do when you go in for exam for babies.
Q. Okay. When you say she did a pap smear --
A. And took tests and I gave her my clothes and stuff.
Q. Okay. When you said she did a pap smear, are you referring to an examination of your vaginal area?
A. Yes, ma'am.
Q. Okay. Did she do a physical examination on any other part

of your body?
A. No.
Q. Okay. Okay. After you're at the second hospital, do you see any police at that point?
A. No.
Q. Okay. Is there a point in time that comes when you do see some police?
A. Yes, the ones at Detroit -- yes, it was like a couple of, you know, the next day.
Q. Okay. When you say you saw the police the next day, did you go down to the police station or did they come to your home?
A. They came to my home.
Q. Okay. When they came to your home, did you tell them what had happened to you?
A. Yes, I did.
Q. Okay. After you tell them what happens to you, what's the next thing you remember happening regarding the police?
A. They questioned Mr. Stone afterwards.
Q. Okay. Were you ever taken to do a lineup?
A. Yes.
Q. Do you remember how long that was after what happened to you the night of the 31st?
A. I think it was like three or four days or something.
MS. CEZIL: Your Honor, may I approach the

witness?

THE COURT: Yes, you may.

MS. CEZIL: Just a minute, Your Honor.

Q. (By Ms. Cezil, continuing): Ms. James, before you go to do the lineup, do you see anybody else with the police department?

A. Just the two guys that -- just the Officer Kane.

Q. Okay. Now other than Officer Kane, do you see anyone else?

A. The other two police officers.

Q. Did anyone try to get to you to do what's referred to as a sketch photo?

A. Not me, no.

Q. Well you say "not me."

Are you aware of them doing that with someone else?

A. Yes, Mr. Stone.

MS. CEZIL: May I approach again, Your Honor?

THE COURT: Yes, you may.

Q. (By Ms. Cezil, continuing): I'm showing you what's been marked as People's Proposed Exhibits 1 and 2.

A. Yes.

Q. Okay. Take a look at those and let me know if you recognize those.

A. Yes.

Q. Okay. Now as far -- let's take it one at a time.
People's Exhibit Number 1, how do you recognize that?
A. By the body image.
Q. Okay. Well what is that?
A. This is a lineup.
Q. Okay. Is that the lineup that you were shown?
A. Yes. They behind the glass.
Q. Okay. Is that in the same or similar condition it was when you were -- when it was shown to you?
A. Same condition.
Q. Okay.
MS. CEZIL: We would move for the admission of People's Exhibit Number 1.
MR. HOWARTH: No objection.
THE COURT: So admitted.
Q. (By Ms. Cezil, continuing): Okay. Now I'm also showing you People's Proposed Exhibit 2.
Do you recognize that?
A. Yes.
Q. Okay. What do you recognize that as?
A. At the where I went to do the identification.
Q. Okay. Is there any signatures on here?
A. Mines.
Q. Okay. And is there a signature or initial next to a

number?

A. Yes, it is number four.

Q. Okay. And what does number four say?

A. Number four it says, "Howard McKnight."

Q. Okay. Is this in the same or similar condition as it was when you signed it?

A. Same condition.

MS. CEZIL: I would move for admission People's Exhibit Number 2.

MR. HOWARTH: No objection.

THE COURT: So admitted.

MS. CEZIL: Thank you, Your Honor.

Q. (By Ms. Cezil, continuing): Now you said that you went and had a lineup and it was behind the glass?

A. Yes.

Q. Is that correct? Can you explain that to us?

A. Well I -- when I went, they took us in there, me and Mr. Stone.

Q. Okay.

A. They put us separate. He told us that we gone take you in first. So they took me back there and asked me did I want to step behind there and see how it is that they couldn't see and I said no.

So he was like well we gon' bring them-- when they bring 'em out, I want you to identify 'em if you can,

if you see anybody you recognize.
Q. Okay. Did any of the officers tell you who to identify?
A. No.
Q. Did Mr. Stone tell you who to pick out?
A. No.
Q. Were you and Mr. Stone in the same room?
A. No.
Q. Okay. Now you said that you picked someone out by the body image earlier; is that correct?
A. Yes.
Q. Do you see that individual in court today?
A. Yes, ma'am.
Q. Okay. If you can please let us know where they're sitting and what they're wearing?
A. He sitting over there at the desk with the prosecutor.
Q. Okay.

THE COURT: With the who?

THE WITNESS: I guess the prosecutor. I don't know what --

THE COURT: Could you point to him?

THE WITNESS: He sitting at the desk right there. He have on a white shirt with black stripe tie and some black pants, shoes.

THE COURT: Record will reflect that the witness has identified the defendant.

MS. CEZIL: Thank you, Your Honor.

May I publish People's Exhibit Number 1?

THE COURT: Yes, you may.

Q. (By Ms. Cezil, continuing): Okay. That's an image of People's Exhibit Number 1?

A. Yes.

Q. Ms. James. Okay. Can you tell us how did you pick out -- you said it was Howard McKnight; is that correct?

A. Yes.

Q. Okay. What -- based off of what? What caused you to pick him out?

A. I was walking and I looked at all of 'em. And after I looked at all of 'em, I was imagining them with a hood on. I walked three times to make sure. And I -- the officer asked me, he said, "Do you think you" -- I was kind of baffled at first. He said, "Do you think you" -- cause by me not seeing his face, you know, I was like going by the image.

And he was like, um, do you recognize anybody. I said, "Yes, the second one from the end." That's what I said. But he was like are you referring to the fourth one. I said, "Yes, the fourth one. I recognize him. He's number four."

Q. Okay. Now you said the second one from the end.

A. I was saying the second one cause I was thinking they was

counting from that way instead of going that way.

Q. Okay. If you could --

MS. CEZIL: Judge, may she come off the stand?

THE COURT: Yes, you may.

MS. CEZIL: If you could come off and show us the one that you identified on People's Exhibit Number 1.

THE COURT: She can do it there, too.

MR. HOWARTH: It doesn't matter.

Q. (By Ms. Cezil, continuing): Just loudly so the court reporter can hear you.

A. All right. I was -- now I was thinking they was coming from this way, this route (indicating).

Q. When you say "this way," do you mean left to right?

A. Yes.

Q. Okay.

A. But they was talking about coming from that way (indicating).

Q. That way?

A. I was like the fourth person which was him.

Q. Okay. And when you say -- if you can just show us that again.

Okay. And when you say the fourth person which is him, is that from right to left?

A. It's from right to left.

THE COURT: She pointed to him, so I think

that's --

MS. CEZIL: Okay. And let the record reflect she has identified the fourth person in this picture Howard McKnight.

Just a moment, Your Honor.

Q. (By Ms. Cezil, continuing): Now the person that you identified in the picture for the jury just a moment ago --

A. Yes.

Q. Okay. Now you said that was based off of body image; is that correct?

A. Yes, it was.

Q. Which body image are you referring to, Ms. James?

A. I'm talking about his whole body.

Q. Okay. And where did you see that body image before?

A. When -- at the incident. When we had the incident.

Q. Okay. When you say, "at the incident," is that the body image of the first person that you saw?

A. Yes, it is.

Q. Okay. Was that the body image of the second person?

A. Yes, it was.

Q. Is it the body image of the person that you said told Mr. Stone with the gun to get your ass around the truck?

A. Yes, it was.

Q. Is that the body image of the same person that had you

slide down outside of the truck and put their penis in your vagina?

A. Yes, it was. Yes, it was.

MS. CEZIL: Nothing further at this time.

THE COURT: Counsel.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. I wanna make sure that I have this correct.

You -- ma'am, you go by the name of Lucille Stone?

A. No, I go by Lucille James.

Q. Okay. I wrote that down wrong this morning.

A. Well it's both of them because we been together 42 years.

Q. Okay. I understand that.

Do you sometimes interchange those names?

A. No, I just use mine.

Q. You use yours which is Lucille James?

A. Yes.

Q. Thank you, ma'am.

Ma'am, do you know who I am?

A. I know -- I just know you his lawyer.

Q. Okay. How do you know that?

A. I seen you last time in court.

Q. You remember me?

A. Yes, I do.

Q. That was --
A. It's been near about a year.
Q. It's been a while, hasn't it?
A. Yes, it is.
Q. If I was to suggest to you, ma'am, that that was January 22nd of this year, about three weeks after the incident, does that sound right?
A. I wouldn't know.
Q. All right.
A. I know it was in court.
Q. But you recognize me, right?
A. In court, yes.
Q. Look the same to you as I did then?
A. Yes.
Q. Nothing different you can think of?
A. I don't see anything.
Q. All right. And you're quite sure of that?
A. I'm quite.
Q. All right. And, you know, and you are correct. That was me.
A. I know.
Q. That was me a year ago.

And if I were to suggest to you, ma'am, that back on January 22nd I had neither mustache nor beard --

MS. CEZIL: Objection, Your Honor. He's

testifying.

MR. HOWARTH: I'm suggesting to her, that's all.

THE WITNESS: I know that was you know. I know that.

Q. (By Mr. Howarth, continuing): Okay. But did you see the moustache and the beard?

A. Yes.

Q. Back in January?

A. Back in January.

Q. Okay. And that's part of the reason you would recognize me, right?

A. Yes.

Q. Because not everybody has a mustache and a beard, right?

A. My husband got it.

Q. Okay. Okay. That's fair. I just wanna make sure --

A. Yep.

Q. -- of your ability to recognize folks.

A. I can recognize.

Q. Good. Thank you, ma'am.

THE COURT: Well, counsel, I don't think she's made -- she hasn't made a facial recognition in this case, so I'm not -- so I'm sustaining the objection now.

Cause I mean you're saying the ability to recognize what? A body image or --

MR. HOWARTH: People. People.

THE COURT: Well that's not --

MR. HOWARTH: That's all I'm talking about.

THE COURT: Well then what's the relevance?

MR. HOWARTH: The relevance is the ability of this witness to make an accurate identification of somebody.

THE COURT: A facial.

MR. HOWARTH: Back in January of last year.

THE COURT: The Court's sustaining the objection.

MS. CEZIL: Thank you, Your Honor.

Q. (By Mr. Howarth, continuing): Ms. James, I wanna take you back to the evening that we're talking about where you had been at the casino and you get stuck. And after you got stuck and you had pulled off at Gratiot, you indicate that a person came up to the car?

A. Yes.

Q. All right. That person was dressed all in black?

A. Yes.

Q. That person you really never saw their face, am I correct?

A. You correct, yes.

Q. Your impression of that person when you think back to the incident was that that person was appeared friendly, am I correct?

A. Yes.

Q. Appeared to be getting along well from what you could tell, seemed to getting along well with your husband?
A. Yes, he was.
Q. He was actually trying to push the truck?
A. Yes.
Q. And he was not only trying to push the truck, that first person was giving you some help with trying to get ahold of one of your sons, right?
A. Yes.
Q. And he was suggesting that maybe even he could get on the cell phone, am I correct?
A. Yes.
Q. And he did get on the cell phone?
A. Yes, he did.
Q. And he seemed to be talking from what you could tell?
A. Right.
Q. He seemed to be talking to one of your sons?
A. Yes.
Q. So everything about that person who first came up was, in your impression, he is a helpful person?
A. That's what I thought.
Q. And you thought he is -- probably thought he was a pretty nice person?
A. Well I wasn't talking to him, so I don't know about the niceness. But I know he was friendly.

Q. He was friendly, all right.

No question in your mind that after that person who tried to push the truck, after that person tried to talk with you and your husband, after that person talked on the phone or tried to talk on the phone with your son, he left, am I right?

A. Yes, sir.

Q. And he physically walked out of your sight?

A. Right, yes.

Q. And he was gone what could have been ten minutes?

A. Yes.

Q. And you would never to this day be able to say who that person was by their face, right?

A. Not by they face, no.

Q. Now ten minutes goes by and someone comes back to the truck, right?

A. Yes.

Q. That person had the same frame, correct, as the person that helped to do the pushing, right?

A. Not only frame; the clothes, too.

Q. All right. The clothes were the same in that they were black clothes?

A. Yes, they was the same clothes.

Q. They're the same color.

And you're identifying them by the color or by

something beyond the color?
A. The clothes and the frame, build, how they fitting him.
THE COURT: For the record, did you say they were the same color or the same clothes?
THE WITNESS: The same color and the same -- I don't know whether he say the same clothes or not, but they was the same clothes that I seen.
Q. (By Mr. Howarth, continuing): And how would you describe those clothes?
A. There was -- it was -- what I seen in the incident was a black hoodie and some black jeans what I seen.
Q. Black hoodie and black jeans, right?
A. Yes.
Q. Anything else you can tell us about the clothes?
A. No, cause I wasn't perceptive enough to look, just really look at him.
Q. Because that first person wasn't somebody you were gonna have to remember, am I right?
A. I thought it wasn't.
Q. All right. Now the person that comes back had the same build, right?
A. Yes.
Q. What you would have called the same frame?
A. Yes.
Q. And it seemed to be the same clothes?

A. Yes.
Q. And you cannot tell us, however, that it was the same face, am I right?
A. I could after the voice.
Q. All right. The voice?
A. Yes, sir.
Q. Did you feel that there was something unusual about the voice?
A. When he came back, no, it was just the same.
Q. Was there something unusual? In other words, some people in your experience have real high-pitch voices, am I right?
A. Yes.
Q. Some folks have a real deep down voice like I just was imitating, am I right?
A. Yes.
Q. The voice of the person who you heard talking either the first time or the second time, is it fair to say that was just a normal voice?
A. He was talking normal, yes.
Q. All right. In other words, it wasn't -- the voice was not unusual?
A. No.
Q. Now when you went to the lineup, you made the identification at the lineup entirely on the frame of the

person?
A. Yes.
Q. Cause the clothes were now different, right?
A. Right.
Q. The person had on entirely different clothing?
A. Yes, he did.
Q. And everybody in the lineup had the same clothes?
A. Yes.
Q. Is that what is called like prison clothes?
A. Yes.
Q. So when you walked down that line, you were looking for somebody entirely that had the same body build?
A. Image, yes.
Q. And did you think that of those people in the lineup; one person stood out because of his body build?
A. Yes.
Q. What stood out?
A. His frame. And I could tell because he had been up on me and I know. When somebody close to you, you gon' know.
Q. All right. But not by the face?
A. If you ain't looking at the face, you gon' know what that image. I'm looking down like this and I can see a body image.
Q. So was his body image significant? In other words, was he real -- was the man particularly heavy-set?

A. It was medium.
Q. Medium?
A. Yes.
Q. What you would call a normal build?
A. Yes.
Q. Not particularly tall?
A. No.
Q. Not particularly short?
A. Not about tall as my husband is.
Q. But not something that stood out by height or shortness or being real heavy or being real thin?
A. No, I wasn't looking at all that.
Q. Ma'am, the man who raped you, when you think about what was happening during the time of that horrible incident, is it true that it is your impression, ma'am, that that man did ejaculate?
A. Yes, it is.
Q. All right. And that's, of course, what you would have told the people at Receiving Hospital, am I right?
A. Not -- yes, at Receiving.
Q. Sure. Because that's when they --
A. But not at Receiving; when I went to St. John. I went to St. John first.
They didn't examine me at St. John, but I told them I had been raped.

