ORIGINAL

STATE OF MICHIGAN

THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN,

-vs- Case No. 13-0628

14 FEB 21 AM 8:00
FILED

HOWARD JAMES MCKNIGHT,

Defendant.

______________________________/

**JURY TRIAL**

BEFORE THE HONORABLE EDWARD EWELL, JR.

502 Frank Murphy Hall of Justice, 1441 St. Antoine,

Detroit, Michigan - Wednesday, November 20, 2013

APPEARANCES:

VENESHIA CEZIL, (P72778)
RALPH ELIZONDO, (P41463)
Wayne County Prosecutor's Office
1441 St. Antoine, 12th Floor
Detroit, Michigan 48226-2302

Appearing on behalf of the People.

JAMES HOWARTH, (P15179)
615 Griswold, Suite 820
Detroit, Michigan 48226

PAUL R. JONES, (P42171)
23442 Tireman, Suite 1
Dearborn Heights, Michigan 48127

Appearing on behalf of the Defendant.

REPORTED BY:
Betty Sanders, CSR-2931
Official Certified Shorthand Reporter

Processed
Notice of Filing Sent
2/21/14
Clerk

TABLE OF CONTENTS


| WITNESSES | PAGE |
| --- | --- |
| **BRIAN SCHLOFF** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 5 |
| **NICOLE SCHALLER** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 60 |
| CROSS-EXAMINATION BY MR. HOWARTH | 96 |
| REDIRECT EXAMINATION BY MR. ELIZONDO | 99 |
| **ROBERT KANE** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 101 |
| CROSS-EXAMINATION BY MR. HOWARTH | 111 |
| REDIRECT EXAMINATION BY MR. ELIZONDO | 118 |
| RECROSS-EXAMINATION BY MR. HOWARTH | 134 |
| **REBECCA TIEPPO** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 141 |
| CROSS-EXAMINATION BY MR. HOWARTH | 149 |
| **ALI JABER** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 157 |
| CROSS-EXAMINATION BY MR. HOWARTH | 171 |
| REDIRECT EXAMINATION BY MR. ELIZONDO | 177 |
| RECROSS-EXAMINATION BY MR. HOWARTH | 178 |


EXHIBITS


| IDENTIFICATION | | MARKED | ADMITTED |
| --- | --- | --- | --- |
| PEOPLE'S 13 | DNA REPORT | -- | 13 |
| PEOPLE'S 16 | DNA REPORT | -- | 32 |
| PEOPLE'S 17 | | 59 | -- |
| PEOPLE'S 18 | EXAM CHART | 59 | 66 |
| PEOPLE'S 19-23 | | 59 | -- |
| PEOPLE'S 24 | DUPLICATE OF PHOTO ARRAY | 59 | 107 |
| PEOPLE'S 25 | | 59 | -- |
| PEOPLE'S 26 | | 100 | -- |
| PEOPLE'S 3 | PHOTO ARRAY | -- | 107 |

Detroit, Michigan
Wednesday, November 20, 2013
9:41 A.M.

\- - -

THE CLERK: Calling Case Number 13-000628; the State of Michigan Howard McKnight before the Court today for a jury trial in progress.

MR. ELIZONDO: Good morning, Your Honor.
Ralph Elizondo, assistant prosecutor.

MS. CEZIL: Good morning, Your Honor.
Veneshia Cezil on behalf of the People.

MR. HOWARTH: Good morning, Your Honor.
James Howarth as co-counsel for Howard McKnight.

MR. JONES: Please the Court, Your Honor.
Paul R. Jones on behalf of the co-counsel Mr. McKnight.

THE COURT: Are you ready to proceed with the continuation of jury trial?

MR. ELIZONDO: Yes, judge.

THE COURT: All right. You can get your next witness ready.

MR. ELIZONDO: Yes. That will be Brian Schloff from the Michigan State Police Forensic Lab.

THE COURT: Thank you.

(The jury entered the courtroom at 9:50 A.M.)

THE COURT: Good morning, ladies and gentlemen.

Thank you for your patience again. I know I probably sound like a broken record. We had some matters we had to take up outside of your presence. Also, we had a -- we could have started earlier, but we had a little -- well, you know.

People ready with their next witness?

MR. ELIZONDO: We are, judge.

THE COURT: All right. You're calling?

MR. ELIZONDO: Brian Schloff.

THE CLERK: Can you state and spell your last name for the court reporter, please?

Brian Schloff, S-c-h-l-o-f-f.

THE CLERK: Mr. Schloff, raise your right hand.

You solemnly swear or affirm that testimony you're about to give before the Court will be the truth?

THE WITNESS: Yes.

THE CLERK: Thank you. You may be seated, sir.

THE COURT: Keep your voice up, sir.

You may proceed.

MR. ELIZONDO: Thank you.

**BRIAN SCHLOFF,**

having been first duly sworn by the Clerk of the Court at about 9:52 A.M., was examined and testified upon his oath, as follows:

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Good morning, sir.

A. Good morning.

Q. Would you tell us your name and occupation, please?

A. My name is Brian Schloff. I am a forensic scientist at Michigan State Police Crime Lab in Northville, Michigan.

Q. All right. And how long have you worked for the crime lab?

A. Since April of 2009. Approximately four and a half years.

Q. All right. And do you have a specific duty or job assignment over there?

A. I work in the biology unit. Specifically I work on DNA, analyze crime scene evidence for the possible presence of DNA. If found, I make comparisons to known reference samples and report any statistics that may be relevant.

Q. And can you just give us briefly your educational background, experience in this area?

A. Sure. I have a bachelor of science from Michigan State University in serology with a concentration in genetics. I also completed graduate coursework at Michigan State University as well as University of Florida where I obtained a certificate in serology and DNA analysis.

Q. Okay. And have you testified in court before as an expert in the area of -- as a forensic scientist and DNA

identification?

A. Yes.

Q. Okay. How many times have you done that?

A. I have testified approximately 25 to 26 times as an expert witness in the areas of forensic DNA analysis, body fluid identification and crime scene analysis.

Q. Okay.

MR. ELIZONDO: Your Honor, I'm going to offer the witness to counsel as far as voir dire as to the issue of expertise and for forensic -- I'm sorry, DNA analysis and bodily fluid identification in those two areas.

THE COURT: Counsel.

MR. JONES: I have no objection, Your Honor.

THE COURT: All right. The Court will qualify him as an expert in bodily fluid analysis and DNA analysis in this case.

MR. ELIZONDO: Okay. That will be bodily fluid identification.

THE COURT: Identification, okay.

MR. ELIZONDO: And DNA analysis.

Q. (By Mr. Elizondo, continuing): All right. Let's talk first -- you were involved in a case involving with the laboratory number of NV 13-35; is that correct, sir?

A. Yes.

Q. Okay. And how is it that you got involved in that

particular case?
A. I analyzed the DNA.
Q. Okay. And let's talk a little bit first about -- we've all heard about DNA. Everybody watches, generally watches CSI, those types of programs.
Kind of in layman's terms just tell us what is DNA?
A. DNA stands for Deoxyribonucleic. It's a substance that is found in most cells in your body and it's codes for things like having two arms or two legs. So most of it is the same from one person to the next. However, there is a small percentage that's different and it's that small percentage that's different that I analyze in order to individualize someone or create a profile from DNA evidence or from crime scene evidence.
Q. Okay. Now you say there are certain specific things that you look for.
How many items or how many different types of things are you looking at or are you attempting to find?
A. So those individual areas that I spoke of before that are different from one person to the next I'm analyzing 16 different locations in order to generate a profile.
Q. Okay. And if you are able to find information as to all 16 of those locations, how do you classify that evidence?
A. As a DNA profile.

Q. Okay. And anything less than that, how would you classify that?
A. Anything less than that full compliment of 16 locations would be termed a partial profile.
Q. Okay. So if you were, let's say, able to locate -- I'm gonna -- and that would fit four of those different locations, you would consider that a partial profile?
A. Yes.

MR. JONES: Objection, Your Honor. Is this a hypothetical he is asking? I'm not sure where he is coming up with this number.

Assumes facts not in evidence as far as I can tell right now. So that's the basis of my objection to that question.

THE COURT: Your response, counsel?

MR. ELIZONDO: Well we're getting into the explanation, judge. This is not -- there is not -- I'm not asking him to offer an opinion. I'm asking him to explain the process so that when we do get to the specifics the jury would have a better understanding and knowledge.

I mean that's what the expert is for relying on his experience and ability to explain what they're going to be hearing here shortly.

MR. JONES: I think the proper question then

would be not to limit it to the number, but let the expert testify as to a number that would be considered partial profile rather than the number he's using for here.

MR. ELIZONDO: Well, again, it's just an example to look at the degrees of the different times of partials that --

THE COURT: Okay. Okay. I got it. I have heard enough.

I will allow it.

MR. ELIZONDO: Thank you, judge.

Q. (By Mr. Elizondo, continuing): All right. So if -- let's say you found four, four spots or four locations.

You would consider that a partial profile?

A. Yes.

Q. All right. What about 15 spots? Would you consider that a partial profile also?

A. Yes.

Q. Okay. Now let's talk a little bit about the process of your job and how this works as far as in this particular case.

What was the first thing you did as far as your involvement in this particular case?

A. The first thing that I do involves retrieving the evidence from storage. The evidence in this case was submitted, was placed into storage and then I retrieve it from

storage then extract the items or extract the items for DNA.

After the extraction process, I quantitate or there is a quantitation step where I'm determining how much DNA is actually present in the sample. And then after that there is an amplification step where I am specifically targeting those areas, those 16 areas that are different from one person to the next and generating multiple copies of those areas. And then also a detection step in which step I am generating that DNA profile and comparing those DNA profiles of crime scene evidence and reference samples.

Q. Okay. Now let's talk about the very first step.

You said the very first thing you do is what again?

A. Extraction.

Q. Okay. I thought you said you gather the -- well, okay, extract, all right.

The initial extraction here, what did you do? Just start as right from the beginning and take us through as to the extraction process.

A. Okay. In this case, I received two evidentiary items. They were vaginal swabs and anal swabs that were submitted. And those items go through a kind of extraction called a differential extraction. That is a

specific kind of extraction. That is aimed at separating any sperm cells that may be present in the sample from the rest of the sample.

So the result of that extraction is two fractions. One fraction is termed an epithelial fraction which is -- the aim of that fraction is to contain mostly anything that's not sperm cells. It usually contains a lot of DNA from the area that is swabbed. So in this case from the vaginal area, from the anal area it's gonna contain a lot of cellular material from the victim in this case.

And the other fraction being the sperm fraction. The aim of that fraction is to contain the DNA that's present from any sperm cells that are present. There is some carryover from those two fractions. It's not a complete process, but that's the goal.

Q. Okay. So the goal then, based upon what I think I'm hearing, you say is to take the samples that you received to do whatever processing you do and to come up with cellular material?

A. A DNA -- DNA from cellular material from one part of the fraction. A cellular material that has DNA extracted from it, the other extraction fragment or the other extraction extract has DNA from the sperm cells that are present.

Q. Okay. The fraction that has the DNA from the sperm cells,

is there ever leakage of other types of material into that, that material?
A. Not leakage but because this is one -- it is submitted as one sample. Because I'm trying to separate those samples into two extracts, there is some carryover of DNA into the sperm fraction and some carryover possibly from the sperm fraction to the epithelial fraction as well.
Q. Okay. Now in this particular case, you said that you received some materials. Were they labeled?
A. Yes.
Q. Okay. And how were they labeled?
A. With the laboratory number.
Q. Okay. And did it indicate -- well strike that. Let me ask you this.
Did you prepare a report concerning all of the work that you did in this area?
A. Yes.
Q. Okay. And I'll hand you this one here in a second.
I'm gonna hand you what's been marked as People's Proposed 13. Ask you to look at that, sir, and ask you, sir, do you recognize what that is?
A. Yes.
Q. And what do you recognize that to be, sir?
A. This is one of the reports that I authored. This is record two of the case.

Q. Okay. Would this be the initial report that you authored in this matter?
A. Yes.
Q. All right. Is that an accurate reflection of your original report?
A. Yes.
Q. Okay.
MR. ELIZONDO: Your Honor, we're going to ask for the admission of Number 13 here.
MR. JONES: No objection, Your Honor.
THE COURT: So admitted.
Q. (By Mr. Elizondo, continuing): Now can you see the report as it is on the screen, sir?
A. Yes.
Q. Okay. Why don't you tell us a little -- let's just kind of rundown.
What do we have up here at the beginning of this report?
A. It's listing the identification of the case. This is the laboratory number, the investigating officer, the agency that submitted the evidence and the agency's number that's associated with this case.
Q. Okay.
A. The record number on that second column, that's record number two on this case. Then the date that it was

received and completed.
Q. Okay. Now record number two, what would record number one have been, if you know?
A. Record number one is the body fluid identification report that was authored by the serologist on this case.
Q. Okay. And that was on Mr. Mikehl --
A. Hafner.
Q. Hafner, all right.
A. Dr. Hafner.
Q. All right. Now as we go down this information that I'm pointing to here, tell us what that is.
A. Would you mind if I refer to the report that's in front of me?
Q. Sure. Is that because you can't see this?
A. It's a little blurry for me from there.
Q. Let's see if I can -- all right. This information here.
A. Okay. That indicates you're -- the case is being processed, the nature of the offense, the victim's name and the suspect's name, and that an elimination sample was submitted.
Q. Okay. And why don't you explain to us what that means, the elimination sample.
A. Sure. In a lot of cases when you have a sexual assault that has occurred, the victim may have had consensual intercourse with another individual. We ask that they

submit an elimination sample from that individual so that any evidence that is recovered can be compared to that individual's DNA as well in order to identify them as possibly a part of the evidence.

Q. Okay. So it lists the name of James Stone on there, correct?

A. Yes. As the elimination, yes.

Q. Okay. And then as we go up, what does this tell us?

A. This is the evidence that was submitted on the case.

I received a buccal swab from Lucille James, the vaginal swabs, the anal swabs; a buccal swab from James Stone, and a buccal swab from Howard McKnight.

Q. Okay. All right. Now let's talk again about the work that you did here.

What did you do with the vaginal swab -- well let's strike that. What did you do with, first, with the known buccal?

A. So the known buccal swabs -- the DNA is extracted through the process and gone through the process that I described earlier. DNA profile is generated and that DNA profile is a known reference DNA profile from that individual that I can compare to the DNA from the crime scene evidence.

Q. All right. Were you able to then come up with a full profile on Lucille James?

A. Yes.

Q. Okay. Saw 16 points?
A. Yes.
Q. All right. As to the next that was labeled 13-35-1B1 vaginal swabs, what did you do with that?
A. I performed differential extraction on that item in order to try to sequester or separate that, those sperm cells from the sample and then generate a profile from those. And so I generated or I do have a -- generated a DNA profile from the vaginal swabs for the epithelial fraction and the sperm cell fracture.
Q. Okay. And we'll talk specifically about what you found there in a second.
Okay. As to the anal swabs labeled 13-35-1D1, what did you do to that?
A. That, those swabs went through same procedure as the vaginal swabs. A differential extraction was performed and DNA profiles were generated.
Q. Okay. And the sample NV13-35-2A, James Stone known buckle, what did you do with that?
A. Again, I extracted and generated a DNA profile and again a full profile was generated.
Q. Okay. Now you have got listed down here under that following up -- is that on there? The following evidence was submitted for DNA analysis on January 24, 2013, listing an item number and it says Howard McKnight known

buccal.

What can you tell us about that as far as how it got to you and --

A. So that evidence was submitted on a later date from the original evidence. That known buccal swab was also extracted and a DNA profile generated.

Q. Were you able to get a full profile on that?

A. Yes.

Q. Okay. And after -- okay.

So now you've got these items, these are the items that you did the work on, correct?

A. Yes.

Q. At least at this stage of the game?

A. Yes.

Q. Okay. And what date was this work done on?

A. Completed?

Q. Completed.

A. February 20, 2013.

Q. Okay. Now let's talk about the results of the examination.

Just so maybe we can translate this report a little bit easier later on, the results of the examination, there is a whole bunch of stuff there. Can you kind of breakdown what that -- what this stuff is and what it means as far as the work that you did?

A. Sure. Yes. This portion is -- this paragraph is just referring to those 16 locations that I analyzed and the specific chemistry that I used in this case.
Q. Okay. Then would it be fair to say, if I'm understanding this right, that each of these items that you got listed separated by a colon, that's kind of like the scientific name for those 16 locations that you were looking at?
A. The ones that are in parentheses, yes. That lists genetic loci, those genetic loci are those 16 locations that I analyzed.
Q. Okay. And that's what you are looking for, okay. Well strike that.
All right. So you got your DNA, the extract from the sperm sample. Did you -- were you ever able to make any findings concerning the materials that you analyzed?
A. Yes.
Q. Okay. Why don't you explain it and then I'll refer to the report in a minute as to where it's at.
A. Okay. Which item, I'm sorry?
Q. Well let's just start with on your conclusions.
A. My first conclusion is pertaining to the vaginal swabs.
The DNA types associated with the vaginal swabs are consistent with a mixture of DNA types from the -- from Lucille James and in one additional donor. And James

Stone cannot be excluded as being a possible donor to that mixture of DNA types.

Q. Okay. Now why do you say that?

A. Because there are -- so a picture of DNA types indicates that more than one person is contributing DNA to this particular item. It would -- it is consistent with the victim and that's something that you would expect to find that the victim's DNA would be swabbed from the victim's vaginal area.

I say that James Stone cannot be excluded as being a donor to that mixture, and specifically to the sperm fracture of this mixture, because there are DNA types present that are not from the victim and they're from an additional donor and they're the same DNA types that James Stone has.

Q. How many locations matched to James Stone of those 16 that you were talking about?

A. Of those 16 that I referred to or that I investigated, 15-- he could not be excluded at 15 of those 16 locations.

Q. Okay. Can you say with any reasonable certainty as to the 16th location, anything at all concerning Mr. Stone and that 16th location?

A. At that 16th location, the only DNA types present were from the victim.

Q. Okay. Is that unusual to find that type of -- make that

kind of finding?
A. No, it's not unusual.
Q. All right. Now did you -- in looking at what you found on the vaginal swab, did you then do anything to compare Mr. -- the swab, the buccal swab that was taken from Mr. Howard McKnight? Did you do any work concerning that?
A. Yes, I did make a comparison to Howard McKnight's DNA types and he, I excluded, from the vaginal swabs.
Q. Okay. Now when you say excluded, exactly what does that mean?
A. It means that he has DNA types that -- the profile that was generated shows DNA types that are attributed to Howard McKnight. His DNA profile is not present in that mixture of DNA types from the vaginal swabs.
Q. Okay. And based on that your conclusion is he's not a contributor to that material that was found?
A. The specific sample was -- that was submitted to me he did not contribute DNA types to that sample.
Q. Okay. All right.
Number two, what was your second conclusion?
A. That the DNA types that are associated with the anal swabs are consistent with Lucille James' DNA types and at least two additional donors.
Q. Okay. Now let's talk about that.
So essentially what that DNA material showed you

was, like you said, the unexpected or the expected aspect that Ms. James' material would be -- DNA material would be there, correct?
A. Yes.
Q. It also shows that there is DNA material that would indicate two additional donors?
A. Yes.
Q. To that mixture?
A. That's correct.
Q. Okay. Now did you do anything to try and come to some conclusions about the mixture of the two -- of the two potential donors?
A. Yes. I did make comparisons to the other known samples, the known reference samples that were submitted. This particular DNA mixture that's from the anal swabs, the mixture is in the sperm fraction of the anal swabs and it's consistent with being Lucille James and two additional donors. Those two additional donors are very low-level limited DNA types that are present. They're-- if they're -- and sometimes in a mixture you can determine somebody's contributing a lot of DNA, somebody is not contributing as much DNA, and you could term those as major and minor DNA profiles.

