STATE OF MICHIGAN

THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN,

-vs- Case No. 13-0628

HOWARD JAMES MCKNIGHT,

Defendant.

_________________________________________/

**JURY TRIAL**

BEFORE THE HONORABLE EDWARD EWELL, JR.

502 Frank Murphy Hall of Justice, 1441 St. Antoine,

Detroit, Michigan - Thursday, November 21, 2013

14 FEB 28 AM 7:46

APPEARANCES:

VENESHIA CEZIL, (P72778)
RALPH ELIZONDO, (P41463)
Wayne County Prosecutor's Office
1441 St. Antoine, 12th Floor
Detroit, Michigan 48226-2302

Appearing on behalf of the People.

JAMES HOWARTH, (P15179)
615 Griswold, Suite 820
Detroit, Michigan 48226

PAUL R. JONES, (P42171)
23442 Tireman, Suite 1
Dearborn Heights, Michigan 48127

Appearing on behalf of the Defendant.

REPORTED BY:
Betty Sanders, CSR-2931
Official Certified Shorthand Reporter

Processed
Notice of Filing Sent
Clerk

# TABLE OF CONTENTS


| WITNESSES | PAGE |
|---|---|
| **CONNIE BELL WATTS** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 5 |
| CROSS-EXAMINATION BY MR. HOWARTH | 16 |
| REDIRECT EXAMINATION BY MR. ELIZONDO | 21 |
| RECROSS-EXAMINATION BY MR. HOWARTH | 22 |
| **JOSE ORTIZ** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 29 |
| CROSS-EXAMINATION BY MR. HOWARTH | 44 |
| **JEFFERY MANSON** | |
| DIRECT EXAMINATION BY MR. ELIZONDO | 49 |
| CROSS-EXAMINATION BY MR. HOWARTH | 58 |
| **JAMES STONE** | |
| DIRECT EXAMINATION BY MS. CEZIL | 63 |
| CROSS-EXAMINATION BY MR. HOWARTH | 109 |
| REDIRECT EXAMINATION BY MS. CEZIL | 130 |
| **ALPHONSO TINSLEY** | |
| RECROSS-EXAMINATION BY MR. HOWARTH | 145 |
| REDIRECT EXAMINATION BY MR. ELIZONDO | 149 |

## EXHIBITS

| IDENTIFICATION | | MARKED | ADMITTED |
|---|---|---|---|
| PEOPLE'S 6, 7 | PHOTOGRAPHS OF TRUCK | -- | 73 |
| PEOPLE'S 21-23 | PHOTOGRAPHS OF TRUCK | -- | 73 |
| PEOPLE'S 26 | PHOTO LINEUP | -- | 102 |
| PEOPLE'S 24 | PHOTO LINEUP | -- | 103 |
| PEOPLE'S 27 | STIPULATION | 143 | 144 |
| DEFENDANT'S 1 | COMPUTER DRAWING | 147 | 148 |
| DEFENDANT'S 2 | COMPUTER DRAWING | 147 | 148 |

Detroit, Michigan
Thursday, November 21, 2013
9:34 A.M.

- - -

THE CLERK: Calling Case Number 13-000628; the State of Michigan versus Howard McKnight before the Court today for a jury trial in progress.

MR. ELIZONDO: Good morning, Your Honor. Ralph Elizondo, assistant prosecutor.

MS. CEZIL: Good morning, Your Honor. Veneshia Cezil on behalf of the People.

MR. HOWARTH: Your Honor, James Howarth, co-counsel for Mr. McKnight.

MR. JONES: If it please the Court, Your Honor. Paul R. Jones, co-counsel for Mr. McKnight.

THE COURT: Good morning, counsel. Today is the date and time scheduled for continuation of jury trial. Are the People ready with their next witness?

MR. ELIZONDO: We are, judge.

THE COURT: All right. Then call that witness.

MR. ELIZONDO: That will be Officer Connie Watts, also known as Connie Bell.

THE COURT: Connie Watts?

MR. ELIZONDO: Correct, or Connie Bell. It's

listed in both on the --

THE COURT: Okay.

MR. ELIZONDO: But it's --

THE COURT: Bring out the jury.

(The jury entered the courtroom at 9:35 A.M.)

THE CLERK: You solemnly swear or affirm that the testimony you're about to give before the Court will be the whole truth?

THE WITNESS: Yes.

THE CLERK: Thank you. You may be seated, ma'am.

THE COURT: Ma'am, keep your voice up.

And, good morning, ladies and gentlemen.

THE JURORS: Good morning.

THE COURT: If you will pull that microphone up, officer.

Thank you.

THE WITNESS: Thank you.

THE COURT: You may proceed, counsel.

MR. ELIZONDO: Thank you, judge.

**CONNIE BELL WATTS,**

having been first duly sworn by the Clerk of the Court at about 9:35 A.M., was examined and testified upon her oath, as follows:

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Good morning.
A. Good morning.
Q. Would you tell the jurors your name, please?
A. Officer Connie Bell Watts.
Q. And, officer, how long have you -- or who do you work for?
A. Detroit Police Department.
Q. Okay. And how long have you worked for them?
A. Thirteen and a half years.
Q. All right. Now I wanna take you back in time to January 13th of 2013 and ask if you have some memory of some things that occurred during the day on that day?
A. Okay.
Q. All right. First of all, can you tell the jurors what was your job, what was your duty assignment that particular day?
A. That particular night I worked as a police detention officer. I'm the person who processes all the prisoners that come in.
Q. Okay. Does that involve any kind of detective work?
A. No.
Q. Does that involve any kind of on the street work?
A. No.
Q. Okay. What was -- as far as the processing, just tell us

a little bit. What does a processing officer do?
A. The processing officer, as each prisoner comes in I catalogue his property, his or her property. I ask all the medical questions that need to be answered. I input all their information into the system and I fingerprint and send the fingerprints down to the necessary agencies.
Q. Okay. Now I wanna take you back again to January 13th of 2013.

Is there anybody in the courtroom today that you came into contact with that day?
A. Yes, the defendant.
Q. Okay. Would you just point to who you are referring to?
A. The defendant right there (indicating).

MR. ELIZONDO: May the record reflect the witness has pointed to and identified the defendant Mr. McKnight?

THE COURT: So reflected.
Q. (By Mr. Elizondo, continuing): All right. Now approximately what time was it that you became involved with that?
A. I work the midnight shift, so I'm not sure exactly what time.
Q. Okay. Sometime after midnight though?
A. Yes, sometime after midnight.
Q. All right. Now prior to coming into contact -- well let

me ask this. Do you know what this case is about?
A. Yes.
Q. Okay. On January 13th of 2013, were you familiar with the facts of this particular case?
A. No.
Q. Did you have any knowledge about the particular case?
A. No.
Q. You knew that there -- you know now that it was or had received some media coverage?
A. Yes.
Q. Okay. And as of January 13th you're telling us you had not seen anything, heard anything or knew anything?
A. No, I didn't know anything.
Q. All right. You didn't know any of the details about it?
A. I didn't know anything.
Q. Okay. Now prior to coming into contact with Mr. McKnight that particular evening, did anyone give you any details about an investigation involving this case?
A. No.
Q. Any information at all?
A. No.
Q. Okay. Now let's talk about the circumstances under which you become into contact with Mr. McKnight.
A. Okay.
Q. Where are you when you first come into contact with him?

A. I was in the cell block when I came in contact with Mr. McKnight.
Q. Okay. And where was that located? Is it a precinct?
A. At the Second Precinct on Schaefer and Lesure in -- I often call it in the back, but it's a back area where we keep all the cells and the processing area where I type in all my information.
Q. Okay. And the procedure when -- and I take it you've processed numerous individuals through that course of your time up to that point; is that correct?
A. Yes.
Q. Okay. When they bring them into this particular precinct, and Mr. McKnight in particular that night when they brought him in, where was the first place he was taken?
A. First there is -- there is like a hallway that you come through, and then when you get inside I'll even use the courtroom. There is like an area where you all are sitting. That's where the first officer in contact does his paperwork.
Then they'll go through a door that may be right here and that's where they come in contact with me. That's when I take the paperwork that the officer has written out and then I begin to pat the offender down for weapons or anything, take all his property, log it and then that's when I start my questions of, you know, where

were you born, stuff like that, medical questions.
Q. Okay. All right. So in this particular evening when Mr. McKnight was brought in, was he brought in by Officer Jaber, if you recall?
A. Yes.
Q. Okay. And the initial part of Mr. McKnight's entry in the precinct would have been in that area that you described over there; is that correct?
A. Yes.
Q. And for the record I'm pointing over towards --
A. And it's blocked by a steel door.
Q. Okay. So when he's brought in with that officer, are you-- or strike that.
Were you paying any attention to what was going on over there?
A. No.
Q. Could you -- would you have been able to see anything over in that area?
A. I could see -- I would be able to see because our door has a little pane glass in it, but I'm not really paying attention.
Q. Okay. Now when this particular evening when -- how are you introduced to Mr. McKnight?
A. When I open the door and say is your prisoner ready, they say yes. I say come on in. That's pretty much how it

works.
Q. And is that what happened that night?
A. Yes, sir.
Q. All right. Now at that point was Mr. McKnight brought in?
A. Yes.
Q. Okay. And did the officer accompany him in?
A. He walks in until I do the pat down. Once I do the pat down and I don't find any weapons or drugs on the person, then I'll tell you okay you can leave.
Q. Okay. Is that what you did that particular day?
A. Yes.
Q. Did that officer tell --
THE COURT: Excuse me. When you say tell you you could leave, you mean the officer can leave?
THE WITNESS: The officer cannot be back there anymore.
THE COURT: After you do the pat down?
THE WITNESS: After I do the pat down.
THE COURT: Okay. Proceed.
Q. (By Mr. Elizondo, continuing): So Officer Jaber brought Mr. McKnight in?
A. Yes.
Q. And did he tell you anything about what had occurred anywhere along the process?
A. No.

Q. Okay. Now did you do the pat down?
A. Yes.
Q. And did you have Officer Jaber leave?
A. Yes.
Q. Okay. And during the pat down time, did that officer tell you anything about what had happened or occurred out in that other area?
A. No.
Q. Now the officer left.
Tell us what you recall doing next after the officer left.
A. After myself and my partner did the pat down search, I took his property. I asked about the medical problems.
Once he said nothing was wrong with him, I take him -- I take the defendant into another room. It's kind of like a little kiddie-corner, around the corner. The defendant sits down. I sit down in front of a computer and then I begin to input all the information that the officer has written down on the intake sheet.
Q. Okay. And did any of the information on that intake sheet have any of the facts or suspected facts of this particular case?
A. Oh, no. The intake form just says name, date of birth. It's just the common questions that I need to put into the computer.

Q. Okay. When Mr. McKnight comes in, first given to you, transferred into your custody and you do the pat down, what's his -- how is his emotional state at that point? How is he acting? How is he behaving?

A. He was more interested in knowing what I knew. Like why am I here, do you know why I'm here.

So I would kind of call it a little nervous, but not like not overly excited. But he just wanted -- he was nervous.

Q. Okay. And did he ask you those questions?

A. Yes, several times.

Q. All right. Now when -- do those questions begin as you do the pat down or when do those questions begin to come to you?

A. As soon as the pat down -- as soon as I told the officer to leave, that's when he began, hey, you know why I'm here? Can you tell me why I'm here?

Q. Did you say anything to him in response to those initially?

A. Not at that time, no.

Q. Okay. You said at that point you took him into another area?

A. Yes.

Q. Okay. And what happens when you get to that other area?

A. When we get into the other area, say I'm sitting right

here and I have a computer in front of myself. He would sit where this divider is. So he's no more than two feet away from me. And that's when I -- I start typing in all the information.

Q. Okay. Now are you asking him questions concerning anything you typed in?

A. Yes.

Q. Okay. Now as you are typing in, does he -- does he ask you anything?

A. Yes, he does.

Q. Okay. Let's take it from when you begin typing and he begins to ask you questions. Tell us what happened then.

A. As I'm typing, he begins to ask me, hey, you know what I'm here for. I say no, no, I don't know what you're here for. I think you know what I'm here nor. You know why I'm here. I said, "No, sir, I don't."

Then he stopped. And it took about a second and he said, "I know why I'm here." And I said, "Go ahead." He says, "You saw that rape that happened on TV, don't you?" And I was like, "No, I don't. What happened? You know, talk to me." He says --

MR. HOWARTH: Well excuse me. Excuse me, Your Honor.

There is no foundation here because it appears that the officer is now asking questions from

Mr. McKnight. And if the officer is questioning Mr. McKnight at all, asking him, you know, tell me what happened, there has to be a foundation as to Mr. McKnight having been advised of certain things which there is no -- hasn't been testified to at this point.

MR. ELIZONDO: There doesn't need -- well --

THE COURT: No. Wait. Wait.

MR. ELIZONDO: Perhaps we need to go off the record on that.

THE COURT: I'll -- the Court's gonna allow the-- I do think there is a foundation. I'll let you put-- we'll put that on the record later.

You can continue.

MR. ELIZONDO: Thank you, judge.

Q. (By Mr. Elizondo, continuing): All right. Go ahead.

A. He kept saying, "You know what happened. This is that rape that happened on TV." I said, "Uh-huh." He said, "I had sex with that girl but I paid her." Then he goes on. I say, "Uh-huh." I said, "Uh-huh." He said, "Well her car broke down, her husband was with her. And I walked up on them and I saw what was going on, so I stopped to help." Okay. Then he says, um, "Well I told her husband he could leave and go get the part for his car that he needed, I'll stay with his wife while he's gone." I said, "Okay." Then he said well while the husband was gone, he

and the wife discussed a price for sex. They agreed upon $20. He said that they had sex and when he was done he didn't like it so he snatched the $20 out of her bra. And I said, "Oh, okay."

Q. And then what -- at that point, what did you do?

A. I turned around and I continued to type and I just continued to let him talk.

Q. Okay. Did he -- okay. Now this thing about taking money from her bra, did you have any information prior to that time that that money from the victim's bra may have been taken?

A. I didn't know anything. Anything.

Q. What happened then?

A. He just said that, um -- he said that I had to know what he was talking about. And I said, "No, I don't know what you're talking about." So I just kept processing him and then when we were finished I fingerprinted him and put him in the cell.

Q. Okay. And the area in which you were processing, is that set up with recording devices or anything?

A. The initial -- the first step where we pat 'em down, that has video and audio with you. When you go into the room with the computer, it doesn't have any video or audio.

Q. Okay. Now after you process and took -- did what you did, what did you do or did you do anything with the

information that you had received?
A. Actually I called Sex Crimes. I did call Sex Crimes.
Q. Okay.
A. Yes.
Q. All right. And then did you discuss what you had heard with the Sex Crimes officer, if you recall?
A. I didn't -- I didn't discuss it. I just said, "I think he just confessed to me." So I said, "You guys need to hurry up and come and talk to him cause he's talking." That's what I kind of said.
Q. All right. And as far as you know, did anybody from Sex Crimes -- if you know, did anybody from Sex Crimes come that night?
A. Yes, two officers came that night.
Q. Okay. All right.
MR. ELIZONDO: Thank you. I have no further questions, judge.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**
Q. Good morning, officer.
A. Good morning.
Q. That's -- I'm sorry. Is that Officer Bell?
A. Bell is my maiden name.
Q. So it's now Watts?
A. Yes.

Q. Do you prefer to be called Officer Watts?
A. Yes, you can.
Q. Thank you. Officer Watts, the -- you've told us that as of January 13th you knew that there had been a somewhat publicized rape which had occurred January 1st in Detroit, am I right?
A. No, that's not what I said.
Q. All right.
A. I said I didn't know.
Q. Didn't -- never heard of it?
A. No.
Q. Didn't hear it on the news?
A. No. I don't watch the news.
Q. Okay. But you didn't hear about it in the precinct, you didn't hear about it from any police officers?
A. No.
Q. And when Officer Jaber brought this person in, you didn't know anything about the case whatsoever?
A. No.
Q. Did Officer Jaber tell you when he brought this young man Mr. McKnight in that Mr. McKnight is supposedly made a confession to him?
A. No.
Q. To Officer Jaber?
A. No.

Q. What, if anything, did Officer Jaber tell you when he turned this man over to you?
A. I had no conversation with Officer Jaber.
Q. So Officer Jaber, for example, didn't say, you know, on the car on the way over here this man was saying that he was involved with this woman, had sex with this woman?
A. No. He was in a separate processing area altogether.
Q. So Mr. McKnight sits down with you.
How far away from you physically was a camera that could take a video of Mr. McKnight?
A. If I'm in this room, you would have to walk out of the room, maybe take three steps and then you're right there with the camera with audio.
Q. So you're about ten feet away from an audio camera?
A. Yes.
Q. And how far away were you from any kind of a device whatsoever that you can take like just audio, not video, like a tape recorder?
A. Maybe near the 10 feet.
Q. Another 10 feet?
A. Because where the audio is is also audio and video, I mean audio and sound.
Q. So you're within 20 feet both audio and video recording equipment?
A. No, they're in the same location. So 10 feet from both.

Q. Ten feet away from both?
A. Yes.
Q. Did it ever occur to you to attempt to take a video of Mr. McKnight making these surprising statements?
A. No.
Q. To take a tape recorder and tape him making this surprising statements?
A. No, because I'm not interviewing him. I'm just in-taking him.
Q. Well you were certainly asking him questions.
A. No. I said, "Uh-huh. Go ahead." That's not questions.
Q. Sure, talk to me, right?
A. Yeah, talk to me. Tell me what's going on.
Q. Because it's pretty important, isn't it?
A. That's not in interview standards, though. That's more of a, hey, you said what.
Q. Did you consider what Mr. McKnight was saying to you to be important?
A. Yes.
Q. He was telling you about having sex with a woman and you knew he was being arrested for raping that woman?
A. Yes.
Q. Well why did you not at the very start call for somebody to record that?
A. That's not my job.