Q. All right. Did you tell them at St. John's whether the man had ejaculated?
A. At St. John?
Q. Yes, ma'am.
A. They didn't ask me.
Q. That's fair. That's fair. That's fine. That's what I'm trying to get.
At Receiving Hospital that's where they asked you the questions?
A. They didn't ask me. She just carried me and examined me.
Q. All right. Did they ask you at Receiving Hospital if the man ejaculated?
A. Yes.
Q. And you said to them yes?
A. Yes, to my knowledge.
Q. Cause that was the truth?
A. Yes.
Q. When you think back to that incident, is it a fair statement that the man who did this to you did not wear a condom?
A. Yes.
Q. That is it's fair he did not?
A. He did not wear none. In fact, could I say something?
Q. Yes. I know -- as a matter of fact, you're gonna say that that man actually asked for one, right?

A. Yes, asked did we have one.
Q. Yeah. And that impressed you as being a pretty nasty thing?
A. Right.
Q. Okay. I understand that.
But you didn't, of course, have one naturally?
A. No, I carry those things.
Q. And so he didn't use one far as you know, correct?
A. Correct.
THE COURT: Excuse me, counsel.
Did you see his -- did you -- ma'am, excuse me. Did you see his actual penis?
THE WITNESS: Yes.
THE COURT: You saw his penis?
THE WITNESS: Well I was looking -- I'm looking down.
THE COURT: So you did see his penis?
THE WITNESS: I didn't see his penis, but I know he put his penis in me.
THE COURT: My question is did you see it?
THE WITNESS: See it, no.
THE COURT: Okay. You may proceed.
Q. (By Mr. Howarth, continuing): And you have indicated to us, ma'am, that a sketch person came out that you talked to, right, the person that was gonna draw a picture?

A. Not to me.
Q. But talked to your husband?
A. Yes.
Q. And the reason that you didn't do a sketch was?
A. Cause I couldn't see his face.
Q. Told the person I couldn't help you with the face, right?
A. Right.
MR. HOWARTH: If you just hold on just one second, please.
No further questions at this time, Your Honor.
THE COURT: Any redirect?
MS. CEZIL: Just briefly, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. CEZIL:**

Q. Ms. James, is it correct that you just said that you did not see the defendant's penis?
A. Yes, I knew he put it in me.
Q. Well is it fair to say that you can't be sure whether or not he wore a condom?
A. I can't be sure that's right.
Q. Okay. And how about the ejac -- how about whether or not he ejaculated? As you sit here today, are you positive on whether or not the defendant ejaculated?
A. Positive.
Q. You're positive?

A. I'm positive that he ejac -- no, I'm not positive but I don't really know.
Q. Okay. Now you were asked by Mr. Howarth some questions about going to get the medical exam done.
A. Yes.
Q. And what you told them. Do you recall that?
A. Yes.
Q. Okay.
MS. CEZIL: May I approach the witness, Your Honor?
THE COURT: Yes, you may.
Q. (By Ms. Cezil, continuing): Okay. I'm showing you some medical records.
Do you recognize who those belong to?
A. Yes, me.
Q. Okay.
A. Yes, they belong to me.
Q. All right. I'm gonna refer you to page four of 15. Don't read it out loud to us, okay?
A. All right.
MR. HOWARTH: Well, Your Honor --
THE COURT: Yes.
MR. HOWARTH: Is this refreshing recollection because there is no --
THE COURT: I'm with you, counsel. Cause I'm

trying to -- for what purpose are you using it? Cause she didn't say she didn't remember anything.

MS. CEZIL: Okay. Well, no, but she said something different, so it's from what's in here.

THE COURT: So impeachment?

MS. CEZIL: Sure, Your Honor.

THE COURT: Okay. Counsel.

MR. HOWARTH: If she is impeaching her own witness, she is allowed to.

THE COURT: Okay. I just want to make sure we are on the same page.

You may proceed.

MS. CEZIL: Absolutely. Okay. Thank you.

Q. (By Ms. Cezil, continuing): Now I don't want you to read this out to me, but if you can read Section D. Just a minute.

A. This is Section D?

Q. Section D. And it has one, two, three and four. So don't read it aloud to us, but look up at me when you're done.

Okay. Now in Section D, does that have yes or no options?

A. It's no.

Q. Okay. And do you know what it's no to, Ms. James?

A. Yes, no that I -- that he didn't ejaculate.

Q. Is that what you saw here in your medical records?

A. I think that's what I seen.
Q. Okay. Do you remember speaking to the nurse?
A. Yes.
Q. Okay. Is it fair to say that that was almost a year ago?
A. It was.
Q. Okay. Were things fresher in your mind back then or were they fresher in your mind regarding your medical records today?
A. It was fresher in my mind back then.
Q. Okay. You were asked about your ability to recognize people; is that correct?
A. Yes.
Q. Okay. Do you have any doubt about who the first person was that you heard speaking to your husband?
A. No.
Q. Okay. Do you have any doubt about that what you recognize that person's body frame?
A. No.
Q. Okay. Do you have any doubt that that first person was the second person you saw come back up and speak to your husband?
A. No.
Q. Is there any doubt that the first person that came up is the second person that forced their penis into your vagina?

A. No.
Q. And who did you identify as that person?
A. Mr. Howard McKnight.
Q. Okay. Is that the person that you identify for us here in court today?
A. Yes, it is.
Q. Okay. You were also asked about anything unusual about a voice on that night.
A. Yes.
Q. Okay. Now you said that there was nothing unusual about the voice; is that correct?
A. Yes.
Q. But did you recognize it as the same voice that you continued to hear from the first person that came up and the second person that came up?
A. Yes.
Q. You also talked about some clothing. Do you recall that with Mr. Howarth?
A. Yes.
Q. Okay. Now you told us that there was a black hoodie; is that correct?
A. Yes.
Q. And black jeans; is that correct?
A. Yes.
Q. Is that what the first person who came up to help with the

truck was wearing?
A. Yes.
Q. Okay. Is that what the second person who came back and put their penis in your vagina was wearing?
A. Yes.
Q. Is that what the person who made your husband at gunpoint take the rings off of your hand was wearing?
A. Yes.
Q. Is this the same -- has the body -- did the body structure change at any point during the series of that event?
A. No.
MS. CEZIL: Nothing further.

**RECROSS-EXAMINATION**

**BY MR. HOWARTH:**
Q. Ma'am, when you think back to that couple of minutes during which you were being raped, did you have an impression as to whether the man who was raping you ejaculated?
A. Yes, I did.
Q. And what was your impression?
A. I felt like that's what he was doing cause I was wet and feel like it.
MR. HOWARTH: All right. Nothing else.
THE COURT: Any questions from the jurors? Show of hands, any questions?

Write it down, sir.
Counsel, approach.
(Discussion had at the bench between the Court and counsel.)
THE COURT: Ma'am, I just have two more -- counsel.
(Discussion had at the bench between the Court and counsel.)
THE COURT: So, ma'am, it's gonna be a couple more questions.
I'm sorry. I'll let you do that first.
MR. HOWARTH: Sure. Thank you.
Q. (By Mr. Howarth, continuing): Ma'am, you recall -- you told us that you did talk to the police a couple of days after the incident, am I right?
A. Yes.
Q. Did the police ask you if the man who raped you did ejaculate?
A. Did they ask me?
Q. Yes, ma'am.
A. I don't recall.
Q. All right.
MR. HOWARTH: May I approach, Your Honor?
THE COURT: Yes, you may.
Q. (By Mr. Howarth, continuing): Ma'am, I'm handing you a

three-page statement. Do you see that -- just think. Do you see what I handed you?

A. Yes.

Q. Do you know what that is?

A. Yes.

Q. Is that the statement that you made to the police?

A. Yes, it is.

Q. I wanna direct your attention to --

MR. ELIZONDO: Judge, I'm gonna object at this point. If this is -- she said she couldn't recall. This is improper method of refreshing recollection. Counsel's sort of going toward the impeachment aspect. But if this is to refresh her recollection, then she should be allowed -- if he's got a document that may refresh it, he should present it to her and see if it does or not.

MR. HOWARTH: That's what I'm doing.

THE COURT: Okay. All right. Next question.

Q. (By Mr. Howarth, continuing): I'm gonna refer you to the bottom of page two. I want you to read this just to yourself, okay?

Now I want you to read those lines here on the bottom of page two and then go up to just the top of page three. Would you read that to yourself, okay?

A. Right.

Q. Okay. Have you read that?

A. Yes, I did.
Q. Does reading that help -- wait a minute.
Does reading that help to refresh your recollection of what you told the police two or three days later?
A. Yes.
Q. Having refreshed your recollection, is it a fair statement that two or three days after the incident that you told the police that he did ejaculate in you?
A. Well just like I said, I thought that's what happened. I felt it.
MR. HOWARTH: Thank you.
THE COURT: Okay. Ma'am, couple more questions.
Did you ever touch his penis at some point?
THE WITNESS: No.
THE COURT: Okay. And were you able to see his hands?
THE WITNESS: No.
THE COURT: All right. You can step down.
(The witness was excused.)
THE COURT: Ladies and gentlemen, we're gonna take a recess at this point. We'll be back with you in about 15 minutes.
I caution you again you can't discuss the case. Leave your note pads on the seats and thank you for your

patience.

(The jury was excused to the jury room at 10:55 A.M.)

THE COURT: Okay. So we'll see you in about 15 minutes.

MS. CEZIL: Thank you, Your Honor.

(Off the record.)

THE CLERK: Recalling Case Number 13-000628; the State of Michigan versus Howard McKnight before the Court today for a jury trial in progress.

MS. CEZIL: For the record, Your Honor, Veneshia Cezil on behalf of the People.

MR. HOWARTH: James Howarth, Your Honor, as co-counsel for Howard McKnight.

MR. JONES: Paul Jones, co-counsel for Howard McKnight.

THE COURT: All right. Are we ready to proceed to trial?

MS. CEZIL: Yes, Your Honor. Thank you.

THE COURT: All right. We can bring the jury out.

(The jury entered the courtroom at 11:29 A.M.)

THE COURT: People ready to call their next witness?

MS. CEZIL: Yes, Your Honor.

The People call Mr. James James.

THE CLERK: Right here for me. Raise your right hand, please.

You do solemnly swear or affirm that the testimony you're about to give before the Court will be the whole truth?

THE WITNESS: Yes.

THE CLERK: Thank you. You may be seated, sir.

THE COURT: Keep your voice up, sir, and pull that microphone up.

You may proceed, counsel.

MS. CEZIL: Thank you, Your Honor.

**JAMES JAMES,**

having been first duly sworn by the Clerk of the Court at about 11:29 A.M., was examined and testified upon his oath, as follows:

**DIRECT EXAMINATION**

**BY MS. CEZIL:**

Q. Good morning, Mr. James.

Can you please introduce yourself to the Court?

A. I'm James Edward James.

Q. Okay. Mr. James, do you know a person by the name of Lucille James?

A. Yes.

Q. And how do you know Ms. James?

A. That's my mother.
Q. Okay. Do you also know a person by the name of James Stone?
A. Yes.
Q. And how do you know Mr. Stone?
A. That's my father.
Q. Okay. I'm gonna direct your attention back to December 31st of 2012, okay?
A. Yes.
Q. Do you recall who you were -- where you were residing on that date?
A. Yes.
Q. Okay. Don't give us the address or anything like that. Do you recall who you were residing with?
A. Yes.
Q. And who was that?
A. I was residing at my mom's.
Q. Okay. And --
A. And my dad's.
Q. All right. Did you see your mother and father on December 21st -- or excuse me, December 31st of 2012?
A. Yes.
Q. Okay. Do you recall around what time?
A. Well earlier that day.
Q. All right. Now when you see them earlier that day, do

they leave the home at some point?
A. Well, yes. We was -- they planned to leave the home, yes.
Q. Okay. Did you plan on leaving?
A. Yes.
Q. Okay. Where was -- what was your plans to go?
A. My plans was I was with like my family, my kids and my baby mom.
Q. Okay. Now when you say that they were leaving, did you see how they left the home, by what means?
A. No, I didn't see.
Q. Do you know if they left by car or if they walked on foot?
A. They drove.
Q. Okay. Can you describe the vehicle that they drove for us?
A. They had a red truck, a red Dodge truck pickup.
Q. Now do you remember what time it was when they left?
A. Well I was -- I left before them, so I'm not sure what time they left the house.
Q. Okay. When you left before them, what's the next time you remember seeing your parents?
A. Well it was after New Year's.
Q. Okay. When you say, "it was after New Year's," do you recall where you saw them at?
A. At the home.
Q. Okay. Can you describe to us the situation of what it was

when you first saw them?
A. Well I was sleep at the time and I heard my dad call me and I jumped up. And I got up and I could hear him crying and my mother was crying. And they said -- my father was like we been robbed and your mother been raped.
Q. Okay. When you say that you hear them crying --
A. Yes.
Q. And your father says that we've been robbed and your mother's been raped --
A. Yes.
Q. Are you able to observe them at this point?
A. Yes.
Q. Okay. Describe for us, paint a picture for us of what you saw.
A. They was real hysterical. They was crying. They was scared. They had been walking and they tried to call me and I wasn't able to get to 'em.
Q. Okay. When you say you weren't able to get to them, do you own a cell phone?
A. Yes.
Q. And when you say they tried to call you, did you have your cell phone that evening?
A. Well my phone when I had -- when I reached my phone, it was dead. It was -- the battery wasn't -- it wasn't charged.

Q. Okay. Now after you say that you see your mother and your father crying, what, if anything, do you do next?
A. I instantly put my clothes on and told my mother "I'm gon' take you to the hospital."
Q. Okay. Do you take your mother to the hospital?
A. No, I took her -- I usually -- I took her that day, yes, I had.
Q. Okay.
A. Yes, ma'am.
Q. Did you and your mother go anywhere else prior to going to the hospital?
A. No.
Q. Do you recall what hospital that was that you took her to?
A. St. John.
Q. Okay. Now when you took your mother to the hospital, to your knowledge do you know if she was seen or treated at St. John's?
A. At the time they was -- they was seeing her, so we had to wait out in the lobby.
Q. Do you take your mother to any other medical facilities or hospitals that night?
A. No.
Q. Okay. Now you said that you have -- your mother is Ms. James and your father is Mr. Stone?
A. Yes.

Q. Is that correct? Do you share any siblings between those parents?
A. Yeah, I have kids of my own.
Q. How about siblings? Do you have any brothers or sisters?
A. Yes. Oh, yes. Yes.
Q. How many siblings do you have?
A. I have two brothers.
Q. Can you tell us their names?
A. Kevin James and Jesse James.
Q. Did you see Jesse James that evening?
A. No.
Q. Okay. Did you see Jesse James earlier that morning?
A. Yes.

MS. CEZIL: Okay. Nothing further.

MR. HOWARTH: I have no questions for this witness, Your Honor.

THE COURT: You can step down.

People call their next witness.

(The witness was excused at 11:34 A.M.)

MS. CEZIL: Jesse James, Your Honor.

THE CLERK: Raise your right hand, please.

You do solemnly swear or affirm that the testimony you're about to give before the Court will be the whole truth?

THE WITNESS: Yes, ma'am.

THE CLERK: Thank you. You may be seated, sir.

THE COURT: You may proceed.

MS. CEZIL: Thank you.