In this case, it's clear that the victim's DNA types are the major DNA types that are present in the

sperm fracture. Lucille James' DNA types are major and minor.

Q. All right.

A. Low-level minor limited DNA are from two additional individuals. And I did make comparison to the known references that were submitted and I determined that James Stone also cannot be excluded from this mixture.

Q. Okay. Now what was it that caused you to make the or come to the conclusion that Mr. James Stone could not be excluded from this mixture?

A. There are DNA types present at 15 of the 16 locations that could be attributed to James Stone.

Q. Okay. Now as to the information that you received concerning a potential second donor to this material, what can you or did you come up with any conclusions concerning that?

MR. JONES: I'm not sure what information he's talking about, Your Honor.

Is there a foundation as to what information he reviewed to come up with that? The question in the form and foundation I am objecting to, Your Honor, as to what he reviewed with respect to that.

THE COURT: I thought the question was clear. The Court's gonna overrule the objection.

MR. ELIZONDO: Thank you, judge.

THE WITNESS: With respect to that particular mixture, there are DNA types present that would be from a third donor; Lucille James being the initial donor, James Stone not being able to be excluded from the mixture as a possible second donor and then there are DNA types that are present from a third donor.

These DNA types are very low and so I could not make any conclusions about those DNA types.

Q. Okay. Could you make any conclusions about why it would be low in concentration?

A. I don't know how you mean.

Q. Well strike that. Let me ask you this. We'll just move on.

Did you do anything to compare the known sample of Howard McKnight to the mixture that was found on the anal swab?

A. Yes.

Q. Okay. And were you able to form any conclusions concerning that?

A. Yes.

Q. Okay. What were your conclusions there?

A. My conclusion is that a comparison of Howard McKnight's DNA types to this mixture is inconclusive.

Q. Okay. Now as an expert in this area in doing the analysis, my understanding is there are four potential

conclusions that you could reach or how many potential conclusions can you reach concerning a specific sample reference concerning a sample and a comparison to a reference sample?

A. I can make a conclusion that a person matches the DNA types present. I can make a conclusion that a person cannot be excluded from a mixture of DNA types that are present. I can make a conclusion that a person is inconclusive as compared to the DNA types present, or I could make a conclusion that a person is excluded from the DNA types present.

Q. Okay. Now what is it that would cause you to be able to come to a conclusion that a person is excluded from that sample?

A. If the DNA types from that individual are not present at the locations analyzed, then that person will be excluded.

Q. Okay. And could you make that conclusion based on the information you had from your work as to Howard McKnight?

MR. JONES: With respect to what?

MR. ELIZONDO: As to whether he was excluded or not.

THE COURT: Why don't you start that question -- the Court will sustain the objection.

MR. ELIZONDO: All right.

THE COURT: Start that over.

MR. ELIZONDO: All right.

Q. (By Mr. Elizondo, continuing): Based on the information that you received -- or I'm sorry, didn't receive it.

The results of your work, were you able to exclude Howard McKnight as a potential contributor to that finding on the anal swab?

A. No, I cannot.

Q. Okay. Now that -- you can't -- and we don't have a match, correct, with Mr. McKnight?

A. Correct.

Q. And we don't have a potential donor conclusion?

A. I did not conclude that he couldn't be excluded from the mixture.

Q. Okay. Your finding then is just inconclusive; is that correct?

A. Correct. I cannot say whether he may have contributed to the mixture or he may not have contributed to the mixture.

Q. Okay. Now what is it that kept you from finding him excluded from the mixture?

A. There are locations that I analyzed where there is a low-level third donor present. Those locations have DNA types that are the same DNA types that Howard McKnight has. And because they are very limited and very low and there are only a couple locations where that occurred, I could not say one way or the other whether they could have

been contributed by Howard McKnight or another individual.

Q. Okay. Now as to report number two, did you come to -- did you do any further work?

A. Yes, I did.

Q. Okay. Let's talk about that. What else did you do?

A. I also authored record five in this case.

Q. Okay. Well let me go back.

As far as on record number -- oh, I'm sorry. Hang on one second. Excuse me just one second.

Let's continue with record two. We'll talk about five in a minute. Record two. There is a section that talks on page two of your report about population statistics?

A. Yes.

Q. Can you tell the jurors what that's about?

A. Sure. This statistic relates -- this first conclusion, the first mixture calculation on the report refers to the vaginal swabs. And it gives weight, lends weight to the association that I'm making that James stone cannot be excluded from this mixture.

This is a calculation that which is an estimate. It's the probability that you can take an individual at random from the general population and that their DNA types would not be able to be excluded from this mixture.

And that probability for the Caucasian

population it's one in 43,630. For the African-American population it's one in 130,600, and for the Hispanic population it's one in 63,570.

Q. Okay. And that's listed on your report on page two, correct?

A. Yes.

Q. Okay. Now put back up here on the screen the page two of your report, specifically here where I'm pointing.

Are these the numbers and the population groupings that you were just referring to?

A. Yes. Yes.

Q. Okay. And this was a comparison as to James Stone and in the finding that you made on him; is that correct?

A. This is a statistic that relates an individual at random being selected from the population being a potential donor to this mixture.

Q. Okay.

A. And again James Stone cannot be excluded as a potential donor to this mixture.

Q. Okay. If I were to translate this then, at least in my kind of thought, then out of the African-American population, if Mr. Stone is of that -- in that group, that you would probably -- would you would need another 130,600 whatever you've got there folks. If you line those folks up, you may find someone else out of that one group that

hit that -- hit those marks also; is that what that means?
A. You would find -- you would -- this mixture calculation refers to all of the DNA types that are present at -- within the entire mixture. So it includes DNA types that are probably contributed to by the victim and it includes the DNA types that are also contributed by that second donor possibly James Stone.

So anybody who has any of those DNA types in any combination could, may not be able to be excluded from this mixture. So you would expect that in 130,600 individuals, you would find one that would have DNA types that could have a combination of those DNA types that are present.
Q. Okay. Now did you do any further calculations?
A. Yes.
Q. In this case, okay.

Is that reflected on page three of your report?
A. Yes.
Q. Okay. And I'm gonna put that up here.

Can you tell us what your calculations were and what they mean?
A. Sure. This mixture calculation is the same type of calculation and it refers to the mixture that was observed in the sperm fraction of anal swabs.

This calculation is the probability that you can

select a person at random from the general population and that person could not be excluded from the mixture observed from the sperm fraction of the anal swabs which is, again, at least three individuals being probably the victim's types and two additional donors.

For the Caucasian population, that number is one in 6,502. For the African-American population, one in 20,990. And for the Hispanic population is one in 17,660.

Q. And, again, these are all looking at essentially Mr. Stone and his potential contributions to this mixture, would that be a fair statement?
A. Yes.
Q. Okay. Now you said something about record five.
What additional work did you do in this matter?
A. Another buccal swab from another individual was submitted for comparison to the evidence.
Q. Okay. Now is that unusual to have that happen?
A. No.
Q. Okay. Any reason why it wouldn't be unusual?
A. In a lot of cases, evidence is submitted and then a suspect is developed at a later date. And then that suspect buccal is submitted or evidence is submitted and then an elimination sample is obtained in a potential partner so that buccal swab is submitted, et cetera.
Q. Okay. So there comes a point then that you receive

another buccal swab; is that correct?
A. Yes.
Q. Okay. When did you receive that?
A. Can I refer to my report?
Q. If it refreshes your memory, sure.
A. February 20, 2013.
Q. Okay. And was it in relation to this case?
A. I'm sorry. Excuse me. The date that that buccal swab was received was May 3, 2013.
Q. Okay. And, once again, was that in relation to this case?
A. Yes.
Q. And we asked -- we ask -- were you asked to do certain work with that relating to this case?
A. I was asked to compare this buccal swab and the profile generated to the evidence.
Q. Okay. And you indicated that the name of the buccal -- indicated that the buccal swab came from whom?
A. Ali Robinson.
Q. Okay. Now did you work a profile up on this particular buccal swab?
A. Yes.
Q. Okay. And was it given a -- an identification number?
A. Yes.
Q. What was that number?
A. NV13-35-6A.

Q. Okay. Now what did you do after you compiled the profile on that buccal swab?
A. After the profile was generated from that buccal swab, I compared it to the vaginal swabs and to the anal swabs and the mixtures of DNA types that are present.
Q. And your finding or were you able to make any conclusions?
A. Ali Robinson is excluded from the DNA types from the vaginal swabs. And Ali Robinson is excluded from the DNA types in the anal swabs.
Q. All right. Now you indicated that there was no conclusive determinations concerning Mr. Howard McKnight, correct?
A. Yes.
Q. All right. But yet you were able to come to a conclusion to eliminate on Mr. Ali Robinson; is that correct?
A. Yes.
Q. Okay. Why was that?
A. Because as I spoke of earlier, those low-level DNA types from a potential third donor that were present are not the same DNA types that Ali Robinson has at those locations. And so I was able to exclude him from this mixture.
Q. Okay. I just want to -- counsel.
Sir, I'm going to hand you what's been marked as People's 16 and just ask you to look at that.
Do you recognize what that is, sir?
A. Yes.

Q. What is that?
A. This is the report that I authored, record five.
Q. Okay. And this accurately reflects your original report?
A. Yes.
MR. ELIZONDO: Your Honor, we're gonna move for the admission of People's Proposed Exhibit Number 16.
MR. JONES: No objection to the admission of -- what is it number?
MR. ELIZONDO: Sixteen.
MR. JONES: Sixteen, Your Honor.
THE COURT: So admitted.
MR. ELIZONDO: Thank you.
Q. (By Mr. Elizondo, continuing): I wanna ask you a hypothetical here.
Okay. There is a person who claims to have been-- a woman who claims to have been sexually penetrated and the penetration is of a very short duration and there is no ejaculation. And she goes to the hospital and is examined within, I don't know, say four hours. No mention of anal penetration. No mention of anal sex.
Is your conclusion -- would that be inconsistent with the conclusion that you came to in the matter that you determined in record number two?
A. Would it be inconsistent with --
Q. Your findings.

A. No, it would not be inconsistent.
Q. Okay. Can you explain to the jury why it wouldn't be inconsistent with that?
A. In this particular case, there is a consensual partner. I believe sperm cells were observed in this case and that's why I did a differential extract to try to sequester those sperm cells in a separate fraction.
If there is no ejaculate from a suspect in this case, you would expect to find DNA from the victim and the consensual partner. Without the ejaculation present, you would not expect to find a lot of DNA from the person who had assaulted the victim.
Q. Okay. Now let's take that a little bit differently. And let's just say there was ejaculation, there was quick admittance to the hospital within a few hours when these samples are taken, and there is no reason to believe that the assailant had had a vasectomy or was wearing a condom.
Would your finding be inconsistent with that type of scenario?
A. Yes. If there is was ejaculation present, you would expect to find DNA from the individual who assaulted the victim.
Q. All right. What about semen? No semen -- the testing is done for semen on the samples and there is -- it's not responsive to that, no evidence of semen.

Would that in and of itself tell you anything?

MR. JONES: Your Honor, I don't believe that was the testimony. I think it was the phosphatase element, the enzyme was not present. But I don't think he testified the semen was not present. I might be wrong, but that's what I understood.

THE COURT: You may be right, but I think that's better left for cross-examination.

I think he is asking a hypothetical. You can adjust it or you will have a opportunity to make those corrections if you think that is on -- cross-examination.

MR. JONES: Thank you, Your Honor.

Q. (By Mr. Elizondo, continuing): Okay. Let me back it up.

If ejaculation occurred and the individual says they didn't wipe or they didn't go to the bathroom, they go to the hospital in a fairly quick time and a sample is taken, would the -- would it be unusual for the acid phosphatase to come back negative?

A. That would be unusual, yes.

Q. All right. Now let's take that into the hypothetical I had given you earlier about -- well strike that.

Okay. The -- if those factors I had given you earlier concerning the allegations of ejaculation and the negative on the acid phosphatase test, would that be sort of a unusual finding?

A. Are you referring to if no ejaculation had taken place?
Q. If ejaculation did take place.
A. It did take place and -- I'm sorry. What are the results of the test?
Q. It's negative.
A. That would be unusual.
Q. Okay. All right. Now, okay. Thank you.

MR. ELIZONDO: Can I have just one second, judge?

I have no further questions, sir.

MR. JONES: Just a second, Your Honor.

**CROSS-EXAMINATION**

**BY MR. JONES:**

Q. Good morning, Mr. Schloff, or --
A. Schloff.
Q. Schloff?
A. Good morning.
Q. I'm sorry. I mispronounced your name.

My name is Paul Jones. I'm one of the attorneys on this case on behalf of Mr. McKnight.

We discussed briefly the two reports that you authored in this case. I'd like to discuss a couple of things about those two reports that you went over with prosecution on this case.

To start with, you testified initially that you

had given testimony of an expert nature 25 to 26 times; is that correct?

A. Yes.

Q. That testimony, was it given at the request of any particular agency or person?

A. I am not sure on any specific case.

Q. Was it -- do you give expert testimony on behalf of people like Mr. McKnight?

A. Yes.

Q. You do?

A. I do. I will respond to subpoenas for defense, yes.

Q. Okay. And you also give testimony on behalf of prosecution's requests?

A. Yes.

Q. Would you say the majority of your testimony as an expert would have been at the request of a prosecutor?

A. Yes.

Q. Would it have been at trials?

A. Yes.

Q. In this particular case, were you requested by the prosecution to review this case?

A. Yes.

Q. I'd like to talk a little bit about the number two report that you authored on January of -- or, I'm sorry, looks like -- we'll get to that in a second but I want to put it

up here, okay, so the jury can look at it.

THE COURT: And, counsel, are you referring to Exhibit 13?

MR. JONES: Yeah.

Q. (By Mr. Jones, continuing): We've got it marked as Exhibit 13. And I know it's a little bit hard for you to see from way back there.

But this sample as it states up here was received on January 15th. Do you see that?

A. Yes.

Q. Where did you receive that sample from? Do you know?

A. That --the submission is from the VFI analyst.

Q. Okay. And he received it from some source?

A. Yes.

Q. Do you know where that original sample was received from, what location? A hospital? A clinic?

A. I don't have that information, no.

Q. Did you review any medical information prior to doing these analysts that you did on this case?

A. No.

Q. Did you review any lab reports that were generated prior to your receiving the sample?

A. No.

Q. So on this date received of January 15th, that refers to the time that you received the sample or that the sample

was received by the Northville Lab?
A. I believe that that is reflective of the submission from the VFI analyst.
Q. Okay. And the VFI analyst in this case was?
A. Dr. Hafner.
Q. Correct. We talked to Dr. Hafner, yes.
This sample completion date that you see up here or on your record number two, was that the date that you completed the analysis?
A. That's the date that I authored the report.
Q. You authored the report?
A. Yes, and completed my analysis.
Q. When did you do the analysis? Do you know? Do you recall?
A. I don't have that in front of me, no.
Q. Would it have been within a short period of time of February the 20th?
A. Yes.
Q. Say a week, within a week of February 20th?
A. Within a few weeks, yes.
Q. So the sample was received at the Northville Lab, it was processed by a Dr. Hafner and then you eventually processed the sample and it would have been within -- would it be fair to say within a month of the time that the sample was originally received by the lab?

A. I don't have that information in front of me. I have that the sample is submitted to me from Dr. Hafner, and then after it's submitted to me I analyze for DNA and then I generate a report.
Q. Okay. The reason I'm asking this you didn't have any concerns about the time between the time the lab received the report, the time the lab -- I mean excuse me. The time the lab, Northville Lab received the sample from wherever that was and the time you analyzed it, you didn't have any concerns about that time difference there a month or so?
A. I'm not sure in what regards I would have concerns. I'm not sure what you're asking.
Q. Well say this sample was received, okay, that you've looked at in February. On January 1st of this year of 2013, would that be a concern to you that the time between January 1st and the time you did your analysis within a week of February 20th, would that be a concern to you in your analysis?
A. Do you mean as far as generating results?
Q. Correct.
A. No.
Q. And why not?
A. I don't know how that would concern me. I'm not sure exactly what you're asking.

THE COURT: I'm not understanding your question either. Why don't you -- what is your concern, counselor?

Q. (By Mr. Jones, continuing): Is it possible that during that time that may have been some changes to the sample from the time it was taken in January 1st 'til the time you analyzed it on February the 1st within a week of February 20th?

A. If the sample's packaged properly and dried, then, no, there is no concern that there is something had changed.

Q. And you did not feel that there was a concern for that?

A. No.

Q. Thank you. Now as I understand it you looked at some known samples, would that be correct?

A. Yes.

Q. And those would have been of Lucille James, James Stone and I'm referring specifically now to record two, okay.

Now those are known samples, correct?

A. Those are known reference samples, yes.

Q. Now when you analyze these samples and you analyze a sample that you receive from either a vaginal or an anal swab as you did in this case, which of those samples do you look at first?

A. The evidentiary samples. The vaginal swabs and anal swabs are analyzed first.

Q. And why is that?

A. Because we have a policy of separating our samples by time and space in order to eliminate any possible contamination so that it would not occur.
Q. Okay. So the first -- you first set up a reference sample, is that what I understand then?
A. No, the first samples that are analyzed are evidentiary samples. The vaginal swabs and anal swabs would have been analyzed first.
Q. Okay. So you're looking at a sample that you have no idea when you get it what could be in it, correct?
A. It is labeled. It is labeled with the item number and the description. So I do know that I'm looking at a tube that contains swabs from the vaginal area, for example.
Q. Or the anal area? The rectal area?
A. Correct.
Q. Okay. Now do you do a complete analysis of those evidentiary samples, I will call them evidentiary samples, the vaginal and the anal swab? Do you do a complete analysis initially?
A. No.
Q. To develop a profile?
A. The process takes some time. It's done over a course of several days, sometimes weeks. The extraction of the evidentiary samples is separated by time and space from the extraction of the known reference samples.

Q. Did you develop a known profile of the vaginal swab?
A. I developed a DNA profile from the vaginal swabs.
Q. Okay. Now actually what you're looking at is not anything physical; is that correct? I mean you're not looking at sperm cells, are you?
A. No, I'm not.
Q. You're looking at some results of a -- I want to call it a machine or an instrument that generates information; is that correct?
A. A DNA profile is generated from an instrument and then DNA profile that I'm looking at is termed an electropherogram.
Q. Do you have those?
A. I don't have them with me, no.
Q. So you're looking at a graph, let's call it a graph, would that be fair to say?
A. It's electropherogram. It relates to the relative intensity of the DNA types that are observed.
Q. Okay. And then does the machine, the instrument also interpret the graph, the information on there?
A. I interpret the information.
Q. Okay. So you obtain the information from the sample.
Now do you put the sample into the actual instrument? Do you prepare the sample?
A. I perform an extraction on the sample.
Q. Correct.

A. The DNA extract I amplify a portion of that sample and then the amplified product is then put into the -- is then moved through the instrument and that's what generates the DNA profile.
Q. And the particular instrument used in this case by your lab was the PowerPlex 16 HS, correct?
A. That's the specific chemistry that's used to amplify the sample. The instrument is termed a 3130.
Q. Okay. And as a reference here there seems to be 16, I wanna call them locations if you want to call them that?
A. Yes.
Q. That you're looking at, 16 areas?
A. That's correct.
Q. Of a person's genetic make-up, would that be fair to say?
A. Yes.
Q. Now you mentioned initially that a large percentage of the genetic make-up of all of us is very similar, correct?
A. That's correct.
Q. Approximately 99.9 percent I think is a statistic I saw, correct?
A. In excess of 99 percent, yes.
Q. But you're looking at a small one-tenth of a percent of the genetic make-up which is very unique to individuals, correct?
A. That's correct. A portion of that small one percent.