Q. Not your job description; is that it?
A. That's correct.
Q. Okay. Why didn't you ask Mr. McKnight if he'd write down some of this stuff?
A. Because I'm not interviewing him. He's freely talking to me.
Q. Is that also not part of your job description?
A. What is not part of my job?
Q. Hand him a piece of paper and say Mr. McKnight write this down, this is important.
A. No.
Q. No?
A. No.
Q. Why not?
A. Because he is freely talking and I'm not gonna stop him.
Q. You don't want to interrupt him with something as trivial as writing down what he's saying?
A. Correct.
Q. Okay. Did you ever think of you writing down what he's saying and handing it to him and say Mr. McKnight why don't memorialize, why don't you put your signature on some of this stuff?
A. No, because that makes it a interview.
Q. Okay. So we don't have any record whatsoever of what happened between you and Mr. McKnight on January the 13th

except your memory?
A. Yes.
Q. You didn't stop him at any time, did you?
A. No.
Q. You didn't say, you know, maybe you shouldn't be blurting this all out to me?
A. No.
Q. You got as much information as you could, right?
A. As much as he was willing to tell me.
Q. And then you decided to call Sex Crimes?
A. Yes.
Q. So you have nothing on paper except your own report as to what happened between you and Mr. McKnight on January the 13th?
A. That's correct.
MR. HOWARTH: I don't have anything else.
THE COURT: Any redirect?
MR. ELIZONDO: Just a couple questions, judge.

**REDIRECT EXAMINATION**

**BY MR. ELIZONDO:**
Q. First of all, counsel asked you or said something to the effect you knew he was being arrested for sexual assault.
Did you know why he had been arrested?
A. Yes. After I read the intake form, it does have the charge on there.

Q. Okay. All right. And as far as the duties or the taking of statements and memorializing, is that part of your job?
A. No.
Q. Is that why you called Sex Crimes?
A. Yes.
MR. ELIZONDO: Thank you. No further questions.

**RECROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Would you agree with me, officer, that the most accurate way of determining for months and months later what Mr. McKnight said would have been to record it?
A. That's why I did a PCR.
Q. No, no, to record him saying it.
A. No.
Q. You don't think that's more accurate than your memory?
A. We don't have physical tape recording devices.
Q. You said they were 10 feet away?
A. They're in the ceiling, sir. I don't have a way of getting a tape recorder and sitting him down and saying okay now keep talking, click, let's press play.
Q. Can't move him 10 feet to do that?
A. No.
MR. HOWARTH: Nothing else.
THE COURT: Any questions from the jurors?
THE JURORS: (No response.)

THE COURT: Okay. You can step down, ma'am.

(The witness was excused at 9:56 A.M.)

THE COURT: Call your -- actually, we are going to take a short recess.

Ladies and gentlemen, we are going to take a short recess. However, you can't discuss the case.

(The jury was excused to the jury room at 9:55 A.M.)

THE COURT: We're back on the record. We're back on the record.

Although I stopped Mr. Howarth, I'm sure he -- I just want to give you a opportunity if you want to make a motion on the foundational information.

MR. HOWARTH: Yes, I do, Your Honor. Thank you.

THE COURT: And the Court will start with if that was a concern, of course certainly of those statements, there is a way that we -- a motion that could be brought to, you know, exclude the statements if you didn't think -- you thought that that was a interrogation.

That motion was not brought. So to a certain extent, I don't know that it was waived but I think you should start with -- to me that is that was a missed -- I think a missed opportunity on the defense's part if they didn't bring a motion. But you said a foundation should have been made and you wanted to give you a opportunity while

it's still fresh in your memory to clarify that motion.

MR. HOWARTH: Well, Your Honor, we had a hearing, I think it was on my motion that to suppress statements that were made by the defendant because of concerns over his not getting Miranda rights while in custody. I brought that motion. We had a hearing in this court.

THE COURT: I don't recall this being --

MR. HOWARTH: They didn't call her, Your Honor.

THE COURT: You could have called. I mean it's your motion.

MR. HOWARTH: Well, Your Honor, I didn't --

THE COURT: You knew the statements were there.

MR. HOWARTH: I did not know that she had encouraged him to make statements.

And we had -- and we have had testimony from Mr. Jaber and we had testimony -- or Officer Jaber. And we had testimony from Officer Ortiz and apparently they said they didn't ask any questions whatsoever. And this Court ruled that there was foundation under Miranda was notice nevertheless.

Now I hear that this witness, in fact, took statements which were not entirely voluntary because she did say to him -- and she didn't testify but she said to him on this record that I said to him, yeah, go on with

it, tell me about it. And I think at that point that I was hearing for the first time that she was, you know, actively encouraging him to give information which I consider to be questioning. And I made the objection when I had the opportunity.

And I mean the Court did the right thing. You understood that I was making a foundational objection and you have given me the chance to make my objection to it. And my position right now is I'd ask that her testimony after the point where she says I told him well come on, talk to me about what happened, start at the beginning, tell me what happened, that --

THE COURT: She didn't say start at the beginning. She didn't say start at the beginning. She just said go ahead.

MR. HOWARTH: I think she said start at the beginning but that --

THE COURT: I didn't hear start at the beginning. All I heard was go ahead. But I'll hear -- let me hear from the People.

Your response.

MR. HOWARTH: I'm asking that that be stricken.

THE COURT: Okay.

MR. ELIZONDO: Yeah, first -- and I agree that-- well, first of all, if we're even going to deal with

Walker hearing issues, there has to be a concession that, in fact, the defendant made that statement. The defendant's consistently denied that he -- and I read the transcript from the Walker Hearing, consistently denied he made any statement at all. Thought if it becomes -- that becomes a question for the jury, and this Court's already made a -- in addition to the fact of that, the Court did hold a hearing and considered the voluntariness, et cetera, and you made your rulings.

Secondly, counsel in the course of discovery and that's -- and I thought it was interesting cause he said start at the beginning because that's what's quoted in her PCR that was given to counsel at the beginning of this.

So to say we didn't have any notice or this was suppressed -- that's totally disingenuous because that is right in the preliminary complaint report that was given to defense months and months and months ago with the basic discovery package.

Secondly, what I heard here was not questions. What I heard was the defendant began to speak on his own, continued to speak on his own. Yes, the officer did nothing to discourage it and the -- you know, kind of go on or whatever. I don't remember the exact word that she used, but that's not a question. That is simply a response to the defendant's own initiation of that

conversation. And his own statements that he's making at least at that point certainly did not seem under the influence of the police at that point. Those were his own free and voluntary words and the officer just essentially nodded and did nothing to encourage him to stop.

So I don't believe, first of all, unless he's gonna say yes he made those statements, it even rises to a level of Miranda. Second of all, that information was there prior to this trial from the very beginning of this case. Second, to put everybody on notice about those statements. And, lastly I, don't believe it was interrogation. I believe those were free and voluntary statements made by the defendant on his own because of his need at that point to try and figure out in his own head why he was under their custody. And I ask you to deny that motion, Your Honor.

MR. HOWARTH: Your Honor, it's interesting to note that the prosecution on one hand says there was no questioning, and on the other hand they said you should have known there was questioning because it's in the police report. I mean they can't have it both ways.

Secondly, it's not necessary for Mr. McKnight to deny that he made these statements, especially if he's not testifying. Now at a previous hearing he may have said he didn't make a statement to Officer Jaber, and he may have

made a statement -- said he didn't make a statement to Officer Ortiz. That's why I haven't objected to those.

He has never said he didn't make this statement and he's not going to testify in this case. He does not have to say I didn't make the statement. The question is when the officer first heard him saying something, if she asked any questions at all before she asked any single question, since I think everybody would concede that he was in custody, he was not free to leave, that she had to give him Miranda rights and she didn't.

And because of that, whether I bring it up at, you know, the first hour or the 11th hour, it still has to be suppressed and she should not have been allowed to have continued with her testimony.

THE COURT: Well the Court's gonna deny the defense motion for the follows reasons: I mean I do think that there is a notice problem. I'm not a hundred percent sure on that whether that could be brought up at the 11th hour, but I mean that's what I'm initially relying on. However, I don't think it was interrogation. I think that, assuming these statements were made by the defendant, it appears to me it was not interrogation. It appears to me to be more just -- I mean she could have done the same thing with her facial expression. I don't think that she was asking or interrogating or asking

questions when she indicated go on. That's the Court's ruling.

Are we ready to go on? We can bring the jury back out.

(The jury entered the courtroom at 10:05 A.M.)

THE CLERK: What's your name, sir?

THE WITNESS: Ortiz.

THE CLERK: You do solemnly swear or affirm that the testimony you're about to give the Court will be the whole truth?

THE WITNESS: Yes.

THE COURT: People are calling who?

THE WITNESS: Jose. Sergeant Ortiz, Jose Ortiz, J-o-s-e O-r-t-i-z.

**JOSE ORTIZ,**

having been first duly sworn by the Clerk of the Court at about 10:05 A.M., was examined and testified upon his oath, as follows:

MR. ELIZONDO: Could I have one second, judge?

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Good afternoon or good morning.

A. Good morning.

Q. Can you tell the jurors your name?

A. Jose Ortiz, sergeant with the Detroit Police Department.

Q. And, sir, I'm gonna ask you were you employed by Detroit Police back on January 10th of 2013?
A. Yes.
Q. And what was your duty assignment at that point?
A. I was assigned to the Sex Crime Unit.
Q. Okay. Now did you come to or does there come a point where you come into contact with an individual by the name of Howard McKnight?
A. Yes.
Q. Okay. Was that on January 10th of 2013?
A. Yes, it was.
Q. Okay. And the person that you came into contact with, is that person in court right now?
A. Yes, he is.
Q. Would you just point out to where he is at, tell us what he has on?
A. Sitting right here; white shirt, black pants.

MR. ELIZONDO: May the record reflect the witness is pointing to and identifying the defendant?

THE COURT: So reflected.

Q. (By Mr. Elizondo, continuing): Now approximately what time do you come into contact with Mr. McKnight, if you recall?
A. I was working the afternoon shift, so sometime in the evening. I'd have to look on the report to refresh my

recollection.
Q. Will that refresh your memory?
A. Yes.
Q. Okay. Does that refresh your memory as to what time you came into contact with him?
A. Yes.
Q. What time was it?
A. 8:45 P.M.
Q. Okay. Now what was it that brought you to come into contact with Mr. McKnight?
A. I was directed by Officer Kane to go and talk to Mr. McKnight.
Q. Okay. And were you directed to go talk to him about a specific incident?
A. Yes.
Q. And what was that?
A. An incident that occurred -- I can't remember if it was the 1st of the year or December 31st.
THE COURT: Okay. Can --
THE WITNESS: Involving --
THE COURT: Can counsel approach?
MR. ELIZONDO: Certainly.
(Discussion had at the bench between the Court and counsel.)
Q. (By Mr. Elizondo, continuing): All right. Now you said

that you were directed to go talk to Mr. McKnight; is that correct?
A. Yes.
Q. All right. Now at this point in time do you go or where did you go to meet him?
A. Southwestern District.
Q. Okay. Was that where he was being held at that point?
A. Yes.
Q. Okay. And do you, in fact, meet up with Mr. McKnight?
A. Yes, I do.
Q. Okay. Now when you do meet with Mr. McKnight --
MR. ELIZONDO: If I can have one second, judge. And I just need one more second.
Q. (By Mr. Elizondo, continuing): I'm sorry, sir.
Now when you meet with Mr. McKnight, do you have any kind of -- well strike that. What's the first thing you do when you meet him?
A. The first thing I did was I started filling out -- it's a sheet called the Interrogation Record where it's personal information from Mr. McKnight.
Q. All right. And did he give you the basic information?
A. Yes.
Q. Okay. Did he give you -- what type of information do you ask on that sheet?
A. Name, address, height and weight, ask him if he has any

tattoos, build. Just a physical characteristics.
Q. Okay. Did you ask him about an address?
A. Yes.
Q. Okay. Did he give you an address?
A. Yes.
Q. Do you recall what it was?
A. No. I'd have to look at the report.
Q. Will that refresh your memory to what it was?
A. Yes.
MR. HOWARTH: Well, Your Honor, I don't again think there is a foundation for this question about even what his address was.
There is no foundation.
THE COURT: I'm -- response, counsel?
MR. ELIZONDO: Well that's what perplexes me. If a person is asked his address and he gives a response, I would think he knows where he lives. I mean that's --
THE COURT: I'll allow it.
The Court -- the objection's overruled.
Q. (By Mr. Elizondo, continuing): What was the address?
A. 12040 Whithorn.
Q. And the location of the incident that you were investigating, do you know where that --
MR. HOWARTH: That's why I made the objection, Your Honor.

They're tying this question in with facts that have to do with this case. And there is no proper foundation for this officer to be answering those questions.

THE COURT: Well if he knows the answer to that-- the Court's willing to allow it.

MR. ELIZONDO: Thank you.

Q. (By Mr. Elizondo, continuing): Do you know where -- the location of the crime that you were investigating, do you know where it occurred?

A. I know Minden was one of the streets. I can't recall the side street.

Q. I'm sorry. What was that?

A. Minden, M-i-n-d-e-n.

Q. Okay. And you don't recall the other --

A. -- side street, no.

Q. Now did you begin to talk to -- oh, strike that.

What's the next thing you did?

A. As I'm asking him the questions on the interrogation record, he was voluntarily speaking.

Q. Okay. What do you mean he was voluntary speaking?

A. He was -- he kept talking about he knew -- he kept saying he knew why he was here.

Q. Okay. And did you respond to the question as to why he was here in any way?

A. No. I just kept writing.
Q. Okay. What did he say or did he say anything after that?
A. He said he was here because of the old lady.
Q. Okay. Did he say anything else?
A. And that he had sex with her and it was a deal for money. He was claiming she was a prostitute.
Q. Okay. And all this was done while you were doing the processing form?
A. Yes.
Q. Okay. While you were doing that processing form, did he say anything else?
A. I have to refer to my report.
Q. Okay. If that will refresh your memory.
A. Yes. Okay.
Q. All right. Does that refresh your recollection as to whether he said anything else?
A. Yes.
Q. Did he say anything else?
A. Yes. He said he saw two guys helping the elderly couple which the car was stuck in the snow. And then he mentioned that he had sex with a prostitute in the same area.
Q. Okay. All right. Does he make any other spontaneous statements to you at that point?
A. No. At that point I start --

Q. Okay. My question is this. Did he make any other spontaneous statements to you at that point?

A. No.

Q. All right. Now -- strike that.

MR. ELIZONDO: I'm done. Thank you, judge.

THE COURT: Okay. I think, ladies and gentlemen, we are going to excuse the jurors for -- I'm sorry. We need to go off the record for a moment.

Remember you can't discuss the case. It will be a short recess.

(The jury was excused to the jury room at 11:15 P.M.)

THE COURT: Mr. Howarth, I have been thinking about that question about opening up the door. And I do think there are certain questions you could ask that could open up the door to have this officer comment on his refusal to make a statement. Like, for example, if you were to say well why didn't you write it -- have him sign it or write it down, what would you expect his answer to be?

MR. HOWARTH: Your Honor, I don't think he has an answer. If he's going to -- if he's gonna give a nonresponsive answer that --

THE COURT: No, I'm saying he's gonna say well I attempted to do so, before I could do that I had to read

him his rights and at that point he refused.

Now do you want him to say that?

MR. HOWARTH: First of all, Your Honor, let's back up.

THE COURT: Okay.

MR. HOWARTH: Mr. McKnight is in custody. Everybody agrees to that.

THE COURT: Correct.

MR. HOWARTH: He's -- at the point that this officer takes the information that he's given us so far, he was not given his Miranda rights. I think we can all agree on that.

THE COURT: Correct.

MR. HOWARTH: He is asked where his address is. Now normally that's an innocuous question, but when his address puts him within a block or so of the scene of the crime that question is no longer innocuous.

Now it may have been an innocent question, but you can't repeat that incriminating statement of I live right where the crime was happening if you don't have Miranda rights. You're -- asking what your name is can be --

THE COURT: We'll put that aside for a moment. That cat is already out of the bag. We'll deal with that.

I think if it gets to that point, another court

will have to deal with that. I mean I don't know if I can put without -- well maybe we can go over the jury instruction that deals with that, but we'll deal with that later.

Let's deal with the real hot issue. And the issue is you said -- I'm asking you if you ask him the question did you write this down, did you memorialize it in some way, why -- the question, I mean, is why didn't you. And what should his answer be is what I'm asking you?

MR. HOWARTH: I can't -- I can't guess what his answer is, may be, will be. I have no idea.

THE COURT: So did you plan on asking him that question?

MR. HOWARTH: I plan on asking him why he didn't memorialize this, yes.

THE COURT: Well then I think you open up the door.

MR. HOWARTH: Well I disagree with the Court.

THE COURT: Well give me some law, case law, that says that asking a officer who is attempting to take a statement, a voluntary statement upon being asked on cross-examination did you attempt to memorialize it or why didn't you put it down. He basically -- he would have to lie to answer that question. He could say I did attempt

to do so but he refused. I mean that's the only answer he could give.