**JESSE JAMES,**

having been first duly sworn by the Clerk of the Court at about 11:34 A.M., was examined and testified upon his oath, as follows:

**DIRECT EXAMINATION**

**BY MS. CEZIL:**

Q. Good morning, Mr. James. Can you pleas introduce yourself to the Court?

A. Good morning. I'm Jesse James.

Q. Okay. Mr. James, do you know a person by the name of Lucille James?

A. Yes, that's my mother.

Q. Okay. Do you also know a person by the name of James Stone?

A. Yes, that's my father.

Q. Okay. Now I'm gonna take you back to New Year's Eve December 31st of 2012.

A. Yes.

Q. Do you recall that date?

A. Yes.

Q. Is there anything that sticks out to you about that day?

A. Yeah, it was a horrible day.

Q. Okay. Now we're gonna go through that.
On December 31st of 2012, were you at your home?
A. Yes.
Q. Okay. Now do you share a home with your parents?
A. No.
Q. Now what were you doing at your home?
A. I was having a New Year's Eve party slash birthday party for myself.
Q. All right. Do you recall receiving a phone call from either of your parents on that day?
A. Yes.
Q. Do you recall around what time?
A. It was like probably close to New Year's Eve.
Q. Do you remember which parent you received the call from?
A. My mom hand the phone to my dad.
Q. Okay. When your mother handed the phone to your dad, did you have a opportunity to speak to your dad?
A. Yes.
Q. Did you have a opportunity to speak to anybody else?
A. Yes.
Q. Okay. Can you please tell us about that?
A. Well my dad -- I guess he was kind of cold and hurt or whatever. He couldn't really tell me where he was at, so he asked the young man to tell me exactly where they was at so I can come and help them.

Q. All right. When your dad told the young man to tell you where they were at, did you speak to the young man?
A. Yes, for a slight second.
Q. Do you recall what he said to you, if anything?
A. Yeah. He said, um, they on Findlay and Bradford between Whithorn and Findlay on Bradford.
Q. Okay. After you spoke with the young man and he told you where they were, did you ever go out to Findlay and Bradford?
A. No, not -- no, not that -- no, I didn't.
Q. Why not?
A. Because I had a house full of people that I really didn't know, so I kind of stuck around for a minute. Like maybe they'll get in touch with one of my other brothers.
Q. All right. After you stick around for a minute and wait for them to get in touch with one of your other brothers, do you hear from your parents again after that first conversation?
A. No. No. My phone never rung back or nothing. And it was like -- it was after New Year's, I tried to call back and I wasn't getting -- my call wasn't getting through.
So I seen I had a voicemail on my phone. So I looked, I went through the voicemail to listen to it and all you can hear was static like somebody moving in somebody pocket or something. That's all I heard. And

then I was like, oh, okay, so I just went on 'head entertaining my little company that I had. Like if they give me a call back, then I'll just gone and help them cause the new year had came in.

Q. Okay. So just so we're all clear, you weren't able to get in touch with your parents after that?

A. No.

Q. Do you recall the next time that you hear from or speak to your parents?

A. Yes. My brother had came to my house probably close to 2:00 or a little bit after 1:00, and he was like he came in crying and hysterical like.

Q. When you say your brother, what's your brother's name?

A. James James.

Q. Okay. Now you said that your brother came to your house hysterical?

A. Yeah.

Q. What -- tell us more about that.

What do you remember?

A. He was crying and he was like, "Bro'," he was like, "Mom and dad just got robbed, mama got raped." The music went off, party was over with. Everybody -- we all rushed down to the hospital.

Q. All right. Now that phone call that you told us when that person gave directions, was that a long conversation or

was it short?
A. No, it was short. It was just brief. He just told me the street they was on and that was it.
MS. CEZIL: Nothing further.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**
Q. Good morning, Mr. James.
A. Good morning.
Q. Mr. James, you were at your home in Detroit having a New Year's Eve party on this past December 31st; is that correct?
A. Yes, sir.
Q. You recall how close it was to midnight that you got a call, the call that you're talking about?
A. Right. It was probably like 11:00, 11:30, 11:40; 11:40, something like that. It was close to New Year's Eve. Like it was real close like coming in.
Q. Sure. And when people are having a New Year's Eve party, sort of the highlight of that party is the --
A. Bringing it in.
Q. Bringing it in when it's 12:00, right?
A. Right.
Q. Am I correct?
A. Right.
Q. So you're conscious that that call came before the ball

drops or whatever you do for New Year's Eve, right?
A. Uh-huh.
Q. Yes?
A. Yes, sir.
Q. Okay. Now when that call came, the call was from your mother, am I right?
A. Right.
Q. Your mother told you something, didn't she, before the phone was handed to your dad?
A. She said they had a flat.
Q. Said he had a flat tire?
A. She said, "we got a flat tire. Here. Here James." That's what she called my dad.
Q. Sure.
A. So he gets the phone.
Q. All right. Well wait a minute. I haven't asked a question yet.
Did your mother tell you where they were?
A. No.
Q. Did you have the impression from talking to her that she might not have known exactly where they were?
A. Right. She wasn't driving so --
Q. The impression you had was your mother's handing the phone to your dad so that you can get located where are you, right?

A. Yeah. Yeah. Yeah.
Q. And they were calling, far as you understood, from that phone call, they were calling for help, right?
A. Right.
Q. They wanted somebody to come out there and get them?
A. Right.
Q. And does your dad get on the phone second?
A. Yeah.
Q. Was he having any trouble at all telling you exactly where they were?
A. Nawl, not really. He just sounded like he was cold and, you know, like kind of hesitant like he -- he hand the phone to the young man, the young man told me exactly where they was at.
Q. Did your dad tell you anything before he handed the phone to someone else?
A. He said he had a flat.
Q. Did he tell you I want you to talk to somebody else here?
A. Yeah. He said, "I want you to talk to this young man and so he can tell you exactly where I'm at."
Q. All right. Did your dad seem to be afraid of the young man?
A. Not really, no.
Q. From the impression you got?
A. No. No, not at the time, no.

Q. Your impression was that he's handing the phone to somebody that's helping your folks, right?
A. Right. Right.
Q. And this young man gets on the phone.
Does he identify himself?
A. No.
Q. Didn't give a name?
A. No.
Q. Anything unusual about the voice?
A. No.
Q. Sound like anybody's voice?
A. Sound like, yeah, anybody, somebody just, you know, was there where they was at.
Q. This man said what to you? I want you to go back and think about it. What did this man say to you?
A. He just told me the street names, that was it.
Q. Did he tell you --
A. He ain't say all right, bye or nothing. He just said the street names and that was it.
Q. He gets on the phone and he says -- does he call you by name?
A. No. He don't know me.
Q. Does he tell you I'm with your mom and dad?
A. No.
Q. Are you saying to us that he just picks up the phone and

says like Bradford --
A. He -- yeah, that's what he said. Yeah, he handed the phone, he said, "We're on." He said, "We're on," that's what he said.
Q. We're on what?
A. Bradford between Whithorn and Findlay.
Q. How far away were you from that address?
A. Around about two and a half miles.
Q. Did he tell you anything about how you might get there?
A. He ain't tell me nothing else. He ain't tell me nothing. He just told me the name of the streets, that was it.
Q. And did you ask him like are my parents gone be able to get back home?
A. I ain't ask him nothing. I just knew my mom and dad was stranded and they needed help.
Q. And did you -- after you talked to the young man, did you talk to your folks again?
A. No.
Q. That was the end of it?
A. That was it.
Q. So it starts out call from your mom, she hands the phone to your dad?
A. She handed the phone to my dad.
Q. And then he hands the phone to the young man?
A. Yes, sir.

Q. All right. And that's it?
A. Yeah. I don't know if he hung up or my dad. I don't know.
Q. And the reason that you did not go to the scene right then and there was because you were entertaining guests?
A. Right.

MR. HOWARTH: I don't have anything else.

THE COURT: Any redirect?

MS. CEZIL: No. Thank you.

THE COURT: Any questions from the jurors?

THE JURORS: (No verbal response.)

THE COURT: You can step down, sir.

(The witness was excused at 11:43 A.M.)

MS. CEZIL: May we approach, Your Honor?

THE COURT: Yes.

(Discussion had at the bench between the Court and counsel.)

THE COURT: Ladies and gentlemen, we are going to take a short recess. We'll be back with you shortly. Remember you can't discuss the case.

We still will be taking our lunch at around the same time. So around between 12:30 -- at 12:30 is when we're going to take lunch. So thank you.

(The jury was excused to the jury room at 11:46 A.M.)

(Off the record.)

(People's Proposed Exhibits 8, 9 marked for identification.)

(The jury entered the courtroom at 12:00 P.M.)

THE COURT: People ready to call their next witness?

MR. ELIZONDO: Yes, Your Honor. Call Officer Tinsley.

THE CLERK: Can you state and spell your name for the record, please?

THE WITNESS: Alphonso Tinsley. That's A-l-p-h-o-n-s-o, T-i-n-s-l-e-y.

THE CLERK: You do solemnly swear or affirm that the testimony you're about to give before the Court will be the whole truth?

THE WITNESS: Yes.

THE CLERK: Thank you, sir.

You may be seated.

THE COURT: You may proceed, counsel.

MR. ELIZONDO: Thank you.

**ALPHONSO TINSLEY,**

having been first duly sworn by the Clerk of the Court at about 12:00 P.M., was examined and testified upon his oath, as follows:

DIRECT EXAMINATION

BY MR. ELIZONDO:

Q. Good afternoon, sir. Can you tell the jurors your name, please?

A. Alfonso Tinsley.

Q. And, sir, your occupation?

A. Detroit police officer.

Q. All right. And are you -- do you have any type of special assignment, duty assignment right now?

A. Yes. I work in the Graphic Art Section of the City of Detroit.

Q. And, sir, can you just tell the jury a little bit about what is it that you do?

A. What I do is I'm a composite sketch artist for the city. I've been doing it for 17 years now, trained by the FBI or forensic facial imaging.

Q. Okay. And forensic facial imaging, what would that be?

A. What that is is we were trained to interview witnesses or complainants to get a description of faces; knowing how to render what's in the mind of another person, in other words.

Q. Okay. Do you have a general procedure that you use in your line of work, sir?

A. Yes.

Q. Just tell us a little bit about how that works.

A. How it works is an investigator gives a call, makes an appointment with the witness or complainants. And what they do is they describe a person. They look into a book and we use the computer and they pick out different eyes, you know, pick out eyes, nose, ears, head shapes, things like it that until they come up with a, you know, the person that they're trying to describe.

From that point, we take that image, find out what the complexion is and we put the, you know, I take that information, plus the notes that they gave me and I do a drawing, a rendering of the person that they're describing.

Q. Okay. And after you do the drawing, what, if anything, do you do next?

A. After that, I scan it into the computer and I make copies for the investigative crew so that they can go out and look for the person that they described.

Q. Okay. All right. Now let me ask you this. Do -- during the course of creating this sketch, do you give the person who is giving you the description, do you give them an opportunity to look and make changes, modifications? Is that things -- is that built in the program somehow?

A. Yes. Yes. They used -- once they get to a point where they says -- they say it looks like them except for this, that and the other, that, this, that and the other is the

notes that I take and then when I do the drawing I do those things.

For example, the computer does not put the skin tone on the drawing, so I take it the next step and do that by doing whatever they said that was on the computer. And I draw it out with pastels, the different colors and I use the colors, the skin tone that they picked. I put that in there.

Sometimes there is like scars, jewelry, hairstyles, hats, clothing, things like that that the computer does not do. I render that also into the drawing to make it more exactly what they saw.

Q. Okay. Now the accuracy of the drawing, what does that really -- what's the underlying, I guess, component to accuracy of the drawings here?

A. I don't understand the question.

Q. Sure. What do you rely on or what is it that will make a drawing accurate?

A. What makes it accurate is that it comes as close to what they remember of the person that they're describing.

When they say that's the one, that's him, that's when I usually stop.

Q. Okay. Now, sir, I'm gonna ask you -- well let me ask you this. Have you ever testified in court concerning your sketch work?

A. Yes.
Q. How many times have you done that?
A. Oh, 50 times.
Q. Okay.
A. Yeah.
Q. Now I'm gonna ask you, sir, back on January, I believe it was the 3rd of January --

MR. HOWARTH: Excuse me.

Your Honor, is Mr. Elizondo offering this witness as an expert under the Rule 701, 702, 703?

MR. ELIZONDO: I haven't got to that point yet, judge. I'm just going to -- I'm not asking any opinions at this point.

If it gets to that point, I may. But at this point I'm not.

THE COURT: I didn't think he was.

I think he's just testifying based on experience. I don't think he's offering an opinion. I haven't heard that that's the case, so.

MR. HOWARTH: I just wanted to clarify.

THE COURT: But I am listening out for it.

MR. HOWARTH: Thank you.

Q. (By Mr. Elizondo, continuing): Now did you come into contact with an individual by the name of James Stone?
A. Yes.

Q. Okay. And what information, if any, did you receive prior to Mr. Stone coming to see you?
A. Just the appointment to do a composite sketch and that there were two people coming. That's the only information that I had.
Q. All right. Now did anyone come to see you on that day?
A. Yes.
Q. Okay. Who came to see you?
A. That would have been Mr. Stone and his wife.
Q. All right. Now when they -- do they come out to your office? Studio?
A. Yes, they come to my office.
Q. All right. Did you speak with both of them?
A. Yes.
Q. Okay. And after you spoke with them, did you utilize any information from both or one or the other to do some work?
A. It would have been him; Mr. Stone.
Q. All right.
A. Yes.
Q. Did you talk to Mrs. James, the person who came in with him?
A. Yes.
Q. And was she able to give you any information?
A. No.
Q. Okay. Now it's fair to say that your sketch is gonna be

of a facial rendition, that's what you do; is that correct?
A. Yes.
Q. Okay. Now tell us when Mr. Stone came to see you, what transpired?
A. They came into my office. And, like I said, they looked into a book and we work with the screen and we just -- as he picked out different parts of the face, I just put them on the screen, all -- as much as possible what was, you know, that the computer could do.
Q. Okay. Now was the lady Ms. James, was she with him while he's going through this rendition?
A. Yes.
Q. Is she offering any opinions during the course of this description?
A. No, most of what she said was describing the events that took place that night. But as far as his face description, he didn't give me much information on that at all.
Q. Well did she give you any, if you recall?
A. I don't remember. I don't remember any information that she gave.
Q. Okay.
A. Yeah.
Q. Now Mr. Stone; was he able to give you information?

A. Yes.
Q. And then did you proceed to utilize the computer to do whatever it is you do?
A. Yes.
Q. Okay. And do you -- well tell us what happens after you-- you're listening and you're doing these things on the computer, what happens?
A. Well what he's describing and we were putting all this together on the screen, we are getting to a point where there is -- the computer can do no more. And so we get that information. I print it out and with the notes of the things that he mentioned that the computer does not do, I render the drawing in pastels.
Q. Okay. Now let me ask you this. What is it that the computer cannot do?
A. The computer does not -- well it does, but it's limited.
It doesn't do like the current hairstyles because it's an out-dated kind of program when it comes to that kind of stuff. It doesn't have certain hats, maybe the hoodies, things like that. Certain jackets, things like that it doesn't have. Scars, scratches, tattoos, things like that, those are things that they may mention that I'll make note of and when I do the drawing I'll put those in the drawing.
Q. Okay. And in this particular case, was hair an issue?