Q. Sixteen in this case. Thirteen -- let's call them 13, plus possibly three more additional in this case 16 areas?
A. I'm looking at 16 different areas of the gene, of the genetic make-up of a person. These 16 different areas vary significantly from person to person, and that's why I can use those areas to generate a profile that is individual to one person.
Q. Very individual, very signature like, correct?
A. That's correct.
Q. I mean the chances are that you have got a 16 loci or 16 location profile substantially different from mine, correct?
A. Likely, yes.
Q. And see this is what is very scientifically recognized in the United States and in the world as a signature of a person sometimes, correct?
A. DNA profile is generally scientifically recognized as individualizing, yes.
Q. So when you are doing these analyses as a lab, you have to comply with very strict standards that are established, correct?
A. Yes.
Q. In fact, you've just gotten your labs in Michigan re-accredited recently, correct?
A. They have been accredited for quite sometime, but we do go

through audit from time to time. We just went through an external audit recently where we were -- we are still an accredited laboratory, yes.

Q. I wanna talk specifically a little bit about your conclusions, if you don't mind.

Now so you take the evidence that's given to you from the vaginal swab, the anal swab, you get a profile based on that, correct?

A. Yes.

Q. And then you do your known samples, your buccal swabs taken from that epithelial cell, the cheek cells of the people that were involved in this case, it sounds like being Mr. Stone and Ms. Lucille James and a suspect Mr. McKnight and another suspect Mr. Robinson; is that correct?

A. Yes.

Q. And then you have all these together at some point, you have profiles for the vaginal swab, you have a profile -- which contains information on a graph that was generated by the instrument used, and then you also have a profile of each of the individual references, in this case Lucille James, correct?

A. Yes.

Q. James Stone?

A. Yes.

Q. And Mr. McKnight?
A. Yes.
Q. And then you compare those individual references to what you found in your vaginal and anal swabs and you compare peeks; is that correct?
A. Yes. The first step when you generate these profiles is to analyze and interpret the DNA profiles from the evidence initially. And then after you interpret the DNA evidence that's present, then make comparisons to known reference samples. And then I generate any statistics that may be relevant.
Q. And this is how you came up with the conclusions that are reflected in part, if not completely, in the reports that we're looking at here today, correct?
A. Yes.
Q. Were there any assumptions that you made with respect to these samples?
A. How do you mean?
Q. Well did you assume that there was -- where did you get the information that there was a sexual assault?
A. From the case file.
Q. So you did receive a case file prior to doing this?
A. Yes. The submission itself indicates what type of crime had occurred.
Q. Okay. Did that fact have any bearing on how you would

have done your analysis in this case?
A. Yes. The thing that bears the most influence on how I process this case is whether or not sperm cells are present. Because I -- right now I'm working on almost exclusively sexual assault cases.
If sperm cells are detected in the sample, that's what indicates whether or not I will do a different extraction. Or if it's something like saliva or blood in the sample, then I'll just do a more general extraction technique.
Q. Okay. Were you given any other information about the events that may have occurred that led to your being presented with this sexual assault case? I mean, in other words, what happened to the victim? Were you given any information about that?
A. No, not initially.
Q. You're trying to be as objective as possible as a scientist in doing this analysis, would that be fair?
A. Yes.
Q. It's very important because the lab in Los Angeles and the lab in New England are gonna possibly be looking at this information that you're generating here in Michigan at some point, you want to be sure that the accuracy and the quality of the work you're doing in this lab is repeatable, correct?

A. I'm not aware of any other laboratories that look at any data, but I do want to maintain as much of that as I can, yes.
Q. Well isn't part of the information put into a national system?
A. If you're referring to DNA profile generated going into CODIS, yes.
Q. Okay.
A. And that can happen.
Q. Okay. And when you refer to CODIS, you're referring to a particular organization?
A. No, CODIS is the Combined DNA Index System. It is a database of DNA profiles from crime scene evidence or from people who may be associated with a crime in order to try to generate investigative leads as to who may have contributed DNA to a particular item of evidence.
Q. Now I'd like to get back to your report and try to keep this as brief as I can at this point.
The mixture that you found, usually in a mixture you have more than one possible DNA type; is that correct?
A. Yes.
Q. And you refer to these terms major and minor contributors, correct?
A. I did refer to those, yes.
Q. Now what do you mean by major contributor and what do you

mean by a minor contributor?
A. When you have a mixture of DNA types, it's possible that one -- you can determine that one person contributes more DNA and another person may be contributing less DNA. In those situations, you can determine a major contributor to the DNA profile.
Q. And in your conclusion 1A, the known buccal swab, you mention that there were 15 of 16 of those locations that we talked about that are very specific to the individuals, correct? Remember me talking to you about that? There are locations that are very specific, they tell the difference on the gene between me and you?
A. I don't remember talking to you about that, but there are-- when we talk about this conclusion, 1A, I'm referring to whether or not James stone can be excluded or if he cannot be excluded from this picture.
I determined that he cannot be excluded from this mixture at 15 of the 16 locations, but that 16th location was only the victim's DNA types.
Q. Now the 16th location, was there just one peek there that you used to make that determination that there was a victim's DNA type?
A. I don't have it in front of me. I don't know.
Q. You know what I'm talking about?
A. The DNA profile that's generated from a person can have

two DNA types at each location because you're inheriting one DNA type from your mother, one DNA type from your father. So each location there are at least -- can be two DNA types from one individual.

In a situation where you have a mixture of DNA types from say two individuals, you could have up to four DNA types that are present at a location.

Q. And in this case there was one that was excluded.

Do you recall which of those it was, which of these loci was excluded?

A. No, I don't recall which one. It would be the one that's not in the conclusion, though.

Q. Okay. So we're looking at the Item 1A and we're looking at the genetic loci listed there for James Stone.

Is it my understanding that those are the 15 loci that were present in the profile I will call it of Mr. James Stone?

A. They are loci. And the DNA types that I'm listing under 1A are the DNA types where James Stone cannot be excluded from the mixture of DNA types of the sperm fraction of the vaginal swabs.

Q. Thank you. Now referring to 1B in that same document, Mr. McKnight's known buccal swab, okay, you have him excluded as being a donor to the DNA obtained in the vaginal swab of Ms. James, correct?

A. Yes.
Q. And we talked about what exclusion means, correct?
A. Yes.
Q. And we talked about what inclusion means; is that correct?
A. Not inclusion.
We talked about what it means to not be able to be excluded from a mixture.
Q. That's not the same as being included in the picture?
A. I don't -- we don't use the terms included in our laboratory. We use the term this person cannot be excluded from the mixture.
Q. Okay. And that would have been the case in Mr. Stone's 1A analysis, correct?
A. Correct. He cannot be excluded from the sperm fraction on the vaginal swabs.
Q. But you can't say he was included?
A. That's just not a term we use.
Q. This is marked as Exhibit 13. It's a little difficult for me to operate this machine here.
But basically this is the -- 1A is the conclusion that we're discussing in this particular report, record number two, correct?
A. Yes.
Q. Where it says that Howard McKnight is excluded, correct?
A. 1B is that Howard McKnight is excluded as a potential

donor to the DNA types detected in the vaginal swabs.
Q. Is there a -- you mentioned a 15 of 16 that were found in Mr. Stone.
Does that mean that there were not 15 of 16 that were found in Mr. McKnight?
A. I'm not sure of your question.
In this case, the 15 of 16 loci that we spoke of refers to the DNA types where Mr. Stone could not be excluded from the vaginal swabs. We are talking about the 15 of 16 in the vaginal swabs themselves?
Q. Correct.
A. I make a comparison of James Stone to those, that sperm fraction of the vaginal swab, and his DNA types may be present at 15 of the 16 locations.
Q. Okay. Let's go down to conclusion two, the anal swabs, correct?
A. Yes.
Q. If hypothetically -- I'm going to ask you a question.
If a person is excluded from a vaginal swab but there is evidence that the person -- in this case, there was no conclusive determination as to that same person in a anal swab, how is that possible?
Do you understand my question?
A. No.
Q. If a person's excluded from a vaginal swab, and we talked,

I guess, a little bit about it because the minor fractions of the vaginal swab were not of a nature that you could come up with a conclusive determination, correct, for Mr. McKnight?

A. No, I did come up with a conclusive determination regarding Mr. McKnight in the vaginal swabs. I concluded that he is excluded from the vaginal swabs.

The DNA types that were detected in the vaginal swabs is a separate item from the DNA types that are detected in the anal swabs. In the vaginal swabs, it's consistent with the Lucille James and one additional donor. The vaginal swabs are consistent with Lucille James and at least two additional donors.

Q. At least two additional donors?

A. Yes. I say at least two because I can't tell you if more people had contributed to those DNA types that are present. I can tell you that there is at least one location where there were five DNA types present, meaning that they could -- there would be from three individuals.

An individual who might share some of the DNA types that are present may also have contributed DNA types in that case, so I say at least two individuals.

Q. Okay. But getting back to my query, my question on this, if someone's excluded from a vaginal sample how is it that that person could be considered as not conclusive with

respect to a anal sample of that same individual?
A. Well these two samples are collected from different areas. One's collected from the vaginal area, one's collected from the anal area.
In this case, this -- the sample collected from the vaginal area is consistent with two individuals; likely the Lucille James in this case and another individual. The DNA types that are collected -- that were detected from the anal swabs are consistent with Lucille James and at least two individuals.
So it is possible that a person can be excluded from one area of that is swabbed and still have contributed DNA to another area of a person's body.
Q. I want you to assume for this question that there is gonna be evidence in this case that there was vaginal penetration, there was not any anal penetration and that there was ejaculation in this case.
Based on that premise, if there was just vaginal penetration and ejaculation, would you expect to find DNA in the vaginal swab?
A. If the D -- if the evidence is collected promptly, yes.
Q. And if there was no anal penetration, would you expect to find any DNA in that area?
A. There can't be an expectation for that. You may, you may not.

Q. If you found anal DNA, is it possible that it could have been leakage from the vaginal area into the anal area?
A. It's possible.
Q. Based upon the anal swab that you ran in record two of this case where you conclude that there are at least two additional donors, based on the samples that you received, the buccal swabs in this case that you were using as a reference, you are not able to determine whether one or any of those samples matched the additional donors in this case? Do you understand my question?
A. No.
Q. You did not come to a conclusion as to whether or not it was possible that the known samples in this case were matched to the additional donors, two additional donors that you had come up with based on the graph that you made of the mixture?
A. So in respect to that conclusion, it's consistent with Lucille James, the victim, and two additional donors. James Stone cannot be excluded from the DNA types that are present in the sperm fraction of that sample.
There are additional DNA types present that do not belong to James Stone and do not belong to Lucille James. Those DNA types may be from a third additional donor or a second additional donor, excuse me. And, no, I can't make conclusions regarding those two additional DNA

types.

Q. Okay. You mentioned that one of the reasons for an inconclusive result is, as was the case with Mr. McKnight in the anal swab, would it be possibly that the results were not -- there was not sufficient sample that you could make a determination?

A. Sort of. Those additional DNA types that are present are present at a very low, limited fashion. There is very little DNA present from that second possible additional donor.

What I had indicated was that I could not make a conclusion regarding Mr. Howard McKnight because the DNA types that are present from that possible third donor are the same DNA types that he has at those locations. And so my result is that he is inconclusive because they are so low and so limited that I cannot make a conclusion regarding those DNA types that are present.

Q. You have no doubt in your mind as we sit here today in front of this jury that Mr. McKnight was excluded from the cervical, correct?

A. The vaginal swabs?

Q. Yes.

A. He is excluded from the DNA types detected in the vaginal swabs.

Q. Record number five you talked briefly about Mr. Robinson.

A. Yes.
Q. And that sample was received sometime after February, correct?
A. Yes.
Q. In May.
And, again, this sample was run by you, I presume?
A. Yes.
Q. You prepared it? You extracted it?
A. I extracted it.
Q. Did you enter it into the instrument that was analyzing this?
A. Yes.
Q. And then you read the graft as the electropherograms as you call 'em?
A. I interpreted the data and I did make comparisons, yes.
Q. And based on that you determined that in each case the vaginal swabs and the anal swabs that were analyzed that were received from Lucille James against the known sample of Ali, I believe it is, Robinson there was no match, he was excluded?
A. He was excluded for both mixtures, yes.
MR. JONES: Could I just have a minute, Your Honor?
THE COURT: Yes.

Q. (By Mr. Jones, continuing): Just like to conclude.
With respect to the population statistics that are at the end of these reports, are those required to be put into these types of reports?
A. I do like to give weight to the associations that I make by including the population statistics. They are required in some situations and not required in others.
In this situation, they are required.
Q. Did you actually perform these population statistics yourself?
A. I did generate the statistical values.
MR. JONES: I have nothing further, Your Honor. Thank you.
THE COURT: Any redirect?
MR. ELIZONDO: No. Thank you, judge.
THE COURT: Any questions from the jurors?
THE JURORS: (No response.)
THE COURT: Okay. You can step down, sir.
(The witness was excused at 11:08 A.M.)
THE COURT: We're going to have our morning recess.
Ladies and gentlemen, it will be about 15 minutes. I caution you again you can't discuss the case. Thank you for your patience.
(The jury was excused to the jury room at 11:09

A.M.)

THE COURT: Counsel, anything else for the record?

MR. ELIZONDO: No, not for us.

(Off the record.)

(People's Proposed Exhibits 17 through 25 marked for identification.)

THE COURT: Recalling Case Number 13-000628; the State of Michigan versus Howard McKnight before the Court today for a jury trial in progress.

MR. ELIZONDO: Ralph Elizondo, assistant prosecutor.

MS. CEZIL: Good morning again, Your Honor.

Veneshia Cezil on behalf of the People.

MR. HOWARTH: James Howarth, Your Honor, on behalf of Howard McKnight as co-counsel.

MR. JONES: Paul Jones on behalf of Howard McKnight, co-counsel, Your Honor.

THE COURT: You might as well remain standing cause we are ready to bring the jury out.

(The jury entered the courtroom at 11:34 A.M.)

THE CLERK: Right here for me, ma'am.

Can you state and spell your last name for the court reporter, please?

THE WITNESS: Nicole Schaller, N-i-c-o-l-e

S-c-h-a-l-l-e-r.

THE CLERK: Raise your right hand.

You do solemnly swear or affirm that the testimony you give before the Court will be the whole truth?

THE WITNESS: Yes.

THE CLERK: Okay. You may be seated.

THE COURT: Ms. Schaller, if you could just keep your voice up and pull that microphone up, please.

THE WITNESS: Okay.

**NICOLE SCHALLER,**

having been first duly sworn by the Clerk of the Court at about 11:34 A.M., was examined and testified upon her oath, as follows:

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Good morning.

A. Good morning.

Q. Tell us your name, please.

A. Nicole Schaller.

Q. And, Ms. Schaller, I'm going to ask you what your occupation is.

A. At the time of this, I was a registered nurse in the State of Michigan and also a forensic nurse.

Q. Okay. Well let me restate it then.

And on January 1, 2013, your occupation at that point?
A. I was a registered nurse in the State of Michigan.
Q. Okay. And were you working for any particular agency at that point?
A. Yes, I was. I worked for Wayne County SAFE.
Q. Okay. Tell the jurors what Wayne County SAFE is.
A. Wayne County SAFE is a Sexual Assault Forensic Examiner program run through the county.
Q. Okay. Now is the Wayne County SAFE, is that part of the Prosecutor's Office?
A. No, it's not.
Q. Police department?
A. No.
Q. Okay. Is it an independent agency essentially?
A. Correct.
Q. Okay. Now you said that you were working as a registered nurse at that particular point in time?
A. Yes.
Q. Did you have a specific type of duty assignment or work responsibilities with Wayne County SAFE?
A. Yes, I was a sexual assault nurse examiner.
Q. Okay. Can you tell us briefly what a sexual assault nurse examiner is?
A. It's a registered nurse or health care professional

trained to do forensic exams, detailed genitalia exams and provide support for patients.
Q. Okay. And do you receive any kind of special training or education concerning that whole area?
A. Yes.
Q. Okay. Tell us briefly what that was.
A. You take your training to become certified and it's a 40-week didactic course that you have to pass. And then you go on to do clinical components where you do training, on-the-job training and cases with an experienced nurse until you meet your requirements.
Q. Okay. Did you -- and that was in addition to your undergraduate degree?
A. Correct.
Q. And what did you get that undergraduate degree in?
A. I have a degree in nursing.
Q. Okay. From?
A. From Macomb Community College.
Q. Okay. And did you successfully complete the course, the sexual assault nurse examiner course?
A. Yes.
Q. And did you successfully complete the other training requirements?
A. Yes, I did.
Q. Okay. Have you ever testified as an expert in the area of

sexual assault as a sexual assault nurse examiner?
A. Yes.
Q. How many times?
A. I think five.
Q. Okay. And would that have been in the -- well where would that have been?
A. In Wayne County.
Q. Okay. At the circuit court level?
A. Circuit court and district court level, both.
MR. ELIZONDO: Okay. Your Honor, I'm going to offer the witness up to counsel for voir dire as to her qualifications in the area of being a sexual assault nurse examiner.
MR. HOWARTH: There is no objection to her testifying, Your Honor.
THE COURT: Okay.
MR. ELIZONDO: Thank you.
Q. (By Mr. Elizondo, continuing): All right. Now I'm gonna take you back to January 1st of 2013 and ask you if you recall events on that day or some events on that day?
A. Yes, I do.
Q. And were you working that particular day?
A. Yes.
Q. All right. And did you come into contact with an individual by the name of Lucille James?

A. Yes, I did.
Q. All right. And tell the jurors the general, you know, circumstances of where she came into contact with you.
A. Usually our agency is contacted either -- usually it's either by the police department or by a hospital when a person has reported that a sexual assault has occurred and then they come to us for a examination.
Q. Okay. Is that what happened in this case?
A. Yes.
Q. Okay. And when you -- and did you meet with Ms. James?
A. Yes.
Q. Okay. Now is there a particular protocol or particular procedure that's used in the examination of patients?
A. Yes.
Q. Okay. And is that particular protocol, is that kind of reflected in -- well strike that. Let me ask you this.
Do you keep records of your findings and the things that you did, that sort of thing, concerning these examinations?
A. Yes, we do.
Q. And is the record part of the process that's required in these examinations?
A. Yes.
Q. Okay. I want to hand you what's been marked as People's Proposed 18.

Ma'am, I'm gonna ask you to look at that and then tell me if you recognize what that is?
A. Yes, I do. This is the charting that we keep from our exams that we perform.
Q. Okay. And the one I handed you specifically, do you recognize that specific chart?
A. Yes.
Q. What did you recognize that to being?
A. This is the chart of an examination I performed on Lucille James.
Q. Okay. Was that done on January 1st of 2013?
A. Yes.
Q. Okay. Is that a full and accurate report of the chart?
A. It looks like page 15 is missing but the rest of it is correct.
Q. Okay. Do you know what page 15 would have been -- strike that. I'll ask you this. Okay.
A. Thank you. Yes, this is all correct.
Q. Okay. So with the addition of the page I just showed you, this is an accurate copy of the record?
A. Yes.
Q. Okay.
MR. ELIZONDO: Your Honor, we're going to ask for the admission of People's Proposed 18.
MR. HOWARTH: No objection.

THE COURT: So admitted.

Q. (By Mr. Elizondo, continuing): Okay. Now do you have a copy of this record with you?

A. Yes, I do.

Q. By chance -- if can you go ahead and get it out, we'll be asking you some questions concerning that.

A. Okay. Sure.

Q. Okay. Now in these examinations, what's the very first thing you do upon meeting the patient?

A. We obtain consent for the exam.

Q. Okay. And is there a purpose for that?

A. Well we want to make sure that the patient understands what the exam is going to include and that they are okay with the portions of the exam, or if they are not okay with any portions of the exam and then what will happen with the information that's received from the exam.