MR. HOWARTH: I'm going to ask him why he didn't video tape that, why he didn't audio tape that, why he didn't ask Mr. McKnight to sign a statement indicating that all of the things which he says he voluntarily blurted out and that's where I'm stopping.

THE COURT: Well and I think he has a right to say well I -- I read him -- before I could ask those questions -- to me it's one thing to voluntarily state -- before he can ask those questions he has to read him his rights.

MR. HOWARTH: But he's already got the information. I'm saying when you have that information that he says he has --

THE COURT: I think you want to have your cake and eat it, too. Yeah, he has information. But to get the information in the form that you want it in, for him to verify it either by his signature or video tape and all this, he has to ask do you wish to make a statement before that it was totally voluntary.

MR. HOWARTH: No, Your Honor.

Prosecution got their cake and wants to eat it, too. They have these statements and I'm going to be hamstrung on the fact that I can't ask him how come you

did not memorialize those statements.

They never should have called this witness. They never should have brought that out. They never should have put me in a position where I can't cross-examine.

THE COURT: So you're telling me in every case where a defendant speaks voluntarily, and then refuses later on to submit to Miranda, that in each of those cases the prosecution can't call that witness because the defense is hamstrung?

MR. HOWARTH: No. This is -- this is -- this is a very unusual case.

THE COURT: I'll give you that, yeah.

MR. HOWARTH: Yeah. And I only want to ask him about the supposed volunteered statements, all right.

And it's very surgical. I can stop right there. You have these supposed volunteered statements.

THE COURT: I think you can ask him you didn't video tape this, did you.

MR. HOWARTH: Right.

THE COURT: You didn't audio tape.

MR. HOWARTH: Right.

THE COURT: But you can't say why didn't you because at that point I think the response would be --

MR. HOWARTH: I'm not interested in why.

I want to ask him did you video tape it? Did you audio tape it? Did you give him a piece of paper and tell him to write it down and/or did you take it and write it down yourself and hand it to him? And he didn't do any of those things.

THE COURT: Well I think the first two you can ask. The last one I don't think you can.

MR. HOWARTH: Well I disagree, but I obviously am not going to be the one that's accused of creating a mistrial.

THE COURT: I guess I'll be that person.

So you want to ask him did you give -- I think you could ask him did he write it down.

MR. HOWARTH: Yeah.

THE COURT: Not did you -- I mean to me once you get him involved in it, I think --

MR. HOWARTH: I want to ask him did he video tape, did he audio tape, did he hand Mr. McKnight a piece of paper and say write down what you've told me. And, lastly, did you write down what Mr. McKnight volunteered to you and say do you want to sign this.

THE COURT: I don't think -- the last one definitely not.

MR. ELIZONDO: Well I don't think he could even ask the third one because the bottom line is he asserted

his right either to counsel or to not make a statement at that point. And that's why those papers aren't being shoved at him. He isn't hamstrung at that point to do anything once those rights have been asserted. And, in fact, they don't get asserted until after he reads them.

In fact, he does read him Miranda. He did read him Miranda. He did Mirandize him. And it's after the Miranda rights are read that he invokes his right not to make any statements.

So, again, you're hamstringing those last two questions I think would be -- he can ask them. I think you can let him ask them, but I think it does open the door to the officer explaining exactly what happened and why these things were not put in writing.

MR. HOWARTH: Your Honor, there is absolutely nothing that I see in this report that says that this officer read Miranda rights.

MR. ELIZONDO: Well, counsel, didn't we have a Walker Hearing?

THE COURT: I thought we did have a Walker Hearing.

MR. ELIZONDO: Didn't this officer testify -- I think counsel was here for that.

Didn't this officer testify that he did Miranda? I thought all that was admitted. I wasn't even here, but

I know that by reading the transcript. So I'll leave it up to you judge, but I think if he goes beyond those, at least the four questions he's proposed to you, I think it does open the door.

THE COURT: Well I'll err on the side of caution. And, counselor, just the first two questions you can make your motion for -- well you will have -- I don't know if it's a motion for mistrial as much as it is a error.

Mr. Howarth, do you agree with my assessment there?

MR. HOWARTH: Well, Your Honor, I'm going to do what the Court has instructed me. I'm only going to ask the first two questions.

THE COURT: Okay. All right. Let's bring the jury back out.

MR. ELIZONDO: Well, judge, can we make -- you didn't tell him he couldn't ask those last two.

I want just want the record to be clearer. You didn't say you couldn't ask those last two questions. You just simply said that if he did it was opening the door.

I don't want this record to reflect that all of a sudden he wasn't able to ask those questions cause he is, at least my understanding from your ruling, but that it does open the door.

THE COURT: The prosecutor is correct.

MR. HOWARTH: If I want to turn in my bar card, I'll ask the third question. Because that will open it up to say that he heard Miranda rights and refused to make a statement, which I think is an incorrect ruling.

So I'm going to abide by what the Court has said as opposed to creating a Sixth Amendment problem.

THE COURT: It will be a interesting law school question. Cause I can't recall ever seeing -- I have never had this particular issue before. And I'm sure if one of the two of you had it, you would certainly let me know what the ruling was on it. But so it will be, I guess, a case of first impression of the appellate court if it gets to that.

Bring the jury out.

(The jury entered the courtroom at 10:25 A.M.)

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Good morning, Officer Ortiz.

A. Good morning.

Q. Officer Ortiz, the events that happened on January 10th of this year between you and Mr. McKnight happened, you said, at the Southwest District Detroit Police Department?

A. Yes.

Q. Where is that located?

A. Schaefer and Grand River.
Q. At one time that was the Sixth Precinct?
A. At one time, and now it's the Second Precinct.
Q. It went from six to two and --
A. Yes.
Q. Then when the precinct got dropped, they called it Southwest, right?
A. Yes. Right.
Q. You were on duty at 8:45 when you came into contact with Mr. McKnight?
A. Yes, I was.
Q. And you were sent by Officer Kane to talk to Mr. McKnight?
A. Yes, I was.
Q. And that's the gentleman Officer Kane is the -- Detective Kane is the man sitting on the back bench here?
A. Yes, he is.
Q. Okay. And when you went to talk to Mr. McKnight, were you aware of whether or not the Southwest Division had video recording devices?
A. I remember when Homicide was housed there they had some video rooms upstairs, but my understanding was they were not operational.
Q. I'm talking about January 10th of this year.
To your knowledge, did the Southwest District over there on -- it's on Schaefer, right?

A. Yes.
Q. That police building, as far as your knowledge, did or did not have video taping devices?
A. Not to my knowledge.
Q. Not to your knowledge.
What about audio taping devices?
A. No.
Q. So if I had asked you why didn't you video tape this conversation that you had with Mr. McKnight, I guess your answer has to be cause there were no video tape machines?
A. That's correct.
Q. And if I'd ask you how come you didn't video tape Mr. McKnight, your answer would have to be because there is no audio tape machine?
A. That's correct.
Q. And that is right. That's why you didn't video tape it?
A. Right.
Q. Right?
A. Yes, sir.
Q. Cause it was pretty damaging stuff, wasn't it? I mean for Mr. McKnight that's pretty damaging if he's being charged with rape and robbery and that, right?
A. Yes.
Q. So if that equipment had been available, as a good police officer you'd have tried to video tape it, right?

A. Yes.
Q. Or audio tape it?
A. Yes.
Q. Did you ask anybody if that equipment was in the building?
A. No, I did not.
Q. When Mr. McKnight made these statements to you, was anybody else within earshot?
A. There was a partner, my partner was there.
Q. Who was that?
A. Laura Manzella.
Q. Did Laura Manzella -- as far as you could tell from where Officer Manzella was, was she close enough to hear Mr. McKnight making these statements?
A. She was in the same room.
Q. So she could have heard it?
A. Yes.
Q. Did you alert Officer Manzella to this guy's giving us some dynamite stuff here?
A. No.
Q. Okay. Did you call anybody to come over and listen to this?
A. No.
Q. So as far as you knew, you were the only one who was listening to this, as far as you know?
A. Well Officer Manzella was sitting right next to me.

MR. HOWARTH: I don't have anything else.

THE COURT: Redirect, counsel?

MR. ELIZONDO: No, nothing. Thank you, judge.

THE COURT: Anything from the jurors?

THE JURORS: (No response.)

THE COURT: You can step down, sir.

THE WITNESS: Thank you.

(The witness was excused at 10:30 A.M.)

THE COURT: People's next witness is?

MR. ELIZONDO: I just want to double check. Officer Manson.

THE CLERK: State your name for the court reporter, please.

THE WITNESS: Jeffery Manson.

THE CLERK: M-a-s-o-n?

THE WITNESS: M-a-n-s-o-n.

THE CLERK: You solemnly swear or affirm that the testimony you're about to give before the Court will be the whole truth?

THE WITNESS: Yes.

THE CLERK: Thank you. You may be seated, sir.

THE WITNESS: J-e-f-f-e-r-y.

**JEFFERY MANSON,**

having been first duly sworn by the Clerk of the Court at about 10:31 A.M., was examined and testified upon his oath, as follows:

**DIRECT EXAMINATION**

**BY MR. ELIZONDO:**

Q. Good morning, sir.

A. Good morning.

Q. Will you tell the jurors your name and occupation?

A. My name is Jeffery Manson. I'm a police officer for the City of Detroit for 18 years.

Q. Okay. And, sir, were you --

MR. ELIZONDO: Just one second, judge.

Q. (By Mr. Elizondo, continuing): Were you on duty back on January 11th of 2013?

A. Yes.

Q. Okay. And, sir, what -- and on that particular day, did you have contact with any individual that's in court today?

A. The individual that's sitting in front of me, yes.

Q. Okay. Can you just point out the person you're referring to?

A. The gentleman wearing the white shirt, black pants and black tie with the braids in his hair.

Q. Okay. Thank you.

MR. ELIZONDO: Your Honor, may the record reflect the witness is identifying the defendant in this the matter?

THE WITNESS: So reflected.

Q. (By Mr. Elizondo, continuing): Now what was it that brought you into contact with Mr. McKnight here?

A. He was being conveyed. Myself and Officer Gilbert conveyed him from the Second Precinct down to the Wayne County Jail.

Q. And what was the purpose of that?

A. For a live lineup.

Q. Okay. And was it involved in the case that we're here today on?

A. Yes.

Q. Okay. And when you conveyed Mr. McKnight, anything unusual occur during the conveyance?

A. On the way --

Q. To the lineup?

A. On the way to the lineup, no, sir.

Q. Okay. Now did you have any conversation with Mr. McKnight on the way there?

A. On the way down there?

Q. Correct.

A. That I can recall, nothing on the way down there.

Q. Okay. Did you in any way let him know why he was going?

A. Oh, yes. We let him know that he was going down there for a lineup, yes.
Q. Okay. And did he know for what incident or was it -- did you just tell him he was going down for a lineup?
A. If I'm not mistaken, I think it was -- we explained to him why he was being taken down there for the live lineup; exactly why he was being taken to the Wayne County Jail for the lineup, yes.
Q. Okay. Now and that was because of this -- the situation in this case, correct?
A. Yes.
Q. Okay.
A. Yes.
Q. Now when he got down to the jail, or to -- for the lineup, tell the jurors how is the lineup set up? What did you do?
A. Okay. The lineup is set up where he is actually put in the clothing, jumpsuit which matches everyone that's in the Wayne County Jail. So everyone has the same type of clothing on.
The young man is allowed to -- when he's in the room, he is allowed to go stand anywhere in the line where he wants to.
Q. Okay. Now you said "the young man." Are you referring to the --

A. The defendant, yes.
Q. Okay.
A. He's allowed to -- he is given the opportunity to stand anywhere from one to six. He chose where he wanted to go.
And then after he's in the lineup, the attorney is also -- the showup attorney's also there to make sure there is, you know, there is no problems. And after he is set in his place where he is in the lineup, then we bring in the -- we brought in the first complainant.
Q. Okay. And the first person that you brought in was a male or female?
A. It was a female.
Q. Okay. Now were you in there when he was brought in?
A. Yes.
Q. Okay. And what happened after she was brought in?
A. When she walked in, she walked in and it's a pretty, you know, nice size room. She walked in and then she looked at everyone and then she stepped back. It may have taken all of maybe like not even a minute and she called out the number that he was -- I think it was number five. But she called out his number and stepped out of the room.
Q. Okay. Called out whose number?
A. The defendant's number.
Q. Okay. And when the number's called out, is there some sort of record that's kept as to who they picked?

A. Yes. We actually -- on the sheet it's a form that we have where we have a listing of every one that's standing in the lineup. And then after she stepped out of the room, I asked her -- cause we actually have them sign the form, too, for the exact number, the person that they chose and state -- usually we have them state, you know, what it is that this person, the reason why you picked this person out or what it is this person did.
Q. Okay. Now let me hand you what's been admitted as People's 2, ask you to look at that.
Do you recognize what that is?
A. Yes, sir.
Q. And what is that?
A. This is the Showup Identification -- Showup Identification Record Form.
Q. Okay. And specifically for who?
A. It's for the lineup for Ms. Lucille James.
Q. All right. And Mr. McKnight was in this lineup?
A. Yes, sir.
Q. And what number was Mr. McKnight?
A. Mr. McKnight was number four.
Q. And did Ms. James indicate on the form who she picked?
A. Yes. She put her initials by number four, yes.
Q. And there is some other writing on there, correct, about body shape or something to that nature?

A. Yes.
Q. Was that Ms. McNichols -- I'm sorry, Ms. James' words?
A. Yes. She actually wrote those words down and signed it herself.
Q. Okay. Now there is a second lineup?
A. Well there is a second complainant that comes in for the lineup, yes.
Q. And were you present for that one?
A. Yes.
Q. Okay. And was that Mr. Stone, James Stone?
A. Yes.
Q. Okay. Now your recollection on that; Ms. James, was she-- did she continue to stay in the room?
A. No, she -- we had her step out of the room.
Q. Do you recall who brought Mr. Stone into the lineup then?
A. If I'm not -- I'm not sure who brought him in. Because she -- I'm not sure who brought Mr. James in.
Q. Okay. Did you -- now did you -- were you in the room when he was brought in, though?
A. Yes.
Q. Okay.
A. Yes.
Q. And did you notice Mr. Stone's demeanor when he came in?
A. Yeah, he was -- he was -- he walked in pretty fast and pointed him out and stepped right back out. He was pretty

fast when he did it.
Q. Okay. And was the sheet also put together for that?
A. Well I tried to get him to -- he was really upset, so I tried to get him --
Q. Who was really upset?
A. Mr. James. I tried to get him to -- because, you know, afterwards we have them -- I asked him the same question as, you know, to the person that you identified. I wanted him to give a description as to where he know him from.
He was so upset that he really couldn't -- I really couldn't get the information out of him. He was upset and he started crying. And I didn't really want to like go into the situation, so I'm not even sure if I was able to finish writing the statement down for Mr. James.
Q. Okay. Well I'm gonna hand you what's been marked as People's Proposed 26, ask you to look at that and see if you can tell us what that is.
Okay. What is that, sir?
A. Yes, this is the photo lineup record --
Q. Okay.
A. -- sheet for Mr. James Stone.
Q. All right. And did Mr. Stone -- is there a mark there as to who Mr. Stone identified?
A. Yes, it's a -- his initials is next to Mr. McKnight's name.

Q. And you indicate that was a pretty quick ID?
A. Yeah, it was -- it was real quick really.
Q. Now after the lineup's over, do you have any contact with Mr. McKnight at that point?
A. Yes, myself and Officer Gilbert we transported him -- after he was put back in his clothing that he had on prior to coming down there, we transported him back to the Second Precinct.
Q. Okay. Prior to him leaving, do you know whether he was informed of whether or not he had been picked out of that lineup?
A. He wasn't -- I don't think he was informed prior to leaving out of the facility, no.
Q. Okay. Now as you're -- did you transport him back?
A. Yes.
Q. Anything unusual occur while you were transporting him back?
A. Yes. He asked if he was picked out of the lineup and I informed him that he was picked out of the lineup.
Q. Okay.
A. This was shortly after we left out of the parking garage where Wayne County Jail is.
Q. Okay. Now let me just stop you a second.
How did that discussion come? Did he ask you? Did you just tell him?

A. Yes. Yes, he asked if he was picked out of the lineup.
Q. And you indicated to him --
A. Yes, that he was.
Q. All right. Did his demeanor change at that point?
A. Before the way I was driving to get back to the Second Precinct, I got on -- I was getting on 75 coming from downtown. I was getting on 75.
I noticed Mr. McKnight, he was in the back seat handcuffed with the handcuffs behind him. He started moving while he was in the back seat. He started moving almost pulling the handcuffs under his legs. I had to actually stop the car on the expressway near the -- I know we were near -- on 75 near where Cass High School is. I had to stop the vehicle and my partner Officer Gilbert had to get out of the vehicle and get in the back seat with Mr. McKnight to prevent anything from happening.
Q. Okay. All right. Did anything else happen at that -- after that point?
A. Well when he got back to the -- well when we got back to the precinct, it was a problem with Mr. McKnight getting out of the vehicle because he had pulled his cuffs down so low that he couldn't get out of the vehicle. So I had to assist him coming out of the vehicle.
Q. Okay. All right.
MR. ELIZONDO: Thank you. No further questions.

**CROSS-EXAMINATION**

**BY MR. HOWARD:**

Q. Officer Manson?

A. Yes, sir.

Q. Police officer 18 years?

A. Yes.

Q. You know the importance of memorializing things that police officers do that are important in their line of duty, do you not?