A. No.
Q. And why is that?
A. Because he was -- the way he described, he had a hat on his head.
Q. Okay. And as far as for the face, were tattoos or any other identifying marks, were those of issue?
A. No.
Q. Okay. Now, sir, I wanna hand you -- do you generate copies of the computer stuff that you do?
A. Yes.
Q. Okay. You know what. Let me do it this way.
Did you generate a composite sketch based on the information that Mr. Stone gave to you that day?
A. Yes.
Q. Okay. Now I'm gonna hand you what's been marked as People's Proposed Exhibit Number 8 and ask you to look at that.
Sir, do you recognize what that is?
A. Yes.
Q. And what is that?
A. This is the composite sketch.
Q. Okay. Now is that the composite sketch you did or is that a copy of the sketch?
A. This is a copy of the sketch.
Q. Okay. Does it accurately reflect the actual sketch that

you put together based on the description from Mr. Stone?
A. Yes.
Q. Okay.
MR. ELIZONDO: Your Honor, we're gonna move for the admission of People's 8.
Let me show that to counsel first.
THE COURT: Any objection?
MR. HOWARTH: Your Honor, any objection would not deal with the testimony that this witness has given and I would preserve that.
But I don't object to the exhibit based on what we've heard to this point.
THE COURT: All right. So admitted.
MR. ELIZONDO: Thank you.
Permission to publish that, judge?
THE COURT: Yes.
Q. (By Mr. Elizondo, continuing): Now was Mr. Stone allowed to see this particular copy?
A. I imagine so. I wasn't there when he did it, but, yes.
Q. Okay. Let me ask you this.
While he was with you, did you ever show him this copy?
A. This copy, no.
Q. Okay. Or any copy of this photo -- of this sketch?
A. Not -- no, I didn't. No.

The part he saw was from the computer. That's what he saw from my end.
Q. Okay. Now as part of a follow-up, do you ever do any kind of imaging or anything to see how close and accurate you are once the person, the known person or a person is arrested?
A. Yes.
Q. Okay. What do you do?
A. I have a wall in my office where after the subject has been caught, I like to see how close the witness came to the actual description. So I have a collection on my wall of the catches with the drawing just to see how close they came.
Q. Okay. Sir, I'm gonna hand you what's been marked as People's Proposed Exhibit Number 9 ask you to look at that.
Do you recognize what that is, sir?
A. Yes.
Q. What is that?
A. This is the one that I have of this composite.
Q. Okay. And whose photograph -- is there a photograph in there?
A. Yes.
Q. And whose photograph is that, if you know, sir?
A. That is of the defendant.

Q. Okay. And is the person whose photograph in there, is that person in court today?
A. Yes.
Q. And just point to where he is at and tell us what he's got on, sir.
A. He's got a white shirt on and a black tie with braids in his hair, dreadlocks.
Q. Thank you.
MR. ELIZONDO: Your Honor, may the record reflect the witness has pointed to, identifying the defendant?
THE COURT: So reflected.
MR. ELIZONDO: Thank you.
Q. (By Mr. Elizondo, continuing): And the second half, what is the other part of that?
A. The other half is the composite that I actually drew.
Q. Okay.
MR. ELIZONDO: Unless counsel has an objection, Your Honor, we are going to ask for the admission of that exhibit also.
MR. HOWARTH: I have the same response to that, Your Honor, as I did to the last exhibit.
THE COURT: So admitted.
MR. ELIZONDO: And permission to publish that, judge?

THE COURT: Yes.

Q. (By Mr. Elizondo, continuing): Now, sir, when you -- when you go back and review your work, did you do that with this comparison here?

A. Yes, I did.

Q. All right. Now as a professional, based upon what you've done and how you've done it, is there any -- as you look at it now, if in fact the sketch is of that person, is there anything you would change in the work you had done?

A. In this particular one, no.

Q. Okay. What similarities, if any, do you see as an artist in this particular photo?

MR. HOWARTH: I object to that, Your Honor. That's an opinion and the witness has not been shown to be qualified to make that type of professional expert opinion.

MR. ELIZONDO: Well I think he is in that he does the comparison of the different body parts. That's what He does.

And that's what I'm asking. Is there anything here, based on that experience, that he would change to make that more accurate.

MR. HOWARTH: I understood the question as ultimately coming down to does he think this is the same person depicted in the composite as in the photograph.

And that he is not qualified to say that.

MR. ELIZONDO: That's not what I said, and if it is then I withdraw that and simply move forward on whether there would be any changes as a professional that he would make to better and accurately reflect that photo; in his opinion as a graphic artist, what he would change.

MR. HOWARTH: Well I don't know what he is basing that decision on.

Is he basing that decision on saying well I'm now looking at this man who is on trial and I'm looking at my picture, would I change my picture at all? That's the same thing as saying whether his picture is this person. That's ultimately what's being asked and this man is not qualified to answer that question.

MR. ELIZONDO: Just asking if the photo reflects the composite and if there is any changes that he'd make to it.

THE COURT: I will allow it for that limited purpose.

The objection's noted for the record.

MR. HOWARTH: Thank you.

Q. (By Mr. Elizondo, continuing): Are there any changes that you would make?

A. No.

THE COURT: Any other questions, counsel?

MR. ELIZONDO: Nothing else, judge. Thank you.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Officer Tinsley, could you give us a date on which you met with Mr. Stone to take his description and attempt to make a drawing?

A. I believe it was January 3rd.

Q. And that picture that you did, was that generated on the same day January 3rd?

A. I'm not sure. I think so. I'm not sure.

Q. But if it wasn't, it would be right around that time?

A. Yes.

MR. HOWARTH: And the computer picture, has that been introduced?

MR. ELIZONDO: NO.

Q. (By Ms. Howarth, continuing): You did come up with a computer picture, did you not?

A. Yes.

Q. Was that done the same day?

A. I'm not sure about that either. It might have -- it's in that same area, yes. It would have been done the day he came, yes, definitely.

Q. That computer picture has not been shown to you while you're on the witness stand this afternoon, right?

A. Right.
Q. Okay. So the only things that you've been shown are a photograph that is of Mr. McKnight and then this composite sketch that you did, right?
A. Yes.
Q. Okay. Now let me ask you this.
When did you turn that over to anyone else within the Detroit Police Department, that is, the sketch that you made?
A. Yes.
Q. When?
A. I am not sure of the exact date, but it was right around the 3rd.
Q. And who did you give it to?
A. I would have given it to Investigator Kane.
Q. That's the gentleman that's seated behind me and to my right?
A. Yes.
Q. And are you quite certain that you gave it to him, let's say, within a couple of days of doing that, of drawing it?
A. I'm sure it was right around that time. That's the normal procedure, yes.
Q. And you say there was also a computer -- well I guess it's a computer sketch, isn't it, that was created?
A. Yes.

Q. And you have that here in court, don't you?
A. I believe it's here in the packet, yes.
Q. You saw it this morning?
A. Yes.
Q. You talked about it with me, didn't you?
A. Yes.
Q. And you met with me for the first time in your life when?
A. Today when we were in -- when I saw you out in the hall, yes.
Q. Within minutes of right now?
A. Yes.
Q. And you -- and you have never discussed any of this before this afternoon, right?
A. Right.
Q. All right. Have you had a instance where you have drawn a sketch and the witness is shown the sketch and is told there is something wrong with it?
A. Say the question one more time, please.
Q. Sure. Have you ever talked to a witness, then created a sketch, then the witness says there is something wrong with your picture?
A. Yes.
Q. As a matter of fact, that happens from time to time?
A. Yes.
Q. Not unusual?

A. Nope.
Q. So that the nose is too broad, the eyes are too large, right?
A. Right.
Q. What do you do then?
A. I then go back to pull that picture together to make the changes that reflect what he says or that person says.
Q. You change the picture, right?
A. Yes.
Q. In this case, I want you to think carefully as to whether James Stone -- whether it was ever made known to you that James Stone thought that your sketch didn't look like the perpetrator.
A. No.
Q. And the first time you ever heard that was out in the hall, right, from me?
A. Yeah, when you -- through the suggestion, yes.

MR. ELIZONDO: Well, judge, I've got to object. There is testimony coming from counsel. Counsel's making himself a witness essentially in this case.

THE COURT: Sustained.

Q. (By Mr. Howarth, continuing): If you had known that James Stone had indicated to any of the police officers that he didn't feel that the sketch was right, are you able to

tell us what you would have done?
A. Say the question once more.
Q. Suppose after you do the sketch you hear that it's been given to Mr. Stone, you find out Mr. Stone has an argument with the sketch, it's not right.
A. Okay.
Q. What would you do?
A. I would make the changes that he said. Cause he saw the person, I didn't.
Q. And you didn't do that in this case?
A. No.
Q. Because you had no such information?
A. Exactly.
MR. HOWARTH: Nothing else.
THE COURT: Any redirect?
MR. ELIZONDO: No. Thank you, judge.
THE COURT: Any questions from the jurors?
JUROR NUMBER EIGHT: I have one.
THE COURT: Write it down, sir.
Counsel, will you approach.
(Discussion had at the bench between the Court and counsel.)
THE COURT: Sir, how long did the process take to get a complete facial recognition? Hours? One day?
THE WITNESS: Normally it usually takes about

four hours to do. In this, I'd have to refer to my notes to see exactly how long it took.

THE COURT: If you could do that.

THE WITNESS: Yes.

Okay. The date of completion that I have on my paperwork says the 3rd. That would have been the day that I turned it over to them.

THE COURT: But you don't know how long it took you to do this?

THE WITNESS: If it was done on the 3rd, and that was the day of the actual appointment, it usually takes me about four hours to do.

THE COURT: Okay. All right. You can step down, sir.

(The witness was excused at 12:21 P.M.)

THE COURT: Ladies and gentlemen, given the hour-- do you have another witness?

MR. ELIZONDO: Yeah.

Can we approach real quick? We don't need to, but I have got a real short one that --

THE COURT: Short witness?

MR. ELIZONDO: Well, actually, yeah.

THE COURT: Okay. We'll try to see what we can do with that. I have a -- okay.

Call your next witness and it will be short.

The name of your next witness?

MR. ELIZONDO: Lori Briggs.

THE CLERK: I'm sorry. State and spell your name for the court reporter, please.

THE WITNESS: Lori Briggs.

THE CLERK: Spell it, please.

THE WITNESS: L-o-r-i B-r-i-g-g-s.

THE CLERK: You do solemnly swear or affirm that the testimony that you give before the Court will be the whole truth?

THE WITNESS: Yes, ma'am.

THE CLERK: Thank you. You may be seated, ma'am.

**LORI BRIGGS,**

having been first duly sworn by the Clerk of the Court at about 12:22 P.M., was examined and testified upon her oath, as follows:

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Good morning or afternoon. Good afternoon.

A. Good afternoon.

Q. Tell the jurors your name and occupation, please.

A. Police officer. My name's Lori Briggs.

Q. All right. And did you have a special assignment with the-- is it Detroit Police?

A. Yes.
Q. Do you have a special assignment?
A. Yes, Crime Scene Services.
Q. Okay. And what do your responsibilities entail?
A. We respond to crime scenes in the City of Detroit and we process the scene with photographs, collection and preservation of evidence, we process for latent fingerprints.
Q. Okay. Now I'm gonna ask you, ma'am, if you were involved with processing a vehicle back on January 2nd of the year 2013?
A. Yes.
Q. Okay. Hand you what's been marked and admitted as People's 4, 5, 6, 7.
THE COURT: What were those numbers again four through seven?
MR. ELIZONDO: Four, five, six and seven, yes.
Q. (By Mr. Elizondo, continuing): Do you recognize -- first of all, those are photographs, for the record, I just handed you, correct?
A. Yes.
Q. Do you recognize what that is a photograph of?
A. Yes, it's a red pickup truck.
Q. All right. And did you have anything to do or involved with that particular vehicle?

A. Yes.
Q. Okay. What was your responsibility reference to that vehicle?
A. I was asked to photograph the vehicle, search for DNA and process for latent fingerprints.
Q. Okay. So let's talk about first the photographing aspect of the photos you have in your hand.
Are those photos that you took?
A. Yes.
Q. Okay. Now and you took others, correct?
A. Correct.
Q. All right. Processing for latent prints, tell the jurors what that means?
A. We process for latent fingerprints. It's fingerprints that are not always visible to the naked eye, but we put powder on it and it enhances the fingerprints.
Q. Okay. And did you receive any kind of information concerning that vehicle, what may have occurred in it, that sort of thing? Did you have any information?
A. It doesn't come like information like that.
What it says is like dust outside driver's door, dust rear of vehicle, dust, you know, where they want us to focus on dusting.
Q. Okay. And did you receive some instructions of where to dust on that particular vehicle?

A. Yes.
Q. Okay. Did you follow those instructions?
A. Yes.
Q. Okay. Now when you dust, just briefly what is that? What are you doing at that point?
A. Again, we have a powder that we put on with a brush and we're using it just to enhance the fingerprints.
Q. Okay. And when you did that, did you find any prints that were usable?
A. No.
Q. Tell the jurors what that means.
A. A usable print is one that actually has definition. It has lines and grooves. We can see actual definition in a fingerprint.
Q. Okay. Is it possible for a print, for some sort of let's say residue of a print to be on an object but then not usable?
A. Yes.
Q. And what -- why would that be?
A. The surface that the print is on, any dirt, if there was dust on it, when you touch something that has dust on it you can see where it's been touched but there is no prints there because you picked up the dust.
Q. Okay. And when you did the dusting on this vehicle, were you able to find any usable prints?

A. No.
Q. And the areas you dusted -- how many areas would you say you dusted on this?
A. I dusted the outside and inside of the driver and passenger door and the rear of the vehicle.
Q. Okay. And there were no prints of any sort?
A. Not usable, no.
Q. Okay. Were there some smudged?
A. Yes.
Q. Now what about the interior? Did you dust the interior at all?
A. Just the windows. Areas that can be dusted.
Q. Okay. So can fingerprints be lifted off of let's say that seat?
A. No.
Q. Okay. If it's cloth?
A. No.
Q. All right. Now when you did do the interior of the parts that you did do, the windows, whatever, any usable prints there?
A. No.
Q. Now you also said something about DNA?
A. Yes.
Q. What -- tell us about that. What is it that you're looking for?

A. In this particular case, I was looking for semen.
Q. Okay. And when you look for semen, based upon your experience, what is it exactly you're looking for? I mean what is it that that's gonna give you the clue that there might be something?
A. We have an ultra-violate light and then we have glasses that we put on. So when you actually see bodily fluid, it almost like glows purple.
Q. And did you do that in this vehicle?
A. Yes.
Q. Which parts of the vehicle did you do that to?
A. The whole seat. And it's like a bench seat, so I did the whole seat.
Q. All right. And that was for both -- I don't know. Was there just one seat or did it have a back seat?
A. No, it's like one of the bench seats so there is the bottom and then there is the back.
Q. Okay. When you did that, did you see any evidence or anything that gave you reason to believe that there might be some sort of bodily fluid there?
A. No.
Q. Okay. Did you do the seat?
A. Yes.
Q. Okay. Did you do any other work on the vehicle itself?
A. No.

Q. Okay. Thank you.

MR. ELIZONDO: No further questions, judge.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Good afternoon, Officer Briggs.

A. Afternoon.

Q. Officer Briggs, does Crime Scene Services, that department that you work for, are they generally an organization or an outfit within Detroit Police that looks for what is called trace evidence?