Q. Okay. And is that standard in every examination that's done?

A. Yes.

Q. Can't make a person -- can you make a person do the exam?

A. No.

Q. Okay. And in this particular case looking at the record, records, page one would be disclosure of medical records; is that correct?

A. Yes.

Q. Okay. Is that where you explain information concerning medical records?
A. Yes, that's correct.
Q. Okay. And did Ms. James indicate that was okay, whatever?
A. Yes.
Q. Okay. Page two -- I should look at page one of 15, consent for medical forensic examination. Tell us about that.
A. This is kind of where we breakdown the exam to explain to them exactly what we're going to be doing. And then they initial that they understand the different portions because they can choose to do some portions and to do -- and to leave some portions out.
Q. Okay. I'm just gonna put up here -- can you see the screen here?
A. Yes.
Q. Again, this is the consent for medical examination, part of it. There is an A, B right through H; is that correct?
A. Yes.
Q. Okay. A; a complete -- complete the sexual assault examination. You explain to them, what that means?
A. Correct.
Q. Okay. What does that mean?
A. The sexual assault examination is -- it's a head-to-toe physical exam of the patients's well-being. It is -- it

includes a detailed genitalia exam and anything else that may be guided based on what the patient's history is.
Q. Okay. And then, B; collect physical samples as indicated. Did you explain that to her?
A. Yes.
Q. And what did you explain that to be?
A. Collecting physical samples is again guided by the patient's history, not all physical samples may be necessary. We just based on what the patient tells us, we let that guide what we collect and what we do not.
Q. Okay. Obtain photographs of body areas indicated for evaluation and peer review.
What's that?
A. Sometimes we take photographs. Sometimes the patient will consent for photographs, but then when it comes time to doing the photographs they may not feel that they want to do them at that point cause it has been a very long process for them sometimes.
Q. Okay. Collect samples, pregnancy test and toxicology evaluations as indicated.
What's that?
A. Pregnancy test is just that. It's a pregnancy test to make sure that the patient isn't pregnant so that if we, me and the patient, decide that pregnancy prophylactic is appropriate that -- we do not give an already pregnant

woman pregnancy prophylactics.
Q. Let me just stop.
Prophylactics is kind of a thing --
A. I'm sorry. It's to prevent something.
So when we do the sexual assault exams, something that we offer is what is known as the Morning-After Pill pregnancy prophylaxis to prevent a pregnancy that may have occurred during a sexual assault.
Q. Okay. And the next one is a statement. It says, "Understand that the collected information may be released to law enforcement and/or prosecution for case investigation"?
A. Correct.
Q. Okay. Is it -- if that person doesn't consent, can you give that information out to law enforcement, et cetera?
A. No.
Q. Okay. And then "G" looks like it says, "I have received information regarding the disclosure of my medical record in accordance with federal guidelines and authorize the release of my record." Pretty self-explanatory, I believe.
And, last, "Permission to draw blood -- to have my blood drawn and tested for HIV and other bloodborne pathogens, in the case that an employee has" -- what's that word?

A. Percutaneous.
Q. What does that mean?
A. It's like at the level of the skin.
Q. Okay. "Mucus membrane, or open wound exposure to my blood or body fluid."
All right. Did you explain and did Ms. James -- all of those and did Ms. James agree to all of these conditions?
A. Yes.
Q. Okay. What was the next process or what did you do next after that?
A. The next part of the exam just includes taking some basic demographics and then talking to the patient about her medical history or, you know, her medications that she may be taking, any health conditions I should be aware of.
Q. Okay. Why is that important in this process, in this procedure?
A. Well this is a medical exam. And I am a nurse first and foremost, so I want to make sure that if this patient has any conditions I should be aware of, for instance, panic disorders or is taking certain medication that may interact with anything I may give, these are all things that I need to know for my exam to keep her safe.
Q. Okay. And this looks like page two of 15 of the record.
And can you see that up on the screen?

A. I can't read it but I can see it.
Q. Okay. Well it's Page two of 15 of your report, so if you want to go ahead and just reflect on that.
A. Okay.
Q. So you indicate -- and this page, would it be fair to say, it began right at the very beginning of the process and the examination?
A. Yes.
Q. And looks like you get basic information; name, address, medications, all that sort of thing, correct, at the top?
A. Correct.
Q. Then you start asking some somewhat specific questions, correct, concerning the medical history?
A. Yes.
Q. All right. Current medications, medical history, recent treatments.
Now why on that question recent medical treatment within six months, why is that one important?
A. Well if the patient has had any genital urinary surgeries, any, anything that has altered anything in that area, it's important for me to know so that I know what I'm looking for that I -- that there may be. I may see injury that's suppose to be there and also so that I don't hurt her further.
Q. Okay. Now it goes on to talk about use of drugs and

medical -- or alcohol. And then you have got toward the bottom of the page here some specific questions.

Any history of active clotting disorder and liver disease. The next; sexual contact within the last 96 hours (four days). You asked that question?

A. Yes.

Q. Is that a question that's asked of every patient that comes in on a sexual assault?

A. Yes.

Q. Is that an important part of the examination process?

A. It doesn't necessarily guide my exam, but it is an important question to know.

Q. Okay. In what way?

A. Because it can affect DNA capture.

Q. Okay. And then the next question again; "If yes, with whom?"

Now sexual contact within the last 96 hours. What did Ms. James indicate?

A. She said that she had.

Q. And the next question is, "If yes, with whom?" Did she indicate someone?

A. Yes.

Q. And who did she indicate?

A. She indicated James Stone.

Q. Okay. And then the next question, "If yes, and the

contact was intercourse, was a condom used?" She answered?

A. She answered no.

Q. Okay. Now when -- while this questioning of Ms. James is going on, were you able -- first of all, let me ask you this.

Do you have a memory of this particular exam?

A. Yes, I do.

Q. Okay. Can you tell us what her emotional status was like when you were talking to her?

A. She was definitely in crisis. She was very distraught and tearful and she repeated the things that she was saying several times. The exam took a long time.

Q. Okay. Now you got this beginning information.

What's the next thing that you collect?

A. The next thing that we collect is a patient history.

Q. Okay. What do you mean by patient history at this stage of the game?

A. This is where the patient tells me what happened, why she is here with me and, you know, the events that occurred.

Q. Okay. Now why is -- is this important to you in your terms of treatment?

A. Well it helps me to know what exactly I'm going to be looking for. And sometimes patients may not think that certain things are important, so when we take a history,

you know, we can, you know, help, help them tell the story so that I can do a complete and full exam.

Q. Okay. Now in this particular case, a patient history was taken from Ms. James; is that correct?

A. Yes.

Q. Okay. Now and then it's recorded in the chart; is that correct?

A. Yes.

Q. Okay. I'm gonna put this page -- this one looks like it says down at the bottom three of 15, and that's still from your chart which was Exhibit Number 18.

First of all, whose handwriting is that?

A. That's my handwriting.

Q. Okay. Tell us how is it -- I want you to think back as best you can. Give us a scenario.

What was going on? Where were you? How was this done and how did you get this information?

A. We have a clinic in the area where we take the patient history and the demographics and everything up until this point is separate from the examination room. And so basically just sit at a table and she tells me in her words and I write in realtime as she's talking.

Q. Okay. Now do you -- and given the fact that we've got maybe ten lines, 12 lines here, were there other things that she may have said that weren't recorded here or how

does -- was this the full scenario of everything she said?

A. There are, is often a lot of things that are not recorded because they are not pertinent for my exam.

Q. Okay. All right. Now during the course of this, were you able to tell, based on this, whether or not -- well strike that. Let me ask you this.

During the patient history, if a person puts out to you that there was vaginal penetration is that important to you and what you're going to do as far as treatment for that individual?

A. Yes.

Q. Okay. Did you or do you ask specifically those kinds of questions if there was or wasn't or do you just let the person talk?

A. At this point, we just let the person talk.

Q. Okay. All right. And so fair statement that at this point, given whatever their emotional state is, circumstances and how close in time in the event they're giving you this information with that kind of umbrella around them, would that be a fair statement?

A. Yes.

Q. And what time did you see Ms. James?

A. She signed the consent form at 3:21 A. M.

Q. Okay. And that would have been the time essentially you began talking to her, would that be a fair statement?

A. Yes.
Q. Okay. Now and when you spoke with her, did you -- it looks like you recorded here again this is page three of 15 at the top information about when the situation that brought her to you would have occurred.
A. Yes.
Q. Okay. And is that based on what she told you or is that based on police reports? What was that information based on?
A. No, this is based on what she told me.
Q. Okay. So she told you that it occurred on 12-31 at about 10:30 P.M., correct?
A. Correct.
Q. Okay. Now you have spoken with her, you've advised her of what this is about, you talked to her a little bit about what happened, gotten this information.
What's the next thing you do?
A. Then we go on to ask some very specific and pointed questions.
Q. Okay. And are those reflected on pages looks like four of 15 and 5 of 15?
A. Yes.
Q. Now when you say you ask very pointed questions, I want you to -- what do you mean? How is this done?
A. The way that I do mine is I ask the patient specifically

did he put his penis in your vagina. Did he put his finger in your vagina? Did he -- and then it goes on several different points.

Q. Okay. The questions that you ask, are they guided by the chart and the --

A. Yes.

Q. Okay. So I'm looking here at page four of 15 of that chart.

Can you see that?

A. Yes.

Q. Okay. Are these the specific questions that you asked?

A. Yes.

Q. Okay. And do you give them -- is it just yes or no, or do you give them an opportunity to kind of expound or do you clarify? How is that done?

A. I -- the way that I do it is I tell the patient I'm going to ask you some questions and I want you to tell me yes, no, he tried or I don't know which is all reflected in the answer choices.

Q. All right. So under Group A, female genital penetration, do you explain to them what that means, first of all?

A. Yes.

Q. Okay. How do you explain that?

A. Female genital penetration would be anything past the labia majora.

Q. Okay. And is that what -- how you explain that to them?
A. Yes.
Q. Did you do that to Ms. James?
A. Yes.
Q. And you asked her specifically penis, finger, or foreign object?
A. Correct.
Q. All right. And she indicated yes to penis, no to finger and no for foreign object, correct?
A. Correct.
Q. Okay. And that's how it's reflected there. All right.

MR. HOWARTH: Well wait a second. That's not what I see.

Oh, I'm sorry. Sorry. I'm looking at "B" instead of "A". I apologize.

THE COURT: No problem.

Q. (By Mr. Elizondo, continuing): All right. Let's go to "B," anal contact, anal penetration.

How do you explain that?
A. Anal contact is just the area outside; the tight, outer ring, not necessarily the inside.
Q. Okay. Is there -- now we've heard the term -- well strike that.

Is there a difference between anal penetration and rectal penetration from a medical standpoint?

A. Yes.
Q. All right. What's the difference?
A. The difference is that the anus is the outside where the rectum ends. The rectum is the inside where stool is.
Q. Okay. So and is it -- do you as a forensic nurse examiner-- when you are doing your examination, do you recognize that as two specific and individual type of areas for testing?
A. Yes. Yes.
Q. Okay. Now when you talked about anal contact slash penetration, you explained to her, to Ms. James what that meant?
A. Yes.
Q. Okay. And she indicated to you as far as her anus being penetrated by a penis she said --
A. She said no.
Q. And her anus being penetrated by a finger?
A. She said no.
Q. Her anus being penetrated by a foreign object?
A. She said no.
Q. Okay. Did you explain to her what you meant by penetration?
A. Yes.
Q. And what was it that you explained to her to mean when you indicated the penetration aspect?

A. Well if she said no to the anal contact, which is touching at all, typically there is no penetration because there would be both. But penetration is anything beyond the outside.

Q. Okay. Now you asked her more questions, oral contact of genitalia the next spot. What does that mean?

A. That means did this person put his or her mouth on your genitalia.

Q. Okay. And her answer to that question?

A. She said no.

Q. Okay. There is two questions. There are patient's genitalia by assault or assailant, I'm sorry, where she answered no. Assailant's genitals by patient she answered no, correct?

A. Correct.

Q. Okay. Now next question is "D".

Okay, "D". Did you talk to her concerning the question did ejaculation occur?

A. I did.

Q. Okay. How or what did you say to her to explain this particular section, if you can recall?

A. I don't remember exactly how I explained it. Sometimes patients know exactly what you mean and it doesn't -- you don't need to expound on it.

Q. Okay. Well what does it mean? I mean from a medical

point, if you know, what does that mean?
A. Ejaculation?
Q. Yeah.
A. It's when sperm and semen leave the penis.
Q. Okay. Sperm and semen. Those of two separate types of things, correct?
A. Correct.
Q. Okay. In fact, semen comes from what two different glands in the body, the male's body?
A. Correct.
Q. Okay. And the sperm itself comes from the testes itself which is separate from that?
A. That's right.
Q. So ejaculation means something occurring where both glands put their stuff into the system and the testes squirt that sperm into that liquid, correct?
A. That's correct.
Q. Okay. Kind of a technical part of it?
A. Yes.
Q. All right. But when you speak to your victims, do you ever get into -- I guess do you ever get into that technical aspect of it like did this happen? I don't mean the glands and all that kind of description.
A. No. No.
Q. Okay. All right. But, at any rate, you indicated here

that you asked her about ejaculation. Number one says oral. What would that mean?
A. That means did he ejaculate in your mouth.
Q. Okay. And she indicated?
A. She said no.
Q. External genitalia. Now what does that mean?
A. That means anything other than internal. So sometimes they will pull out and ejaculate on the outer surface of the body.
Q. Okay. And she answered?
A. She answered no.
Q. Okay. Anal rectal, what -- again, we have talked about that and then the difference between that and she indicated?
A. She indicated no.
Q. And then on body surface?
A. And she indicated no.
Q. Okay. Now maybe I'm missing it and maybe it's just -- but is there a question that indicates was there vaginal interior type ejaculation? Is there a question that deals with that?
A. No, there isn't.
Q. Okay. Is there a reason that that isn't asked or --
A. Well it's sort of hard to know.
Q. What do you mean by that?

A. Well because even if she said yes, there can still be DNA transfer. There can still be pre-ejaculate in the vagina.
So if she said that there was vaginal penetration, whether or not there was ejaculation we would take samples anyway.
Q. Okay.
A. Really doesn't matter.
Q. Okay. And you said something about it would be hard for her to know?
A. Uh-huh.
Q. What do you mean by that?
A. Sometimes people don't know if they have been ejaculated in. They don't know.
Q. Okay. All right. Now other contacts, that last part, fondling, licking, kissing, biting; she answered no to all that, correct?
A. Correct.
Q. Okay. How is that relevant to your exam?
A. Then I would know to examine those areas and that those would be additional areas that I need to collect.
Q. Okay. All right. What's the next part that we go to? You have taken this information. You have got a patient's history. What do you do then?
A. Well there is still some more patient history that we take.

Q. Okay. Page five of 15 on the records, is that what we're referring to?
A. Yes.
Q. Okay. You talk about -- now it says, "Barriers: Was lubricant, foam, jelly and/or spermicides used?" She answered?
A. She answered no.
Q. Condom used?
A. She said no.
Q. "Tampon in during incident?"
A. No.
Q. And then next: "Post-incident patient actions." What is that about?
A. This is her where we ask the patient, for example, if they've showered, bathed, douched, used the bathroom, washed, taken out a tampon, put in a tampon, anything that may affect the exam.
Q. Okay. And when you asked her these questions, one whether she showered or bathed, she indicated -- let me ask you this.
Do you put out like a time frame in which these actions would have occurred? I mean do you say to her, for example, is it from the time of the assault to now have you done these things or do you just --
A. Right. It's from the time of the assault 'til the time

that I am seeing her.

Q. Okay. And the time of the assault she said was about 10:30, you saw her maybe five hours later, five or six hours later, correct?

A. Correct.

Q. So that's what the time frame we're talking about here about, these questions?

A. Right.

Q. Okay. So within that time frame you asked her whether she showered or bathed and she said no?

A. Right.

Q. Okay. Whether she had douched, she said no?

A. Yes.

Q. Okay. Whether she had urinated?

A. And she said yes.

Q. Okay. So during that period of time she had urinated, correct?

A. Yes.

Q. Based on her response. All right. Genital wipe wash, slash wash. She answered yes and then you put a note.

What can you tell us about that?

A. She said yes and then I put after urinating the "P" with the line over means after.

Q. Okay. I'm sorry. Explain one more time.

A. I said that she did -- she did wipe. She wiped after

urinating.
Q. Okay. All right. And then the rest of the things that you asked, she answered no to all of those, correct?
A. That's correct.
Q. All right. And then the last part now this general physical exam, is this the beginning of the exam or is this still part of the patient history part?
A. This is still part of the patient history.
Q. Okay. Physical complaints. She complained about her stomach hurting?
A. Yes.
Q. And then what's the last part? And tell us the significance of that in the whole process here.
A. We asked or we note what the patient's demeanor was like during the exam and the history so that we can have a record of what they were -- what they were like at the time that we saw them. Cause often we do see people when they're in a crisis situation. And then it's also important for us to know so that we can provide advocacy and follow-up for the patient.
Q. Okay. Now got all that part done, we move on to the next part of your examination. Is that what we do?
A. Yes.
Q. Okay. And tell the jurors what's the next part.
A. The next part is that we take a vital signs, a blood

pressure, pulse, temperature and respiration rate.
Q. Okay. And that was done here?
A. Yes.
Q. Okay. Anything unusual about those findings?
A. No.
Q. Okay. What did you do next?
A. And then we begin the physical exam.
Q. Okay. Tell the jurors how. Take it step-by-step on that physical exam.
A. Okay. The exam begins, it's head-to-toe. The patient is in a gown and we begin looking, touching everything from the head all the way to the tips of the toes, looking at everything, asking does this hurt, looking for injury, anything unusual. And then we collect as we go.
Q. Okay. Now in your chart you have pages that are related to the physical exam, correct?
A. Yes.
Q. Okay. And I'm looking at six of 15 here.
These -- if an injury is noted or some sort of tenderness or that sort of thing, what would you do concerning this page?
A. I would mark where my abnormal finding was and then a description of it.
Q. Okay. Now on page six of 15, which has a full frontal, full back, was there any injury noted?

A. No.
Q. Okay. Seven of 15 we have looks like front of the face and then side, body views right and left side; is that correct?
A. Correct.
Q. And once again if you noted any injuries or point tenderness, that sort of thing, it would be indicated here, right?
A. Right.
Q. Were there any injuries?
A. No, there was not.
Q. Okay. And did you do -- okay.
Well let's just start. You did the full body. What did you do next?
A. And then we do -- once we do the full body, we do a detailed genital exam.
Q. Okay. And once again is there a chart similar to the full body of the genital region?
A. Yes.
Q. And in there you would note if there were any injuries, correct?
A. Correct.
Q. Were there any injuries noted?
A. No.
Q. Okay. What did you do next?