A. Yes.

Q. Did you make a report of the events of January the 11th of this year?

A. If I'm not mistaken, it's probably documented in the report. I mean it should be a report on that information.

Q. Did you make one?

A. If I'm not mistaken, it should be a report in there in the file.

Q. Did you make a report?

A. That's what I'm saying. I'm pretty sure that I made a report on it. It was a form that had to be filled out, yes.

Q. Well you're familiar with what we call CRISNT reports, right?

A. Yes, exactly.

Q. That's a computer form, isn't it?

A. Yes.
Q. And usually there is like a template that's already made up, though, the case is all in there; you don't have to type all that stuff in the way cops used to, right?
A. In most cases, yes.
Q. And did you make a CRISNT report?
A. I'm not exactly for sure. Well make a report on what exactly?
Q. About the incident with Mr. McKnight and his what sounds like an attempt to escape?
A. Where he actually -- where he was moving his handcuff behind him?
Q. Yeah.
A. I'm not exactly sure if I made a CRISNT report because it actually didn't occur. But it was for me and my partner's safety that I actually pulled over on the expressway.
Q. I am stand -- I'm not asking you about that.
A. So I'm not exactly sure if I made a CRISNT report because it actually didn't happen.
Q. Okay. To this date -- from January 10th to this date, have you seen a CRISNT report about this incident?
A. It's not my case, so I haven't looked in the file to see if there is a CRISNT report done on that, no.
Q. The answer is just simply, no, I haven't, right?
A. If I seen a report on it? No, I sure haven't.

Q. Okay. Let's go back to this incident with Mr. Stone going into the lineup.
Mr. Stone and the identification he made kind of stands out in your mind to this day, do they not?
A. Yes.
Q. I mean that's not the first time you had let somebody go in a lineup room, am I right?
A. No, it's not.
Q. Okay. And is it a fair statement that most cases people go in, take a look at everybody, you know, go down, look at all the faces, right?
A. Yes.
Q. And sometimes they go back and take even a second look, right?
A. Yes.
Q. Or step back a little or step up a little, am I right?
A. Yes.
Q. Mr. Stone lickety-split walked in the room, that's the man, walked out, right?
A. Walked in, took a couple seconds and turned around and came back out and say that's him, yes.
Q. Just like he saw something astounding, right?
A. Like he saw somebody he knew.
Q. Thanks.
You didn't make a report on that either, though,

did you?

A. We don't do reports on that, no.

MR. HOWARTH: I don't have anything else.

THE COURT: Redirect?

MR. ELIZONDO: No. Thank you, judge.

THE COURT: Questions from the jurors?

Sir, you can step down.

THE WITNESS: Thank you.

(The witness was excused at 10:44 A.M.)

MR. ELIZONDO: Mr. James is going to -- or Mr. Stone is going to be our next witness, judge.

THE COURT: Why don't we take our morning recess.

Ladies and gentlemen, we are going to take a 15-minute break. Caution you not to discuss the case. We will be back with you shortly. Thank you very much.

(The jury was excused to the jury room at 10:45 A.M.)

MR. ELIZONDO: And that will be our last witness.

THE COURT: Okay. Is the defense planning on calling any witnesses?

MR. HOWARTH: No, Your Honor.

THE COURT: So jury instructions.

(Off the record.)

THE CLERK: Recalling Case Number 13-0000628; the State of Michigan versus Howard McKnight before the Court today for a jury trial in progress.

MR. ELIZONDO: Ralph Elizondo, assistant prosecutor.

MS. CEZIL: Good morning again, Your Honor. Veneshia Cezil on behalf of the People.

MR. JONES: Good morning, Your Honor. I believe Mr. Howarth has stepped out.

Paul R. Jones appearing on behalf of Mr. McKnight, co-counsel. I will --

THE COURT: Thank you, counsel.

Mr. Howarth, want to put your appearance on the record?

MR. HOWARTH: Good morning, Your Honor.

James Howarth appearing as co-counsel for Mr. McKnight.

THE COURT: Okay. Bring out the jury.

(The jury entered the courtroom at 11:31 A.M.)

THE COURT: People call their next witness.

MR. ELIZONDO: Yes, sir.

MS. CEZIL: People call Mr. James Stone.

THE CLERK: Hi. Mr. Stone, right there for me. One second.

Can you raise your right hand for me?

THE WITNESS: Yes.

THE CLERK: You solemnly swear or affirm that the testimony you will give before the Court will be the whole truth?

THE WITNESS: Yes, I do.

THE CLERK: Thank you. You may be seated.

THE COURT: Sir, if you can keep your voice up, okay.

THE WITNESS: Yes, sir.

THE COURT: All right. You may proceed.

MS. CEZIL: Thank you, Your Honor.

**JAMES STONE,**

having been first duly sworn by the Clerk of the Court at about 11:33 A.M., was examined and testified upon his oath, as follows:

**DIRECT EXAMINATION**

**BY MS. CEZIL:**

Q. Mr. Stone, if you could pull that microphone just a bit closer to you.

Good morning. Can you please introduce yourself to the Court?

A. My name is James Edward Stone.

Q. Mr. Stone, I'm gonna take you back to December 31st of 2012, the late evening hours of that day.

A. All right. Thank you.

Q. Do you recall that?
A. Yes, I do.
Q. Is there anything unusual that occurred on that day during the evening hours that brings you here to court today?
A. Yes, I do. I had a flat. I got off on at -- I can't call the name of the street, but I came off of Gratiot onto Wilford. I say I can't call the name of the street, but I know where it is very, very, very good. I had a flat.
Q. Okay. Are you familiar with the name of a street by the name of Whithorn?
A. Yes. Yes. Yes.
Q. Is that the street that you're referring to?
A. I went -- I went across Whithorn on to Dresden. I came to Dresden. I went across Whithorn and when I cross it I got out and stopped and got out to check my tire. My tire was flat.

Then I started trying to get my truck to move. I had got out and looked at it and I got back in my truck. I told my wife, I said, "I might can get out of here." And I kept rocking and kept rocking and kept steady going further to the curb. I got out again. I said, "I'm stuck."

I seen the young man coming down the street walking which I think it was Whithorn. He walked up. He walked up to me and he asked me, "Sir, can I help you?"

And I said, "I don't know." I say, "We can try it if I can get back on the streets." That's what we did.

Q. Okay. When you said -- you just said you seen him from Whithorn?

A. Yeah.

Q. Can you explain? Do you mean that you saw the young man walking from Whithorn?

A. Well I seen him coming up the street towards where I was.

Q. Okay.

A. I did not know that he was coming to where I was.

When I seen him come up to my truck, I actually thought that he was, you know, coming to give me some help cause he asked me, "Can I help you?"

Q. Okay. And you mentioned your wife earlier.

What is your wife's name?

A. My wife name Lucille James.

Q. Okay. Now when you say that that is your wife, are the two of you legally married, Mr. Stone?

A. No. We've been together -- 27th of November we have been together 42 years.

Q. Okay. Now you said that the young man walked up?

A. Yes.

Q. Do you recall that?

A. Yes.

Q. Tell us what's the next thing you remember happening as

the young man walks up?

A. Well after we discovered that we couldn't get it out, I was like -- I asked my wife, say call one of my sons. So she called -- I think she called them both, but I know she called Jesse and she say, "He on the phone."

Well I walked across the front of my truck and I-- she hand me the phone out the window. And I was like, "Jesse, I got a flat. Would you come to," you know, come to where I was. And then I started trying to give him the directions. Then the young man was like let me give it to him.

Q. Okay.

A. So I hand him the phone and he was telling him where, you know, direction to where we were.

Q. Okay.

A. Then I got the phone from him and I say, "Hello, hello." And I say how -- I say, "He ain't saying nothing," and hand the phone back through the window to her.

Then we walked back around the truck and we stood up there and we talked just -- it was New Year's Eve. We talked about New Year's Eve.

Q. Okay. What other types of things did you talk about?

A. Like I say, we talked about New Year's Eve.

Q. Do you remember any other details of that conversation?

A. Yes. He was like -- now at first we saw this truck

coming.

Q. Okay.

A. What we thought -- I thought it was a truck. He was like, "Oh, that's my friend. He can give you a push, man. He can give you a push. I can beck for him." So he becked for this truck to come but that truck come all the way almost to where we were, cause the Whithorn or whatever were right there, and he made that left turn onto Whithorn and, you know, like went away from us. And he was like, "All man. All man. He'll come back. He'll come back."

And went on from there to New Year's Eve. He looked at me. He say, "I got that thang, man." And I was like, "Man, you know it's New Year's Eve. You shouldn't be carrying that thing, loud gun, shooting going on everywhere." I say, "It's loud, man, you shouldn't be carrying no gun around here. Police see you, they check you, man, you going to jail for a long time. Man, I hear they give twix two to three years for that," you know, which I cursed. I say, "Shit."

Q. Okay.

A. And he is going, "No, I'm a good guy, sir. I'm a good guy."

Q. When you say, Mr. Stone, that he said to you I got that thing --

A. Yeah.

Q. Explain to the jury what you meant, what that meant to you.
A. Well in the 'hood or the ghetto, I call that a gun.
Q. Okay. Now you said that the young man first came up to your truck?
A. Yeah.
Q. Do you remember that?
A. Yes.
Q. Okay. When he first came up to the truck, how far were you away -- how far were the two of you away from one another?
A. We stood up side-to-side, face-to-face. We talked, like I say, about the New Year. And I even had went far as to telling him about I had been to the casino and yadda, yadda, yadda. Man, they tore my ass up, you know. Just casino stuff, you know, talk.
MS. CEZIL: May I approach the witness, Your Honor?
THE COURT: Yes, you may.
Q. (By Ms. Cezil, continuing): Mr. Stone, I'm gonna walk towards you and you tell me when to stop to show me the relationship of how close you and that young man were.
A. All right. We were closer than that. You can come on up. Cause we were like shoulder to shoulder for 10 to 15 minutes.

We stood out there and talked almost holding one another up cause it was so slick. It was so slick until, like I said, we was almost like that far one another. I'm talking eye-to-eye talking. And to me it wasn't about stuff, but it was just a nice young man.

And I talk -- they tell me that I talk a lots cause everybody's my friend.

Q. Okay. So just so we're clearer, I'm up on the first step of the witness seat and you're saying that this is how close you and the young man were talking?

A. Yes. Yes. Yes. We were close. I'm talking close.

MR. ELIZONDO: Just so the record is clear --

THE COURT: Closer than arm's length.

MR. ELIZONDO: Thank you.

Q. (By Ms. Cezil, continuing): Okay. Mr. Stone, you indicated that the two of you were talking for 10 to 15 minutes that close on that stand?

A. Yes. Yes.

Q. Do you see that individual in the courtroom today?

A. Yes, I do.

Q. If you can please indicate for us, tell the jury where that person is sitting and what they're wearing?

A. There he sitting right there (indicating).

Q. Okay. What is that individual wearing?

A. He wearing a white shirt and black pants.

MS. CEZIL: Your Honor, let the record reflect that this witness has identified the defendant Howard McKnight.

THE COURT: So reflected.

MS. CEZIL: Thank you.

Q. (By Ms. Cezil, continuing): So you've told us that you and the young man are face-to-face, eye-to-eye?

A. Yes.

Q. You're having conversations about New Year's and a gun?

A. Yes. Yes. Yes.

Q. Okay. What's the next thing you remember after that?

A. Well after we couldn't get out and couldn't get out, I guess we had talked enough. He left and he went back the way he came from.

Q. Okay. Is that back towards Whithorn?

A. Yes.

Q. Now you said that you and the young man were having conversation for 10 to 15 minutes; is that correct?

A. Right. Right.

Q. How was his demeanor during that conversation?

A. To me, it was a good young man that tried to help me.

Q. Okay.

A. That's the way I felt on that. I did not fear no harm from him.

Q. All right.

A. I mean he was a good guy.
Q. Okay.
A. I thought. I thought.
Q. All right. Now you say that the two -- you and the young man attempted to push your truck?
A. Yes. Yes.
Q. And that was because you had a flat tire?
A. Well I was stuck, but I say with a little bit of help I thought that I could have got up on the center of the street and I could have rolled. That truck would have had went straight -- that street would have went straight to my house if I could have got back on the street. That's the way I felt.
Q. Okay.
MS. CEZIL: May I approach the witness, Your Honor?
THE COURT: Yes, you may.
Q. (By Ms. Cezil, continuing): Mr. Stone, I'm showing you what's been marked as People's Proposed Exhibits 23, 21, Number 6, Number 7 and 22, okay?
A. Okay.
Q. If you can please take a look at each of those and let me know if you recognize them?
A. Yeah, this is my truck.
Q. Okay. Which -- what number is that that you're referring

to?
A. Twenty-three.
Q. That's Proposed Exhibits 23, okay.
Is that in the same or similar condition it was on December 31st of 2012?
A. I would say it's the same. Same condition.
Q. Okay.
A. That's my truck.
Q. Okay. And which number do you see on that?
A. Twenty-one.
Q. Okay. People's Proposed 21, is that in the same or similar condition as it was?
A. Yes, it is my truck.
Q. Okay. Which number do you see on that, Mr. Stone?
A. Number 6.
Q. Is that in the same or similar condition?
A. Yes, it is.
Q. Okay.
A. It's my truck.
Q. Is there a number on that picture?
A. Seven.
Q. Okay. Is Number 7 in the same or similar condition?
A. Yes.
Q. Okay. And what about the next photo you have there?
A. This my truck.

Q. Okay. Which number is that?
A. Twenty-two.
Q. Is that also notice same or similar condition?
A. Yes.
MS. CEZIL: Your Honor, we would move for the admission of People's Proposed Exhibit Number 22, Number 7, Number 6, Number 21 and Number 23.
MR. HOWARTH: If they haven't been previously admitted, I have no objection to any of them.
THE COURT: So admitted.
MS. CEZIL: Okay. Thank you.
May I publish to the jury, Your Honor?
THE COURT: Yes.
Q. (By Ms. Cezil, continuing): Can you see those, the monitor?
A. Yes, I can.
Q. All right. I'm showing you what's been admitted as People's Exhibit Number 6.
Can you describe to us what that is?
A. Yes. It's the front of my truck left side flat tire.
Q. Okay. Is this the truck and the tire that you're referring to that you got stuck with earlier?
A. Yes. Yes.
Q. I'm now showing you People's Exhibit Number 21, okay?
A. Yes.

Q. Can you describe to us what that is?
A. That's my truck.
THE COURT: Number 21 was the back of the truck, for the record.
MS. CEZIL: Thank you, Your Honor.
Q. (By Ms. Cezil, continuing): I'm now showing you People's Exhibit Number 23. Do you recognize that?
A. Yes, I do.
Q. Okay. And what's the position of the truck in that picture?
A. Well I'm looking at the right side of it, passenger side.
Q. Thank you.
Okay. I'm now showing you People's Exhibit Number 23 -- or excuse me, 22. Do you recognize that?
A. Yes, that's my truck.
Q. Okay. What direction is that of the picture taking of the truck?
A. Well that's my right side passenger side east, west or south. I don't know. I'm going across.
Q. Okay. Is the tire flat or in that picture as well?
A. No, that tire is not flat. It's almost flat though. It's low.
Q. Okay.
A. It's low.
Q. I'm also showing you People's Exhibit Number 7.

Can you describe for us what that picture is of?

A. Yeah, that's the left-hand side of my truck, my driver's side. It's on a flat. Tire beat off the rim almost.

Q. Okay. Now you've told us, the last thing we talked about was that you were talking to the young man as close as I was here on the stand 10 to 15 minutes?

A. Yes.

Q. What's the next thing you remember happening after that?

A. Well he left. He left. Then my truck was sitting there running. I gets back in trying to absorb me a little heat cause it was cold, and my wife was asking me what we gon' do. I said, "Keep trying to call somebody."

Q. Okay. When you get back in the truck and the truck is running, do you have lights on inside of the truck?

A. My headlights and my park lights are on.

Q. How about the headlights and the park lights when the young man that you identified earlier was there talking to you?

A. When he was there, they were on. My truck sat there all the while we were talking running idle cause I was keeping, trying to keep heat in my truck for my wife.

Q. Okay. After you are back in the truck with your wife and you are trying to get her to call, do you see the defendant again that evening?

A. Well he came back when -- excuse me.

When he came back, I was inside the truck. We was talking, hoping that my son, you know, show up to help us. And, um, me and her talked. We were talking about the young man came back, you know what I'm saying. So I gets out of the truck.

Q. Okay.

A. We gets out, we talk. He was like, um, he haven't made it here yet. No, that's not the words.

Q. I didn't hear the last thing you said.

A. That's not the word he used. He said, "He haven't showed up yet?" That's the words he used. I said, "No, he haven't."

Q. Okay.

A. He said, "You wanna try it again?" I say to me why not.

We did that, that didn't work. So we stood out-- we both -- well he run out there to the weeds and stuff, got little stuff trying to throw under my wheel as I am spinning, trying to hoping it will catch ahold and pull up in the street. He was doing everything to help me.

We stopped. I said, "We can't do it." We standing up there talking and then all of a sudden he was like kind of like looking around me, but I ain't paying nothing no attention.

Q. When you say he was looking around you, who are you

referring to?

A. He say, "I told you I got that thang." I said, "I told you what's gon' happen to you," like that, you know. And he had kept like looking around me and, um, I think my wife said something like this, um, he gon' probably be here directly, maybe something, some sort of stuff that she said. Maybe he'll be here directly.

When I know anything, like behind that word, that doggone thing were in the side. He say, "Tell her to give me them damn rings on her finger."