A. Yes.

Q. What is encompassed by trace evidence other than what you told us so far which is fingerprints and bodily fluids?

A. Hairs, pieces of material, blood, yes.

Q. Did you make any examination of that car for hairs?

A. No.

Q. Any reason why not?

A. Just was not like requested to search for hair samples.

Q. So as you testify right now, you're not able to tell us whether any hairs were left on that -- anywhere in the interior of that car; is that right?

A. No.

Q. And materials. That would be like, for example, if somebody had a wool jacket, that might leave fibers, am I right?

A. It could, yes.
Q. Or a cotton hoodie; that might leave fibers?
A. It could, yes.
Q. Certain pants can leave fibers?
A. It could.
Q. And did -- your testimony is because of your instructions you just didn't look for those things?
A. No.

MR. HOWARTH: Nothing else.

MR. ELIZONDO: I have nothing further, judge.

THE COURT: One moment.

Are there questions from the jurors?

I do have a question. How common is it for at the crime scene do you not find evidence of -- that's usable prints, something like that? Is that a common thing?

THE WITNESS: Oh, it's very common, yes.

THE COURT: Okay. You can step down.

You have another short witness?

MR. ELIZONDO: No.

THE COURT: Okay. All right. You can step down.

(The witness was excused at 12:30 P.M.)

THE COURT: Ladies and gentlemen, we're going to take our lunch break. Caution you again not to discuss

the case.

If you can come back at -- I'll give you an hour and 15 minutes. Seems like we are moving at a pretty good pace. Come back at a quarter to two and we will begin.

(The jury was excused for lunch at 12:30 P.M.)

MR. HOWARTH: Your Honor.

THE COURT: Yes, sir.

MR. HOWARTH: Whenever it's convenient, I wanted to make a short separate record on the last exhibits that were entered.

THE COURT: Okay. Why don't we do that when we come back.

MR. HOWARTH: That's fine. No problem.

THE COURT: Okay.

Okay. You can take him back. You want to take him back.

(Off the record.)

(People's Proposed's Exhibits 10 through 16 marked for identification.)

THE CLERK: Recalling Case Number 13-000628; the State of Michigan versus Howard McKnight before the Court today for a jury trial in progress.

MR. ELIZONDO: Ralph Elizondo, assistant prosecutor.

MS. CEZIL: Good afternoon, Your Honor.

Veneshia Cezil on behalf of the People.

MR. HOWARTH: Afternoon, Your Honor.

James Howarth, co-counsel for Mr. McKnight.

MR. JONES: Afternoon, Your Honor, and the court.

Paul R. Jones on behalf of and the co-counsel for Mr. McKnight.

THE COURT: I think counsel for the defense had something they want to put on the record.

MR. HOWARTH: Yes, thank you, Your Honor.

Your Honor, it was either late, very late this morning or very early this afternoon that counsel for the prosecution showed Mr. Jones and I for the first time what amounts to the People's Exhibits 8 and 9, that's composite sketch and a sketch of photo that were admitted into evidence.

We had never seen those in the 10 months that this case has been pending. The only thing that we had received from the prosecution on the subject of any identification-type photos was a Xeroxed photo. But, Your Honor, I think the Court has seen it before. It's a Xerox photo of a man apparently wearing some kind of a hoodie and a baseball cap.

About the only thing that's discernable, other than a dome-shaped black mask, is two obviously human

eyeballs in it. That's the only thing we'd ever seen. So we were caught very much by surprise that these other --

THE COURT: Let me ask you a question. When did you receive that?

MR. HOWARTH: This?

THE COURT: Yeah.

MR. HOWARTH: Item was -- I had this item I know at the preliminary examination cause I remember seeing it.

THE COURT: And you didn't think to inquire was there something better for you to view?

MR. HOWARTH: I have asked different counsel who have represented the People on this.

THE COURT: Did you ever ask the Court well I've had this at preliminary exam, I've asked for it several times, haven't received it, is this what's gonna be presented?

MR. HOWARTH: Well, Your Honor, that's to me in the position of poking a dog.

Because if the government wants to admit something into evidence, I expect that they're gonna give it to us before trial. Other than that, I'm not trying to sit there and awaken them to the fact -- we certainly told them we didn't have anything but this. That was made known to the prosecution.

THE COURT: But you also certainly told me on

several occasions where you were dissatisfied with the DNA analysis, all that, you brought that to the Court's attention that you thought that that was inadequate.

MR. HOWARTH: I explained to this Court that we got DNA sometime very late in relation to the fact that the DNA report is dated February the 20th, and we didn't get it for at least a month after that. That's fine, but we have it now.

THE COURT: But you also told the Court that. And I believe you came back several times that you wanted more -- you wanted something different, that you thought that the conclusions were inadequate and they didn't -- so that you could -- you wanted more so that you can go to your expert and seek to get a better explanation. That's what I recall.

Maybe I'm not saying it as artfully -- I guess all I am trying to point out is you found something deficient in what the prosecution was intending to put on and you brought it to the Court's attention that you needed to have more going forward.

MR. HOWARTH: That's not exactly how I remember it, Your Honor.

What I remember is that on DNA we took the reports that the prosecution had and we submitted them to a laboratory in Lansing, the Sakeen Laboratory. We wanted

an expert of our own to explain how someone could be excluded and yet still be considered a potential donor.

And what I did was the Sakeen Laboratory sent me a list of eight items that they wanted from the prosecution. I asked the Court if they would provide it. The government said we will not give them to you, and we argued this out in court. And the Court, after argument both ways, said I'm not ordering them to turn over the items that you've asked for. So we said fine, we'll go with this Sakeen Laboratories -- I mean, excuse me. We'll got with the State Crime Lab and settle for cross-examining their experts.

When it comes to the pictures, that's an entirely different matter. This is all we knew that there was. Now we find out there is a computer-generated picture which we never heard of.

THE COURT: It's hard for me to believe that you thought that that's what, I guess, that that's what they were gonna go forward with. But, okay. Finish your argument.

MR. HOWARTH: Your Honor, until the trial that's what they did go forward with. It was on the second day of trial that they come up with new evidence.

At any rate, counsel and I have discussed it and we've decided that we are not asking that those items be

excluded, but I want the record to reflect as to when we got them and under what circumstances. I mean some other counsel looking at this at some other time may disagree with us and --

THE COURT: That's fair. That's fair.

MR. HOWARTH: I think the record should be made.

THE COURT: I mean I'm a little frustrated, Mr. Elizondo, that on a case that had all these delays why evidence is just getting found and stuff just getting turned over at the late hour. I will be honest with you.

MR. ELIZONDO: Well, judge, and I --

THE COURT: And I recognize you are the last of I think of maybe three counsel that have appeared on this case.

MR. ELIZONDO: Correct. And Ms. Cezil and I got this case about, you know, two weeks ago. But in that two weeks we, you know -- this photo, first of all, let's just start with that.

I know this isn't counsel's first rodeo, you know, judge. I mean there is years -- it's hard for me to believe that by looking-- and I agree. I mean if this is all I got, I would be -- although it does have the name of the person who did this, we did know in the past witness list that Mr. -- officer Tinsley's name was listed.

There was nothing preventing counsel from

seeking, and as the Court said asking for clarification. There was nothing stopping him from calling up and setting an appointment to go talk to that officer either.

And this case has been set for trial how many times? I think it's been twice before, hasn't it?

THE COURT: At least twice.

MR. ELIZONDO: Yeah, this is the third time it's been set for trial.

In two weeks, I have done the diligence that I have needed to do. And we have found things that perhaps should have been done earlier, but we found them in the last two weeks. I can't believe that someone who has the experience that they have at the table over here hadn't thought of -- but that's beyond that. And I don't believe that there was anything stopping counsel from seeking that information out.

I forget what was the other? Was there another?

THE COURT: I don't think - at this point there not anything else.

So you're just making objections for getting it late?

MR. HOWARTH: It's a Brady objection, Your Honor. And the Brady doctrine does not require me to do anything but to rely on the standing order of the Court for discovery. If they don't comply with the discovery,

it's not on the back of the defendant to come in and say --

THE COURT: How is that exculpatory?

MR. HOWARTH: It doesn't have to be exculpatory under Brady. It's evidence that relates to guilt or innocence of the defendant or punishment. That Brady doctrine doesn't ask the size -- the government, for example, to decide whether something's exculpatory or inculpatory. And as a matter of fact I think it is -- that the further documents were exculpatory.

THE COURT: If they were exculpatory, why are you objecting to them?

MR. HOWARTH: I didn't say I was. I said I'm putting the Court on notice that we believe that we -- that evidence has been systematically withheld for us -- from us in this case.

For example, we have a witness who is about to testify that we weren't told about until a couple of days before trial. And we -- a week before trial. And that we demanded a lineup and we weren't given that until the first day of trial.

I'm making a record that evidence -- I don't blame Mr. Elizondo because I know when he got this case. What I'm saying is that there has been a pattern in this case of not turning over discoverable evidence to the

defense. And I'm --

THE COURT: A pattern. I don't know if one or two things are pattern. So --

MR. HOWARTH: Well I got three. You got the -- you've got the --

THE COURT: Well the thing you got a week before, anything that's before -- you could have asked for an adjournment and I would have granted it. If you had said, look, judge, I just received this witness, I think that's crucial to the case, I would have granted an adjournment. So you've made a record.

Why don't we bring the jury out.

(The jury entered the courtroom at 2:11 P. M.)

THE COURT: Ladies and gentlemen, good afternoon. Apologize for the delay. We had to take care of a matter, couple matters outside of your presence.

Are the People ready to call their next witness?

MR. ELIZONDO: We are, judge.

We call Mr. Golson to the stand.

THE CLERK: Sir, right here for me.

State and spell your name for the court reporter, please.

THE WITNESS: Jerry Leon Golson.

THE CLERK: The last name, can you spell it for the court reporter, please?

THE WITNESS: G-o-l-s-o-n.

THE CLERK: You do solemnly swear or affirm that the testimony you're about to give before the Court will be the whole truth?

THE WITNESS: I do.

THE CLERK: Thank you. You may be seated, sir.

THE COURT: You may proceed, counsel.

MR. ELIZONDO: Thank you.

**JERRY GOLSON,**

having been first duly sworn by the Clerk of the Court at about 2:12 P.M., was examined and testified upon his oath, as follows:

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Good afternoon, sir.

A. Good afternoon.

Q. Tell the jurors who you are, please.

A. My name is Jerry Leon Golson.

Q. And, Mr. Golson, can you tell us, sir, back beginning of the year January 1, 2013, I don't need the address but the cross streets of where your house is?

A. Bradford.

Q. Bradford?

A. Yes.

Q. And what's -- is it at another cross -- are you the corner

house there?
A. Yes.
Q. What is the other street?
A. Findlay.
Q. Findlay. And you were living there back at the beginning of the year?
A. Yes.
Q. In fact, how long have you lived there?
A. Twelve years.
Q. Okay. Now take you back in time, back to right around on New Year's Eve is really of last year is what we're talking about here.
Do you have some memory of some things that happened around that time?
A. Yes, sir.
Q. All right. Now were you out for the New Year's or were you at home?
A. No, I was home.
Q. Okay. And did you happen to notice something unusual around your house somewhere in the evening?
A. Yes.
Q. Okay. About what time -- if you can recall, about what time would that have been?
A. It was early morning between I would say 1:00 or 2:00 in the morning.

Q. Okay. Now when -- what was it that drew your attention to whatever this was going on here?
A. There was a truck that seemed to be having -- a pickup truck that seemed to be having problems. And I noticed it when I looked out the window. And I just happened to turn on the sidelight to let whoever it was know that I was watching them.
Q. So did you turn on the sidelight?
A. Yes, I did.
Q. Okay. When you turned on the sidelight -- well strike that. Let me ask you this.
I'm gonna hand you what's been marked as People's Proposed Exhibit Number 10. Take a look at this a second.
That's a photograph, correct, sir?
A. Pardon.
Q. It's a photograph?
A. Yes.
Q. Do you recognize what that's a photograph of?
A. Yes.
Q. What's that a photograph of?
A. It's my home.
Q. Your house?
A. Yes.
Q. Is that the one you were living with back there on --

A. Yes.
Q. On New Year's of 2013?
A. Yes, I was.
Q. And I want to hand you what's been marked as People's Proposed Exhibit Number 11 and ask you to look at that.
And that also is a photograph, correct, sir?
A. Yes, that's the street Bradford.
Q. Okay. And is that a view of the street right outside of your home?
A. Outside of my kitchen, my kitchen window, yes, sir.
Q. Okay. All right. Now can you see the monitor?
MR. ELIZONDO: Excuse me. I'm sorry. I'm gonna ask for the admission of the Exhibits 10 and 11, Your Honor?
MR. HOWARTH: No objection.
THE COURT: So admitted.
Q. (By Mr. Elizondo, continuing): Can you see the monitor up here, sir?
A. Yes.
Q. All right, sir. Now --
THE COURT: This is exhibit?
MR. ELIZONDO: This is Exhibit Number 10.
Q. (By Mr. Elizondo, continuing): Sir, you indicated that that truck was out there on the side of your home; is that correct?

A. Yes.
Q. And does that show the side of the house where it was at?
A. Yes, sir, it does.
Q. Now can you see up here at the top, and I'm kind of moving my pen around, where it has like the street signs?
A. Yes, sir.
Q. Okay. The one on the side says Bradford; is that correct?
A. Correct.
Q. And the one in front of your house would be Findlay; is that correct?
A. Would be Findlay, yes.
Q. Okay. When you see this, first see this truck, where do you see it?
A. Outside of my kitchen window.
Q. Okay.
A. Which is the first window that you see on the side of the house.
Q. Okay. Now I'm gonna point on here. And tell me if this is the one you're talking about.
A. Right there.
Q. This one right here (indicating)?
A. Yes.
Q. All right. I'm gonna mark that as a -- put a "K" over that, okay, for the kitchen. Do you see that?
A. Yes.

Q. All right. So you're looking out that window?
A. Yes.
Q. And what do you see when you look out?
A. I see the pickup truck.
Q. Could you tell what color it was?
A. Red.
Q. All right. And at that point do you have any lights on on the outside when you first look out?
A. Yes, the back light is on.
Q. Okay. And where is that back light located?
A. In the back of the house.
Q. Okay.
A. Right there (indicating).
Q. Okay. Right back here (indicating)?
A. Yes.
Q. All right. I'm just gonna mark, put a "L" there so we know where the light was, all right.
And was that light on?
A. That light is on.
Q. Is that light on all the time?
A. All the time.
Q. Okay. Now you said that you looked out and you kind of wanted to let them know you were looking out there; is that correct?
A. Yes. So I turned the sidelight on which is located above

the door.

Q. Okay. And I'm gonna -- are we talking about right here (indicating)?

A. That's it right there.

Q. And I'm gonna mark that with an "SL" for sidelight.

All right. Now when you do that, when you turn that sidelight on, are you still looking outside?

A. I'm still looking outside.

Q. Okay. Which window are you looking out at that point?

A. The kitchen window.

Q. Still the kitchen, okay.

Now where is that truck located at that time?