A. Then we place the evidence and the swabs to dry.
Q. Okay. Well let's talk about that.
You place the evidence. Once or when you have the person and you're doing the genital exam, how is that person positioned? What's going on with that genital exam?
A. They're laying on a -- on an exam table with their feet in what we call stirrups. They're like little holders for the feet so their legs are kinds of in a "V". And then we examine with our fingers. We pull, we look and then at the very end we do use a speculum to visualize the inside of the vagina.
Q. Okay. And at that point again you indicated there were no injuries, correct?
A. Correct.
Q. All right. While the patient is in that position, do you then do anything concerning evidence gathering?
A. Yes.
Q. Okay. Let's talk about that part.
A. Okay.
Q. All right. So the evidence gathering, potential evidence gathering is basically a separate situation from the actual physical exam, would that be fair?
A. No, they're kind of simultaneous.
Q. Okay. All right. What is it and how is it that the

evidence is gathered? What do you use to gather evidence in a case like this?
A. We use what's called -- we call swabs. They basically are like Q-tips. They're moistened with water and they are just rubbed on the patient's body.
Q. Okay. And is there a special kind of kit that's utilized to do these kinds of examinations?
A. Yes, we use a evidence collection kit.
Q. Okay. And is that a standardized kit?
A. Yes.
Q. That's used in any kind of sexual assault examination?
A. Yes.
Q. Okay. And what does this kit contain?
A. It contains the supplies that we need; swabs, envelopes, drying boxes, combs, things that for a -- we don't always use everything that's in it and sometimes we need extra things that aren't in it. But it typically contains everything we need.
Q. Okay. Now what do you utilize or do you utilize any information to kind of direct you to where you are going to collect the evidence from?
A. Yes.
Q. What do you use?
A. The patient history.
Q. Now we already went through the patient history.

Based on the patient history, what evidence did you collect?
A. Let's see. Okay. I collected buccal swabs, underwear, two anal swabs, two vaginal swabs, two cervical swabs and then an anal smear and a vaginal smear, two swabs from her right thigh and two swabs from her left thigh.
Q. Okay. Now you record that what you collected, correct, in your report?
A. Yes.
Q. Okay. And I'm gonna refer you to what looks look it's page ten of 15.
A. Yes.
Q. Does that indicate where and what you collected?
A. Yes.
Q. Okay. I'm gonna put that here.
So there is three columns there and under those-- in those columns are listed certain things. And this is where you just indicated and referenced what you collected, correct?
A. Yes.
Q. Okay. Buccal swab, DNA buccal swab.
How do you collect that? What did you do?
A. It's collected from the inside of the patient's mouth.
Q. Okay. So that's what you did for Ms. James?
A. Yes.

Q. Now underwear. Did you do anything with the underwear that was there?
A. I placed them inside of the evidence collection kit.
Q. Okay. Is there a special kind of container or something for that or does it just go in --
A. They are folded. They are folded and then placed inside of an envelope, sealed, labeled and then placed inside of the kit.
Q. Okay. Then we have -- looks like that's all on the sample kit collected. Then we've got swab numbers. Then we've got oral. You didn't take any oral swabs?
A. No.
Q. And why was that?
A. Because it wasn't indicated.
Q. Okay. Two anal swabs.
You indicated on here that you took two anal swabs, correct?
A. Correct.
Q. All right. Now there was nothing in the patient history about anal penetration, was there?
A. No.
Q. Or anal contact?
A. Right.
Q. Okay. Is there -- is that consistent? Why would you have taken the anal swabs?

A. Anal swabs are always taken whenever there is vaginal penetration because of the potential for DNA transfer in that area whether or not it was penetrated.
Q. Okay. And how or how can that occur?
A. It can occur from dripping, rubbing, any kind of contact from other areas of his genitals into her anus.
Q. Okay. Now when we say into, are we talking again inside the body at that point or are we talking still exterior of the body?
A. No, just -- no, not inside of the body. Just exterior; inside of the butt cheeks.
Q. Okay. So that's not an unusual sample to take given the fact the patient history said no anal contact?
A. No, that is standard of care.
Q. Okay. Then we have rectal.
You did not take rectal smear or swabs, correct?
A. Correct.
Q. You didn't do that because?
A. Because they were not indicated.
Q. Okay. And then you took some vaginal, cervical and then the rest of listed there what you took, correct?
A. Correct.
Q. Okay. Now what's the difference between a swab and a smear?
A. A smear is placed on a glass slide after the area is

swabbed, then it's rubbed on the slide. And then a cover slide is placed on that and then it's placed inside of another container and then placed inside the evidence collect kit.

Q. Okay. So you do the swab with the Q-tip?

A. Yes.

Q. Correct?

A. Yes.

Q. And that same Q-tip is smeared on the glass slide?

A. Yes.

Q. Okay. Are both of those then preserved?

A. Yes.

Q. All right. And there are specific procedures in how to preserve them, correct?

A. That's correct.

Q. And did you follow those procedures?

A. Yes.

Q. What did you do next -- strike that. Let me ask you this.

After you collect these swabs and things, what do you do with them?

A. There is -- the swabs are set to dry. The smears are left to dry. And then we come out of the room where the examination was done and it's a locked door with a code. And then once the patient leaves, then I go back in and when everything is dry and seal the kit.

Q. Okay. And did you do that?
A. Yes.
Q. And is that the procedure of how these are suppose to be done?
A. Yes.
Q. Okay. And then after you seal the kit, what do you do with it?
A. Then it's labeled and then placed inside of a evidence locker.
Q. Okay. And when you say you seal the kits, is it -- is there a specific kind of container where all those things go in?
A. Yes, it's just a cardboard box.
Q. All right. After that, what did you do with the container after you sealed it?
A. Then it's placed inside of the evidence locker that we have in our -- at our site.
Q. Okay. Do you see it? Did you see it after it all, after you put it into the evidence locker or after it got there?
A. No.
Q. Okay. After the gathering of that, what else did you do, if anything?
A. And then at that point we talked to the patient about medications that may be indicated to help keep her safe, STD prophylactics, pregnancy prophylactics is offered at

this point.
Q. Okay. One last question. There was no noted injury to the genital area, correct?
A. Correct.
Q. Okay. Now is that -- is it unusual to have no injury when there is alleged sexual penetration?
A. No.
Q. Okay.
MR. ELIZONDO: I have no further questions, judge.
Thank you.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Good afternoon. And it's Ms. -- is it Schaller?
A. Schaller.
Q. Schaller. Thank you. Make sure I got that right.
Ms. Schaller, I'm gonna be very brief. I want to direct your attention to page four of the Wayne County SAFE report program that -- and that you've testified to, all right?
A. Okay.
Q. And direct your attention there to subsection D.
And that's the subsection on ejaculation, am I correct?
A. Yes.

Q. Just so I understood this correctly, in this subsection you are not saying here that the patient told you that her assailant did not ejaculate inside of her; is that correct?
A. Correct.
Q. That question is more or less left open as to whether he did or he did not as far as your reports are concerned?
A. Correct.
Q. Now I want you to assume a couple of other things about this patient.
First of all, I want you to assume that this patient, in talking about what happened to her on the evening of December 31st going into January 1st, first of all, that she told the truth, okay?
A. Okay.
Q. And that this patient Ms. James indicated that she had had sexual contact with her husband a couple of days before the incident, all right?
A. Yes.
Q. That the person who raped her, she believes, climaxed or had an ejaculation inside of her, okay. That that's her impression, all right?
A. I don't know that.
Q. No, I'm saying I want you to assume that the person said that.

A. Okay.
Q. All right. And that Ms. James said she didn't have sex with anyone other than the assailant and her husband.
Are you with me so far?
A. Okay.
Q. Now let's assume that when this case was investigated by the Michigan State Police Crime Lab that they came to a conclusion about DNA that was found in the anus, all right?
A. Okay.
Q. And they found that the -- that that DNA was consistent with there being at least two additional donors to the DNA other than the patient herself, okay?
A. Okay.
Q. So we know that one of those would be the husband, right?
A. Correct.
Q. And assuming that the patient is telling the truth when she said she didn't have sex with anyone else, would it not be a logical assumption, based on your training, that the other DNA in the anus came from the assailant?
A. Yes.
MR. HOWARTH: That's it. Nothing else.
THE COURT: Any redirect?

REDIRECT EXAMINATION

BY MR. ELIZONDO:

Q. Just inside -- they came -- I think counsel's question was that they came inside the anus.

Once again, based on all that what he just gave you, are we talking about inside the body or are we talking on the outside of the body at this point?

A. We're talking about the outside.

MR. ELIZONDO: Okay. Thank you.

Nothing else, judge.

MR. HOWARTH: I have nothing.

THE COURT: Any questions from the jurors?

THE JURORS: (No response.)

THE COURT: Ma'am, you're excused.

(The witness was excused at 12:25 P.M.)

THE COURT: Ladies and gentlemen, we are going to take our lunch break now, ask that you come back at 1:45.

Again, please don't discuss the case. Thank you very much for your careful attention.

(The jury was excused for lunch at 12:25 P.M.)

THE COURT: Nothing else for the record, counsel?

MR. ELIZONDO: No.

THE COURT: All right. Who is your next witness

going to be?

MR. ELIZONDO: Officer --

THE COURT: We'll see at 1:45.

MR. ELIZONDO: Yeah.

(Off the record.)

(People's Proposed Exhibit Number 26 marked for identification.)

THE CLERK: Recalling Case Number 13-000628; the State of Michigan versus Howard McKnight before the Court today for a jury trial in progress.

MR. ELIZONDO: Ralph Elizondo, assistant prosecutor.

MS. CEZIL: Good afternoon, Your Honor.

Veneshia Cezil on behalf of the People.

MR. HOWARTH: James Howarth on behalf of Mr. McKnight as co-counsel.

MR. JONES: Paul Jones on behalf of Mr. McKnight, co-counsel.

THE COURT: Good afternoon, counsel.

Are you ready to continue with the jury trial?

MR. ELIZONDO: We are, judge.

Officer McKay -- Kane is our next witness.

THE COURT: Kane?

MR. ELIZONDO: K-a-i-n.

THE WITNESS: K-a-n-e.

MR. ELIZONDO: K-a-n-e, I'm sorry.

THE COURT: Okay.

(The jury entered the courtroom at 2:02 P.M.)

THE CLERK: You do solemnly swear or affirm that the testimony you're about to give before the Court will be the whole truth?

THE WITNESS: I do.

THE CLERK: Thank you. You may be seated, sir.

THE COURT: You may proceed, counsel.

MR. ELIZONDO: Thank you.

**ROBERT KANE,**

having been first duly sworn by the Clerk of the Court at about 2:04, P.M., was examined and testified upon his oath, as follows:

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Tell the jurors your name, please.

A. I'm Police Officer Robert Kane.

Q. And, Officer Kane, how are you involved in this particular case?

A. I'm the officer-in-charge of this case.

Q. Okay. Can you just briefly tell us what's the duties of the officer-in-charge?

A. As the officer-in-charge of the case, I gather all the facts and information in the case and make sure that it's

compiled. And then whatever work is needed to be done on it, I just dictate it out. And then after a suspect is found, we present a warrant to the prosecutor and that's then typed up and package put together and brought to the Prosecutor's Office.
Q. Okay. So as part of your duties as the officer-in-charge, it's fair to say that any investigation that occurred in this crime came funneled into you at some point; is that correct?
A. It did.
Q. Okay. Now I wanna ask you, sir, as part of the investigation did the name of an individual by the name of Ali Robinson, I believe there was a first name, Deshawn Ali Robinson, did that come across your desk or come across to you as part of the investigation?
A. Yes. His name was Ali Deshawn Robinson.
Q. Okay. And how does that come to you?
A. I had put out a sketch over media and also put the sketch out to the different districts in the City of Detroit. And an officer from a different district, the Northeast District, had a person that was in custody and he brought it to my attention that this person may or may not look like the sketch. So, of course, we took a look at it and that's how the name came about to our office at Sex Crimes.

Q. Okay. I'm gonna put up here on this, this is People's Exhibit Number 9 -- strike that. Let me get the sketch itself.
People's 8. Is this a sketch that you're referring to?
A. Yes, this is the sketch that was done by Mr. Stone.
The sketch artist was Mr. Tinsley that already testified.
Q. Okay. And that was out in the community, correct?
A. Correct.
Q. This sketch at the time.
Now when is it that you first become aware of this name, Mr. Robinson's name?
A. It came across the end of January of this year.
Q. Okay. And was that prior to, if you know, Mr. Howard McKnight becoming a person of interest in the case?
A. Yes, it is.
Q. Okay. Now after this information came to you, what, if anything, was done as part of the investigation concerning Ali Robinson, Mr. Robinson, to see if in fact he had or played any part in this?
A. We had one of our colleagues in this case, it was Sergeant Denbeck, went to the district and took a statement from Mr. Robinson and she also obtained consent to take a buccal swab from him.

Q. Okay. Was a buccal swab taken from him?
A. It was.
Q. And was that buccal swab submitted to the lab?
A. It was.
Q. All right. And in addition you said a statement; is that correct?
A. Yes. She was able to read him his Constitutional Rights and was able to obtain a statement from Mr. Robinson.
Q. Okay. And what -- without telling me what was in the statement, did it contain anything that would be considered incriminating?

MR. JONES: That does go into the statement, Your Honor. That's a back door hearsay as to what's in that statement. It's a way of saying what Mr. Robinson said.

MR. ELIZONDO: It is -- the specifics of the statement would be the subject of the hearsay objection.

I'm not asking for the specifics of any of the statement; simply a general outcome based on all the statement or the entirety of the statement that was given. I'm not asking for a specific rendition of the statement and that's what hearsay would go to.

THE COURT: What is the question again?

MR. ELIZONDO: Was there anything -- based on everything that was there, was there anything that

incriminated Mr. Robinson concerning this particular offense?

THE COURT: In the statement?

MR. ELIZONDO: In that statement.

THE COURT: I will allow that, counsel, but your objection's noted for the record.

THE WITNESS: The answer is no to that question.

Q. (By Mr. Elizondo, continuing): Okay. Now in addition to the statements that was taken, the buccal swab that was submitted to the lab, now did you do anything else concerning Mr. Robinson as part of the investigation here?

A. Yes, I did.

Q. Okay. Now what did you do next or what else did you do?

A. I put up -- I put a photo lineup together with Mr. Robinson's picture in the lineups. It's what we call a six pack, a photo array with six pictures in it. And I showed it to both the victim and Mr. Stone.

Q. Okay. And the victim, are you referring to Lucille James?

A. Correct.

Q. Okay. Now I'm gonna hand you what's been marked as People's Proposed Exhibit 3 and Number 24.

MR. HOWARTH: Your Honor, these exhibits contain affirmative information on them which is hearsay.

MR. ELIZONDO: All right. Well then what I'll do, we'll sort of redact that, the statement part. I

don't have any problem with that.

THE COURT: With that, is that okay, counsel?

MR. HOWARTH: Yes, that's fine.

THE COURT: Okay.

Q. (By Mr. Elizondo, continuing): I'm going to hand you what's been marked as People's Proposed Exhibit 3 and Number 24, ask you to look at those.

A. All right.

Q. Do you recognize what those are?

A. I do.

Q. Okay. What is Number 3?

A. Number 3 is the photo array that I put together with Mr. Robinson in the one of the pictures.

Q. Okay. And does Number 3 indicate whether or not it was presented to anyone involved in this case?

A. It does.

Q. Who was that one -- who did you present that to?

A. To Ms. James, the victim.

Q. And that's Number 3; is that correct?

A. Correct.

Q. All right. And what about the other exhibit, was it 24?

A. The other exhibit is an exact duplicate and it was shown to Mr. James.

Q. Okay.

MR. ELIZONDO: Now at that point, judge, with

the redactions we're going to move for the admissions of 3 and 24.

MR. HOWARTH: No objection with redactions.

THE COURT: All right. So admitted with the redactions.

Q. (By Mr. Elizondo, continuing): All right. Now I'm gonna show you People's Exhibit 3 that was shown to Ms. James.

Was Mr. Robinson's photo included in this?

A. It was.

Q. And which one is Mr. Robinson?

A. He is on the bottom middle photo labeled number five.

Q. Okay. This one that I'm pointing to here?

A. Correct.

Q. Okay. Now you presented that to Ms. James?

A. Correct.

Q. Okay. And did you present a question to her when you presented this?

A. I did.

Q. What was the question?

A. "Do you recognize anyone in these photos?"

Q. Okay. Now was she able to recognize anyone in the photos?

MR. HOWARTH: Well that's the hearsay, Your Honor. That's for her to testify to, not for the officer to testify.

He's testifying to hearsay to prove the truth of

what's in her statement?

MR. ELIZONDO: It's an identification. It's for purposes of identification, judge. I think it falls outside the hearsay scope on that; the statements that were made here.

And I am not asking for her words. I'm simply asking whether or not she was able to accomplish something and that is identify someone in there. So it takes it out of the hearsay scope.

THE COURT: Counsel, you're saying that a gesture or something pointing, is that not hearsay?

MR. ELIZONDO: No, no, cause I'm not saying that she's pointed.

What I'm asking is based on her seeing these was she able to identify anyone.

MR. HOWARTH: That's a communication.

THE COURT: Well, first of all --

MR. ELIZONDO: The words would be a communication. The fact whether she could or not is something else.

THE COURT: Well in this -- given all the other testimony, it's my understanding she never saw the person's face anyway. So I don't see how -- I'll allow it.

MR. ELIZONDO: Thank you.

Q. (By Mr. Elizondo, continuing): Was she able to identify anyone here?
A. No, she was not.
Q. Okay. Now when you showed this to her, did you give her any information concerning what was in this, what was in this lineup?
A. No, I did not.
Q. What specifically did you say to her when you presented this?
A. I just asked her if -- do you see anyone that you recognize.
Q. Okay. Now in Exhibit Number 24, once again you said that the photos were duplicates; is that correct?
A. That's correct. Same -- they were the same order as the Exhibit Number 3.
Q. Okay. And this one was presented to who?
A. Mr. Stone.
Q. Okay. What did you say to Mr. Stone?
A. I said the exact same wording: "Do you see anybody that you recognize?"
Q. Okay.

THE COURT: And the Court's gonna note the same objection.

MR. HOWARTH: Same objection, yes.

Thank you, Your Honor.

Q. (By Mr. Elizondo, continuing): Based on that question, was he able to identify anyone?
A. He was not.
Q. The buccal swab that was collected from Mr. Robinson, that was submitted to the lab?
A. Yes, it was.
Q. Okay. And is the buccal swab that was -- well let me -- that buccal swab was submitted for testing in this particular matter; is that correct?
A. Yes, it was.
Q. And that -- was that buccal swab tested, if you know?
A. Yes, tested, yes.
I received paperwork back from the lab that stated, yes, it was tested.
Q. Okay. Now I'm just gonna hand you People's Exhibit 16 and ask you if -- to look at that, first of all.
A. Okay.
Q. Is this the paperwork that you received from the lab?
A. This is one of the paperwork -- pieces of paperwork that I received from the lab. This is record number five.
Q. Okay. And is that concerning the buccal swab of Ali Robinson?
A. It is.
Q. Okay. And the information you received out of this indicated that he was excluded; is that correct?

MR. HOWARTH: Well there again, Your Honor, we're going back to testifying what's in these documents.

MR. ELIZONDO: These documents have been admitted, judge. They speak for them self. It's not for him to interpret what's in the documents.

THE COURT: I'll sustain that.

MR. ELIZONDO: Okay.

Q. (By Mr. Elizondo, continuing): As to Mr. Robinson, was he eliminated as a suspect?

A. He was.

THE COURT: Counsel, that's -- oh, you're asking him was he eliminated?

MR. ELIZONDO: Correct.

THE COURT: Okay.

Q. (By Mr. Elizondo, continuing): So Mr. Robinson was eliminated as a suspect?

A. Yes.

MR. ELIZONDO: Okay. Thank you.

Nothing further, judge.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Would I be correct in calling you Detective Kane? Officer Kane?

A. Correct. That's fine.

Q. Detective Kane, how long have you been with the Detroit

Police Department?
A. Going on 25 years.
Q. How long have you been with the Detective Bureau?
A. At the Sex Crimes Unit I've been going on 12 years.
Q. You're familiar with procedures and the rules that govern Detroit police officers and the investigation of crimes, aren't you?
A. Correct.
Q. Let's talk about Mr. Robinson.
Mr. Robinson became what could be fairly called a person of interest as of about January 7th of this year; is that right?
A. That's correct.
Q. Now that's about the same time, would be within a couple of days that Mr. McKnight became a person of interest, isn't it?
A. Three days before Mr. McKnight.
Q. So a separation there of three days?
A. Correct.
Q. Is there a separation in the time that you sent Mr. McKnight's information to the State Police Crime Lab on DNA and when you sent Mr. Robinson's information on DNA? Is there a separation there, too?
A. By who?
Q. By the Detroit Police Department.