Q. Okay. Now when you say that doggone thing was in your side, what are you referring to?

A. I'm talking about that gun he had that I didn't think he had.

Q. Okay. Let's back up a little bit, Mr. Stone.

You said that he came back and he said, "Let's try it again"?

A. Yeah.

Q. Do you see the person in the courtroom today that said "Let's try it again" when they came back?

A. Yeah, I do.

Q. Can you please let the jury know where that person is sitting?

A. That young man sitting right there (indicating).

Q. Okay.

MS. CEZIL: So for the record, Your Honor, he's pointing to the defendant.

Q. (By Ms. Cezil, continuing): Now you also told us that the person said to you your help hadn't got here yet; is that correct?

A. He say -- he didn't say my help. He say, "He haven't made it here yet?"

Q. Okay. Do you see the person in the courtroom today that said that to you?

A. Right there (indicating).

MS. CEZIL: Your Honor, let the record reflect the witness has pointed to the defendant.

THE COURT: So reflected.

Q. (By Ms. Cezil, continuing): You also told us about him coming back and helping, continuing to help you try to move that truck?

A. Yes. That's the way I felt like he was helping me.

Q. Okay. Did his demeanor change at that point from the first time that you talked to him for the 10 to 15 minutes and when he came back and was helping you the second time?

A. No. No. No. I keep saying and wants to say that, I ain't gon' say cause he was the same man. The man was a good -- he talked with a good conversation. A devil was sent to me in disguise and he had a good one on cause he-- mother --

THE COURT: Do we need to take a minute, counsel?

Are you going to be okay, sir.

THE WITNESS: Yeah, I'm gon' be all right.

THE COURT: Take your time.

THE WITNESS: Yeah, I'm gon' be fine.

Q. (By Ms. Cezil, continuing): Mr. Stone, do you need a minute or --

A. Nawl, I'm all right. I'm all right.

Q. Now after the defendant comes back to you, says he hasn't made it yet and let's try it again, you told us about a thing that you described to us as a gun being at your side?

A. Yes. Yes. Yes. Yes.

Q. Who placed the gun at your side, Mr. Stone?

A. That young man right there (indicating).

Q. Okay. What's the next thing you remember after the defendant placed the gun at your side?

A. He asked me to tell my wife to give him, he say, "Damn rings off her finger." I said man they ain't worth nothing. She said -- I say, "He say give him the rings off your finger." She handed her hand to the window and I reached and pulled the rings off of her finger.

Q. Why did you reach and pull the ring off her finger?

A. Cause she had her hand -- she leaned over and handed out

of, you know, the window. I reached in the window cause she didn't come all the way out the window and pulled them off her finger and hand them to him.

I said, "I told you they ain't worth shit." She said, "Yeah, them Dollar Store rings." You know, our grand kids gave them to her.

Q. When you reached and pulled the rings off of your wife's fingers, where was the gun at that point?

A. In my side.

Q. Okay.

A. In my side.

Q. Who was holding the gun in your side at that point?

A. The young man right there (indicating).

Q. Okay. What's the next thing you remember happening after you had to pull the --

A. He say, he say -- when we both hollered at him, told him they weren't worth shit, he said, "I want that damn chain around her neck." She started trying to take the thing off. He said, "Snatch that" -- he say, "Snatch that mother fucker." So she pulled it and it came off and I hand it to him.

Q. Okay. Why did you hand him your wife's chain at that point?

A. Cause he had that damn -- he had that damn gun in my side.

He say, "Man, give me the money." I say, "We

ain't got no money, man. We ain't got no money. I told you we come from the casino." He say, "I'm gon' shoot your damn ass." I'm real scared. I told him, I say, "Give him the damn money." She reached up there and got the money, I gave it to him.

I am thinking now he get the money that he gon' just do what he ought to do, run, you know. Then he stood there with the thing. He say, "Get your ass around the front of the truck." I gets aren't to the front of the -- to the truck. I'm hoping he will take off cause how he got everything right there. I am hoping he'll take off, go, whatever. He didn't.

When we got around front of the truck, he said, "Man, I want to fuck your wife." I say, "Nawl, nawl, man." By this time, I done got all the way to the corner. Tell me, "Get your ass on down side there. I told you I'm gon' fuck your wife or I'm gon' kill your damn ass." And I went, did what he say cause I was afraid.

He walked down, walked -- he said, "Open that damn door I reached and grabbed that damn handle telling him, "No, man. No, man. That's a old woman, man. You don't want to fuck my wife." And the door open and --

THE COURT: Counsel, why don't we take a short break.

Sir. Sir. Sir, we're gonna take a short

recess, okay.

THE WITNESS: Okay.

THE COURT: Ladies and gentlemen of the jury, please we're gonna come back shortly.

(The jury was excused to the jury room at 11:55 A.M.)

(Off the record.)

THE COURT: Counsel, you ready to go back on the record?

MS. CEZIL: Yes, judge.

THE COURT: Mr. Stone, sir, are you going to be all right?

THE WITNESS: I'm going to be all right.

THE COURT: All right.

(The jury entered the courtroom at 12:00 P.M.)

THE COURT: Mr. Stone, you're still under oath, sir, okay?

THE WITNESS: Yes, sir.

THE COURT: You may proceed, counselor.

MS. CEZIL: Thank you, Your Honor.

Q. (By Ms. Cezil, continuing): Mr. Stone, you left off and you said that the defendant walked you around to the truck after he told you he was gonna fuck your wife; is that correct?

A. Yes. Yes.

Q. Okay. What is the next thing you remember happening after that?

A. He told me, "Get your ass around to the front of the truck." That's when I seen that he had the gun in my wife's chest now. He said, "Get your ass on around there and get in." I did what he say because I was scared he was gon' shoot my wife and me.

I couldn't move fast. I moved on around to the truck and I got in. He say, "Put your damn hands on the steering wheel." I took this hand, cause I couldn't move this hand, it was all the way locked up, and I puts it up on the wheel and put this one on it. And he was trying to do what he was doing to my wife. And I went to turn my head like that, he said, "Don't look at me, motherfucker."

Q. Okay. Let me ask you something.

You just took your left hand I believe it is and you had to use your right hand to guide that left hand?

A. To guide my left hand, yes.

Q. Is there anything medically that causes that hand to close up as you were describing?

A. Well like I done had a stroke and two heart attacks.

Q. Was this prior to December 31st?

A. Yes, it was three or four months before.

And I couldn't -- well I have a erythema (sic) on my brain. This hand is like sometime it just wanna --

it does what it wanna do. I can't hold it still or keep from moving it. It almost like move itself.

Well I got it up on the steering wheel, and he trying to do what he doing to my wife. I could see in my rear view mirror there is something coming down the streets which it were a clearly a Jeep.

Q. When you say he tries to do what he was doing to your wife, who is the "he" you're referring to?

A. The young man right there (indicating).

Q. Is this the same young man that you described to us that you talked to for 10 to 15 minutes closely the first time?

A. Yes. Yes. Yes.

Q. Is it the same young man that you said that you spoke to the second time?

A. Yes. Yes.

Q. When you spoke to the young man the second time, before that gun went into your side, how long did the two of you speak to one another?

A. We probably had talked for about ten minutes before this happened.

Q. Okay.

A. Because --

Q. When you say you spoke for five or ten minutes, how far away from the two of you from one another?

A. We were close.

Q. Okay.

MS. CEZIL: May I approach the witness, Your Honor?

THE COURT: Yes, you may.

Q. (By Ms. Cezil, continuing): Mr. Stone, just like before, I'm gonna walk toward you and you tell me when to stop to show us however close you were to the defendant the second time the two of you were talking.

A. Okay. Okay. Come on up where you were at. He was up real close. He was closer. Take that arm, put it in my side and I can give you some more closeness.

Q. Okay. Would you say we were --

A. I was standing, he was standing and he was more or less like behind my left side here.

Q. Okay.

A. He had the gun right in my side. I mean I couldn't turn without turning on him.

Q. So are we still less than a arm's length --

A. Closer.

Q. -- from one another?

A. Closer.

Q. So come up on this step?

A. Kind of like a blindness, you know, from somebody out there looking at you.

Q. Okay.

MS. CEZIL: Just so the record is clearer, I'm on the first step of the witness stand standing directly next to the witness.

A. Yes.

THE COURT: Okay.

MS. CEZIL: Thank you.

Q. (By Ms. Cezil, continuing): Mr. Stone, in that second time are the lights, the headlights on your car still on as you told us earlier?

A. Yeah. I said -- listen, I'm not telling you that I'm sorry for that. I burnt -- I was a half a tank of gas when I got there. From the time I left my truck, my gas light were on from a half a tank. I sat there and ran at least a hour and a half, two hours just running. Then I had gunned it for 30 minutes or more.

Q. Okay.

A. And I'm talking I burned a lot of gas. It was so cold, I was trying to keep my wife warm. I was not letting -- I love my wife. I was trying to keep my wife --

THE COURT: Excuse me. She asked you were the lights, front lights on.

THE WITNESS: The lights were on on that truck. The lights didn't go off until I cut my engine off.

Q. (By Ms. Cezil, continuing): Okay. You say after he was doing what he is doing with your wife --

A. Yes.
Q. Do you recall that? Are you referring to the person that you've identified for us in court today?
A. Yes, I is.
Q. Okay. After you put your hands on the steering wheel, what's the next thing you remember happening?
A. Well I was looking in my rear view mirror. A car was coming. I was like, oh, to myself, this is gonna scare him. He gonna run. He stands up straight. Like my dome light were on in my truck.
THE COURT: You said the dome light was on?
THE WITNESS: The dome light inside of my truck were on cause that door were open.
Q. (By Ms. Cezil, continuing): Which door, Mr. Stone?
A. My passenger side door, the right-hand, right side door.
Q. Was anybody at the passenger side door when it was open?
A. Him.
Q. Okay. When you say "him," are you referring to the defendant?
A. I'm talking about the young man right there.
Q. Okay.
A. Anyway, this car getting real close. And when it get almost even with my door, I was trying to move my hand to try to get some attention. He said, "Move again, mothafucka, I'm gon' shoot the bitch."

Now I couldn't move. "Put them hands on the steering wheel." I never got it off. I was trying to, though, but he told me to move again. Now I don't want to take my right hand, try to hold it down and get shot. I just suffered with it.

But when that car went on past, that's when he backed up and he ran between 20 or 30 steps which were the next street. He stopped and he, pow, pow, pow and ran down that street. And my wife was hollering "Oh, he gon' kill us. He gon' kill us."

Q. Okay. Let's back up a little bit.

You said after he is doing what he is doing to your wife and you're still in the truck holding on to the steering wheel --

A. Still in the truck holding on to the steering wheel.

Q. Why are you staying in the truck holding on to the steering wheel?

A. Cause he got this gun on me and telling me he gon' kill my wife, which he was referring to "I'm gon' kill the bitch."

Q. Okay.

A. This is his words, "I'm gon' kill the bitch if you move." What the -- Lord knows what do I suppose to do?

Q. Mr. Stone.

A. I feel less than a man right now for letting another man fuck my wife, man. Goddamn. Lord have mercy. I'm a man.

I been a man 63 motherfuckin' years and I couldn't help her. Lord have mercy. Mercy. Mercy. Mercy.
Q. Mr. Stone, as you were holding your hands on the steering wheel --
A. Oh, Lord.
Q. Do you need a minute, Mr. Stone?
A. No, I would like to get this over with cause I'm tired of it. I'm tired of it.
Q. As the defendant is telling you --
A. I'm tired of it.
Q. -- that he's he going to --
A. Lord knows.
Q. -- kill that bitch as you referred to, and you're holding your hands on the steering wheel, how is your wife positioned, Mr. Stone?
A. He had her laying had her head on my damn leg. On my leg.
Y'all listening to me? Son of a bitch had her head on my leg, on this leg matter of fact. Son of a -- Lord have mercy. Lord have mercy.
Q. Mr. Stone, I understand it's very difficult, okay?
A. Yes. Yes.
Q. Do you see the person in the courtroom today that had your wife --
A. Yes, I do. Yeah, I do.
MR. HOWARTH: Your Honor, Your Honor, Your

Honor.

THE WITNESS: Yes, I do.

THE COURT: Sustained. I think he's identified him enough.

THE WITNESS: Yeah, I do.

MS. CEZIL: Okay.

THE WITNESS: Lord have mercy.

Q. (By Ms. Cezil, continuing): Now you said your wife's head was in your lap; is that correct?

A. Yes.

Q. Do you know how the other part of her body was positioned?

A. They was on my seat. He told her, "Scoot down, bitch, scoot down. Lay your ass on down there." That's what I would say she was straight on the edge of the seat and her head on my leg.

And that's not a full-size truck. So if she lay back any at all, she over half of the seat. He had her, had her right there like.

Q. Mr. Stone, do you recall how long it was from the time your wife's head first went into your lap 'til the time where, as you described earlier, the defendant ran off toward the end of the street?

A. I don't understand what you saying.

Q. Okay. You said that the defendant had your wife's -- had your wife lay her head in your lap?

A. Okay.
Q. Is that correct?
A. Yes.
Q. Okay. What I'm trying to ask you is do you recall, when you remember back to that evening, how long had passed from the time her head first touched your lap 'til the time when the defendant ran off?
A. I'm gon' put that -- let's say within that 10 to 15 minutes that he were there.
Q. Okay. So it occurred sometime during that 10 to 15 minute period?
A. In that 10 to 15 minutes after we were done, done talking, say another, I'm gon' say, roughly five, eight, ten minutes.

I don't have no watch. I can't wear one. I really couldn't tell, but I do know how to measure time a little bit. So I would say he -- I would have to add on another five, eight, ten minutes. No, I ain't gon' say 10. Maybe eight or nine minutes on that. Because when he done what he did like three, four, five minutes and he were out of there. What I mean by out of there, he were gone.
Q. Okay. Mr. Stone, do you recall what you were wearing that evening?
A. Yes, I do.

Q. What were you wearing?
A. I had on black pants, a silk black jacket.
Q. Okay. Did you have anything on your head?
A. That cap he got over there side him.
Q. Okay. Do you recall what the defendant was wearing that evening the first time you spoke to him?
A. Yeah. He had on dark blue coat, winter coat with a hood, a sweater type hoodie on and he had a cap on; it was dark with a red or orange bill.
Q. Okay. Now the second time that you saw him, do you recall what he was wearing?
A. Same thing.
Q. Now you said that you spoke to the defendant 10 to 15 minutes the first time; is that correct?
A. Yes. Yes.
Q. Okay. When you spoke to him, did you have the opportunity to listen to his voice?
A. Yeah, I know that young man. Long as we talked, anyone would know him.
Q. Okay. Did you recognize that voice from the person that came up the second time that said, "Let's try it again"?
A. Same person. Same person.
Q. Now you've told us that he ran towards the end of the street, the defendant; that's correct?
A. Yes.

Q. And you said he fired some shots?
A. He shot three times.
Q. Do you know which direction those shots were going in?
A. I felt like they were coming toward me. I didn't hear them hit anything but --
THE COURT: The question is did you see him firing or you heard?
THE WITNESS: Yes, I seen him firing.
THE COURT: Go ahead, counsel.
MS. CEZIL: Thank you.
THE WITNESS: I seen him firing.
Q. (By Ms. Cezil, continuing): When you say you seen, you are referring to the defendant that you have been talking about the first time, the second time?
A. He throwed his hands up like pow, pow, pow.
And I was trying to get around the truck, trying to make sure that my wife were all right. And I were hollering, "You all right?" She said, "Yes, I'm all right. You all right?" She said, "He gon' kill us. He gon' kill us." And I was like, "Nawl, Baby, he ain't gon' kill us. He gone. He gone. He gone."
Then when I got over around there where she is, was trying to put her leg in her pants. I say, "Call the police." Cause she know I don't see that good at night. She was punching the phone. She said, "These phones dead.

That phone died." I said, "Take mine." And she called the police and I'm like, "What they saying? What they saying?" She say, "They say someone gon' be in our area in a minute."

Q. Okay. Did the police ever come?

A. Police never came.

Q. All right. What, if anything, do you do after that?

A. Well I say -- we sat there for like 30 minutes or longer.

And she was steady hollering, "Let's go. He gon' come back. Let's go. He gon' come back and kill us. Let's go." So now she is like talked me into walking. And I'm like, you know, "We gon' have to help one another." Cause I couldn't walk good. And we helped one another all the way to our house.

Q. When you say that the two of you were walking, do you recall the weather conditions that night?

A. It was so cold. I didn't even see how we got four blocks. It was just that cold.

Q. Was it snowing that evening?

A. It was snowing and the streets -- it was freezing fast as it falls. The streets was slick as glass. And we were walking and trying to hold one another. She fell a couple times on me. I slipped like fall down a couple times. Then we made it home.

Q. Okay.

A. We made it, thank God. Thank God. Thank God we made it.
Q. When you make it home, who is the first person that you see, Mr. Stone?
A. I knock on my door. And I had saw my van -- a van -- excuse me. I had saw a van there. Cause I knew my son was going to pick up four of my grand kids which were his kids.
I said, "Junior here. Thank God." He was sleep but he heard us. I said, "Son," I said, "I been robbed and your mama been raped." And I was crying and she were crying cause we done cried all the way home. He was like, "All nawl, mama or daddy." He got hysterical. Mama said, "I got to go to the doctor. So we went to St. John.
Q. Okay.
A. Well he carried us to St. John.
Q. You say "he." Are you referring to your son James?
A. My son James carried us to St. John.
And first thing come out of they mouth like what is wrong and we told them. They said, "Y'all contact the police?" We say, "Yeah, but they never showed up." And told them where we had came from. They say, "Well we'll get 'em."
Q. Did the police come to the St. John's Hospital?
A. After we was there say a hour, hour and a half or may have been longer. I'm saying roughly there.