A. Approximately in the -- right in the middle of Bradford just a little behind the side door.

Q. Okay. When you say the side door, are you talking about where the sidelight is?

A. Yes. So, yeah, you put -- yeah, right there was where the truck located.

Q. Is that the front of the truck or the back of the truck?

A. The front of the truck.

Q. Okay. I'm just gonna put a "F" for the front truck, "FT."

Okay. Then the back is obviously which way? Is it towards your --

A. It's toward the other street.

Q. Okay. So the back of the truck is here (indicating)?
A. No. The back of the truck it south, is south.
Q. Back up here, this direction?
A. Yes.
Q. Okay. I'll just put "BC" for back of the truck.
So the truck's in that vicinity there; is that correct?
A. Yes.
Q. All right. Now you turn on your light.
When you first look out and see the truck, do you see anything besides the truck?
A. No.
Q. Okay. You flip on your light; is that correct?
A. Yes.
Q. Do you see something after you flip on the light?
A. Yes.
Q. What do you see?
A. When I flipped on the light, it's to let them know, you know, that I'm watching you so do what you gotta do and will you please leave the vicinity. I don't like anybody hanging around the house cause I got a corner house.
So I will say maybe a minute after I cut the light on, I wait there for a few minutes and the guy got out the passenger side of the truck.
Q. Okay. So you see a man?

A. I see a man got out the passenger side of the truck, go around the front of the truck to the driver's side and at that time I notice the truck had a flat.
Q. Okay.
A. Now I couldn't see exactly -- I couldn't see the driver exactly or to see if there was more than one person in the truck other than the driver.
Q. Okay.
A. But I knew somebody was in the truck cause they was on the gas pedal. Cause the guy who got out proceeded to try to push the truck.
Q. Okay. The person who was pushing the truck, were they pushing from behind or --
A. Pushing from the front.
Q. From the front end of the truck?
A. Yeah, trying to push the truck back.
Q. Okay. Now when you see this person that you say is pushing --
A. Yes.
Q. -- is he by himself or is there -- on the outside is he by himself or is there somebody else outside there with him?
A. He's by his self.
Q. All right. Now are you able to kind of see that person?
A. Yes.
Q. Okay. Did they have a hat on or anything, if you

remember?
A. Yeah, like maybe a hood on. They had dark clothing. He had blue jeans.
Q. Okay.
A. But I can pretty much see who it was.
Q. All right. Now could you see whether this was a young person?
A. From my recollection, it was a older person.
Q. Okay. Now when say a older, kind of what age range are we talking?
A. I would say between the middle 30's and early 40's.
Q. Okay. All right. And when you see this person, about how far are you? How far -- well you say that the truck is -- is the truck in the middle of the street?
A. Yeah. About in the middle of the street, yes.
Q. And you're still looking out your window?
A. Yes.
Q. Okay. Do you have any lights on on the inside?
A. Yes.
Q. Okay.
A. The kitchen light.
Q. So the kitchen light on the inside is on?
A. Is on.
Q. And you're looking through that?
A. Yes.

Q. Is that correct?
A. With the sidelight on also.
Q. With the sidelight, okay.
Now do you see -- okay. You see this person trying to push?
A. Yes.
Q. At that point, what do you see?
A. The person trying to push and who is ever in the truck is on the gas trying to make the truck move as he pushes.
So at that point I thought no more of it because they're trying to move away from my house.
Q. Okay. And then what did you do at that point?
A. I turned the light off and I stood back in the windows and studied. They was -- it was a slow process for moving slow, but nevertheless they were trying to get away from the house. So I cut the light off and I went to bed.
Q. Okay. Now which light did you turn off?
A. Just the sidelight. The backlight stays on all night.
Q. Okay. So the sidelight you turned off at that point?
A. Yes.
Q. Okay. Does that backlight, does that give pretty good lighting out there?
A. Yes, it is.
Q. Okay. Now at that point you say you went to bed, correct?
A. I went to bed, yeah.

Q. You didn't pay anymore attention to what was going on?
A. I paid no more attention.
Q. Okay. Now did you get a good enough view at that point that you think you would be able to say, you know, if you saw that person again that you'd be able to recognize them after this period of time?
A. Yes. Yes.
Q. Now yesterday -- I believe it was yesterday.
A. Yes.
Q. You were asked to attend a lineup; is that correct?
A. Yes, sir, I was.
Q. All right. Tell the jurors about what -- how was that set up?
A. Before I went in the lineup, I was told what not to do and to be sure if I made a pick to be sure that I was sure of myself of who I pick, certain things to ignore and pretty much go in and pick out who you see.
Q. Okay.
A. If you see anybody you know.
Q. Okay. Now you said things to ignore.
What kind ever things were you told to ignore?
A. Stuff like mustache, braids cause all that could be altered.
Q. Okay.
A. Could have been altered.

Q. All right.
A. So that was --
Q. Any other instructions?
A. Just, you know, relax and take my time.
Q. Okay.
A. And go up and down the line.
Q. Okay. Now when you were presented this group, were they already standing out there when you walked in?
A. Yes.
Q. Okay. What did you think when you first saw this group?
A. These guys are too young for the guy that I thought, I thought I saw.
Q. Okay.
A. That night.
Q. Okay. Were you a little surprised at what you saw there?
A. Yes.
Q. Okay. Now were you -- after you looked at that, did you see anybody you knew?
A. No, I did not.
Q. Okay. And is that what you told the police at that particular time?
A. Yes.
Q. Okay.

MR. ELIZONDO: May I have just one second, judge?

Q. (By Mr. Elizondo, continuing): After the incident with the truck, you know, with that truck being out there --
A. Yes.
Q. -- did you know that something had happened out in that truck?
A. No. No, I did not.
Q. Okay. Do you find out at some point in time?
A. Yes, I did. Excuse me. Yes, I did.
Q. Okay. How much time passed from when you saw the truck to when you actually found out something may have occurred out there?
A. It might have been a couple of days, maybe five days.
Q. Okay. Did you -- were you around -- well strike that. Let me ask it this way.
Do you know how that truck -- well was that truck eventually moved out of that area?
A. Yes.
Q. Do you know how it was moved?
A. No, I don't.
Q. Okay. Did you ever talk to any police officers the day after that you recall?
A. Yes, I did but it wasn't the day after, no.
Q. Okay.
A. It was a few days later.
Q. A few days later, okay.

Did they talk to you concerning the truck?
A. Yes, they did.
Q. Okay. Were you able to give them any information at that point concerning the truck?
A. I gave them -- I told them what had happened and I gave them the best description that I could give them of the person I saw who got out trying to push the truck.
Q. Okay. All right. Do you recall what that description was?
A. I told them it was a older guy that hangs out in the neighborhood. And I told them the locations that he hangs out at and that was about it.
Q. Okay. So the person you saw out at the truck you thought at that point that you knew who it was?
A. Yes, sir, I did.
Q. Okay. All right. And that's what you told the police?
A. Yes.
Q. Okay. And it was an older person you said that you --
A. Well I said between the middle 30's or early 40's.
Q. Okay. All right. And all of that information -- all of that information was based on looking out that window that night for about how long would you say?
A. Absolutely.
Q. How long would you say you were looking out there?
A. Maybe five or ten minutes.

Q. Okay. And again you had the interior light on?
A. Yes.
Q. And you had those exterior lights out there?
A. Yes.
Q. Okay.
MR. ELIZONDO: I have no further questions, judge.
THE COURT: Counsel.
MR. HOWARTH: Thanks, judge.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Good afternoon, Mr. Golson.
A. Good afternoon.
Q. Mr. Golson, do you know me, sir?
A. I just had the pleasure of meeting you today.
Q. A mutual pleasure.
Before that, you ever recall seeing me, talking to me, conversations?
A. I seen you yesterday.
Q. Okay. Where did you see me yesterday?
A. Well where they had the lineup.
Q. Before yesterday at the lineup, had you ever seen me anyplace?
A. No.
Q. All right. At the lineup yesterday, did we talk at all?

A. No.
Q. Not so much as a word between us, right?
A. No.
Q. Okay. And then you met me, what, about 20 minutes ago out in the hall?
A. Yes, sir.
Q. And we had a conversation about the lineup, right?
A. Yes, sir.
Q. And I asked you when you went to the lineup did anybody try to help you make an identification, didn't I?
A. Yes, sir.
Q. And you said no?
A. No.
Q. You said it was a fair, honest lineup, didn't you?
A. Yes, it was.
Q. And you still say that?
A. Yes.
Q. All right. There were six people in the lineup?
A. Yes, it was.
Q. Did they dress them all in the same kind of an outfit?
A. Yes.
Q. So the clothing at that lineup didn't influence you at all?
A. No, it didn't.
Q. You were looking, sir, for the face that you saw looking

out your window back on January the 1st of this year, right?

A. Yes.

Q. And you see the gentleman in the white shirt with the tie sitting down here? I'm pointing at him with my left hand (indicating).

A. Yes, sir.

Q. Was he in the lineup?

A. I can't remember.

Q. Okay.

A. Yes, sir, he was.

Q. Okay. You are able to see him clearly now, aren't you?

A. Yes.

Q. And your memory -- I'm sure by the fact that he's here, he's one of the people who was in the lineup, right?

A. Yes.

Q. Did you take a look at him yesterday?

A. Yes.

Q. And what conclusion did you come in your mind? Forget the rest of the people in the lineup just for this minute.

A. Okay.

Q. What conclusion did you come into your mind yesterday as far as the man I'm pointing out here in the white shirt? Is that the guy?

A. No. No, the guy that I saw was a little older.

Q. All right. But this isn't him?
A. No.
Q. All right. Now take you back to the view that you got of the man that's pushing the truck.
Your neighborhood, sir, I don't wanna demean where you live at --
A. I understand.
Q. There is crimes there, right?
A. I understand. Yes.
Q. Am I right?
A. Yes.
Q. And folks that live there, the homeowners, honest folks, you try to keep an eye out on that neighborhood, don't you?
A. Yes, sir. I'm locked and loaded every night.
Q. Are you?
A. Yes, sir.
Q. Very good. Thankfully you didn't have to do anything like that back on January 1st, right?
A. Yes, sir.
Q. All right. Do you keep -- is one of the reasons you keep that outside light so that if there is any trouble around that side of the house you can flip it on at night?
A. The sidelight.
Q. Yes, sir.

A. The back -- the light in the back is on from the minute it gets dark until daylight.
Q. I appreciate that. But I'm talking about the light you actually turned on.
A. Oh, that's not on all the time.
Q. But you turned that on so you could get a better view?
A. I turn that on, yes, to get a better view.
Q. And do you know how many -- like the wattage or anything on that light?
A. It's a 60-watt bulb.
Q. Is it a floodlight type thing?
A. No, it's a regular light bulb.
Q. Does it light the area up where the truck was?
A. Pretty much, yes.
Q. What you saw when you looked out was a person, would I be correct in saying that person was a black male?
A. Yes, it was.
Q. He got out of the passenger side?
A. Yes.
Q. Walks around to the front of the truck?
A. Yes.
Q. Now as you're watching him as he goes out to that passenger door to the front of the truck, you also notice that there is somebody in the driver's seat, right?
A. Yes.

Q. All right. That person you didn't see really?
A. No, I didn't see.
Q. Now that fella that got out of the passenger seat and walks around to the front, you correct me but I believe you said you thought you recognized him?
A. Yes.
Q. As a fellow that hangs around the neighborhood?
A. Yes.
Q. Is that person in your mind somebody that you kind of wonder about in the neighborhood that --
A. Yes.
Q. A troublemaker?
A. No, but somebody to be watched.
Q. Okay. Just a person to look at, right?
A. Yes.
Q. And that's who you think it was?
A. Yes, sir, I do.
Q. Now when the police come, whether it's two days later, four days later, five days later, whatever it is, was that uniformed police officers that came to see you?
A. It was a patrol car the first time they came and questioned me. It was maybe a week, maybe ten days that the detectives came to my house. We sat down at night and I proceeded to tell them exactly what I'm telling you.
Q. So you had two visits from the police?

A. Yes.
Q. When the patrol officers came, did you tell them what you had seen?
A. Yeah, I told them exactly what I told the prosecutor and what I'm telling you.
Q. And at that time this is definitely still back in January, am I right?
A. Yes.
Q. Isn't it a fact, Mr. Golston (sic), you told them I think I can identify this guy if I get a chance to look at him?
A. Yes.
Q. You told that to the patrol officers?
A. Yes.
Q. You told that to some detective that came some days after that?
A. Yes. Yes.
Q. Do you know what detective it was?
A. No, I don't.
Q. Black male? White female?
A. It was two males. I think one was black, one was white.
Q. And you told them I think I can identify that guy?
A. Yes.
Q. And you say you told that to a prosecutor?
A. Yes.
Q. All right. When did that happen?

A. Happened yesterday.
Q. All right. That's the only time you talked to prosecutors, right?
A. Yes.
Q. The rest is all the police?
A. Yes.
Q. And I want you to think back now about this guy that you saw and from what you saw him wearing.
Could he have been wearing like a hoodie?
A. Yes.
Q. And dark one?
A. Yes.
Q. But you could still see his face?
A. Yes.
MR. HOWARTH: That's all I have. Thank you, Your Honor.
THE COURT: Any redirect?
MR. ELIZONDO: Yeah. Just a couple questions.

**REDIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Let me go back to the wattage of the light bulb.
That back one that's always on, what's the wattage on that, if you know?
A. The back one is an LCD light, the new type of light bulb, you know, that's round. It's about a hundred watt.

Q. Okay. Now let me ask you this. If -- is that -- have you been outside in that area with that light on?
A. Yes.
Q. Okay. If I were -- if you were speaking to someone out there, is there enough light there to see them and see their face and that sort of thing?
A. Yes, because it's also a surveillance camera in the back of the house.
Q. Okay. There is?
A. Pardon.
Q. You have a surveillance camera?
A. Yes, a surveillance camera in the back of the house.
Q. Did that take out in the backyard or does it take out on the side?
A. No, it covers the back door.
Q. Okay. All right. Now but again I'm just -- what I guess I wanna make real clear with that light, if I were standing out in the side of your house --
A. Yes. Yes, I could see the street with that -- with just the back light on.
Q. Okay. Well, okay. I want you to listen. This is just a little different.

If you were outside of your home --
A. Yes.
Q. -- standing out there where that truck was.

A. Yes.
Q. And I was let's say two, three feet from you.
A. Yes.
Q. Is there enough light from that light for you to see my face?
A. Yes, it sure is.
Q. And to recognize it?
A. Yes, sir.
Q. Wouldn't be any problem, would it?
A. No, it wouldn't.
Q. Now when you were looking out that window at this person, you said the light was on behind you, right?
A. Yeah, the sidelight. I had the sidelight on also and the back light was on.
Q. Got you. But you're inside looking out a window?
A. Yes.
Q. Light's on in the kitchen?
A. Yeah, in the kitchen.
Q. Didn't you have a reflection on that window?
A. No.
Q. No reflection?
A. No.
Q. Okay. Now when you look out again, how many people do you see outside pushing that truck at any one time?
A. Just one.

Q. Just the one?
A. Yes.
Q. Now did -- this person that was there you said had a hoodie on?
A. Yeah.
Q. Are you sure?
A. Well I mean it wasn't completely on his head. It was like it was like half covering it, half covering his head.
When he got out the truck and walked around the front of the truck, he was facing me.
Q. Okay.
A. He was facing exactly where I was looking out the window.
Q. Okay.
A. And then when he turned around, bent down and look and see that the truck had a flat tire.
Q. Okay. Now he looked, he came out from around the truck, went around front, at that point he's looking right at your window, right?
A. Yeah, he looking right at my window.
Q. All right. And then he went around, did he turn to go up the side of the truck?
A. Yeah, he bent down. He bent down to look at the tire.
Q. Okay. So he bends down.
Are you able to see his face when he bends down looking at the tire?