A. No.
Q. They were sent at the same time?
A. Correct.
Q. So they were both sent to the Detroit -- I mean the Michigan State Crime Lab on February 20th?
A. That's a negative. They were sent to the Detroit Police Crime Lab and then after that items were sent to the Michigan State Police Crime Lab.
Q. Well, sir, I have the information in front of me as to the Michigan State Department of Police receiving evidence as to Mr. McKnight on January the 15th of this year.
A. That's correct.
Q. All right. And I have the same as to Mr. Robinson being sent to them on May the 3rd.
A. That is correct.
Q. So there is a difference of months and months?
A. Yes, there is.
Q. But you had the information in both of them being a person of interest within about three or four days of each other?
A. I -- that is correct.
Q. Now we had a gentleman testify, I believe while you were here in court, by the name of Officer Tinsley. You remember that?
A. Yes, I do.
Q. Officer Tinsley generated pictures, did he not, both

sketch drawings and computer drawings?
A. He did.
Q. All right. And he indicated, when he was here, that there was a computer drawing that was made after Officer Tinsley spoke to Mr. James; is that right?
A. That's what they testified to.
Q. Or Mr. Stone. James Stone?
A. Mr. Stone, yes. That's what they testified here.
Q. Do you have that drawing somewhere here? Do you have --
A. Do I? I don't have it.
Q. Do you have the computer drawing?
A. No, I do not.
Q. Where is it?
A. Probably back with Mr. Tinsley, Officer Tinsley.
Q. It's not here in the courtroom?
A. I have not seen it.
Q. Did you see it yesterday?
A. I saw it when he was here, yes.
Q. All right. Can you bring that to court with you tomorrow?
A. If so requested.
Q. I request it. Would you bring it?

THE COURT: Was that something that was admitted into evidence?

MS. CEZIL: No, Your Honor.

MR. HOWARTH: It was talked about. That's why I

would like it see it.

I would like to have it admitted.

MR. ELIZONDO: Well if he wanted to have it admitted into evidence, it was here. Counsel saw it when the Officer Tinsley was here. He had a perfect opportunity to cross-examine him, perfect opportunity to bring it up. He didn't.

If he wishes to do it now, this officer is not the proper person because the foundation can't be laid for what it is, how it was generated and everything else. This officer is not the proper one. He should have done that through Officer Tinsley.

MR. HOWARTH: I told the prosecutor about this yesterday afternoon which I'm sure he will concede.

MR. ELIZONDO: He did. And, again, it's improper to bring it in through him and I told him.

THE COURT: I tell you what. We will discuss this out of the presence of the jury later.

You can move on to your next point.

MR. HOWARTH: Thank you, Your Honor.

Q. (By Mr. Howarth, continuing): You heard testimony, did you not, about a Mr. Golston (sic), right?

A. Say that again. I'm sorry.

Q. There is a Mr. Goldston (sic) involved in this case; is that right?

A. Yes. He testified in court, yes.
Q. And Mr. Golston (sic) said that a couple of days after the incident he was contacted by Detroit police officers. You remember that?
A. That's what he said, yes.
Q. And as officer-in-charge of this case, you certainly would have some knowledge of that?
A. I do.
Q. And who was it that contacted him?
A. The first time uniform officers contacted him. Then Officer Strong from the Sex Crimes Unit had contacted him along with Sergeant Jones. And then I had made contact with Mr. Goldston (sic).
Q. Is this all back in January of this year?
A. It was.
Q. All right. And you heard Mr. Golston (sic) say that he told officers who interviewed him that he saw what he thought may have been a part of this incident, this rape and robbery incident?
A. Yes, he saw a part of the incident.
Q. Right.
A. A part of a vehicle and a person.
He didn't see -- he didn't say he saw anything else.
Q. And he told Detroit police officers when asked that he

thought he could identify the person that he saw pushing that car, didn't he?
A. He did.
Q. Well when was that report, if you know, turned over to me?
A. There is no report on that.
Q. There is no report that was ever made?
A. No.
Q. And Mr. Goldston (sic) wasn't even asked to participate in a lineup until this trial started; isn't that right?
A. That is correct.
Q. Can you explain that?
A. Sure. I decided that Mr. Goldstein -- I'm sorry, Golston had only seen the driver of the vehicle who was Mr. Stone come out of his vehicle and go around the vehicle to the flat tire. And then he said that he saw him trying to push his vehicle and that is all he saw. And he turned the light off and he went back to bed.
Q. And didn't he tell you that the man he saw was approximately 30 some years of age?
A. He said it was approximately between 30 and 40.
Q. That doesn't seem to fit Mr. Stone, does it?
A. No, it doesn't.
Q. And as a matter of fact, you knew that Mr. Stone, from talking to him, had been a victim, didn't you?
A. Mr. Stone?

Q. Yes, sir.
A. Yes, he is.
Q. Now and didn't that occur to you, Detective Kane, that it probably wasn't Mr. Stone that's up there pushing this semi-truck (sic), but actually the person who first made contact with the complainants in this case?
A. I don't believe that at all. I believe it was Mr. Stone that got out of his vehicle and tried to push his vehicle.
MR. HOWARTH: I don't have any further questions.

**REDIRECT EXAMINATION**

**BY MR. ELIZONDO:**
Q. Did you interrogate Mr. Stone -- not interrogate, but did you take a statement or have a statement taken from him?
A. A statement was taken from Mr. Stone.
Q. And have you talked to Mr. Stone concerning the incident?
A. Yes, I have.
Q. All right. During that statement and your discussion with Mr. Stone, did he give you any reason to believe that, in fact, he was the one out there pushing the truck?
A. He did indicate that he did get out of his vehicle, did go out and look at his tire and then also tried to push his car before anybody else came to his location.
Q. And Mr. Golson was given an opportunity to participate in a lineup; is that correct?

A. He was.
Q. As counsel indicated?
A. He was.
Q. Okay. And when he did participate in that lineup, was he able to pick out anyone?
A. He was not.
Q. Now the counsel indicated there were -- there was a delay in submitting the buccal swab to the Michigan State Police.
A. To the Michigan State Police, correct.
Q. A buccal swab was taken and you indicated something was done with that one immediately. What was done?
A. It was taken back to Sex Crimes. It was documented. It was given an evidence tag number. It was then submitted to the Detroit Police Crime Lab.
Q. Now is that standard procedure on how that's done?
A. It is.
Q. Okay. And then what's the next step as far as buccal swabs that are collected?
A. When the items went to Michigan State Police Crime Lab, only the sexual assault kit and the DNA sample from Mr. Stone and Mr. McKnight went to the crime lab.
Q. Okay. Now sometime during this delay of Mr. Robinson's buccal swab going there, does there come a point in time when you have a suspect in this case?

A. Correct.
Q. And is it someone other than Mr. Robinson?
A. Correct.
Q. Who is that?
A. Mr. McKnight.
Q. All right. Is it fair to say at that point the focus became focused on that particular suspect?
A. That is correct.
Q. What things was it that created that evidence that made you believe Mr. McKnight was the suspect in this case and close this --

MR. HOWARTH: I hope the prosecutor realizes that he is walking on very thin ice right now.

THE COURT: Yeah, why don't you approach. Counsel, approach.

(Discussion had at the bench between the Court and counsel.)

THE COURT: Ladies and gentlemen, we are going to take a five-minute recess and we'll be right back with you.

Please don't discuss the case.

(The jury was excused to the jury room at 2:30 P.M.)

THE COURT: Before you do that, I just want to get the issue on the record. So briefly, you don't have

to do the whole thing, counselor, if you could just give the basis for your objection.

MR. HOWARTH: Your Honor, I asked this officer a series of questions merely or indicating that it appears that the police did not follow-up other leads which they should have at that time.

It appears the prosecutor, in response to that, wants to ask why was their interest focused on Mr. McKnight. That's absolutely irrelevant as to why they were suspicious out of Mr. McKnight. It takes the idea that well if we've got one guy that we're really suspicious of, it's okay for us to ignore everybody else.

What's gonna happen, however, in the way that the question was asked, is they're allowing the police officer to talk about things which have not been admitted into evidence, which may or may not be allowed into evidence, and to really poison the jury right now with just a blanket at the discretion of the police officer why do we think Mr. McKnight's a guilty person. That's what the question is.

MR. ELIZONDO: Well the question was why did they ignore this-- the other people in this investigation. That's one broad question. And that's what counsel opens this door with that particular broad question.

There are a lot of reasons why other people were

ignored. This jury right now has this thing or at least the insinuation of the late -- the late work that was done on the turning in the buccal swab. And the identification can give them and probably has given them some sort of, I think, very misleading ideas and thoughts.

So if we get back to the broad question that counsel asked, and that's why did the police ignore the other people in this investigation, there are a lot of reasons; number one were all the statements that the defendant made to the police department, those statements which I believe are gonna be admitted in this case. Statements to Officer Jaber or statements that were made to Police Officer Watts, statements that were made to Officer Ortiz. That's part of it.

The other part is the lineup and the identification that the defendant -- or the one victim picks the defendant out of the lineup. Those reasons are very valid as to why all of a sudden now the focus is on this particular person. I didn't open that door. Counsel did. I think I should be able to answer it.

If you speculation well we thought -- now that's not where we're going. I just want to be able to say there were a lot of things that came up, evidentiary things specifically.

And this is why we took a break so I could

inform the officer, and I hope he's listening to this, specifically the statements that were -- the spontaneous statements that were elicited from the defendant from three different sources that put him there and gave them reason to believe he might be the person that was a perpetrator in this crime, and the actual lineup that was held with Mr. Stone, with the defendant in that lineup, and Mr. Stone picking him out with some certainty.

Those would be the things that I would be expecting the officer to answer. And I'll instruct him not to go any further than those things. And that that was why the investigation on these other individuals ceased; they believed they had the person at that point in time.

MR. HOWARTH: I just can't imagine that the officer's going to be allowed to tell the jury about evidence that hasn't even come in yet. He's going to be able to tell the jury, oh, we've got three police officers that Mr. McKnight made statements to that incriminate him. The jury hasn't heard that. They're going to allow this officer to say well --

THE COURT: Well how about this as kind of a way to placate. Maybe if you agree to it, instead of saying statements that the defendant -- why don't you say we had information that placed him at the scene?

MR. ELIZONDO: From three different police or three different sources, certainly.

MR. HOWARTH: No.

THE COURT: What's wrong with that?

MR. HOWARTH: Knowing that they haven't yet heard and been tested to the test of cross-examination, to now poison this jury with this officer giving them a preview of why was I suspicious of Mr. McKnight and why did I just focus my investigation on him, when I had other suspects, and to say I did it because of information that's not before the jury is absolutely incorrect and prejudicial.

MR. ELIZONDO: Why did he ask the question is the question. Why did he ask that question to that officer about --

THE COURT: I do think you opened up the door somewhat. I am just trying to not have it all hung out to dry.

MR. HOWARTH: I restricted myself to things that this jury has heard.

This jury has heard from Mr. Golson.

THE COURT: No, no. You came out and said -- I mean you were very -- it was very good. You said well -- cause you knew exactly where you were going.

I thought it was -- I thought, hmm, this is

going to be interesting when you indicated well, you know, the date of when these were submitted. And you already knew the answer to the question and you knew that there was a lag time. That was not something that the jury knew beforehand.

MR. HOWARTH: Yes, they did.

THE COURT: No, they didn't.

MR. HOWARTH: Sure, they did. They heard all of these dates.

THE COURT: If they did, that's not something that was -- that I picked up on.

MR. HOWARTH: I did. I've got notes on them.

THE COURT: Well I don't think the jurors knew that there was lag in between the two. I think you pointed that out. I think that did open up the door.

So I will allow a limited -- my ruling is I'll allow a very limited, without getting into specifics, that they had some information that placed him at the scene. I'll let you -- I mean to me that is -- the Court's ruling on if you want to talk to the officer some more.

MR. ELIZONDO: Either that or if the Court would permit me to essentially lead through that section. Were there other reasons? Yes. Did they include incriminating sources made to three other independent sources? Yes. Did it include the positive identification at the lineup

by Mr. Stone? Yes.

THE COURT: Okay.

MR. ELIZONDO: If you let me lead that, I'll do that.

THE COURT: I'll allow that over defense counsel's objection, unless you have something else, a better --

MR. HOWARTH: Well, Your Honor, when this is done I want to inform the Court I will ask for a mistrial.

THE COURT: Well give me a better -- I think you opened up the door.

Give me a way that I could meet the People halfway to ask the question.

MR. HOWARTH: I opened up the door only to show that they did not follow-up leads. It wouldn't matter --

THE COURT: Well if you had a main -- if you had a statement from a person indicating that they did it, why would you chase -- as a practical matter, the police department has been ordered not to submit stuff to the DNA just on everything because there is a lot of submission for cost reasons. I mean that's -- we have a standing order knowing that that's what actually happens.

So you're not -- if there are ten different people who are suspects, they are not supposed to -- they are supposed to know only the ones that are main ones.

Because it's just takes a lot of time for them to do. It's not a real quick and easy process.

I do think that the jury has been asked a question of why did they focus on, why did the police focus on Mr. McKnight. And you left the impression that there might be some kind of nefarious reason why. That's what's -- I mean what other reason would you --

MR. HOWARTH: My -- judge, it wouldn't matter if the police officer himself saw this man, in his opinion, commit the crime. If you've got somebody else out there that gives you information to the contrary, the police are saying we don't have to follow-up on that because of our beliefs and then be allowed to testify as to what the belief is of the prosecuting authorities?

THE COURT: Why didn't you ask him why did you wait so long to submit the DNA on the other individual? I mean I was wondering if that question was going to be asked.

MR. HOWARTH: They never intended to submit it.

It's only because my coming into court and raising everything I could about the fact that they got these other people out there that they've never tested that they even bothered to test.

THE COURT: And these are other people who were excluded.

MR. HOWARTH: No, no. That they even bothered--

THE COURT: I'm talking --

MR. HOWARTH: -- to test Mr. Robinson.

THE COURT: You're talking about Mr. Robinson?

MR. HOWARTH: Sure.

THE COURT: I thought Mr. Robinson was tested.

MR. HOWARTH: He was tested in May after I came into this court and said, you know, that I wanted an expert witness, and among the problems that I had is that they have got this other fella who fit description and had never been tested. It's only in response to that, as a historical fact in this case, that the prosecution ever bothered getting DNA.

THE COURT: Let's assume that that's true. That's true.

We've had several different prosecutors on the case and maybe everything wasn't done how it should have been. How does that -- you've left the jurors with the impression that the police focused on your client improperly, that they didn't have a good reason to do it.

MR. HOWARTH: No, not improperly but certainly didn't conduct a proper investigation into who the actual perpetrator was of the crime.

And I don't think they can get off the hook by saying well we believed that this is the man that did it.

Their belief is -- cannot go before the jury.

The police officer's gonna, in fact, say I didn't do this and that because I believed that Mr. McKnight is the person that did the rape.

THE COURT: But they believed it for a couple of reasons. One, he was identified by one of the victims and, two, that he made statements at least putting himself at the scene of the crime.

MR. HOWARTH: But he can't tell the jury what his belief was.

THE COURT: Well he may not say his belief, but those are reasons why he did what he did.

So I think we made a good record. You can ask for a mistrial, we'll deal --

MR. ELIZONDO: And if I could, judge, I am not going to use the word belief. I will use what evidence do you have that gave you reason, belief you have probable cause to move on this and to close in focus the investigation here. It has to do with the statements that were made, has to do with the positive identification. It had to do the sketch and the resemblance.

And I didn't put that on the record, but I will put it on now that he would be testifying to that. And it would also be to the -- due to the fact that given the investigation, the location of the crime and the

defendant's place of residence, which is just around the block, all of that led them to believe they had probable cause and submit the warrant and close off the investigation. That's essentially the answer to the question of --

THE COURT: Mr. Howarth, I'm going to give you the last word.

MR. HOWARTH: All right. I still make my objection. But then I'm going to recross this officer on why he didn't follow-up on the man that Mr. Gholston (sic) told him he believed was the criminal. If they want to open this door which I object to, then I would go after that, too.

Why in the world -- if Mr. Golson tells them not only did I see this guy, I think I know who the guy was, and it's not -- obviously clearly not Mr. Stone, it's another person that they left completely alone.

THE COURT: But the thing is obvious to me -- I'm not gonna argue your case.

If this other person Mr. Golson saw this person, why didn't he see, as both of the victims testified to, two people out there at the car?

MR. HOWARTH: He saw a person behind the wheel.

THE COURT: I asked him did he see anybody else in the car. He saw one person.

MR. HOWARTH: So one.

THE COURT: With the other person, there had to be three people out there. He only saw two people.

So obviously to me, from me deductively -- I don't know what he saw. So to me there is a good reason for that. I mean to me I think you're doing a, you know, you're doing your job, a very adequate one at that.

So to me I don't -- from my perspective I don't understand.

MR. HOWARTH: Well, Your Honor, I'm saying I think it's absolutely improper for this witness to talk to the jury about evidence in this case that hasn't been presented.

THE COURT: But you asked -- but the question is being asked why he did what he did. I mean if you would like to wait and have him recalled until then -- is that what you want?

MR. HOWARTH: Well I certainly don't want him talking about it before the --

THE COURT: Well I have already ruled that the evidence is coming in, so I don't see -- what difference does it make?

MR. HOWARTH: It makes a big difference to us. We object and that's our position.

THE COURT: Objection's noted.

Let's bring the jury back out.

(The jury entered the courtroom at 2:45 P.M.)

THE COURT: Sir, you're still under oath.

Counsel, you may proceed.

MR. ELIZONDO: Thank you.

I am gonna withdraw that last question and preface it with this.

Q. (By Mr. Elizondo, continuing): Sir, when counsel was asking you questions earlier, he asked you a question basically that, maybe not exactly, but it was in the nature of why did you ignore the other person in this investigation and focus only on the defendant at some point. You remember him asking you that?

A. Yes.

Q. All right. Well let me ask you this, sir.

Did you have evidence at that time when the focus went to Mr. McKnight that you felt sufficient to submit the warrant request at that point?

A. That is correct.

Q. All right. And did that evidence include the sketch and the resemblance in the sketch?

A. It did.

Q. Did it include the results of a lineup involving Ms. James and Mr. Stone where they both identified the defendant?

A. It did.

Q. Did it include statements from three different police officers that were made by, allegedly made by the defendant that placed him at the scene of the crime that night?
A. It did.
Q. Did it also include an investigation as to where the defendant resided in location to the actual crime?
A. It did.
Q. And how close was that, by the way?
A. Estimated to be around two minutes walking distance from his house to the location.
Q. Okay. Now based on all of that evidence at the time that all this came to you as part of the investigation, is that what culminated in the preparation of the warrant request?
A. That is correct.
Q. All right. Now did there come a time when you were requested to submit the buccal swab of Mr. Robinson to the Michigan State Police?
A. That is correct.
Q. And that was well -- and it's fair to say it was well after the fact; is that correct?
A. That is correct.
Q. All right. And this buccal swab was submitted and tested, correct?
A. It was.

Q. And that was what Mr. Schloff testified about?
A. That is correct.
Q. All right. And the results were the elimination of that individual from this whole scene as far as that evidence?
A. Correct.
Q. You requested later also this photo lineup that you did with him, that was also done well after the fact; is that correct?
A. It was.
Q. But it was done, correct?
A. Yes.
Q. All right. And the results were as you testified?
A. Correct.