Q. Mr. Stone, do you remember whether or not your wife got medical treatment at St. John's Hospital?
A. They did what -- I think what they did was probably took her some kind of tests. I don't know what it was. Something they do for women. I don't know.
But they say, "We gonna have to send her to Receiving."
Q. Okay.
A. To the specialist.
Q. When they said that they had to send her to Receiving, do you know whether or not your wife went to the Receiving Hospital?
A. Yes. They carried me, too.
Q. After you and your wife go to the Receiving Hospital, is she treated there?
A. Yes.
Q. Okay. At some upon do you leave the hospital?
A. No. No. From word go from St. John all -- I was by my wife's side all the way to Receiving when the lady taken her back there to do whatever they do to women, I don't know. They asked me did I need anything. She gave me some water and aspirin and I sat right there. And she turned the TV on up there, the radio whatever. We gone do what they do.
Q. Okay. Mr. Stone, do you remember when is the next time

that you spoke to any police?
A. Well I spoke with -- I spoke to police at St. John.
Q. After that, do you remember the next time you spoke to any police after you spoke to the police at St. John's?
A. I ain't talk to no police 'til they came to my house, which I think it was -- I don't know they names.
Q. Okay. Do you know if that was the next day or the following day after that?
A. That was the following day after that, I think.
Q. Okay. Would that be January 1st?
A. I say yeah.
Q. Okay. When the police came to your house, did you tell them what had happened to you and your wife the night before?
A. Yes, I did.
Q. Did you tell them a description of the person that came out and spoke to you the first and the second time that you identified here today?
A. Yes, I did.
Q. Do you remember giving them a age range of that person?
A. Yes, I did.
Q. And how old did you say that that person was?
A. I say -- I won't give him 24. I will say 22, 23, maybe 24.
Q. After the police come to your house and you tell them what

has happened to you, what had happened to you and your wife, do you ever go down to the police station?
A. No, I never went to the police station until Officer Kane came. He called and told me that he needed me to go and do a sketch.
Q. Okay.
MS. CEZIL: Your Honor, may I approach the witness?
THE COURT: Yes, you may.
Q. (By Ms. Cezil, continuing): Mr. Stone, I'm showing you what has been admitted as People's Exhibit Number 8.
A. This the sketch I gave.
Q. Okay. When you say that that's the sketch that you gave, can you please tell us about that?
A. What do you mean? What he wearing or whatever? Whatever?
Q. No, about how you gave the sketch.
A. Well I gave the sketch by what I had seen. I had a face that I won't ever forget that I was trying to put, you now, on some paper.
Q. Did you go down and speak with a officer to give them things that you had remembered from the person that night?
A. Yes.
Q. Did you have an issue with that sketch, Mr. Stone?
A. Nawl, I didn't. And then a little bit I gave this sketch. I told the officer I am not perfect but I would say this

were a nine, but I could give it higher. But I might -- in a sketch like nine or ten was good to me. And this is what I gave.
Q. Okay. Did you ever tell the officer that you had a issue with the cheeks on that sketch?
A. You know, I don't -- I didn't see nothing wrong with the sketch. I think this is the best I can do.
Q. Okay. When you said it's the best that you can do, you've told us about a nine. Is that a nine out of a ten score?
A. Oh, it's all the way nine. It's all the way nine.
Q. But you say that's nine out of ten?
A. Out of ten I'm gon' give this my nine.
Q. Okay. On a scale -- if we had a scale of one to 10, are you referring to that nine on a scale out of one to 10?
A. Nine.
MS. CEZIL: May I approach?
THE COURT: Yes, you may.
Q. (By Mr. Cezil, continuing): Mr. Stone, after you go down to the police station and you do the sketch, do you ever go back and do what's referred to as a lineup?
A. Yes, I did.
Q. Okay. Now do you recall where you went to do that lineup at?
A. I ain't familiar with a lot of downtown, but I would say I went to a 1300 over there, the county jail or whatever.

Q. Okay. When you went down to do the lineup --
A. Well they carried me there.
Q. I'm sorry.
A. I said I was carried there by the officers to the station cause I didn't have no travel.
Q. Okay. I'm gonna show --
MS. CEZIL: May I approach, Your Honor?
THE COURT: Yes, you may.
Q. (By Ms. Cezil, continuing): I'm showing you what's been admitted as People's Exhibit Number 1.
Do you recognize what I've showed you?
A. Yes, I do.
Q. Okay. And how do you recognize that?
A. By the young man I see sitting right there.
Q. Did you identify anybody in that lineup back when you went to have it done?
A. No, I -- I ain't see none. I ain't seen none of these guys 'til that lineup.
Q. How about when you went to the lineup? Did you pick anybody out of that lineup?
A. Yeah. Yeah, this one here. I'm gon' call it number four.
Q. Okay. Mr. Stone, can you still see that monitor or that screen?
A. Yes, I can.
Q. Okay. Now this is People's Exhibit Number 1.

Is this the exhibit that you just testified and told is that you picked out number four?

A. Yes, it is.

Q. Okay. Did anybody tell you who to pick out when you went to do that lineup?

A. Ain't nobody told me nothing.

Q. How about your wife? Was she in the room with you when you picked out number four?

A. No, she wasn't.

MS. CEZIL: May I approach, Your Honor?

THE COURT: You may approach.

Q. (By Ms. Cezil, continuing): Mr. Stone, I'm handing you what's been marked as People's Proposed Exhibit Number 26.

Do you recognize that?

A. Yeah.

Q. Okay. And how do you recognize this?

A. By my signature.

Q. Where is your signature?

A. Up top.

Q. Okay. Do you see any other --

A. And this my initials.

Q. Okay. Where is your initials located at?

A. Right here on number four.

Q. Okay. Do you see a name at number four?

A. Yes, I do.

Q. Okay. And what is that name?
A. The name say Howard McKnight.
Q. Okay.
MR. HOWARTH: I've seen it.
MS. CEZIL: Your Honor, we would move for the admission of People's Proposed Exhibit Number 26.
MR. HOWARTH: No objection.
THE COURT: So admitted.
Ms. Cezil.
MS. CEZIL: Just a minute, Your Honor.
Q. (By Ms. Cezil, continuing): Okay.
Mr. Stone, were you ever shown any other lineups in this case?
A. No.
Q. Okay. Do you recall coming to the Prosecutor's Office last week at sometime?
A. Yes.
Q. Okay. Did you meet with a Officer Kane during that time?
A. Yes, I seen him.
Q. Did Officer Kane ever show you a display or an array of pictures?
A. Yes, he did.
MS. CEZIL: May I approach again, Your Honor?
THE COURT: Yes, you may.
Q. (By Ms. Cezil, continuing): I'm showing what you what's

been marked as People's Proposed Exhibit Number 24.

Do you recognize that?

A. This piece of paper, yes.

Q. And how do you recognize it?

A. This the one he showed me.

Q. When you say "he," are you referring to Officer Kane?

A. Officer Kane, yes.

Q. Were you able to identify anybody out of those pictures?

A. No, I wasn't.

Q. Do you see your signature on this as well?

A. Yes, I do.

Q. Okay.

MR. HOWARTH: I've seen it.

MS. CEZIL: We will move for the admission of People's Proposed Exhibit Number 24.

THE COURT: So admitted.

Q. (By Ms. Cezil, continuing): Mr. Stone, did you indicate on this exhibit that I just showed you that you didn't recognize anybody in those photos?

A. I didn't recognize no one.

Q. Earlier you indicated when the defendant said to get the money that -- who was it that reached in? You did something with your hands.

A. He say, "Tell her to give me that damn money." She reached in there and she got her money, then she put it in

my hand and I handed it to him.
Q. Okay. Now when you say she reached in there, I see that you are doing a motion with your hand. But just so the record is clear, where did she reach in at?
A. She reach in her, I would say bosom or bra or whatever. Her bosom.
Q. Okay. She reached into her bra and gave you the money?
A. Yeah, gave me the money.
Q. Okay. Did you give the money to the defendant at that point?
A. Well when she hand it to me, I handed it to him.
Q. Okay. Why did you hand it to him?
A. He had the gun in my doggone side.
Q. Okay. Let's talk about that scale. And I just wanna make sure it's clear.
A. Okay.
Q. Okay. You said that this picture here, other than the cheeks, you would have given a nine; is that correct?
A. Yes.
Q. Okay. With scale being with number one?
A. I don't know --
THE COURT: Counsel, we -- I think that's been-- we got it.
MS. CEZIL: Okay.
Q. (By Ms. Cezil, continuing): Mr. Stone, how sure are you

that it's the man that you've identified here today sitting here that assaulted you and your wife?

A. How sure? Let me be real. The man, I put all the time together, was with me over 30 to 40 minutes talking to me. Ten to 15 minutes, leave and come back, another 15, 20 minutes. I could not ever forget him.

MS. CEZIL: Nothing further at this time.

THE COURT: Counsel.

(Discussion had at the bench between the Court and counsel.)

THE COURT: Ladies and gentlemen of the jury, we are going to break now for lunch.

Again, I caution you you can't discuss the case. We will be back at 2:00 and we will begin the cross-examination. We thank you for your patience.

(The jury was excused for lunch at 12:31 P.M.)

THE COURT: We're not putting anything on the record, are we?

MR. ELIZONDO: No.

THE COURT: All right.

(Off the record.)

THE COURT: All right. Are we ready to bring out the jury?

MR. HOWARTH: Yes. Thank you.

THE COURT: Get your witness. Why don't you get

him out first since he's going to be a minute.

MR. HOWARTH: Your Honor, yesterday I asked the officer-in-charge while he was on the stand if he would provide us today with the computer-designed sketch that they made with Mr. Stone of the suspect. And I said would you bring me that, I want you to bring that to court. And now they tell me it's not here.

MS. CEZIL: Yesterday the Court did address this. That was not the proper witness to be asking for that.

We had Officer Tinsley, who was here, who testified. Defense had a opportunity to cross-examine and he did not get whatever picture sketch it is that he's asking for. This officer does not have possession of that composite, computer picture sketch.

MR. HOWARTH: The officer-in-charge doesn't have it?

MS. CEZIL: No. We have the --

MR. HOWARTH: That's a bit odd.

MS. CEZIL: I'm sorry. I don't want to talk over you.

Go ahead.

MR. HOWARTH: No, Your Honor, I made it very clear, I think, to everybody I want to introduce into evidence the composite sketch that was made, that was

talked about but not introduced by the prosecutor.

THE COURT: But was this witness shown a composite sketch?

MR. HOWARTH: He created it. Mr. Stone created it.

MS. CEZIL: What Officer Tinsley spoke about, Your Honor, was the process that they use. What is generally given to the Prosecutor's Office is the final completed composite sketch, not the computer processes.

Officer Tinsley apparently came over here today which what I would refer -- or excuse me, yesterday when he testified to his work product. What he used to get to the point of this sketch. That was addressed and brought up that day. He could have asked him. He could have admitted it through that witness.

THE COURT: But I do recall Mr. Howarth asking for that to be produced.

MR. HOWARTH: Correct.

MS. CEZIL: If he was going to call that witness, Your Honor; that was my understanding.

Officer Kane is not the proper witness. If he wants to recall Officer Tinsley --

THE COURT: No, I think he wanted to use it with the witness that's on the stand now.

Is that my understanding?

MR. HOWARTH: Yes, whether he created that and whether he saw it and that was, you know, something that they put together and looked at, yeah.

MS. CEZIL: That would be outside of his personal knowledge, Your Honor.

This is what he has always testified to as to what he saw and what he approved or disapproved of.

THE COURT: I will see how we can get to see -- you can ask him did you see anything else other than that.

MS. CEZIL: Okay.

MR. HOWARTH: And I do consider it for the -- Your Honor, for the record I consider that sketch to be Brady material because the defense maintains that that sketch doesn't look anything like -- and that's a matter for the trier of fact, but we maintain that that sketch does not look like Mr. McKnight. And, you know --

THE COURT: But, counsel, you had opportunities when that witness was on the stand, you saw it. You could have at that point in time introduced it all with that witness at that time, true?

MR. HOWARTH: Yes, but I asked the officer-in-charge did he have it here.

THE COURT: I do recall you asking the officer-in-charge that. I do recall that. So --

MR. HOWARTH: And now they say it's not here.

THE COURT: But if this witness says that he didn't prepare -- he didn't -- then you're going to have to go back to Officer Tinsley.

MR. HOWARTH: That's fine.

THE COURT: Okay.

MR. HOWARTH: Then I ask to recall Officer Tinsley at the proper time when we're done with cross-examination.

THE COURT: Okay.

MR. HOWARTH: So someone needs to get in contact, we can see when we can get him back.

THE COURT: All right.

MR. HOWARTH: With the sketch hopefully.

Okay.

THE COURT: All right. Bring the jurors back.

(The jury entered the courtroom at 2:35 P.M.)

THE COURT: Good afternoon, ladies and gentlemen. We apologize for the delay.

Counsel, you may proceed. Sir, you're still under oath.

**CROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Good afternoon, Mr. Stone.

A. Afternoon.

Q. Mr. Stone, do you know who I am, sir?

A. I have seen you. I know you his attorney or whatever, yes.
Q. Have you -- have you met me before?
A. Beg your pardon.
Q. Have you seen me before?
A. Yes, I have.
Q. When was that?
A. When we was over at 36th District and here.
Q. All right. You saw me at the 36th District Court across the street, am I right?
A. Right.
Q. About three weeks after this terrible incident happened, am I right?
A. Yep.
Q. And you recognize me from that meeting?
A. Yeah.
Q. Do I look the same to you as I did then?
A. Hey, man, I know your face, if that's what you --
Q. Yes. Okay. Does it look the same to you as it then did?
A. No, you done growed (sic) a little facial hair.
Q. Right. Now I know you have mustache and goatee, right?
A. Over 30 years.
Q. Somewhat similar to mine, right? Somewhat similar, right?
A. Somewhat, yeah.
Q. Okay. And back in January when you met me over at

36th District, I was clean shaven, right?
A. You still had a little.
Q. You think so?
A. It wasn't that thick.
Q. Okay.
A. You had a little hair, yeah.
Q. Mr. Stone, I saw this morning when you were giving your testimony, and I think everybody understands that you had some breakdown feelings as you were telling what happened, am I right?
A. Yeah. Yeah. Yeah.
Q. And understandably you became very tearful when you were recounting the terrible things that happened to you in your life?
A. Right.
Q. If you think back to when we were together in the 36th District Court, and this would have been the end of January of this year, right, that you testified in 36th District Court?
A. Yes, I did.
Q. Okay. And prosecutor asked you pretty much the same questions as you heard today?
A. Yes.
Q. I asked you a whole bunch of questions, didn't I?
A. Yeah.

Q. And, sir, back on that date, back in January of this year, did you have any breakdown like you did today?
A. Yeah.
Q. Just the same way?
A. I would say, yeah, I did.
Q. Mr. Stone, when we -- let's go back to that evening of December the 31, 2012.
You and your wife were coming back from the casino and you had had a good time, am I right?
A. Yeah, we had a time.
Q. Everything -- everything was fine until --
A. Everything was lovey dovey.
Q. Until the car --
A. Everything was lovey dovey 'til I --
Q. Until the car broke down?
A. I discovered that my tire was low. I knew it was low.
I been driving for a long time. I know my tire were low, but when it went all the way down I'm like all this traffic, traffic downtown like. Everybody had somewhere to go. It was so much traffic.
Q. All right. We set?
All right. Then your car got in trouble and you got stuck, am I right?
A. Okay.
Q. You tried to get out of being stuck, right?

A. For about 20 or 30 minutes, yes.
Q. Sure. And at that time your health was not so good, was it?
A. No, it wasn't.
Q. And you had had -- very unfortunately you said you had had both a stroke and a heart attack not long before?
A. I have had two heart attacks, two. My son say one. I had two heart attacks, had a stroke.
Q. I assume --
A. Behind this stroke, I had a aneurysm on my brain. That didn't make me crazy.
Q. No, sir, that's the last thing I'm suggesting. I'm only talking about your physical health. We're not suggesting anything wrong with your mind, okay?
A. All right.
Q. All right. But physically as of that night you were not a strong person?
A. No, I was not a strong, no, no, no, no.
Q. You weren't the kind of person that would want to be pushing a heavy truck out of a snow bank, am I right?
A. I'm the person that I'm going to do what I got to do, no matter where I'm at.
Q. Sure.
A. Especially when I'm down and I have my wife with me.
Q. But you were happy to accept help from strangers?

A. I'd have accepted help from you.
Q. I don't know where that puts me, sir, but I hope you meant that in a friendly way.
A. That's the only way I can. I don't know what -- I would have accepted anyone.
Q. I understand what you're saying. I appreciate the fact. Thank you, sir.
But when you're in this bad situation, cause you're stuck in the snow and your health isn't good, man comes up to you and he seems to want to help you, right?
A. Yes, he did.
Q. He seemed to be a friendly man?
A. Oh, he was very friendly.
Q. Good natured?
A. I don't know what you call nature, but I do know what being friendly and nice is.
Q. You had a good conversation?
A. Yeah, we did.
Q. Talked about things even other than the car being stuck?
A. I talked to a lot of young men's. I love talking to young men's, especially one that's already like he's on a good road for going somewhere. I got time to talk with him.
He seemed to me to be a nice guy. We did not have a whole lot to talk about, but we did talk about this is New Year's, yadda, yadda, yadda. We talked about stuff

like that. We didn't go off in all, man, I know you well beyond or you know me. We did not go there.