A. Yes.
Q. You could see his face?
A. Not at that point. When he comes back up.
Q. Okay.
A. And he comes back up like you just did and turned back around.
Q. And you saw his face there?
A. Yeah. And he turned back around, went back to the passenger side.
Q. Okay.
A. At that point, I didn't think no more of it because they, you know, I thought maybe they was gone get, you know, get moved.
Q. Okay. So you see his face for that moment when he's walking towards from the front of the truck towards your house?
A. Yes.
Q. He does whatever he does and he gets done?
A. Gets back --
Q. He turns around, you see his face again?
A. Yes, just like you're doing.
Q. Then he turns around, walks away?
A. So at that point, you know, I cut the light off and I went to bed.
Q. Okay. All right. Did you have your glasses on that

night?

A. Yes. I don't -- these are just for reading. I don't wear glasses to see.

Q. Oh, okay. You're a lucky man. You're a lucky man.

All right. Now --

MR. ELIZONDO: Yeah, nothing else. Thank you. Thank you, sir.

**RECROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Mr. Golson, by the time the police came to see you, the detectives, would you have any way of knowing --

THE COURT: Counsel, let me stop you there.

Counsel, does that question -- I don't think it goes beyond the scope of the redirect.

MR. ELIZONDO: Thank you, judge.

THE COURT: It wasn't asked. I'm keeping -- you know, if you want to ask something totally different that goes beyond what -- if you're gonna do recross, it has to go to not something that you may have missed before but only something that was just asked here. And he didn't ask anything about talking to the police.

MR. HOWARTH: All right.

Q. (By Mr. Howarth, continuing): The man that you saw, that you were telling Mr. Elizondo that you saw, was he in the neighborhood again ever since that night?

A. I haven't seen him lately. No, I haven't.
Q. Since that viewing, right?
A. Yes. Because if I may say so --
MR. ELIZONDO: Judge, and I am gonna object.
THE COURT: Yeah. Yeah. That goes beyond.
MR. HOWARTH: Okay.
THE COURT: You can't answer that question.
Okay. I have a couple questions before we get to the jury.
Just in terms of distance, you're in your house looking out your kitchen window?
THE WITNESS: Yes, sir.
THE COURT: Would you -- fair to say the car, the truck was before or after that wall in the back?
THE WITNESS: Oh, before.
THE COURT: Before?
THE WITNESS: I'm much closer. I can --
THE COURT: To where that bench is right here?
THE WITNESS: Yes.
THE COURT: So that's about where it is?
THE WITNESS: Yes.
THE COURT: Okay. That's the first question.
Second question. Did you ever see more than one person outside of that truck?
THE WITNESS: No, just the one guy that got out

of the passenger side of the truck.

THE COURT: Did you ever see the person inside the truck?

THE WITNESS: No, I just seen -- at the point I cut the sidelight on, the person got out the passenger side of the truck, walked around the front of the truck, bent down, looked down and seen it was a flat, went back to the front of the truck and tried to push.

THE COURT: Okay. I got you there.

My question is you only saw one person outside?

THE WITNESS: One person.

THE COURT: Did you ever see the person inside?

THE WITNESS: No. I couldn't -- I couldn't get a good --

THE COURT: Could you tell if it was a man or a woman?

THE WITNESS: I couldn't tell.

THE COURT: Okay. Do the jurors have any questions? Okay.

And while they're getting the question -- and you're sure this was between 1:00 and 2:00 A.M.? Could it have been earlier than that?

THE WITNESS: It could have been, yes.

THE COURT: Counsel.

(Discussion had at the bench between the Court

and counsel.)

THE COURT: Last question, sir.

Did you ever hear any gunshots later that evening?

THE WITNESS: No, I didn't.

THE COURT: Okay. You can step down, sir.

(The witness was excused at 2:43 P.M.)

THE COURT: People ready with their next witness?

MR. ELIZONDO: Yes, sir.

It will be Mikehl, M-i-k-e-h-l, last name spelled H-a-f-n-e-r.

THE COURT: Stop. State your name.

THE WITNESS: Mikehl S. Hoffman.

THE COURT: Okay. Raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give is true to the best of your knowledge or ability?

THE WITNESS: Yes, sir.

THE COURT: Please give your name, spell it to the court reporter.

THE WITNESS: My name's Mikehl, M-i-k-e-h-l S. H-a-f-n-e-r.

THE COURT: Please pull that microphone up and keep your voice up.

You may proceed, counsel.

MR. ELIZONDO: Thank you, judge.

**MIKEHL HAFNER,**

having been first duly sworn by the Court at about 2:44, P.M., was examined and testified upon his oath, as follows:

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Tell the jurors your name and occupation, sir.

A. Yes, my name's Mikehl S. Hafner and I work for Michigan State Police in the forensic lab, crime lab at Northville.

Q. Okay. And how long have you worked there, sir?

A. A little over four and a half years.

Q. All right. And what's your job title?

A. Title is a forensic scientist 12.

Q. All right. Now could you give us a brief background on your educational background?

A. I have a bachelor's degree from the University of Michigan. I have a Ph.D. in biochemistry from Wayne State University. I did a few post-doc's, and then after that I started working for the Detroit Police Crime Lab. And when they closed down, then I started working for Michigan State Police.

Q. All right. And have you ever testified in court before as an expert in any areas?

A. Yes, I have.
Q. And what areas was that?
A. Three times for DNA and this will be my fifth time for body fluid identification, BFI.
Q. Okay. Essentially what is body fluid identification? What is that area?
A. Essentially we just look for bodily fluids, blood, semen, saliva. The old term was serology, but now we use BFI for short.
Q. Okay. And you said that you have been qualified in this area in the past?
A. Yes, I have.

MR. ELIZONDO: Okay. I'm gonna leave the witness to counsel for voir dire as to his qualifications as to the -- as an expert in the area of bodily fluid identification.

MR. HOWARTH: Your Honor, I think that we'll incorporate into cross-examination.

I make no objection at this time.

THE COURT: So you have no objection?

MR. HOWARTH: To his qualifications as an expert.

THE COURT: As an expert, okay.

Q. (By Mr. Elizondo, continuing): Now, I'm going to -- can you explain to the jurors when a case comes into you is

there some sort of identification number given to it?
A. Yes, there is a case number given to every case that comes into the front door at M.S.P.
Q. And based on where you're at, is there a preface, some letters that you utilize to preface the case number?
A. Yes. Always case numbers at Northville start with NV, Northville short.
Q. All right. I'm gonna ask you, sir, if you are familiar with a Case Number NV 13-35?
A. Yes, I am.
Q. And how are you familiar with that particular case, sir?
A. That case was assigned to me. That's the case I worked on. One of the cases I worked on.
Q. Okay. Now this particular case -- in fact, I kind of want to start a general sense.
A forensic evidence kit, what is that?
A. That's an evidence collection kit. It's something that is taken either at a clinic or a hospital. And it's usually taken in a sexual assault case and contains swabs from certain areas, collection of hair sometimes, undergarments, every once in a while there may be something else present. And that's then packaged up, sent to the police agency and then the agency eventually sends it to us.
Q. Okay. Now as far as what's included in that evidence

gathering kit, you as a bodily fluid identification person, do you have any input as to what goes into that kit prior to it getting to you?
A. No.
Q. Okay. So it's fair to say that you receive a piece of evidence from a law enforcement?
A. Yes.
Q. All right. And that -- whatever's in it's been determined elsewhere for whatever reasons they've felt necessary?
A. That's correct.
Q. Okay. Now in this particular case, did you receive a forensic evidence gathering kit?
A. Yes, I did.
Q. Okay. Can you tell us, tell the jury what is it that you received?
A. I received an evidence collection kit identified as being collected from -- may I look at my notes?
Q. If it refreshes your recollection.
A. From Lucille James.
Q. And tell us what was it that you received? Physically what was in that?
A. In the kit there was a buccal swab from Lucille James.
Q. Okay. I'm gonna stop you real quick.
Can you explain to the jury what a buccal swab is?

A. Buccal swab is a sample in the inside of your cheeks.
Q. Okay. Why is that collected routinely?
A. That's collected routinely and used as a known standard.
Q. Okay. And it's a known standard for what?
A. For eventual comparison to DNA profiles that may be generated at a later date.
Q. Okay. So it's a scraping that inside and that's routinely done, correct?
A. Yes, it is.
Q. Okay. Fair to say that that's to give us a known sample of a particular individual?
A. Say that again, please.
Q. I said would it be fair to say so that a potential known sample from an individual, specific individual can be developed?
A. Yes.
Q. Now in addition to the buccal swab what else did you receive?
A. I received vaginal swabs, a vaginal slide, anal swabs, anal slide, cervical swabs, labia majora swabs, labia minora swabs, black pair of panties, left thigh swabs, right thigh swabs.
Q. Okay. And in addition -- now that all came in one container; is that correct?
A. That's correct.

Q. Okay. And did you receive a second container?
A. Yes, I did.
Q. And what was in that second container?
A. Second container was a buccal swab that was collected from James Stone.
Q. All right. Now when you get these materials and they come to you, what is it that you do next with these materials when you begin your work?
A. I read the case information that comes along with the paperwork. And after opening the kit there is a medical report. I go through that, read what's in there and that gives me the idea of what I may expect, gives me some background on the case and, again, the results that I should expect.
Q. Okay. And now is your job at this stage of the game to generate DNA?
A. No, it is not.
Q. Okay. Is that done somewhere else?
A. That's done later.
Q. Okay. What is your job then once you open this kit? What is your job with these items that you've received? What are you supposed to do with them?
A. I'm suppose to test these items based on again the information I receive from the RFLE, which is a Request For Laboratory Examination, the medical report, and then I

systematically use that and test everything.
Q. Okay. Now you say you test. What does that mean? What did you do?
A. There are a couple of chemicals that we add to, for instance, the swabs and any slide that we get that are pertinent, they're stained and we put them under microscope.
THE COURT: Can I stop you there.
What is the significance or difference between a swab and a slide?
THE WITNESS: Swab, Your Honor, is something you would use like a Q-tip.
THE COURT: Okay.
THE WITNESS: So maybe swab your ear, for example. We have swabs that would be taken by the forensic nurse or the nurse at the clinic, whoever has taken the samples from the victim. They would then take a vaginal swab. So they would swab over the vagina, labia minora, majora depending on what we got, and they would be put in an envelope, put inside the kits.
It's my understanding, I'm never there when this is done, but I have talked to a few nurses that actually participate in this or do this and they take a swab say from the vagina, they will smear a slide and then put that swab into the envelope. And then that all goes into the

kit and comes to us.

THE COURT: So basically part of that that's repetition; a swab and the slide may have some of the same, if there is anything, the same material?

THE WITNESS: The slide should be a representation of what is on the swab.

THE COURT: Okay.

THE WITNESS: And we have to look at the slide to see if we can find sperm cells which we can't do on a swab.

THE COURT: Okay. You may proceed, counsel.

MR. ELIZONDO: Okay.

Q. (By Mr. Elizondo, continuing): Now the test that you do on these items, did you do any testing on -- well strike that. Let me ask you this.

Do you generate a report for the work that you do?

A. Yes.

Q. Does that report indicate like what you received and eventually what you did to it and what the results were?

A. Yes, it does.

Q. Okay. Let me show you what's been marked as People's Proposed Exhibit Number 12, sir. I've handed you Proposed Exhibit Number 12.

Do you recognize what that is, sir?

A. Yes, I do.
Q. What do you recognize that to be?
A. This is my report for the case that we're talking about.
Q. Okay. And that's a copy of the original?
A. Yes, it is.
Q. Is it an accurate representation of the original?
A. It looks like the one I have here, yes.
Q. Okay.
MR. ELIZONDO: We're gonna ask for the admission of Proposed 12.
MR. JONES: No objection, Your Honor.
THE COURT: So admitted.
Q. (By Mr. Elizondo, continuing): All right. Now --
MR. ELIZONDO: And permission to publish it, too, judge?
THE COURT: There may be some problems seeing that, but go ahead.
Q. (By Mr. Elizondo, continuing): Can you see the screen from there, sir?
A. Yes, I can.
Q. Okay. Can you see the objects that are essentially showing up there, the different items that are displayed up there?
A. Yes, I can.
Q. Can you tell the jurors what those are or what that

represents?
A. Those represent all the way down to the right thigh swabs. From the right thigh swabs up were the items that were contained in the evidence collection kit.
Q. Okay. And these are the items that you're going to be examining and that you're going to be testing; is that correct?
A. That's correct.
Q. Okay. Buccal swab located -- this first one collected from Lucille -- kit's cut off here, but Lucille James.
Did you do any work to that?
A. No.
Q. Okay. Tell us why you didn't do anything.
A. That is submitted as a known standard -- oh, buccal swabs are not tested. They are cut, so to speak, put in the tube and then sent forward for DNA.
Q. Okay. It would be fair to say there is a presumption that DNA is gonna be located on that buccal swab; is that correct?
A. Yes.
Q. Okay. Next it says there were two vaginal swabs.
Did you do anything test wise to the vaginal swabs?
A. Yes, I did.
Q. Okay. Tell the jurors what you did as far as vaginal

swabs.
A. Vaginal swabs I took a little cutting from each swab and I tested them with two chemicals. The test is for acid phosphatase which is found in concentration in the prostrate gland.
Q. Okay. And was there any results on that?
A. Yes, that was negative for AP.
Q. Okay.
THE COURT: Negative for AP?
THE WITNESS: Which is short for acid phosphatase, Your Honor.
THE COURT: And what does that mean?
THE WITNESS: That means I did not find any presence of that enzyme there.
THE COURT: And what does that tell you -- I guess I'm curious.
What does that say?
THE WITNESS: Perhaps that there was no semen or seminal fluid present.
THE COURT: Okay. You may proceed.
Q. (By Mr. Elizondo, continuing): Okay. If there -- theoretically if there had been, it should have tested positive; is that correct?
A. Yes.
Q. Okay. Now the vaginal slide that's listed next, did you

do any work to that?
A. I stained that slide and then I looked under the microscope to see if I could find sperm cells.
Q. Okay.
A. And I did.
Q. You did find sperm cells?
A. Yes.
Q. Okay. Sperm cells -- okay. Well we'll move on.
Now let's see. That was done. The slide.
What about the anal swab itself? Did you do anything there?
A. Yes. I performed the acid phosphatase or AP test just like I did with the vaginal swabs and that was also negative.
Q. So no evidence of semen, correct?
A. Yes.
Q. All right. And then the anal slide, did you do anything to that?
A. Yes. I stained it just like I did the vaginal slide and I found a few sperm cells.
Q. Okay. Now and I don't know if this falls in your realm or not, but no semen but sperm. Is that unusual? And if it doesn't fall within your realm, just tell me. But that concept --
A. Say that one more time.