MR. ELIZONDO: One second.

Thank you, judge.

THE COURT: Mr. Howarth.

**RECROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Sergeant, you indicated when you were doing all these inclusions about why we focus on my client Mr. McKnight, and during that time period you had in your mind the conversations that the police had with Mr. Golston (sic), didn't you?
A. Correct.
Q. And isn't it a fact that you understood from those

conversations with Detroit police officers that Mr. Golston not only said that he saw a person pushing that car, but that he believed he knew who the person was?
A. He said he saw a person attempt to push that car and that he thought he knew who he was.
Q. He thought he knew who he was and it was somebody he knew from the neighborhood, wasn't it?
A. That's what he said.
Q. And what did you folks do to try to find that person?
A. I determined that he saw Mr. James pushing the car, go out and look at the car, come around the car and look at the tire and then try and push the car.
Q. Is the answer to that you didn't do anything to try and find the person that Mr. Golston (sic) said he knew from the neighborhood?
A. That is correct.

MR. HOWARTH: Thank you. Nothing else.

THE COURT: Any questions from the jurors? Counsel.

(Discussion had at the bench between the Court and counsel.)

THE COURT: I have three questions from the jurors, one of them this witness can't answer. We'll have to let the other officers -- who did one of the questions is how did the officers place Howard McKnight at the

scene. That question will be answered by the officer himself.

When you interviewed Mr. Golson, when did he say-- or did you interview Mr. Golson?

THE WITNESS: I did.

THE COURT: When did he say he saw the red truck and man adjacent to his house?

THE WITNESS: Can you repeat? I didn't hear the last part.

THE COURT: When did he say he saw the red truck and man adjacent to his house, if you recall?

THE WITNESS: It was the evening of New Year's Eve into New Year's.

THE COURT: You don't remember the time?

THE WITNESS: The time I believe was around midnight is what he told me.

THE COURT: Okay. And last question. You -- did the defendant live in the neighborhood of where the crime took place? Well how far, I guess, is that question.

THE WITNESS: Within two minutes of walking from his home to the location of the pickup truck.

THE COURT: Okay. All right.

Sir, you can step down.

Ladies and gentlemen, we are going to take

another short recess and we will be ready with the next witness.

(The jury was excused to the jury room at 2:55 P.M.)

MR. ELIZONDO: How long, judge?

THE COURT: About ten minutes.

But I guess I wanted to give, while it was still fresh in his mind, Mr. Howarth a chance to put his motion on the record.

Mr. Howarth.

MR. HOWARTH: Oh, you're giving me ten minutes to put it on or do it now?

THE COURT: No, no, no. I thought you wanted to put your -- you wanted to do it later.

We can do it when we come back.

MR. HOWARTH: Sure. Anytime the Court wants.

THE COURT: Okay. I thought you wanted to do it while it was fresh.

MR. HOWARTH: I can do it right now.

THE COURT: All right.

MR. HOWARTH: Your Honor, I believe that the prosecution has in the last set of questions allowed the officer to express his beliefs on the guilt of Mr. McKnight. I timely objected to that. We had discussions at side bar and the court had indicated that

it would allow those questions. May have limited the prosecution in some respects, but the net effect was that Officer Kane has, in effect, told the jury that he believed that this was the person that committed the crime and that's why he didn't follow-up with other people that was objected to before he made the statement. He's made that statement. That's an opinion that a police officer may never give in a case. I don't care what the provocation, he may not give his opinion for his belief of the defendant's guilt.

For that reason, I respectfully ask for mistrial in this case.

THE COURT: Counsel.

MR. ELIZONDO: Well for the record, judge, again it was in response to counsel's question why did the police ignore the other people in this investigation. I very specifically asked this officer when we began, it was kicked off, but when we came back I specifically asked the officer whether it came a point where he had what he believed to be evidence that amounted to probable cause to believe there was ripe to submit -- well I don't want to use the word ripe, but was ready to submit the warrant request and he said he did.

And then I went through and listed certain objects which we had discussed on the record earlier about

the statements and about the other things. And I believe that based on that it was simply at that point, based on that evidence he had sufficient evidence to submit a warrant and that's what he did.

MR. HOWARTH: And just, Your Honor, some of the things that the officer is referring to are things which are not in evidence, absolutely improper. Because the jury has now heard the officer talk about this evidence and now we're going to hear it after that is confirmation of the officer's -- is confirmation of why he believes this man is guilty, is confirmation that the police have acted absolutely properly in this case.

It's not fair and I ask for a mistrial and that's my position.

THE COURT: Well the Court's heard the argument.

I don't believe that Mr. McKnight's fundamental rights have been abridged in terms of for purpose of a mistrial for the following reasons. One, I do think the door was open. Second, I tried to limit or we tried to limit what the officer would say. Third, it is testimony that I have already ruled on. And, finally, I don't think it's the officer's belief so much that what were the reasons why he focused on Mr. McKnight as opposed to the other individuals.

For all those reasons, and for those I think

stated by the People, I don't think that a mistrial is appropriate here.

All right. See you in about ten minutes.

MR. ELIZONDO: Thank you, judge.

(Off the record.)

THE COURT: Bring your witness out. We can bring the jury out.

(The jury entered the courtroom at 3:10 P.M.)

THE COURT: People will call their next witness.

MR. ELIZONDO: I'm sorry. What?

THE CLERK: The judge said call your next witness.

MR. ELIZONDO: Here she is. Ms. Tieppo.

THE CLERK: You do solemnly swear or affirm that the testimony you give before the Court will be the whole truth?

THE WITNESS: Yes, I do.

THE CLERK: Thank you. You may be seated.

THE WITNESS: Thank you.

THE COURT: Ma'am, can you please keep your voice up.

THE WITNESS: Yes. Thank you, judge.

**REBECCA TIEPPO,**

having been first duly sworn by the Clerk of the Court at about 3:12 P.M., was examined and testified upon her oath, as follows:

THE COURT: Pull make phone up, too, please. Thank you.

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Good afternoon.

A. Hello.

Q. Tell the jurors your name, please.

A. Rebecca Tieppo.

Q. And, Ms. Tieppo, can you tell them your occupation?

A. I am an attorney.

Q. And do you work for the Prosecutor's Office?

A. I do not, no.

Q. Are you self-employed?

A. Yes.

Q. Okay. Now, ma'am, I'm gonna ask you are you familiar with the term Showup and Photo Identification?

A. Yes.

Q. Okay. Tell the jurors what that is or what that means to you.

A. Well showup, that typically refers to the process by which a witness to some incident will view either photos or a

live lineup, and based on viewing that make a -- possibly make a identification.

Q. Okay. So, in general, that's what we're talking about here.

Now have you ever participated in this type of situation?

A. Yes, on several occasions.

Q. Okay. And when you participate in them, what is your role?

A. My role is simply to really observe and make sure that the lineup is conducted in a fair manner in terms of making sure whoever is the witness, the person possibly picking someone out of a lineup, making sure there is no undue suggestion. Just making sure -- there are various factors. Making sure that if -- it's done properly.

Q. Okay. Well does that include looking at the makeup of the individuals who are in the lineup?

A. Yes.

Q. Making sure that that's fair?

A. Yes, absolutely.

Q. Okay. Does that also include -- now when this happens, and I'm gonna talk specifically.

Did you participate as a showup attorney in a situation back on January 11th of 2013?

A. Yes, I did.

Q. Okay. And on that particular time was your job to participate, as you had just indicated, as a showup attorney?
A. Yes.
Q. Okay. And do you have recollection of that particular showup?
A. I do, yes.
Q. Okay. I'm gonna hand you what's been marked, admitted as People's Proposed Exhibit Number 1. I'm sorry, it's already been admitted. People's 1 and ask you for the record that's a photograph, is it not?
A. Yes, it is.
Q. Okay. Do you recognize what that particular photograph is?
A. This appears to be the lineup that I observed on January 11th of this year.
Q. Okay. And were you aware -- were you aware of any of the individuals who were in the lineup? Were you given any information about the people in the lineup?
A. As I recall, the only information I was given was -- well I was shown a list of names and some basic information about each of the people. And I was -- it was pointed out to me by one of the investigators, one of the people conducting the lineup, which was their suspect.
Q. Okay.

A. Beyond that, I didn't have much information.
Q. Okay. Was that done with any of the people who came in to observe? Was that information given to you while any of the people who came in to observe were in the room with you?
A. No, absolutely not.
Q. Okay.
A. It was just me and the -- I think it was two people conducting the lineup.
Q. Okay. Now I'm gonna put this up on the screen here.
Can you see that?
A. Yes.
Q. All right. Now you indicated that part of the your job is to make sure that the array is fair; is that correct?
A. Correct.
Q. Okay. Was there anything in this array that gave you any issues about fairness?
A. Well that's a good question. I mean they're obviously not identical. There are differences there.
I believe I made a comment about the hairstyle of one of the individuals.
Q. Okay.
A. And I believe that was it.
Q. Okay. And when you note something like that, do you place that, those comments anywhere?

A. Sometimes I do. I generally, for my own purposes, will make a few notes right after observing such a lineup.
Q. Okay.
A. To assist me in recalling at a later date.
Q. Okay. And did you do that in this case?
A. I did.
Q. Okay. Did you review the notes?
A. I did.
Q. Okay. And was there anything indicated in your notes that, you know, refresh your recollection as to whether you had any major concerns here?
A. I did not write anything in my notes about any major concerns.
Q. Okay. All right. Now do you recall the -- perhaps not the names or whatever, but do you recall individuals being brought into the room to make that identification?
A. Yes.
Q. All right. Do you recall a female coming in to make an identification?
A. Yes, I do.
Q. Okay. Now I'm gonna hand you what's been marked as People's Proposed Exhibit Number 2. It's been admitted as People's 2.
I wanna ask you to look at that and see if you recognize what that document is.

A. This appears to be the list of the individuals in the lineup and then what appears to be the female witness's writing related to the person that she picked.
Q. Okay. Now what about at the bottom, in the bottom area? There is a name of the attorney present?
A. Yes, that's my name and my address, phone number, et cetera, written in my handwriting. So I wrote that myself.
Q. Okay. And is that the standard that you use when you do these kind of lineups?
A. Yes.
Q. Okay. So you did participate in this one and then the date that coincides with the date we talked about earlier?
A. Yes.
Q. Okay. Now did you observe that person make some sort of identification, if you recall?
A. I did observe the woman go into the area to observe the lineup, yes.
Q. Okay. All right. And was there are anybody -- were you in the area when she was making her observations?
A. I was able to observe her, yes.
Q. Okay. Was there anybody else in there with her at that time, if you know?
A. There were -- I think there were possibly two individuals that were conducting the lineup, but I don't remember

exactly where they were. They were in the general area.
Q. During the time of the lineup, did you hear anything that would have been said to that female who made that observation that would have caused you concern?
A. I don't recall anything like that, no.
Q. Okay. Is it your -- have you ever been in a lineup where something has occurred like that?
A. In some situations there have been some concerns. People conducting lineups will often have their own style and their own way of presenting things to the witnesses.
Q. All right. Do you make notes of those on that paper, that type of form when you observe anything that you feel that would have been inappropriate?
A. Yes. Yes.
Q. It's important to do that, wouldn't you say?
A. Yes, absolutely.
Q. Okay. Did you note anything on the document that I showed you concerning any concerns at all that you had that day?
A. No.
Q. Okay. Had you had concerns, they would have been there, right?
A. Yes.
Q. Okay. Now did you observe a gentleman come in and do the same?
A. Yes, he observed the lineup as well.

Q. Okay. I'm gonna hand you what's been marked as -- this is a Proposed Exhibit 26, ask you to look at that.

First of all, I ask you down in the corner, right-hand corner, do you observe your name on that?

A. Yes. Once again, that's my signature, name and in my handwriting.

Q. Okay. And you filled that in to indicate that in fact you were attending the lineup; is that correct?

A. Correct.

Q. Okay. And, once again, I will ask you did you make any notations on that document concerning any problems that you had in the observation and the actions of the individual who was viewing that lineup?

A. No.

Q. Okay. And, once again, you would have if there had been a problem?

A. Correct.

MR. ELIZONDO: No further questions, judge. I'm sorry. Just a second.

Q. (By Mr. Elizondo, continuing): When these individuals came in to view the subjects, did they come in together or were they done separately?

A. There were done separately.

Q. Okay. Thank you.

CROSS-EXAMINATION

**BY MR. HOWARTH:**

Q. Good afternoon, Ms. Tieppo.
A. Hello.
Q. How are you?
A. Good, thank you.
Q. Ms. Tieppo, is your practice of law exclusively the practice of criminal law?
A. It is not exclusively, but it is primarily criminal law.
Q. How many years have you been practicing criminal law in the Detroit-Metropolitan area?
A. Approximately 10.
Q. And you said that prior to the date of January 11th of this year you had done lineups before?
A. Yes.
Q. How many?
A. I would be guessing. Thirty.
Q. Thirty in 10 years?
A. Yes.
Q. About three a year?
A. Well actually the lineups I've probably only been doing those over the last five years or so.
Q. Do you have any training in conducting lineups or being the participating attorney at a lineup?
A. I have had training in the form of, I guess primarily of a

pretty extensive hand-out that was provided by the Wayne County, I think, Assigned Counsel Services when I first started to do that sort of work, observing lineups.
Q. You went to a presentation that was done some years ago?
A. Yes, several years ago.
Q. You got a hand-out?
A. Correct.
Q. Anything else other than that?
A. It was more than a hand-out. It was like -- it was a, you know, maybe 20 pages of various factors to look for in terms of what I should be observing.
Q. Have you ever read any books on the subject?
A. Not specifically.
Q. Ever attended any specific classes other than the one you've talked about?
A. No.
Q. On January the 11th of this year, you were called down to what place to conduct this or to help assist in this particular lineup? Where did you go?
A. I believe it was the old Wayne County Jail. That's what I know it as. I don't recall if it's Division One or Division Two, but it's the older one.
Q. Clinton Street?
A. Yes.
Q. Corner of Clinton and Beaubien or the corner of Clinton

and St. Antoine?
A. Well it's not --
Q. The old one is Clinton and Beaubien. The new one is Clinton and St. Antoine.
A. The old jail, yes.
Q. Okay. And when you got down there, were you told that you were gonna conduct a lineup on this particular case?
A. I wasn't told much about the case; simply that it was a live lineup and there were two witnesses that were going to observe.
Q. Did you know what the charges were?
A. I think I was told something very brief in terms of what the charges were or what the possible allegations were.
Q. Were you told anything about the circumstances of the identification that the people who were gonna see the lineup had made? In other words, whether they knew the person, whether that was the first time they had ever seen them, how long they saw them? Get any of that kind of information?
A. No, nothing like that.
Q. Did you take the opportunity to talk to the person that was the subject matter of the lineup?
A. Meaning the suspect?
Q. Yes, ma'am.
A. I did not talk to that person.

Q. Did not talk to the suspect?
A. No. No.
Q. Did not get any information from him that might have been helpful?
A. No.
Q. Would you agree, Ms. Tieppo, that one of the things that a lineup attorney would be looking for in a lineup is as close as is humanly possible you want a lineup of look-alikes, am I right?
A. Within reason, yes.
Q. Sure. I mean it's not possible to have cookie-cutter everybody looks the same, right?
A. Correct.
Q. But you do strive to make sure that the people look reasonably alike?
A. Yes.
Q. Did you voice any problem whatsoever with anybody that was in the lineup? You're hesitating. I'm not sure. Is there a reason for that?
A. Well I'm just trying to remember specifically what I might have said.

THE COURT: And, counsel I, won't characterize her pause as hesitating. I think every question that both the prosecution and you asked she pauses, as most attorneys pause before they answer a question.

MR. HOWARTH: I merely asked if there was anything --

THE COURT: I think she's thinking.

Q. (By Mr. Howarth, continuing): Any reason for hesitating?

THE COURT: Again, she pauses before she answers every question.

Q. (By Mr. Howarth, continuing): Did you talk to the -- any of the officers that were conducting the lineup about any of the facts and circumstances of the case?

A. I did briefly talk to a couple of the officers, but not about a lot of detail, no.

Q. See anybody in the courtroom that you talked to?

A. No. I don't recall, no.

Q. You made reference, Ms. Tieppo, to notes; is that correct?

A. Yes.

Q. Do you have your notes with you?

A. I have them in the other room. I did not make many notes so --

Q. About how many?

A. I am -- I made one note.

Q. What was that about?

A. It was in reference to the second individual, the second witness.

Q. Yes, ma'am. That would have been -- would the second person have been the mail or the female?

A. The male.
Q. All right. What note did you make about him?
A. That his identification was almost instantaneous.
He was -- he very quickly picked out the person that he thought was the one responsible for the incident.
Q. Did it seem unusually fast to you?
A. No. He seemed -- he just seemed very certain.
Q. The identification that was made by the female person, was there any note made on her identification?
A. No.
Q. Have you seen the lineup sheet? I think that that was presented to you as the People's Exhibit Number 2.
A. I believe the prosecutor did show me that just a bit ago.
Q. And that had some writing on it, underneath the people?
A. Yes.
Q. Who wrote that, if you know?
A. It depends on which writing you're referring to.
MR. HOWARTH: May I approach?
THE COURT: Yes, you may, sir.
Q. (By Mr. Howarth, continuing): Right there, yes.
A. I --
Q. Well you don't have to read it.
Do you know who wrote it?
A. I believe it was the female witness.
Q. And did the female witness indicate to you that she was

making the selection of a person based on some particular factor?
A. She indicated that her selection was based on his frame or his build, something along those lines.
Q. All right. Not on his face, right?
A. She didn't specifically say anything about the face.
Q. Well if her notation was I picked him from the frame of his body when he raped me, does that sound right?
A. Yes.
Q. So did you understand that she was picking him because of his build?
A. That's what it sounds like.
Q. Did you make any inquiry of either of the people who made the selections that day, the man and the woman? Did you make any inquiry of either of them whether they had talked to anybody before they went into the lineup room?
A. No, I didn't speak directly to either one of them at all.
Q. Right. You didn't ask them, for example, has anybody said anything to you about who you should pick out? You didn't ask them that?
A. No.
Q. Ms. Tieppo, you indicated that you have been practicing law for approximately 10 years; is that correct?
A. Correct.
Q. You don't know me, do you?

A. No.
Q. That doesn't warm my ego, but you don't know anything about me, right?
A. No, I don't.
Q. We haven't met or worked on a case or anything like that?
A. I don't believe so.
Q. Okay.

MR. HOWARTH: That's all I have. Thank you very much.

THE COURT: Redirect?

MR. ELIZONDO: No. Thank you.

THE COURT: Jurors?

You can step down, ma'am.

Next witness.

(The witness was excused at 3:32 P.M.)

MR. ELIZONDO: Judge, can we approach?

(Discussion had at the bench between the Court and counsel.)

THE COURT: Okay.

THE CLERK: I didn't get your name, sir.

THE WITNESS: Ali Jaber.

THE CLERK: Spell your first and last name for me.

THE WITNESS: J-a-b-e-r.

THE CLERK: Do you solemnly swear or affirm that

the testimony you're about to give before the Court will be the whole truth, sir?

THE WITNESS: I do.

THE CLERK: Thank you. You may be seated.

THE COURT: You may proceed, counsel.

MR. ELIZONDO: Thank you.

**ALI JABER,**

having been first duly sworn by the Clerk of the Court at about 3:35 P.M., was examined and testified upon his oath, as follows:

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Good afternoon, sir.

A. Good afternoon.

Q. Tell the jurors your name and occupation, please.

A. Ali Jaber, Detroit Police Department, police officer.

Q. All right. And I'm gonna take you back to -- let's see when was that date. Could I have that report right quick, sir?

Back to January 10, 2013, were you working with the Detroit Police Department at that time?