Q. But that man, that man that you are talking to that first approaches you, that man didn't say to you don't look at my face, did he?

A. Not until --

Q. No, I'm saying when you're first encountering the man.

A. Oh, no, no, no.

Q. No. And that's the man that eventually left, am I right?

A. Who left?

Q. That man who came up and tried to help you, eventually he left?

A. Yes, he did.

Q. And up to the time that he left, he didn't ever threaten you, did he?

A. No.

Q. Didn't ever tell you he was gon' rob you?

A. Let me tell you. Can I say something that happened?

THE COURT: Excuse me, sir. You only have to answer -- you have to answer his questions. You just have to answer his questions. And the other lawyer --

THE WITNESS: Yes.

Q. (By Mr. Howarth, continuing): Okay. Up to the time he left, he didn't threaten you in any way?

A. No.

Q. Didn't say don't look at my face?
A. No.
Q. All right. Now he's gone and he's gone for, what did you say, ten minutes?
A. Five to ten minutes, yes.
Q. And then what you have told us is that the same man came back?
A. Yes.
Q. You don't know why he was gone five to ten minutes?
A. No, I don't.
Q. I wouldn't expect you to. I'm just saying you didn't -- he didn't tell you that he was coming back or anything?
A. He didn't tell me he was gone.
Q. He just said goodbye, right?
A. No, he just walked off.
Q. Because he had tried to help you and couldn't do it?
A. Well that's the way I accepted it.
Q. He had gotten on the phone and talked to your son?
A. Yes, he did.
Q. And when he left, when that man left, you had every reason to think he's just a nice, friendly guy in the neighborhood?
A. That's the way I felt.
Q. Then when you see this man coming back who had pulled the gun on you and threatened you, right?

A. I don't understand what you saying.
To me you a little further than the game go.
Q. I'm saying when the man came back with the gun that he pulled on you, right?
A. Well he came back. We talked, then he produced the gun.
Q. Okay. So within a very short time of coming back that man became nasty?
A. Until the man pulled the gun, he was not nasty. So, no, he was not nasty.
Q. But when he did, he became a very different person, right?
A. When he did to me he -- when he did what he did, he seemed, voice wise, calm as calm can be. Voice haven't changed. Voice haven't did nothing. It was just the way he said it and I had a gun to my side. I knew he meant he was gonna shoot me. I thought that he was going to shoot me.
Q. Sir, you have given us a description of the man who comes back with the gun. That's what I'm talking about, for sure who threatened you and the man that snatched your wife's rings and that, okay. I want you to think about that man, all right?
A. I got nothing to think about. I knew who it was.
Q. Sure. Did you get asked by a Detroit policeman about 10 days after this happened if you could give a description of the man?

A. I don't know.
Q. You're not sure?
A. I can't say nine or 10 days.
Q. But --
A. I wasn't counting days.
Q. Let's say a week or so?
A. When I got contact by the officer, he told me that he had a lineup he wanted me to go see.
Q. Okay.
A. I went for that. I don't know how many days it was in between that or what. I do not know.
All I know is I did what the officer asked me to do when he took me down there.
Q. Wait, sir. My question is this.
A. I understand what the question is.
Q. All right. The question is did there come a time after the robbery that a uniformed police officer came out and asked you to give a description of the man who did these things?
A. A uniform officer haven't come out to my house or anywhere else and asked me anything.
Q. Let's just say a Detroit Police officer.
Did a Detroit Police officer come out and ask you if you could give a description of the man who robbed you?

A. I ain't quite understanding like what you talking about.
Q. All right.
A. But I do know I had officers come to my house more than one time and they was not uniform or what I call a uniform or whatever. I don't know if you call that uniform or not, but I had several polices came to my house.
Q. Do you remember police officers coming to your house, whether they're in a uniform or they're not in a uniform doesn't matter, but asking you to describe the man who robbed you?
A. I say I said yes.
Q. Okay. Do you remember the description that you gave them?
A. Yeah.
Q. What description did you give them as to his height?
A. I said probably around five seven. Probably my height.
Q. And what did you tell them about weight?
A. I say he wasn't real heavy. I said I would give him anywhere from a hundred 30 to 40 pounds, maybe 50.
Q. What about facial hair?
A. He had facial hair, young hair.
Q. All right. Now I'd like to show you a document and --
MS. CEZIL: Can we approach, Your Honor?
THE COURT: Yes, you can.
(Discussion had at the bench between the Court and counsel.)

Q. (By Mr. Howarth, continuing): Mr. Stone, did you ever tell any Detroit Police officer in the days after this incident happened that the man who robbed you was six foot two?
A. No.
Q. One hundred eighty pounds?
A. No.
Q. Clean shaven?
A. No.
Q. Mr. Stone, you attended a lineup in this case; is that correct?
A. Yes, I did.
Q. And you had reason to believe, did you not, that someone had been arrested because of the robbery?
A. If I -- yes.
Q. So when you went to the lineup, you had in your mind that it was entirely possible that that person that robbed you was going to be in that lineup, right?
A. Yes. Yes. Yes.
Q. Gonna take you back to walking into that lineup room, okay?
A. All right. All right.
Q. Did you look at everybody and spend, say, a minute, two minutes in there looking at each face?
A. No, I didn't.

Q. Okay. Would it be fair to say that you made --
A. Excuse me, judge. Excuse me. I need to raise up a little bit.

THE COURT: Okay. Go ahead.

Q. (By Mr. Howarth, continuing): Would it be fair to say that you made that identification almost immediately upon walking into the room?
A. I walked, say, two people. Like, you know, I passed two. And I looked right in the man's face.

I went to turn around the officer said, "Sir, what's wrong?" I said, "I see him already." He says, "No, I need you to make a few more steps," which I did.
Q. Isn't it a fact --
A. He say, "Do you know him?" I say, "Yes. Yes. Do you see a face?" I said, "Yes."
Q. Mr. Stone, isn't it a fact that the fourth person in that line looked away from you?
A. I don't think nan one of them actually looked away from me.
Q. Well isn't it a fact that you made your identification partially on the fact that one of those men in the lineup, the man in the fourth spot, had his eyes down and looked suspicious?
A. He did not look suspicious.
Q. I'm sorry.

A. I say he did not look suspicious.
Q. All right.
A. I looked and seen the same face that I seen twice before this lineup in my presence. I won't ever forget that face. That man did something to me you probably would never understand. But I'm a man and I love my wife. And this man would hurt my wife or me at the same damn time, I won't ever forget that face.
You can sit up here, you can do anything you want. I will never forget, never.
Q. Sir, my question --
A. His --
Q. My question to you, Mr. Stone, is isn't it a fact that when you looked at the lineup the person who was the four, fourth spot, when you looked at him he seemed to look down away from you?
A. He had his head kind of like in a down with his eyes up, like I hope he don't pick me.
Q. Right. And you thought that looked suspicious?
A. I didn't think nothing that was suspicious to me. I did not think.
That's him. And I ain't saying it because it looked like him or acted like him. It was him. I know him.
Q. Did the fact that the man either looked down or wouldn't

look at you, did that help you in choosing that man?
A. No.
Q. No, all right.
Mr. Stone, you testified as you have told us at a preliminary examination, this was back at the 36th District Court, right? You remember that, am I correct?
A. Yeah, I remember it.
Q. Okay. I'm gonna ask you -- this is on page 98 of the testimony. I'm gonna ask you if you remember being asked the following question and giving the following answers. This is page 98 and I'm starting at question number -- the question on line two. "Question" --
THE COURT: Who is this question by? Who asked this question?
MR. HOWARTH: This question on page 98 has to be asked by me.
THE COURT: So this was asked by you, okay.
MR. HOWARTH: Yes.
THE COURT: Go ahead.
Q. (By Mr. Howarth, continuing): "QUESTION. One of those people put a look on you, didn't they?" Your answer: "I think all of 'em put a look on me."
A. I still say that.
Q. I just want to read for you.

"QUESTION: Was there anything special about the look that the person you picked put on you?"

Your answer: "Yeah.

"QUESTION: Tell me about that.

"ANSWER: The one I knew he was supposed to have his head up like this where I can see him, I know this. The young man had his head up, had his eyes down like don't look at me. You understand what I'm saying? Please don't look at me.

"QUESTION: That's suspicious, isn't it?

"ANSWER: I call that suspicious, yeah?"

Were those questions asked of you, did you give those answers?

A. You asked me which -- you asked me that and I told you they all were giving suspicious looks like don't pick me.

But I also told you he -- this one had his head down and he was looking under eyed. And I already automatically knew him. I didn't have to look no more.

THE COURT: Sir, let me stop you for a second. He just asked you -- he read that. Did you say that back then?

THE WITNESS: I did not say everything he saying there, no.

Q. (By Mr. Howarth, continuing): Okay. You think that some

of this which I'm reading to you really didn't happen, right?
A. I'm saying there is something added under that I didn't say.
Q. Somebody added something to this; is that right?
A. I'm saying I know what I said.
Q. Do you think, sir, that other things have been added to things that you say in this case?
A. Sir, I don't know how y'all do what y'all do, but I do know what I said.
Q. Just take me a second. I apologize to you, sir.
A. Don't bother me.
MR. HOWARTH: May I approach the witness? Just one minute. Yes.
THE COURT: You may proceed, counsel.
MR. HOWARTH: Thank you.
THE COURT: And what's the purpose for your approaching?
MR. HOWARTH: To show him his statement, ask him a question about it.
THE COURT: Well he hasn't said he hasn't -- if you're not -- if it's impeachment, there is nothing out there. He hasn't said he doesn't remember anything, so what are you -- that's not a proper purpose.
Q. (By Mr. Howarth, continuing): Mr. Stone, have you ever

been shown the statement that you made to the Detroit Police, the written statement, the one you signed?

A. Uh-huh.

Q. You've seen that before?

A. Yes. Yes, I have.

Q. And do you remember me showing that to you back in the 36th District Court?

A. Yes, I do.

Q. And do you remember telling me there was something wrong with that statement?

A. Yes, I do.

Q. Do you remember telling me that the name that -- the signature on that statement's not yours?

A. No. I remember telling you that I signed that paper and I signed -- well first I sign one, then the next one I signed James. And I was so emotional 'til, I don't know what officer it were, he said, "I'll put that Stone on there."

That's the paper I told you about in 36th District. I identified all the papers, including the one I told you what I didn't sign. I did not sign James Stone because I was too emotional. But I signed James and when I start to sign Stone, I start -- well I broke down. I broke down. He said, "That's all right. It's straight." And I left that like that.

Q. Sir, I showed you the police report that you signed, am I correct?

A. Yes, sir.

Q. Isn't it a fact that you told me when you looked at that signature on the first page of the report that that was not your signature?

A. I'm gon' say I said what you say. But I will say I did not see it that way cause you say explain and I explained.

I explained why it was the way it were. I signed it. I initialed it. And I still say the same thing. I signed James and when I went to sign the Stone I was -- I was emotional like and that was that. That was that. I mean that's all I can say about it.

Now if you want me to say, yeah, I told you that; yeah I told you that. But that is -- I just told you then how it was.

Q. And that it wasn't your signature?

A. No, I ain't gon' say it wasn't my signature. My signature, I know it. I know it all were there except I know I didn't sign Stone.

Q. Well, sir, I want to take you again back to the -- your testimony at 36th District Court.

MR. HOWARTH: And, counsel, I'm on page 82. I'm going to line seven. This again is questioning by myself.

Q. (By Mr. Howarth, continuing): It says, "I'm showing you

the report and" -- question from me. "And this report on both pages, sir, have your signature on the bottom?"

A. Right.

Q. Your answer:

"That one's mine, yes, sir. This one, that's my signature there.

"QUESTION: Are you saying this first page?

"ANSWER: That ain't my signature.

"QUESTION: That isn't?

"ANSWER: This part. This part. This ain't me that I sign right here. I don't sign like that."

"All right." I'm' looking at page one.

"All right."

"ANSWER: All right.

"And down there, there is an "X." Do you see that?

"Yeah.

"And next to that it looks like the name James and Stone, am I right?

"Right."

A. Right.

Q. "Is that your signature? That's not your signature on page one? ANSWER: That's not me."

And then we go down to line seven on page 83.

"QUESTION: That's your signature?"

THE COURT: Counsel. Counsel. Counsel. You're getting way too convoluted here.

MR. HOWARTH: All right. I will stop there.

Q. (By Mr. Howarth, continuing): Did you give that testimony?

A. I gave --

THE COURT: That's a yes or no. Did you give that --

THE WITNESS: Yes, but I ain't never said it wasn't me.

Q. (By Mr. Howarth, continuing): The man who did the attack and that pulled the gun, that snatched the rings and that, isn't it a fact that that man had a hood on?

A. No.

Q. He did not have a had on?

A. No, he did not have a water gun.

Q. Did he have anything up over his head?

A. A hood.

Q. That's what I said. Did he have a hood on?

A. Yes. Yes.

Q. I'm sorry if I misspoke.

My question to you was did they have a hood on?

A. Yes, he did.

Q. And that kind of hid part of his face, didn't it?

A. It hid some, yes.
Q. And he put his face deep, deep down inside that hood; isn't that right?
A. No.
Q. Did he tell you don't look at my face?
A. At one point in time.
Q. And did you not look at his face when he told you that?
A. No. Hey, I wasn't --
THE COURT: Sir, just answer yes --
THE WITNESS: No.
MR. HOWARTH: All right. I don't have anything else.
MS. CEZIL: May I, Your Honor?
THE COURT: Yeah.
MS. CEZIL: Just really brief.
THE COURT: Okay.

**REDIRECT EXAMINATION**

**BY MS. CEZIL:**
Q. Mr. Stone, I'm gonna take you back.
Do you recall as Mr. Howarth asked you about testifying at 36th District Court?
A. Who?
Q. At the 36th District Court, the prior hearing.
A. Beg your pardon. I am trying to figure now what --
Q. Do you remember testifying before?

A. No, nowhere but here and here today.
Q. Okay. What about in January of the beginning -- at the beginning of the year?
A. In January I was recollect this right we came here, but we didn't testify or anything.
Q. Okay. On January 22nd of 2013, do you remember going in front of a Judge Prentis Edwards at the 36th District Court?
A. Yes, I do.
Q. Did you testify that day when you went in front of that judge?
A. I told what happened to us, yes.
Q. Okay. I'm gonna --
MS. CEZIL: Counselor, page 83.
Q. (By Ms. Cezil, continuing): Do you remember when Mr. Howarth was asking you questions about your signature?
A. Yeah.
Q. Okay. Now do you remember being asked, "QUESTION: All right. Page two there is also an "X" at the bottom?"
A. Yes.
Q. Do you remember answering, "That's me"?
MR. HOWARTH: Can I have what line this is, please?
MS. CEZIL: Line two.
MR. HOWARTH: Thank you.

Q. (By Ms. Cezil, continuing): Do you remember answering, "That's me"?
A. Yes.
Q. Do you remember question line five, "And that one does have a signature?" Do you remember answering line six, "Right, right"?
A. I remember answering, but I didn't say "Right, right," nothing. I don't use those kind of words. I did not say, "Right, right."
Q. Do you remember being asked question line seven. "That's your signature?" And answering line eight, "That's my signature on it"?
A. That's my signature.
Q. Okay. Line nine, do you remember being asked, "QUESTION: You feel quite certain that you're correct that that is a-- page one is not your signature and page two is?"
A. No, both of those pages were my signature, all except the Stone part.
Q. Okay. Do you remember line 12 giving the answer: "I'm saying that the "J" part of it there, I'm saying that's mine. The Stone part of it, that's not mine."
A. That's my words.
Q. Is that what you said back in January of this year?
A. That's what I said, yes, when I was asked that.
Q. Okay. Do you remember line 15 -- or excuse me 14.

"QUESTION: You signed James, but you didn't sign Stone?"
A. Didn't sign Stone, yes.
Q. Do you remember line 15 giving the answer, "I sign my name all the time" --

THE COURT: Slow down a little bit, Ms. Cezil?

MS. CEZIL: I'm sorry.

THE COURT: Slow down.

MS. CEZIL: I apologize.

Q. (By Ms. Cezil, continuing): Do you remember giving the answer at line 15, "I signed my name all the time James Stone, all of it"? Right?
A. Uh-huh. Yes.

MS. CEZIL: Nothing further.

MR. HOWARTH: I don't have anything else.

THE COURT: Do the jurors have anything?

THE JURORS: (No verbal response.)

THE COURT: All right. Sir, you can step down. You're excused.

(The witness was excused at 3:10 P.M.)

MR. ELIZONDO: Can we approach, judge?

THE COURT: Yes, but I'm getting ready to excuse the jury right now if that's okay.

MR. ELIZONDO: That's fine.

THE COURT: Ladies and gentlemen of the jury, we're going to excuse you for a few moments.

We'll be back with you shortly, however, you can't discuss the case.

(The jury was excused to the jury room at 3:11 P.M.)

THE COURT: Okay. Do you still need to approach or you want to put it on the record?

MR. ELIZONDO: We can put it on the record.

What I was just gonna indicate was what I was just informed about something transpired while I wasn't here involving Officer Tinsley.

My position was this, judge. We had a stipulation I believe we were going to enter concerning the felon in possession charge, and at that point we were prepared to rest.

This issue about Officer Tinsley, like I say, I missed that discussion so I guess --

THE COURT: Well there is two issues. There is Officer Tinsley and then there is also this other officer.

MS. CEZIL: Tillerson, I believe.