Q. Sure. We've got sperm?
A. Right.
Q. Sperm being the little cells, correct, that float in semen? Fair enough?
A. Yes.
Q. But there is no evidence of semen?
A. Well over time the acid phosphatase can break down. Acid phosphatase is present or can be found in the vaginal track up to 72 hours later.
Semen, on the other hand -- I'm sorry. Sperm cells can be found up to six or seven days later. So it is not uncommon to find sperm cells but no acid phosphatase.
Q. Okay. All right. Now let's move on to cervical swabs.
There were two of them there. Did you do any tests to those?
A. Yes, I did.
Q. And what testing did you do to the cervical swabs?
A. Again, I did the acid phosphatase test and that was negative.
Q. So no evidence of semen at that point, correct?
A. Yes, that's correct.
Q. All right. What about -- did you find anything else?
A. For all the other swabs, there was negative results for acid phosphatase.

Q. Okay. So in all of these swabs no evidence of any semen, correct?
A. That's correct.
Q. Okay. Testing all the rest of these items, other than you said the sperm found on the vaginal slide and on the anal slide, did you find anything else on any of the other tests that you performed?
A. No, I did not.
Q. All right. Now what you just testified to, that's contained in this report; is that correct?
A. Yes, it is.
Q. That's what -- the rest of this stuff is explaining just what you said?
A. Yes.
Q. Okay. Now after you do your testing and your findings, what's the next step of your work in this, with this evidence kit?
A. Anything that I find that's positive, a sample will be cut or several samples depending on the swabs. Let's say a pair of underwear. I will take a cutting from that, that's put in a tub, labeled. All those tubes are put in a small envelope that is then put in the property room in a certain bin, and then when it is assigned to a DNA analyst they go, retrieve that and they start the DNA exam.

Q. Okay. So at this stage of the game you're just kind of saying, okay, I found evidence of sperm cells and the two slides. And as a result of that, did you package something for and to save for further DNA testing?
A. Yes.
Q. What was that?
A. I packaged vaginal swabs and anal swabs which corresponded to the vaginal slide and anal slide and sent that forward along with the buccal swab from Ms. James, cause that is a known standard, and from Mr. Stone which was the other known standard.
Q. Okay. All right. Now as far as the evidence that was received and listed in record number one that we admitted, did you do any other work involved in this, with this material?
A. Involved with this case, yes.
Q. Okay. But as far as the materials that were listed in record one, did you do anything else? Did you do DNA analysis? Did you do anything else?
A. No, nothing else.
Q. Packaged it up, sent it forward, correct?
A. Yes.
Q. And to the best of your knowledge, it was then assigned to a DNA analyst in your office for them to look at it closer?

A. That's correct.
Q. Okay. Now as far as this case is concerned, do you do anything else?
A. Yes, I did.
Q. Okay. And that would be reflected in what report?
A. In two other reports; record number three and record number four.
Q. Okay. Well let's look at record number three.
All right. And again that's still in furtherance of this case; is that correct?
A. That's correct.
Q. Okay. What did you do concerning record number three?
A. Record number three consisted of a buccal swab from Mr. McKnight. And all I did in that case was to cut the buccal swab, package it up in a tube in a envelope and put it in the same bin with all the rest of the DNA samples that are gonna go forward.
Q. Okay. And that buccal swab that -- you say you put it in the same bin as all the materials that you have forwarded that you testified to earlier; is that correct?
A. Yes, they all go in Bin 10. Those are all the samples that go forward for DNA, Bin 10.
Q. Okay. So the DNA analyst now is going to have a buccal swab that was taken from someone by the name of Howard McKnight?

A. That's correct.
Q. Okay. And that's reflected in number three; is that correct?
A. That is correct.
Q. Okay.
MR. ELIZONDO: And we're gonna move for the admission of People's 14.
MR. JONES: No objection.
THE COURT: So admitted.
MR. ELIZONDO: Did you want to look at it, just make sure it's the same? Just want to make sure.
Q. (By Mr. Elizondo, continuing): Now you indicated that there was a third item that you -- or a third way you were involved in this particular case; is that correct?
A. That's correct.
Q. Okay. And that aspect generated another report and that was number what?
A. That should be record number four.
Q. Okay. And what did you do relative to this case that would be reflected in record number four?
A. Record number four was another buccal swab. That was from Mr. Robinson. And I essentially did the same thing. I cut the buccal swab, put it in the tube, packaged it in a envelope, put that envelope in Bin 10 waiting for DNA analysis.

Q. Okay. And that's reflected in record number four, correct?
A. That is correct.
Q. Everything that you did?
A. That's correct.
MR. ELIZONDO: And, again, the People's Proposed 15 we'd ask for the admission of that unless counsel has an objection to that.
MR. JONES: No objection, Your Honor.
THE COURT: So admitted.
Q. (By Mr. Elizondo, continuing): All right. Mr. Robinson's buccal swab, would that go in the same bin as all the other materials?
A. Yes, it did.
Q. So at this point after you finished your work we've got buccal swabs from Mr. Robinson?
A. Yes.
Q. One from Howard McKnight?
A. Yes.
Q. One from Mr. Stone?
A. Correct.
Q. And one from Ms. James?
A. Correct.
Q. Okay. All right. Anything else that you were involved in in this area?

A. No, sir.

MR. ELIZONDO: Okay. Thank you. No further questions, sir.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

**BY MR. JONES:**

Q. Good afternoon, Mr. -- or Dr. Hafner is it?

A. Good afternoon.

Q. My name is Paul Jones.

A. How you doing, sir?

Q. Just have a couple of questions.

With respect to your record number one, you did have findings on that record of sperm presence in two sources; is that correct?

A. That's correct.

Q. Now sperm contains DNA, does it not?

A. Yes, it does.

Q. You obtained those samples from another source when they arrived to you at the lab in Northville?

A. I'm not sure what you mean by another source.

Q. Well you stated that they arrive at your lab and they are originally obtained from another source, hospital or --

A. Okay. Yes.

Q. Is that correct?

A. Yes. Yes. Okay.

Q. Do you know where these came from, these samples, what source as far as hospital?
A. I would have to look at the collection kit and/or the medical record.
Q. Okay. But off the top of your head, is it a reflection in the records?
A. No, that's not written down here as to what hospital it came from.
Q. Would it be important to you in your analysis to know where they came from?
A. No. No.
Q. Okay. What stain did you use for the slides that you viewed the sperm in?
A. We call it a Christmas tree stain because it's a red stain and a green stain.
Q. Now when -- I'm sorry.
A. I was just gonna explain what they do.
Q. We'll get to that in a second.
A. Okay.
Q. The slides then when they were delivered to you didn't actually have any stain on them; is that correct?
A. That's correct.
Q. Those were just obtained, as far as you know, from someone at another location and then they arrived at Northville in a package, correct?

A. That's correct.
Q. So when you obtained these, then you prepared them in a way that you could analyze them; is that fair?
A. And we could visually see what's on the slide, yes.
Q. So as far as record number one being of any significance to this case --

THE COURT: Counsel, when you say record number one, are you referring to Exhibit 12 that's been admitted?

MR. JONES: Exhibit 12. I believe it's marked Exhibit 12. I'm referring to the report record number one.

THE COURT: I just wanna make sure it's clear for the record which one.

I believe that is Exhibit 12.

MR. JONES: That's correct, Your Honor.

Q. (By Mr. Jones, continuing): As far as this particular document, okay, record number one we're talking about, there was no findings of significance with respect to the seminal fluid in this report, correct? Isn't that what I understood you to say there was no significant findings of seminal fluid in these reports in number one?
A. As far as the AP test is concerned.
Q. As far as the phosphate test?
A. Yes.
Q. And then the slides. What did you do with the slides

after they were looked at?
A. Packaged them back up in the holder and put those back into the evidence collection kit and they went back to the agency.
Q. Now looking at these slides, you're actually looking at cells, correct?
A. That's correct.
Q. And you can't really tell much by looking where those cells came from, correct?
A. That's correct.
Q. I mean as far as a person, if they were my cells or if they were his cells or if they were his cells, you couldn't tell by looking at the sperm where they came from, correct?
A. That's correct.
Q. Did you actually obtain the buccal swabs from Mr. McKnight and Mr. Robinson?
A. No, I did not.
Q. You received them from a second source?
A. Yes, I did.
Q. What source was that? Do you remember?
A. I can tell you the agency.
Q. The agency.
A. Detroit Police Department but --
Q. Okay. So they were obtained by someone at the Detroit

Police Department and then sent to you at Northville?
A. Yes.
Q. Would that be correct?
A. Yes.
Q. And then as I understand it they were -- portions of these samples that were separately put aside for further analysis?
A. That's correct.
Q. And would you have been actually involved in that further analysis at any point?
A. No, I would not.
MR. JONES: I have nothing further from this witness, Your Honor.
THE COURT: Any redirect?
MR. JONES: Thank you.
MR. ELIZONDO: Just a couple questions.

**REDIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Just as far as the buccals, is it -- do you ever take buccal swabs?
A. No, I don't.
Q. Is it the standard for the Michigan State Police Forensic Lab to receive those items from the outside source, generally the police agencies?
A. Yes, it is.

Q. Okay. That's the standard, right?
A. Yes.
Q. Okay.

MR. ELIZONDO: No further questions, judge.

THE COURT: Any questions from the jurors? Okay. Counsel.

(Discussion had at the bench between the Court and counsel.)

THE COURT: Sir.

THE WITNESS: Yes.

THE COURT: Couple questions.

THE WITNESS: Okay.

THE COURT: Was any analysis done on the panties?

THE WITNESS: Yes, it was.

THE COURT: And what were the results of that?

THE WITNESS: Those were negative for AP. May I look at my notes?

THE COURT: Yes.

THE WITNESS: Or shall I say report.

It was negative for AP. I also tested for blood, that was also negative. But the alternate light source revealed that there might be possible biological material present.

THE COURT: Okay. And what does that mean?

THE WITNESS: Alternate light source looks at things that would fluoresce. For example, semen fluoresces, sweat fluoresces, urine fluoresces, sometimes bleach. So it depends on what the clothes were washed in may give a florescent when hit with the alternate light source.

THE COURT: What about blood?

THE WITNESS: Blood does not fluoresce, no.

THE COURT: But you couldn't -- is it your testimony that you can't analyze that or you couldn't -- there was something there but you couldn't pull it out?

THE WITNESS: No, for underwear or undergarments if we didn't see anything visibly or visible that perhaps may look like semen or seminal fluid, we go in the dark, look at that item under the alternate light source. If something fluoresces, then we could use the AP test. If that's negative, then that's a pretty good indication that there is nothing there. And what fluoresce it was either again urine, maybe sweat, bleach, something like that.

So alternate light source is a tool to sort of guide us in a direction where with the unaided eye we don't see anything.

THE COURT: Okay. Thank you. And from the time of evidence sampling to evidence analysis, could any of the evidence deteriorate so as not to be detected?

THE WITNESS: No.

THE COURT: So that includes, that would be included semen?

THE WITNESS: Right. Because the semen is either on an underwear garment or in this case would be on the swabs. And they are packaged up, they are -- if they do come to the lab wet, they have to be dried. But those were not wet, otherwise I would have noted it.

THE COURT: I thought -- this was my follow-up question. Then I thought you indicated that semen only lasts for so long, whereas the sperm cells last longer.

Did you indicate that?

THE WITNESS: No, the acid phosphatase.

The presence will break down, you can't find that after maybe-- it's up to about 72 hours.

The sperm lasts, in the vaginal track lasts up to six or seven days. But once specific cells are on a swab or clothing, then they stay unless they're in an adverse environment or if they're wet; then bacteria has a chance to degrade them. That's why I said if it comes to the lab wet, we have to dry it.

There was nothing wet in this case. I don't have it in my notes. Everything was dried, packaged up. As long as it's packaged up and sealed like that, it will last for potentially for years like that.

THE COURT: So to go back to the question, if it was there present when it was taken it wouldn't deteriorate?

THE WITNESS: Yes. It should still be there when we go to analyze for DNA, yes.

THE COURT: Okay. You can step down, sir.

Ladies and gentlemen, we are going to take a short break now. We will be back with you momentarily. Remember you can't discuss the case.

THE WITNESS: Thank you, Your Honor.

(The witness was excused at 3:18 P.M.)

(The jury was excused to the jury room at 3:18 P.M.)

THE COURT: People -- anything else to go on the record?

Your next witness?

MS. CEZIL: Mr. Brain Schloff from the Michigan State Police lab.

THE COURT: Is he gonna be a long witness?

MR. ELIZONDO: He is the DNA guy.

THE COURT: He will be long.

MR. ELIZONDO: He will take us to the end of the day.

THE COURT: How long do you think you'll be with him?

MR. ELIZONDO: I'm hoping not more than 20 minutes.

THE COURT: Would you want to start and stop or would you rather just do it all in the morning? Cause we're only gonna go 'til 4:00.

MR. JONES: I'm thinking tomorrow morning would be better, Your Honor.

THE COURT: So whenever you finish, we will take off and you can start fresh in the morning.

MR. ELIZONDO: Okay.

THE COURT: So we are gonna do direct now.

MR. ELIZONDO: Oh, you are, okay.

THE COURT: And then that was the understanding.

MR. ELIZONDO: But the cross --

MR. JONES: Cross tomorrow morning.

THE COURT: Do you have a problem with that?

MR. ELIZONDO: I'd rather do it all at once, to be honest with you.

Cause then he's got all night to think about this.

MS. CEZIL: Not only that, I mean it's a convoluted issue.

MR. JONES: What's wrong with that?

MR. ELIZONDO: Plus it's a very -- it's a very-- this is the heart the case here.

THE COURT: I mean part of them might not want the jury to ruminate on everything you say without any response until -- so it can go either way.

MR. ELIZONDO: Just by -- I just think this is the crux of the case and I prefer not to split it, to be honest with you. I mean I think that's important that it all kind of be there together.

THE COURT: So how are we doing in terms of witnesses?

MR. ELIZONDO: Everybody - it seems like everybody could be here Wednesday. I will have them here, we'll be ready to go back to back.

THE COURT: So you may finish by tomorrow.

MR. ELIZONDO: We will be real close by the end of the day tomorrow, if not done.

MR. JONES: One thing I need to let the Court know. I have got a sentencing tomorrow morning in front of Judge Robbins --

THE COURT: At what time?

MR. JONES: -- on a case. 9:00.

THE COURT: Just so you know, the trials take precedence over anything.

And he has like 30 matters in his courtroom, so you can go to him on a break.

MR. JONES: Okay.

THE COURT: Either beforehand.

MR. JONES: I will check in, let him know.

THE COURT: Check in, let them know that you are down in trial. If I have to bring one of the deputies down to get you, that's what I will do if you need me to.

So what time should I tell them tomorrow?

MR. ELIZONDO: I am going to tell my witness to be here whatever time you say.

MR. JONES: 9:15.

THE COURT: 9:15, okay.

Send them home, tell them come back tomorrow morning.

(The jury was excused for the day at 3:20 P.M.)

\- - -

# C E R T I F I C A T E

STATE OF MICHIGAN)
)
COUNTY OF WAYNE )

I, Betty Sanders, CSR-2931, and Official Court Reporter of the Third Judicial Circuit Court for the County of Wayne, Criminal Division, State of Michigan, do hereby certify that the foregoing pages 1 through 188, inclusive, comprise a full, true and correct transcript of the proceedings and testimony taken in the matter of the People of the State of Michigan versus Howard McKnight, on Tuesday, November 19, 2013.

Betty Sanders, CSR-2931

Dated this 3rd day of February, 2014.