A. Yes.

Q. Did you have a particular duty assignment?

A. Yes, I was assigned to Headquarters Surveillance.

Q. Okay. And what are your specific duties in that capacity?

A. I work armed robberies within the City of Detroit and other violent crimes.
Q. Okay. Now are you familiar with the kind of, sort of the anonymous tip reporting, crime reporting system in the city?
A. Yes.
Q. How does that work in general?
A. Normally you submit a tip to Crime Stoppers and then Crime Stoppers will e-mail it to whatever unit specified. So if it's a narcotics tip, it goes to Narcotics Section. If it's a armed robbery tip, it goes to armed robbery task force or stuff like that. If homicide, goes to homicide.
Q. All right. Now does there come a time on January -- on around January 10th of 2013, when a tip comes in that you become aware of?
A. Yes.
Q. All right. And did it involve a situation that had happened on January 1st of 2010 or 2013?
A. Yes.
Q. Okay. And at that point in time the tip itself, did it direct you to a specific individual?
A. Yes.
Q. Okay. Was that individual named in that anonymous tip?
A. Yes.
Q. All right. And what did you do when you received that

information concerning checking it out or whatever?
A. Looked up the photo, mugging photo of that name that was listed, and I compared it to a sketch that I had.
Q. And what -- do you recall what the sketch, what crime that was involving?
A. Yeah, that was a armed robbery and CSC, a rape.
Q. Okay. That had occurred when?
A. I believe it was -- happened January 1st.
Q. Okay. And what did you do at that point?
A. Well at that point the name that I had was Howard McKnight. I ran it in LEIN, in the Law Enforcement Network.
Q. Okay. And did you do anything else?
A. Yes. I compared it to the sketch like the photo. It had a strong resemblance and when I checked his name he has a outstanding --
Q. Okay. Now let me ask you this.
I'm gonna hand you People's Defense Exhibit 8 -- I'm sorry, People's 8, ask you if you recognize that?
A. Yes.
Q. And what do you recognize that?
A. That's the sketch photo.
Q. Okay. So it's fair to say at this point in the game you have the sketch, you have some information, you have a name?

A. Yes.
Q. All right. Do you at that point take some action?
A. Yes.
Q. Okay. Do you do it by yourself?
A. No, with my crew members.
Q. Okay. And how many are involved in that?
A. Normally I think we're 10 officers behind. Specifically I think seven officers and a sergeant.
Q. Okay. Now on that particular time -- okay.
As a result of all this information, did you go to look for the person named Howard McKnight?
A. Yes.
Q. Okay. And do you, in fact, come in contact with him that night?
A. Yes.
Q. All right. And do you, in fact, take him into custody that night?
A. Not personally but, yes, he was taken into custody that night.
Q. Okay. Now when he's taken into custody, does he ever come into contact with you?
A. Yes.
Q. That night, okay.
What were the circumstances of him coming into contact with you?

A. I -- me and my partner transported him from where we -- where he got detained to police station, Schaefer station.
Q. Okay. Now the Howard McKnight that you picked up that night, is that person in the courtroom today?
A. Yes.
Q. Okay. Just point to where he is at, tell jury what he is wearing.
A. Sitting right across from you wearing white shirt with the tie, black tie, black pants.
MR. ELIZONDO: Your Honor, may the record reflect the witness is pointing to, identifying the defendant in this matter?
THE COURT: So reflected.
Q. (By Mr. Elizondo, continuing): All right. Now Mr. McKnight's been detained.
Is he transferred to your custody at that point for transportation?
A. Yes.
Q. Okay. Now is he transported?
A. Yes.
Q. Okay. How is that done?
A. He is transported in the back of the car, in the back of our car at the police station.
Q. Are you by yourself when you're doing this transport?
A. No, I was with my partner.

Q. Your partner's name?
A. Officer Parra.
Q. P-a-r-r-o?
A. P-a-r-r-a.
Q. Okay. Now while you're transporting Mr. McKnight, where in fact were you taking him at that point?
A. We took him from Livonia to the Schaefer station, the Second Precinct.
Q. Okay. During the course of the transport, you said Mr. McKnight is in the back seat; is that correct?
A. Yes.
Q. Okay. Is any -- is Mr. McKnight talking? Is he saying anything during the course of this transport?
A. Well during the transport, he was just like curious. He wanted to know what was he locked up for.
Q. Okay. Did you give him any information about why you had him in the back seat at that point?
A. When he was locked up in Livonia, he was advised that he was -- yes, for a warrant.
Q. Okay. When he -- did he say anything else?
A. He wanted to know why he was locked up.
Q. Did he say anything else to you?
A. He just -- he was curious. He just kept asking questions and we were just -- I was kind of ignoring him.
Q. What was his emotional state? Would you describe that?

A. Looked nervous, just kept asking questions. Just wanting to know why, why, why just like repeatedly.
Q. Okay. Now you said that you are not responding to those?
A. No.
Q. Okay. Was your partner responding?
A. No.
Q. All right. Now what -- from where he is picked up, you said you transport him by car to where again?
A. To the Second Precinct, Detroit. It's called Schaefer Station.
Q. Okay. Now when you transport him, what's the purpose of taking him over there? What were you gonna do with him?
A. So he can get processed and booked.
Q. All right. And were you going to be doing the processing?
A. No, I just transport him there. There is a sheet that you have to fill out and when you turn him ever to the custody.
Q. Okay. Now does the car that you're transporting him get to the station?
A. Yes.
Q. All right. Tell the jurors what happens once you get to the station.
A. When we get to the station, I have to -- it's like through the garage, there is a door that takes you in the cell block. And I escort him in there through that door from

the garage into it's a small hole, kind of hallway that you go in. It's got a glass door that separates the processing area from the small hallway.
Q. Okay. Is this the normal, normal way that any prisoner coming in --
A. Yes. Any prisoners that is to go in through the garage through that door, they get -- there is a sheet that you have to fill out, an in-take sheet with their information, name, phone number, date of birth.
Q. Oh, who has to fill that out?
A. The arresting officers, whoever transports him, which is myself.
Q. So did you find yourself in a position to have to do that paperwork?
A. Yes.
Q. Okay. Now do you begin to do the paper work?
A. Yes.
Q. All right. When you begin to do the paperwork, are you in any particular location in the station at that point?
A. Inside the hallway.
Q. Okay. Are there chairs there, seats there?
A. There is a couple of chairs going right there, just there, yes.
Q. All right. Now when you get in there, are you there with your partner?

A. Inside the detaining area, no, I'm by myself with the prisoner.
Q. Okay. Now did you start to fill out the paperwork?
A. Yes.
Q. Okay. What happens as you're filling that out?
A. Again, Mr. McKnight keeps asking me what's this about, what's this about, what did they say and just like I said blurting stuff. And, again, I'm just ignoring him, asking him like the questions like what's your name, filling it out. And he was like I said, curious, just nervous, like just wanted to know what this is about.
So I didn't know if he was testing me, wanted to know what I know or -- cause at one point he asked me is this about the rape, is this about the stuff that happened on Dresden. Or I could tell you exactly, if I could look at my PCR, what he said.
Q. Sure, if that will refresh your memory.
A. Yes. He kept asking me why did I get arrested, man, just be honest with me. What's this about? Who did they say I raped? Did they say they found my DNA?
Q. Okay. Let me just stop you for a second.
He says all this; Mr. McKnight?
A. Yes.
Q. This person right here (indicating)?
A. Yes.

Q. Okay. Had you asked him any questions at all at that point?
A. No, sir.
Q. Okay. Is it your job to interrogate?
A. No.
Q. Okay. Your job was just basically transport; is that your statement?
A. Yes.
Q. Okay. Does he stop at that point?
A. No.
Q. Okay. What else -- does he say anything else?
A. He said did -- did they say did they find any DNA? Where did they find any DNA? Was it in that car? Was it inside that bitch?
So I just kept listening. I let him like talk. He was just talking. I'm just listening. Then he tells me I know what this is about. This about the rape on Dresden and Findlay. I already know. So at that point I'm still listening. And then he kind of blurts it out again. He seemed nervous, just wanted to know what this is about, more what the arrest is about.
Q. Okay.
A. Then he tells me, "I already know I didn't rape that bitch. I fucked her in the back seat and I gave her $20." He said, "that's not the first time I fuck her."

Q. Now these are his words?
A. Yes, word for word.
Q. Okay.
A. And then he said, "I fuck a lot of the tramps in the neighborhood."
At that point, I went outside the glass door, he was still in the hallway, so I could let my officer -- my partner Officer Parra know what he was saying so he can come in and witness it.
Q. Okay. What happened then?
A. I called for my officers from behind the counter. He came back there with me, and at that point he didn't wanna say anything else. He just game nervous, agitated and like start moving his cuffs like he was trying to get out of his cuffs and just like mad, really agitated.
He even tried to like just bite on the piece of paper, the detainee sheets I was filling out.
Q. Now let's talk about that a little bit.
How did that transpire, the paper?
A. Well he was standing there. We're in that small hallway. We standing there.
And I'm like filling out the sheets, so I don't know if he knew that or how I was writing down whatever like he was saying in the statement. He just like went with his mouth trying to bite it, trying to bite the piece

of paper, the detainer form.
Q. Did you say anything to him at that point?
A. Yes, I told him to chill, man, you know. Just trying to calm him down cause the guy -- he moving his cuffs and all that.
Q. Okay. At that point in time were you have writing down what he was saying?
A. No.
Q. Okay. There comes a point later when you do?
A. Yes, when I did my report.
Q. Okay. Now are there any video cameras or audio recording things going on in that location where you had him at that point?
A. I can't tell you for sure, but when you go into the precinct, there is a TV on the wall that shows cameras into the back. But I'm not sure if it covers that and the cell block but I know there is cameras.
Q. Okay. Now do you know whether or not there is audio recording parts in there?
A. I'm not sure.
Q. Okay. Now after this happens, now the paper chewing or the attempting to try and chew the paper, does that happen before or after you go get your partner?
A. After I got my partner.
Q. Okay. Now at this point in time what do you recall

happening?

A. After that, like we were just trying to calm him down and it was time to take him through that glass door. Once you go from that hallway to the glass door, that's when you turn in that sheet if it's complete to the detention officers, the ones that actually do the fingerprinting and the processing.

So we handed the paper over to whoever is working in the back and they take custody. When they take custody, I left.

Q. Okay. Now let me ask you this. Had you done any research about the situation that he was being looked at, the CSC armed robbery? Did you know the facts or anything about that at that time?

A. Yes.

Q. You did, okay.

Did you at any time tell Mr. McKnight any of those facts or inform him of anything?

A. None. I never even told him anything about the rape or anything whatsoever about this.

Q. Okay. When -- okay. So then it gets to that point where you turn him over to you said somebody else?

A. Yes.

Q. Who is that, if you recall?

A. I'm not sure who was working. It's just whoever normally

handles the detaining. I'm not sure who it was.
Q. Okay. And did you tell them anything about what had just occurred?
A. No.
Q. Okay. After you turn him over to the officer there, what did you do?
A. I notified my sergeant, Sergeant Mendoza, of the same, the voluntarily statement that he gave me. And I called Sex Crimes to let them know and I think I spoke to Officer Ortiz and who said they were gonna come out to interview him.
Q. Okay. Now did you ask him any questions concerning these things or was these --
THE COURT: Counsel, you've already asked him and answered that.
MR. ELIZONDO: All right. Okay.
Q. (By Mr. Elizondo, continuing): Then you said you turned him -- you turned him over and that was as far as your contact with Mr. McKnight?
A. Yes.
Q. All right. After that, you generated a report?
A. Yes.
Q. Okay. And that's where -- the things that you are recalling, that's what you have in your hand right now; is that correct?

A. Yes.

MR. ELIZONDO: Okay. Thank you. No further questions.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Good afternoon, Officer --

A. Jaber.

Q. Jaber. Thank you.

A. You're welcome, sir.

Q. Officer Jaber, as of January 10th, the day that you have been talking with us or talking to us about, you knew about the January 1, 2013, rape and robbery over on the east side, right?

A. Yes.

Q. And you knew that as of January 10th that was a fairly talked about crime within the Detroit Police Department, wasn't it?

A. Yes.

Q. I mean it was a big issue, right?

A. Yes.

Q. Okay. And it had reached all the way over to officers on the west side, right? It was a talk in the precinct?

A. I'm not sure.

Q. You had talked about it, hadn't you?

A. I talked about it, yes.
Q. It was the talk?
A. I know it was on the news as well.
Q. So when you went out to pick up this Mr. McKnight, you knew that he was a suspect in that rape, robbery, right?
A. Possibly, yes.
Q. You knew he was a suspect?
A. Again, there was a Crime Stoppers tip that came. So comparing that, yes, I thought he was a suspect. He was possible suspect.
Q. And where did you pick him up?
A. Livonia.
Q. Did not pick him up anywhere near Gratiot?
A. No, sir.
Q. So you pick him up. And you and a crew of how many people?
A. I would say six. Including the sergeant, it was about six or seven.
Q. Did the -- and you've said this is the gentleman right here that you picked up, right?
A. Yes.
Q. No question about that.
He offer some resistance?
A. No.
Q. Try to run away?

A. No.
Q. Cooperative?
A. Yes.
Q. All right. Now he gets in the police car and you're in the police car and your partner Officer Parra's in the police car, right?
A. Yes.
Q. And you make absolutely no attempt whatsoever to ask him a single question?
A. No.
Q. You know that you've got this guy that was being picked up on one of the more notorious rapes, certainly probably the most notorious rape of that year, 2013 cause it's still January, right?
THE COURT: I will -- I'm going to allow it, so go ahead.
MR. ELIZONDO: Well I'm just saying that that opens doors, judge.
THE COURT: I don't think so.
But go ahead.
Q. (By Mr. Howarth, continuing): Right?
A. Can you repeat the question? I'm sorry.
Q. Could you read back the question?
(The record was read as requested.)
A. At that point, it was an allegation, sir. He was picked

up for a felony warrant and he was advised he was arrested for that felony warrant. So I didn't want to get into details about Sex Crimes or anything like that and that's-- I think that's what was causing him all the nervousness because nobody told him anything about that.
Q. The question is you didn't even think to ask him a single thing about the crime that you were picking him up for?
A. He was picked up on the felony warrant, sir.
Q. You didn't ask him anything at all about the sex crime?
A. Correct.
Q. He just blurted all this out?
A. When we got to the station, yes.
Q. Again and again and again, right?
A. Yes.
Q. And did you think that was important information?
A. Yes.
Q. Very important?
A. Very.
Q. All right. Now you've got a gentleman who's blurting out information that kind of pins him on that rape and robbery, right?
A. Yes.
Q. Did you make a single inquiry when you got to the station that we got some kind of a video cameras? Did you make any inquiry about that?

A. I went and called my partner so he can listen to what I'm hearing.
Q. Did you make a single inquiry as to whether the station has a -- some kind of a video camera where we can pick -- we can record this?
A. No.
Q. Did you make any inquiry as to whether the station had so much as a tape recorder?
A. Well I know they have cameras. But like I said, when you walk in you could see there is on the TV --
Q. Sir, that's not what I asked you. I asked you a simple question.
A. What is your question, sir?
Q. The question was did you make any inquiry as to whether there was even just a little tape recorder?
A. No. No.
Q. That wasn't important to you?
A. Nope.
Q. Was it important at all to you to get this gentleman to record what he was saying, these incriminating statements?
A. That's why I called for my partner to witness this.
Q. And when you did that, he stopped talking?
A. Yes.
Q. All right. Now did you think maybe you would say to him Mr. McKnight why don't you write down some of this stuff?

Did that occur to you?

A. Yes. Like I said, I just notified Sex Crime who handles this and I didn't want to be involved in this case. I just let them know cause they the one that handles the situations.

Q. Did that occur to you?

A. No.

Q. Didn't you think it might be important to get that recorded in some way that he's making all of these very, very incriminating statements to a very major crime?

A. Well at that point he got very nervous and agitated and he was getting out of cuffs. So to control him, they didn't want to ask anything. Just wanted to make sure he's calmed down so he can get processed.

I was more worried about -- cause at that point he just going crazy trying to get out of cuffs, trying to bite the paper out of my hands.

Q. Trying to escape?

A. Probably, yes.

Q. And did you see him try to escape?

A. He was moving his cuffs around and telling him to stop.

Q. Moving the cuffs around, right?

A. Yes.

Q. Okay. Are you upset about this for any reason?

A. No, sir.

Q. Okay. Do you have anything, Officer Jaber, other than, you know, your recollection about this that preserves in any way what you say that Mr. McKnight told you, a writing, a video, an audio tape, anything?
A. No, sir.
MR. HOWARTH: I don't have anything else.
THE COURT: Any redirect?
MR. ELIZONDO: Just a second, judge.

**REDIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Counsel asked you about the video recording equipment, that sort of thing.
A. Yes.
Q. Fair to say it would have been nice to have had it at the time, correct?
A. Correct.
Q. Okay. But you didn't?
A. I didn't have, no, sir.
Q. And by the time you went -- how much time went past between you going to get your partner and coming back?
A. Just like a minute, not even. It was just -- I was on the other side of the door.
Q. Okay. At that point was there anything to record?
A. No.
MR. ELIZONDO: Thank you. Nothing else.

RECROSS-EXAMINATION

**BY MR. HOWARTH:**

Q. Just one question, Officer Jaber.

A. Sir.

Q. Were you aware as of January 10th of this year whether there was a protocol in effect for Detroit Police Officers --

THE COURT: Counsel, let me stop you.

Why don't you approach.

(Discussion had at the bench between the Court and counsel.)

THE COURT: Do the jurors have any questions?

THE JURORS: (No verbal response.)

THE COURT: Sir, you can step down. Thank you.

(The witness was excused at 3:59 P.M.)

THE COURT: Ladies and gentlemen, we have gone as far as we're gonna go today.

We will be at some point in time -- the indication is we will be finishing tomorrow and hopefully we'll have closing argument. We appreciate your careful attention.

Hopefully we will -- we are going to try this 9:15 thing again and hopefully we'll start as close to 9:15 in the morning as possible.

Thank you again. Remember you can't discuss the

case. However, I would imagine in the next 24 hours you will be able to discuss it with each other.

Thank you again and have a good evening.

(The jury was excused at 4:00 P.M.)

THE COURT: Okay. Counsel, anything else you want to put on the record?

MR. ELIZONDO: Nothing from us, Your Honor.

MR. HOWARTH: Your Honor, I was told by Judge Bill to be in his courtroom at 9:15 tomorrow without fail, I guess trying to get a plea in. And I was told to be there or see the sheriff. So I -- I'm going to be here at 9:00 and I will do what the Courts have me to do.

THE COURT: Okay. Well we will contact Judge Bill for you in the morning.

MR. HOWARTH: Thank you. It's not going to take long.

THE COURT: But I will have Tonia contact Judge Bill's clerk and if you could be done in a very, very short period of time --

MR. HOWARTH: It's nothing that's going to take a long time.

THE COURT: Okay. But I don't want you to get up there and get in line with something else. If you can go and come back, fine. If it's going to be anything else, then I will just have a deputy come back and have

you removed.

MR. HOWARTH: I am a servant of the courts.

THE COURT: We're done.

(The proceedings were concluded at about 4:03 P.M.)

- - -

# C E R T I F I C A T E

STATE OF MICHIGAN)

)

COUNTY OF WAYNE )

I, Betty Sanders, CSR-2931, and Official Court Reporter of the Third Judicial Circuit Court for the County of Wayne, Criminal Division, State of Michigan, do hereby certify that the foregoing pages 1 through 181, inclusive, comprise a full, true and correct transcript of the proceedings and testimony taken in the matter of the People of the State of Michigan versus Howard McKnight, on November 20, 2013.

Betty Sanders, CSR-2931

Dated this 5th day of January, 2014.