MR. HOWARTH: Well actually there are three -- I mean two other officers.

THE COURT: First you said one.

MR. HOWARTH: I now see that there is another who said, apparently says the same thing in a different report.

THE COURT: Okay.

MR. ELIZONDO: Well here is our position.

The witnesses that we endorsed we have presented. I think there is, with the exception of one --

THE COURT: Roy Gilbert?

MR. ELIZONDO: Officer Gilbert is one.

THE COURT: Connie Watts.

MR. ELIZONDO: The keeper of the records Julie Groat.

THE COURT: Connie Watts?

MR. ELIZONDO: That was -- we did present her. That's Connie Bell Watts or Watts Bell.

THE COURT: That's right. Okay.

MR. ELIZONDO: Now if counsel wishes us to present those, we're prepared to bring them in. If counsel wishes to call additional people, that's up to him. He can call them in his case-in-chief or his case.

Our position at this point we presented the witnesses that we indicated we -- that we had endorsed except for those two or three that we mentioned. We're prepared to bring them in if counsel wants them.

If he doesn't, we're prepared to rest at this time.

THE COURT: Well that's two, that's A and B.

So first we have need to find out if counsel

wants those witnesses that you have endorsed.

MR. ELIZONDO: All right, judge.

MR. HOWARTH: We wanted Officer Tillerson recalled to -- in order to submit the computer-generated description sketch, in effect, of the assailant.

MR. ELIZONDO: And I think at this point well that's not Tillerson. That's --

MS. CEZIL: Tinsley.

MR. ELIZONDO: Officer Tinsley that he is referring to.

MR. HOWARTH: Yes, that's correct.

MR. ELIZONDO: And I understand that, but that's "C". I think the Court at least at this point --

THE COURT: In terms of the other ones, other than Tinsley, are you -- the two officers that they indicated that they are not going to call, do you have any objection or do you want them?

MR. HOWARTH: No. As long as those officers -- I was trying to listen, Your Honor, but the two officers that we now wish to see are --

THE COURT: Before we get to that, I just want to make sure -- get the endorsed witnesses out of the way.

MR. HOWARTH: Okay.

MR. ELIZONDO: And that was again Officer Roy Gilbert.

MR. HOWARTH: We will waive Roy Gilbert.

MR. ELIZONDO: Keeper of the records Julie Groat, registered nurse.

MR. HOWARTH: We're not asking that she be produced.

THE COURT: Okay.

MR. ELIZONDO: I think that's it.

Those are the endorsed witnesses that we did not or do not intend to offer here.

THE COURT: All right. So the People are resting?

MR. ELIZONDO: With the stipulation entered. There is a stipulation we need to enter before we can rest. Once that stipulation's entered, we're prepared to rest.

THE COURT: And that stipulation is that he was convicted of an unspecified felony?

MR. ELIZONDO: Correct.

THE COURT: You stipulate to that?

MR. HOWARTH: Yes.

MR. ELIZONDO: And we have a written stipulation.

I think counsel has agreed to the written stipulation.

THE COURT: Okay. So the People are now

resting?

MR. ELIZONDO: We are.

THE COURT: So now turning to the three officers that -- and they are in two different categories that defense counsel wants.

MR. HOWARTH: Yes.

THE COURT: Counsel, I am -- I do recall counsel asking that he wanted the computer-generated diagram. I thought it only could come in under, through Officer Tinsley. And the Court is ordering that you produce him to bring that in. So that --

MR. ELIZONDO: Officer Tinsley is present today right now with his file.

THE COURT: Okay. That's one.

Two. The other two, I'm having a problem with that, counsel. I will be honest with you. I don't see how you have made a showing that the Court should produce-- should ask the People to produce them when you had every right to -- you had those reports. You had the-- you could have subpoenaed them. And if you had a problem with the subpoena, you know, I could have assisted you then.

But I didn't see how now at the 11th hour you are -- to me it was a trial tactic that you wanted to wait to see if you could possibly surprise one of the witnesses

with it, and when you couldn't do it that way seems like you are trying to -- that's the way it appears. Maybe I'm wrong.

But if your intention was to impeach the victim with a prior statement, then you should have had -- should have prepared for those officers to be here.

MR. HOWARTH: Let's look at it, Your Honor, in the light most favorable to the defense; then I'm guilty. That makes me guilty of ineffective assistance of counsel.

Here is what we have, Your Honor, so that the record is clear.

THE COURT: Okay.

MR. HOWARTH: We have two police reports. They are police reports on this case. I don't think anybody's gonna dispute that.

They are labeled the CRISNT report number on the two, one is 1301010036.1. The other one has all the same numbers but .5, which would be typical in CRISNT.

Now these reports, one shows the reporting officer -- the first one shows the reporting officer as Vinceon Perkins. The other shows the reporting officer as Tamara Tillerson.

Now those reports indicate that on or about January 1st, January the 10th and 1st, January the 1st, that the witness, which appears to be James Stone, gave an

identification of the assailant who on page two of each report is listed as the unknown assailant. And it gives a description of that person in the Perkins report as being a 25-year-old black male, six foot two, 180 pounds, clean shaven.

In the Tillerson report, that person is described as being the age about given, described as being six foot two, 180 pounds, clean shaven.

Now, all right. Let's assume that I blew it, I didn't ask that these witnesses be called. It's now going on 3:30 in the afternoon on Thursday. We're gonna have at least one more witness to testify before this jury.

THE COURT: And that should be very brief.

MR. HOWARTH: Might be relatively brief.

But I'm asking that the prosecution be required to call in those two witnesses for testimony for the defense.

THE COURT: And to ask those --

MR. HOWARTH: Ask them if they got that description from -- I don't know who they got -- they got the description either from Lucille or from James, and did they give those descriptions which would be -- which would impeach the testimony of those witnesses who said that the person was five foot seven, 130 pounds with a mustache and goatee.

THE COURT: Counsel.

MR. ELIZONDO: Well counsel has a right to put on his case. If he wants to call, he can call them. I don't care. I mean that's his right. I mean he has a constitutional right to present a case.

THE COURT: But he is asking me to ask you for assistance in getting the officers here.

MR. ELIZONDO: Well I don't know if they're available. I don't know if they're on furlough. I don't know if they're gonna be able to be here tomorrow. I don't know.

This is -- I mean counsel has the ability to send out subpoenas. That should have been done in anticipation.

Again, this is the third trial date here. I mean we've had two adjournments. These things should have been anticipated. I don't see why they weren't anticipated.

THE COURT: What about the answer to his question about ineffective assistance? I don't want you to put it all on me.

MR. ELIZONDO: No, I'm not saying that we can. I can make phone calls. I can certainly do that. I just can't guarantee that they're going to be available.

THE COURT: Okay. All right. Why don't you

make a phone call, see if they are available in the morning 9:00. If they are not, then they are not. If they are, then --

MR. ELIZONDO: We'll make every effort to get them here if they are.

THE COURT: All right. I think there was one other issue.

MR. ELIZONDO: Well the only other issue was the-- well it's not really even recalling.

Counsel is calling this witness, Officer Tinsley, in his case. This isn't a continuation of my direct and all that because I have questions for Officer Tinsley concerning those computer-generated things.

THE COURT: You do?

MR. ELIZONDO: Absolutely I do. I mean they just don't come out.

THE COURT: Okay.

MR. ELIZONDO: This should have all been done.

I mean counsel's already had a chance to cross-examine that witness and recross that witness. He didn't think about bringing that up.

THE COURT: Well then I'm just letting you both know now if he is going to call a witness, we are not going to go over anything else already asked. So it only is going to go back to the --

MR. ELIZONDO: How those things would relate.

THE COURT: How they relate and that's it.

MR. ELIZONDO: Okay. That's fine.

MS. CEZIL: Judge, we would like to mark the stipulation as an exhibit and then place it into evidence in front of the jury.

THE COURT: Okay. We'll do that first. We'll let you rest in front of the jury, then the defense can call its witness and we'll go from there.

Anything else you want to put on the record now, counsel?

MR. ELIZONDO: Nope.

MR. HOWARTH: No, Your Honor.

(People's Exhibit Number 27 marked for identification.)

THE COURT: Okay. Bring the jury back out.

(The jury entered the courtroom at 3:23 P.M.)

THE COURT: Thank you, ladies and gentlemen. People.

MS. CEZIL: Thank you, Your Honor.

We have a stipulation, People's Proposed Exhibit Number 27, which indicates that both parties, the defendant, his counsel of record and the People of the State of Michigan, stipulate that the defendant Howard McKnight, for the purposes of the charge felon in

possession of firearm, has been convicted of a specified felony.

Further, the defendant did not have a right to possess, use or carry a firearm because his requirements to regain eligibility had not been met on December 31st of 2012.

With that, we move for the admission of People's Proposed 27.

THE COURT: Any objection?

MR. HOWARTH: I signed that, Your Honor. No objection.

THE COURT: All right. The Court will admit Exhibit 20, the stipulation.

Anything else from the People?

MS. CEZIL: No, Your Honor.

At this time, the People rest.

THE COURT: Defense ready with -- to begin a case?

MR. HOWARTH: Your Honor, we ask you that Officer Tinsley be called.

THE CLERK: Mr. Tinsley, you do solemnly swear or affirm that the testimony you are about to give before the Court will be the whole truth?

THE WITNESS: I do.

THE CLERK: Thank you. You may be seated.

**ALPHONSO TINSLEY,**

having been previously duly sworn by the Clerk, was recalled at about 3:25, P.M., and continued to testify upon his oath, as follows:

THE COURT: Pull that make phone up, sir.

THE WITNESS: How you doing, sir?

**RECROSS-EXAMINATION**

**BY MR. HOWARTH:**

Q. Would you state your name again for the record?
A. Alfonso Tinsley.
Q. And, officer, it's Officer Tinsley, right?
A. Yes.
Q. And you testified for us, what was it yesterday?
A. Yeah, I believe so.
Q. Okay. I'm confused to --
A. Yesterday or the day before. I don't remember.
Q. I'm sorry. It was this week, right?
A. Yes. Yes.
Q. Okay. Officer Tinsley, you're the gentleman from the Detroit Police Department that does graphic sketches and drawings and works with computers in order to help the People, who are the complainant in criminal cases, identify the person who assaulted them or came into contact with them, right?
A. Yes. Complainant and witnesses, yes.

Q. And you in this case met with a gentleman by the name of James Stone?
A. Yes.
Q. And you attempted to -- for one thing, you attempted to get a sketch together of the person who robbed him and, you know, committed these crimes back on January 1st this year, right?
A. January 3rd.
Q. Well the crimes were January 1st, right?
A. Oh, okay. Yeah, when I met him was the 3rd.
Q. You met him on January 3rd?
A. Yes.
Q. We've already seen the sketch that was done, right?
A. Yes.
Q. You showed us that. Did you also say that you made up a computer-enhanced representation of the person that did the robbery?
A. Yes.
Q. Where did you get the information to put in the computer?
A. I got that from the complainant.
Q. Mr. Stone?
A. Yes, Mr. Stone.
Q. Have you done those before?
A. Yes.
Q. Have you ever had those introduced into court in a

criminal case?
A. May have. I may. I don't remember, but probably.
Q. Okay. And do you have that computer drawing with you today?
A. Yes.
Q. All right.
MR. HOWARTH: May I approach?
THE COURT: Yes, you may.
Q. (By Mr. Howarth, continuing): Without you flashing it around here, I want you to give it to me without -- okay. Which one is that?
A. You want the computer generated?
Q. The computer one, sure. Just you keep it so that we -- wait until it's introduced.
Is it this one?
A. Yes.
Q. Okay. Is there any way we can get this one out?
Are there two of them, one is just smaller than that one?
A. It's a little smaller. It's the same.
Q. Could I have both of them?
A. Sure.
Q. Thank you.
(Defendant's Proposed Exhibits 1 and 2 marked for identification.)

Q. (By Mr. Howarth, continuing): I'm gonna show you first, sir, what has been marked as the Defendant's Proposed Exhibit Number 1.

Is this one of the computer drawings that we talked about in this case?

A. Yes.

Q. Came from James Stone?

A. Yes.

Q. And number two is just a larger version of the same thing?

A. Yes.

Q. And are these the ones that you showed to Mr. Stone?

A. At the time, yes. Yes.

MR. HOWARTH: I move for the admission of Defendant's Proposed Exhibits 1 and 2.

THE COURT: So admitted.

MR. HOWARTH: May I publish them, Your Honor?

THE COURT: Yes.

MR. HOWARTH: I don't know if we have Elmo up and working here, but have they been previously just been given to the jurors?

THE COURT: No, they have been put up on the monitor.

You could pass them around if you want.

MR. HOWARTH: I'm happy to just pass them around.

THE COURT: Why don't you just pass them around.

MR. HOWARTH: Actually, that's the only questions I have for Officer Tinsley. I don't mind waiting until the jurors have seen them.

THE COURT: Cross-examination?

MR. ELIZONDO: Oh, thank you, judge, but I wanted to wait until they got through.

THE COURT: Okay. Counsel.

MR. ELIZONDO: Thank you.

**REDIRECT-EXAMINATION**

**BY MR. ELIZONDO:**

Q. Now let's talk about the process that you utilize to put these things together.

Now my understanding is you brought -- or Mr. Stone came out to see you, correct?

A. Correct.

Q. All right. Now you start out, I assume, with a blank computer screen; is that correct?

A. That's correct.

Q. All right. And then you -- I believe your testimony earlier was you talk to him or you show him different shapes of eyes, noses, this sort of thing; is that correct?

A. Correct.

Q. Every time he gives you a response -- a positive one

saying that looks like it or that looks like it, this is then put onto the computer screen; is that correct?
A. Correct.
Q. All right. And it goes through nose and mouth and the whole gamut of things that you have available to put on that screen; is that correct?
A. That's correct.
Q. Okay. Now in this particular case -- and then after you get to all you can put on the computer, this is -- would it be fair to say that this is what's generated; is that correct?
A. That's correct.
Q. All right. This your finished product?
A. No.
Q. What's the next step from this?
A. The next step from that is from the notes that he gave as far as the changes that the computer could not do, I render by hand.
Q. Okay.
A. And that's where it comes to the skin tone, the clothes they're wearing, like the hat, the hood, if they had a hairstyle, things like that that the computer can't do, I go in and do.
Q. Okay.
A. By hand.

Q. So this is what you started with based on his description, correct?
A. Yes.
Q. Then he -- did he tell you well this person's bald?
A. Well we didn't need the hair because he couldn't see the hair in that situation. He had a hat on and he also had a hoodie on.
Q. Okay. All right. And Mr. Stone told you that, correct?
A. Correct.
Q. Okay. And then so what did you do with the information he gave you?
A. I just started drawing the picture with the pastels. He chose a skin tone. I used that skin tone to put in there and rendered it, popped it over three dimensional, you know, so to speak. Then I put the hat on his head. I put the hood on his head -- I mean around his shoulders and up in here and all the other details that were in the drawing.
Q. Okay. And then this is Exhibit Number 8, that's what you ultimately ended up with, correct?
A. Correct.
Q. So this is basically just the beginning putting a few pieces together of the puzzle?
A. Exactly. It's more like the notes. That's part of the notes of putting the whole thing together, yes.

Q. Okay. And then from that you get more specific information?

A. Yes.

Q. And then you use your artistic talents to fill in like the hat, the hood?

A. Exactly.

Q. And the skin color?

A. Yes.

Q. All right. And if we took that away off of the sketch, we'd end up with this; is that a fair statement?

A. Exactly.

MR. ELIZONDO: Thank you. Nothing else, judge. Thank you.

THE COURT: Redirect?

MR. HOWARTH: I don't have any other questions.

THE COURT: You can step down, sir.

Ladies and gentlemen, we have gone as far as we can for today. I will guarantee that tomorrow you will get the case to -- we couldn't get everything in today anyway, so you have to come back tomorrow 9:15.

See you in the morning. I will say that I'm going to need your patience tomorrow because we have -- tomorrow's usually scheduled -- I initially thought we would be able to get you deliberating today, but we have a like a lot of other matters that we will have to put in in

between.

This case will be the priority, but I just wanted you to know that sometimes other matters may come. So, again, we thank out for your patience. You can't discuss the case. Tomorrow you will be able to.

Thank you.

(The jury was excused at 3:35 P.M.)

THE COURT: Anything else to go on the record at this time?

MR. ELIZONDO: It can wait until tomorrow.

THE COURT: Okay. I expect to have the jury instructions done.

MR. ELIZONDO: I have 98 percent of them right now. Just got to -- and then what I'll do is--

THE COURT: I would ask that you guys be here at 9:00 and do that because what I don't want to do is have a whole lot -- that should have been done today.

So tomorrow my expectation is that when we -- you will have -- you be ready to go on it once we go on the record.

MR. ELIZONDO: I will have them done before I leave today and e-mail them to counsel so --

THE COURT: Thank you. We'll see you in the morning.

MR. ELIZONDO: All right, judge.

MR. HOWARTH: Thank you, judge.

(The proceedings were concluded at about 3:38 P.M.)

C E R T I F I C A T E

STATE OF MICHIGAN)
)
COUNTY OF WAYNE )

I, Betty Sanders, CSR-2931, and Official Court Reporter of the Third Judicial Circuit Court for the County of Wayne, Criminal Division, State of Michigan, do hereby certify that the foregoing pages 1 through 155, inclusive, comprise a full, true and correct transcript of the proceedings and testimony taken in the matter of the People of the State of Michigan versus Howard McKnight, on Thursday, November 21, 2013.

Betty Sanders, CSR-2931

Dated this 10th day of February, 2014.